1                    IN THE UNITED STATES DISTRICT COURT
                 FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
2
UNITED STATES OF AMERICA          :
3                                 :  Case No. 1:16-CR-075
                                  :
4              vs.                :  (Judge Kane)
                                  :
5    CHRISTOPHER MARK HEATH,       :
                    Defendant     :
6

7          TRANSCRIPT OF JURY SELECTION & TRIAL PROCEEDINGS
                              VOLUME 1
8                        PAGES 1 THROUGH 178

9              BEFORE THE HONORABLE YVETTE KANE
               UNITED STATES DISTRICT COURT JUDGE
10                  MAY 8, 2017; 10:15 A.M.
                    HARRISBURG, PENNSYLVANIA
11

12   FOR THE GOVERNMENT:

13      Meredith A. Taylor, Assistant United States Attorney
        Joseph J. Terz, Assistant United States Attorney
14      United States Attorney's Office
        228 Walnut Street, Second Floor
15      Harrisburg, PA  17101

16   FOR THE DEFENDANT:

17      Lori J. Ulrich, Assistant Federal Public Defender
        Federal Public Defender's Office
18      100 Chestnut Street, Suite 306
        Harrisburg, PA  17101
19

20

21
                           Lori A. Shuey
22              Federal Certified Realtime Reporter
                   United States Courthouse
23            228 Walnut Street, P.O. Box 983
                 Harrisburg, PA  17108-0983
24                     717-215-1270
                 lori_shuey@pamd.uscourts.gov
25   Proceedings recorded by mechanical stenography; transcript
            produced by computer-aided transcription.

1                           I N D E X

2

3    OPENING STATEMENTS                               PAGE

4    By Ms. Taylor                                    85
     By Ms. Ulrich                                    95

5

6

                          GOVERNMENT WITNESSES
7

     RUSSELL SCHAUER                                  PAGE
8
     Direct Examination by Ms. Taylor                 100
9    Cross-Examination by Ms. Ulrich                  123
     Redirect Examination by Ms. Taylor              143
10
     TRAVIS SHEARER                                   PAGE
11
     Direct Examination by Ms. Taylor                 147
12   Cross-Examination by Ms. Ulrich                  168
     Redirect Examination by Ms. Taylor              176
13

14

15

16

17

18

19

20

21

22

23

24

25

1    THE COURT:  Good morning, prospective jurors, and

2  welcome to the Middle District of Pennsylvania.  We're here

3  this morning to hear the case of *United States v. Christopher*

4  *Mark Heath*.  Is the government ready to proceed?

5    MS. TAYLOR:  We are, Your Honor.

6    THE COURT:  Is the defendant ready to proceed?

7    MS. ULRICH:  Yes, Your Honor.

8    THE COURT:  All right.  Ms. Weida, would you please

9  swear the jury.

10   *(Prospective jurors sworn.)*

11    THE COURT:  Prospective jurors, are you all able to

12  hear me?  Okay.  If at any time you can't hear me or the

13  lawyers, I want you to alert us to that fact.  We're going to

14  streamline the jury selection process in the case by using the

15  questionnaires that you all have with you.  Does everybody have

16  the questionnaire?  Terrific.  Okay.

17    I'm going to ask you a series of questions.  The

18  purpose of my questions is, first of all, to make sure that all

19  of the jurors who are being considered by the parties in the

20  case are legally qualified to serve.  And then the other thing

21  we'll do is ask questions that will assist the lawyers in

22  exercising their individual judgment with respect to what we

23  call peremptory challenges, challenges for which no reason need

24  be given.

25    As I said, this is a criminal case.  We expect that

1    the case will take no more than two, possibly two and a half

2    days.  Is there anybody who has been called for service who

3    would not be able to be with us through Wednesday morning?

4            Is there anybody who has an important medical

5    appointment that can't be rescheduled or travel plans that

6    would take you out of the state?  Good.  Okay.

7            Juror Number 1 -- and, jurors, we're going to refer to

8    each of you by your numbers to preserve your privacy, and we'll

9    begin with the jury questionnaires beginning with Juror 1.

10           Juror Number 1, I see from your questionnaire that you

11   did serve on a jury previously.

12           *PROSPECTIVE JUROR:*  Yes.

13           *THE COURT:*  About three years ago?

14           *PROSPECTIVE JUROR:*  Yes, ma'am.

15           *THE COURT:*  Was that in state court?

16           *PROSPECTIVE JUROR:*  County.

17           *THE COURT:*  Sorry?

18           *PROSPECTIVE JUROR:*  It was in county.

19           *THE COURT:*  In county court.  Do you remember what

20   kind of case it was?

21           *PROSPECTIVE JUROR:*  I believe a civil.

22           *THE COURT:*  A civil case?

23           *PROSPECTIVE JUROR:*  I believe so, yes.

24           *THE COURT:*  Do you remember anything about the case?

25           *PROSPECTIVE JUROR:*  Yes, I do.

1          THE COURT:  What can you tell me?

2          PROSPECTIVE JUROR:  Basically it was an inmate,

3    basically an inmate in York County Prison, and he was caught

4    with a cellphone, so it was basically the correctional officers

5    in the State of Pennsylvania against the inmate over a

6    cellphone.

7          THE COURT:  Okay.  And I'm never going to ask any

8    juror what the verdict was in the case, but I do want to know

9    if you deliberated to verdict.  So was there a verdict in that

10   case?

11         PROSPECTIVE JUROR:  Yes.

12         THE COURT:  In that particular case, the judge would

13   have given you some instructions on the law that applies to the

14   case.  I'll be doing that here.

15         The instructions that I'll give you in a civil case

16   will be very different from anything that you would have heard

17   in that other case, and your oath will require you to set aside

18   what you might have heard earlier and follow the instructions

19   that I give you on the law.  Any problem with doing that here?

20         PROSPECTIVE JUROR:  No, Your Honor.

21         THE COURT:  Is there any other reason why you could

22   not serve and be a fair and impartial juror in the case?

23         PROSPECTIVE JUROR:  No.

24         THE COURT:  Okay.  Terrific.  Juror Number 2, you also

25   had prior jury service?

1    PROSPECTIVE JUROR:  Correct.

2    THE COURT:  And where was that?

3    PROSPECTIVE JUROR:  Maryland.

4    THE COURT:  What kind of case was it?

5    PROSPECTIVE JUROR:  It was a theft, so is that

6    criminal?

7    THE COURT:  A criminal case.  And I see that you

8    deliberated to verdict.  Any issues with that?

9    PROSPECTIVE JUROR:  No.

10   THE COURT:  All right.  Thank you.  Juror Number 3,

11   prior jury service?

12   PROSPECTIVE JUROR:  Yes.

13   THE COURT:  In 1990?

14   PROSPECTIVE JUROR:  Approximately.

15   THE COURT:  Okay.

16   PROSPECTIVE JUROR:  I'm not sure anymore.

17   THE COURT:  Do you remember much about the case?

18   PROSPECTIVE JUROR:  Yes.  It was a drunk driving case.

19   THE COURT:  You indicated that someone in your

20   household had a lawsuit --

21   PROSPECTIVE JUROR:  Yes.

22   THE COURT:  -- involving an injury.

23   PROSPECTIVE JUROR:  Yes.

24   THE COURT:  Was that brought here in the Middle

25   District?

1            *PROSPECTIVE JUROR:* Yes, it was.

2            *THE COURT:* Has it concluded?

3            *PROSPECTIVE JUROR:* Yes.

4            *THE COURT:* Was it to your satisfaction?

5            *PROSPECTIVE JUROR:* No.

6            *THE COURT:* Was there a trial?

7            *PROSPECTIVE JUROR:* Yes.

8            *THE COURT:* In what courtroom was it, do you remember?

9            *PROSPECTIVE JUROR:* It wasn't this room. It was in

10  2000. I don't remember which number the courtroom was.

11          *THE COURT:* Do you remember who presided?

12          *PROSPECTIVE JUROR:* No, I don't. It was a lady judge.

13          *THE COURT:* It wasn't me?

14          *PROSPECTIVE JUROR:* No, it wasn't.

15          *THE COURT:* No? Okay. I think I would have

16  remembered that. All right. As I said, this is a criminal

17  case, and the instructions will be very different, everything

18  will be very different. The number of jurors is different, our

19  processes are very different.

20        Do you think that that unfortunate experience would

21  prohibit you from following my instructions on this case and

22  being a fair and impartial juror to both sides?

23          *PROSPECTIVE JUROR:* I don't think it would have any

24  effect.

25          *THE COURT:* Okay. You told me on your questionnaire

1  that someone close to you is employed in law enforcement.

2          *PROSPECTIVE JUROR:*  Well, he's a criminal defense

3  attorney.

4          *THE COURT:*  Who is that?

5          *PROSPECTIVE JUROR:*  My next-door neighbor.

6          *THE COURT:*  Your next-door neighbor?

7          *PROSPECTIVE JUROR:*  Yes.

8          *THE COURT:*  Can you tell us his name?

9          *PROSPECTIVE JUROR:*  Mr. McGowan.

10          *THE COURT:*  Terry McGowan?

11          *PROSPECTIVE JUROR:*  Yes.

12          *THE COURT:*  Okay.  Do you have an opportunity to talk

13  to him about his cases?

14          *PROSPECTIVE JUROR:*  In a general sense, yes.

15          *THE COURT:*  All right.  He's appeared in this court

16  many times, and, as you said, he's a defense attorney.  Do you

17  think those discussions would influence you to make you more

18  favorable to the government or more favorable to the defendant

19  in the case?

20          *PROSPECTIVE JUROR:*  I think it depends on the

21  presentation of the case.

22          *THE COURT:*  What do you mean by that?

23          *PROSPECTIVE JUROR:*  We've talked a lot about some of

24  the general cases that he's had, and it's just experience, just

25  the items that we've gone over.  And I can't tell you what kind

1   of opinion I'm going to form until I hear this case.

2        *THE COURT:* Okay. In other words, you're keeping an

3   open mind until you hear the evidence?

4        *PROSPECTIVE JUROR:* Yes.

5        *THE COURT:* That's what I'm going to call upon all of

6   the jurors to do. Before we go further and speak with Juror

7   Number 4, let me just tell you a little bit about this case.

8        As I've told you, this is a criminal case. It comes

9   before you by reason of an indictment, which is a formal

10   document that the government uses to bring charges against a

11   defendant and upon which it bases its case.

12        The defendant, Christopher Mark Heath, has pleaded not

13   guilty to the charges and has thereby raised issues of fact to

14   be tried by you, the jury.

15        The sole purpose of an indictment is to serve as an

16   accusation or charge that the government makes against a

17   defendant. It serves to inform a defendant of the crimes with

18   which he is charged. The indictment serves no other trial

19   purpose whatsoever. It is not evidence against the accused,

20   and it raises no inference of guilt.

21        As I will instruct you, the government has the burden

22   of proof to establish guilt beyond a reasonable doubt.

23        I want to now summarize for you the charges against

24   the defendant in this case. The specific charges are that

25   Mr. Christopher Mark Heath is guilty of conspiracy to

1     manufacture, distribute, and possess with the intent to

2     manufacture and distribute marijuana.

3          The government has also charged conspiracy to commit

4     money laundering, manufacture, distribution, and possession

5     with intent to manufacture and distribute marijuana, and the

6     government has charged possession of a firearm in furtherance

7     of a drug trafficking crime.

8          This is a brief overview of the indictment.  The

9     specific charges will be explained to you in greater detail

10    later when the trial is underway.  Jurors, is there anyone who

11    before coming to court today has heard anything about these

12    charges?  Okay.

13         Juror Number 4, I see that you, according to your

14    questionnaire, have had no prior jury service.

15         *PROSPECTIVE JUROR:*  Correct.

16         *THE COURT:*  And in answer to the questions on the

17    reverse of the form, all of the answers are no?

18         *PROSPECTIVE JUROR:*  Correct.

19         *THE COURT:*  Okay.  Juror Number 5, the same thing, no

20    prior jury service?

21         *PROSPECTIVE JUROR:*  Correct.

22         *THE COURT:*  No lawsuits?

23         *PROSPECTIVE JUROR:*  No.

24         *THE COURT:*  And no familiarity or close association

25    with anyone in law enforcement?

1         *PROSPECTIVE JUROR:* No.

2         *THE COURT:* Okay. Thank you.

3         *PROSPECTIVE JUROR:* You're welcome.

4         *THE COURT:* Juror Number 6, someone close to you is

5 employed in law enforcement?

6         *PROSPECTIVE JUROR:* Yes, my brother-in-law.

7         *THE COURT:* Jurors, make sure that the lawyers are

8 also able to hear you. Did you say your brother-in-law?

9         *PROSPECTIVE JUROR:* Yes. He's a police officer.

10        *THE COURT:* And where is he employed?

11        *PROSPECTIVE JUROR:* Lower Allen.

12        *THE COURT:* Sorry?

13        *PROSPECTIVE JUROR:* Lower Allen.

14        *THE COURT:* Lower Allen Township Police Department?

15        *PROSPECTIVE JUROR:* Yes.

16        *THE COURT:* How long has he been on the force there?

17        *PROSPECTIVE JUROR:* I'm not sure.

18        *THE COURT:* How long has he been your brother-in-law?

19        *PROSPECTIVE JUROR:* Eight years.

20        *THE COURT:* Has he always been a police officer?

21        *PROSPECTIVE JUROR:* Yes.

22        *THE COURT:* Do you talk to him about his cases?

23        *PROSPECTIVE JUROR:* Occasionally.

24        *THE COURT:* Do you know whether or not he has

25 prosecuted or been a witness or a charging officer in any

1   offenses involving drugs and guns?

2          *PROSPECTIVE JUROR:*  I do not know.

3          *THE COURT:*  Is there anything about your association

4   with him, having heard the charges in this case, that you think

5   would keep you from being a fair and impartial juror to both

6   sides?

7          *PROSPECTIVE JUROR:*  No.

8          *THE COURT:*  All right.  Thank you.  Juror Number 7,

9   you indicated that someone close to you had been arrested,

10  charged, or convicted of a crime?

11         *PROSPECTIVE JUROR:*  That is correct.

12         *THE COURT:*  Is that something you can talk comfortably

13  about in open court?

14         *PROSPECTIVE JUROR:*  Yeah.  My brother-in-law, he was

15  convicted of crimes against children.

16         *THE COURT:*  And where was he convicted?

17         *PROSPECTIVE JUROR:*  Lebanon County.

18         *THE COURT:*  That was a state court prosecution then?

19         *PROSPECTIVE JUROR:*  Yes, ma'am.

20         *THE COURT:*  How long ago was that?

21         *PROSPECTIVE JUROR:*  Twenty years, plus twenty years.

22         *THE COURT:*  Did you feel that the system was fair to

23  him?

24         *PROSPECTIVE JUROR:*  Yes.

25         *THE COURT:*  You indicated also that someone close to

you was victimized?

PROSPECTIVE JUROR:  That is correct.

THE COURT:  Is that in relation to the offense we're talking about here?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Okay.  And who was the victim of that crime?

PROSPECTIVE JUROR:  It was my brother.

THE COURT:  You indicated in answer to the last question that you had been involved in the investigation of a crime, and it sounds like that might be the same case, as well.

PROSPECTIVE JUROR:  Yes.

THE COURT:  And then was there another case in York, Pennsylvania?

PROSPECTIVE JUROR:  It was a -- my previous employer, I was a manager at a department store, and we had a big theft case, so I was a witness for the theft case.

THE COURT:  All right.  Do any of those experiences, you think, make you more or less inclined towards one side or the other in this case, having heard none of the evidence yet?

PROSPECTIVE JUROR:  No.

THE COURT:  You think you can be fair and follow my instructions on the law?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Okay.  Terrific.  Thank you.  Juror Number

1    8, prior jury duty, where was that?

2              *PROSPECTIVE JUROR:*  York County.

3              *THE COURT:*  What kind of case was it, sir?

4              *PROSPECTIVE JUROR:*  I really didn't get on the jury.

5    I was there for jury duty, but I didn't get on any case.

6              *THE COURT:*  So you were there for a few days in the

7    courthouse.  We don't do that here.  If there's not another

8    case in the courthouse, the jurors who are not to be serving

9    here will be released and your jury service will be complete.

10   So nobody close to you is involved in law enforcement?

11             *PROSPECTIVE JUROR:*  No.

12             *THE COURT:*  Okay.  Juror Number 9, no jury service?

13             *PROSPECTIVE JUROR:*  No, Your Honor.

14             *THE COURT:*  No law enforcement in the family?

15             *PROSPECTIVE JUROR:*  No.

16             *THE COURT:*  No lawsuits?

17             *PROSPECTIVE JUROR:*  Nope.

18             *THE COURT:*  Okay.  Good.  Juror Number 10, you served

19   as a juror previously in a criminal case that went to verdict?

20             *PROSPECTIVE JUROR:*  Yes, ma'am.

21             *THE COURT:*  What kind of case was that?

22             *PROSPECTIVE JUROR:*  It was a criminal case.  It had to

23   do with a father disciplining his son in public.

24             *THE COURT:*  Was that in York County?

25             *PROSPECTIVE JUROR:*  Yes, ma'am.

1          THE COURT:  Even though it was a criminal case, in

2     this case, the instructions will be tailored to the facts of

3     the case and they'll be different and you'll be called upon to

4     follow my instructions setting aside anything you might have

5     heard before.  Any problem with that?

6          PROSPECTIVE JUROR:  No, ma'am.

7          THE COURT:  Thank you.  Juror Number 11, no prior jury

8     service?

9          PROSPECTIVE JUROR:  That is correct.

10         THE COURT:  Okay.  Thank you.  And you indicated that

11    you had been involved in a local investigation involving some

12    vandalism?

13         PROSPECTIVE JUROR:  Correct.

14         THE COURT:  And was that concluded to your

15    satisfaction?

16         PROSPECTIVE JUROR:  Yes, it was.

17         THE COURT:  All right.  Thank you.  Juror Number 12,

18    good morning.

19         PROSPECTIVE JUROR:  Good morning.

20         THE COURT:  No prior jury service?

21         PROSPECTIVE JUROR:  Well, actually, I think I had a

22    senior moment, I'm sorry.  In the early '80s, I served on a

23    grand jury in the State of New Jersey.

24         THE COURT:  Was that a positive experience?

25         PROSPECTIVE JUROR:  Um-hum.

1        *THE COURT:*  How long is jury service in New Jersey

2   when you're called for grand jury?

3        *PROSPECTIVE JUROR:*  From what I remember, I think it

4   was only maybe a month, six weeks, one week -- or one day a

5   week.

6        *THE COURT:*  Any particular kinds of cases that you

7   might have heard that you can remember?

8        *PROSPECTIVE JUROR:*  No.

9        *THE COURT:*  Okay.  And no law enforcement in the

10  family?

11       *PROSPECTIVE JUROR:*  No.

12       *THE COURT:*  Juror Number 13.

13       *PROSPECTIVE JUROR:*  Hi.

14       *THE COURT:*  Good morning.  No prior jury service?

15       *PROSPECTIVE JUROR:*  No.

16       *THE COURT:*  No law enforcement?

17       *PROSPECTIVE JUROR:*  No.

18       *THE COURT:*  No lawsuits?

19       *PROSPECTIVE JUROR:*  No.

20       *THE COURT:*  All right.  Juror Number 14, where did you

21  serve as a juror?

22       *PROSPECTIVE JUROR:*  New Bloomfield.

23       *THE COURT:*  New Bloomfield?

24       *PROSPECTIVE JUROR:*  Yes.

25       *THE COURT:*  That's Perry County?

1              *PROSPECTIVE JUROR:*  Um-hum.

2              *THE COURT:*  What kind of case?

3              *PROSPECTIVE JUROR:*  I'm not sure if it was civil or

4    criminal.

5              *THE COURT:*  What was it about?

6              *PROSPECTIVE JUROR:*  Drugs.

7              *THE COURT:*  It involved drugs?

8              *PROSPECTIVE JUROR:*  Drugs and theft.

9              *THE COURT:*  Drugs and --

10             *PROSPECTIVE JUROR:*  Theft.

11             *THE COURT:*  Someone died?

12             *PROSPECTIVE JUROR:*  Theft.

13             *THE COURT:*  Oh, theft.  Someone stole drugs?

14             *PROSPECTIVE JUROR:*  Someone stole money to buy drugs.

15             *THE COURT:*  All right.  And there was a verdict in the

16   case?

17             *PROSPECTIVE JUROR:*  Yes.

18             *THE COURT:*  Good.  Okay.  Anything about that

19   experience that you think would keep you from being a fair

20   juror in this case?

21             *PROSPECTIVE JUROR:*  No.

22             *THE COURT:*  Juror Number 15.

23             *PROSPECTIVE JUROR:*  Yes.

24             *THE COURT:*  Good morning.

25             *PROSPECTIVE JUROR:*  Good morning.

1          THE COURT:  Are you able to hear back there?

2          PROSPECTIVE JUROR:  Yes, I am.

3          THE COURT:  Good.  No prior jury service?

4          PROSPECTIVE JUROR:  No, ma'am.

5          THE COURT:  And no answers on the reverse of the form,

6     no yeses?

7          PROSPECTIVE JUROR:  Correct.

8          THE COURT:  Okay.  If there's anything, jurors, that

9     you remember after you filled out your form, there's no issue

10    with your updating that form.  Tell us if you forgot something,

11    as one jury has already done.  Juror Number 16.

12         PROSPECTIVE JUROR:  Yes.

13         THE COURT:  Good morning.  No prior jury service?

14         PROSPECTIVE JUROR:  Yes.

15         THE COURT:  Yes.  Where?

16         PROSPECTIVE JUROR:  Dauphin County.

17         THE COURT:  Dauphin County.  What kind of case?

18         PROSPECTIVE JUROR:  It was a 30-year-old and a

19    12-year-old.  I guess it went to verdict on that.

20         THE COURT:  Okay.  Speak a little louder so the

21    lawyers can hear you.  Am I understanding you that it was a

22    sexual misconduct?

23         PROSPECTIVE JUROR:  Yes, yes.

24         THE COURT:  All right.  And that did go to verdict?

25         PROSPECTIVE JUROR:  Yes.

1          *THE COURT:*  And you said that somebody close to you is

2     employed in law enforcement?

3          *PROSPECTIVE JUROR:*  That would be myself.

4          *THE COURT:*  Okay.  Tell me about that.

5          *PROSPECTIVE JUROR:*  I'm a correctional officer at

6     Dauphin County.

7          *THE COURT:*  How long?

8          *PROSPECTIVE JUROR:*  Eight years.

9          *THE COURT:*  And what did you do before that?

10         *PROSPECTIVE JUROR:*  I was a machinist.

11         *THE COURT:*  Really?  Where?

12         *PROSPECTIVE JUROR:*  In Millersburg.

13         *THE COURT:*  And how did you happen to change

14    professions?

15         *PROSPECTIVE JUROR:*  Well, somebody came up and said,

16    hey, you look like you'd do a good job in the CO business, so I

17    applied.  Because my business that I was in was failing, so

18    they said you need to find work.  So that's what happened.

19         *THE COURT:*  Okay.  You plan to stay there for the long

20    term?

21         *PROSPECTIVE JUROR:*  Yes.

22         *THE COURT:*  Are the duties pretty standard in Dauphin

23    County Prison?  Everybody does the same thing?

24         *PROSPECTIVE JUROR:*  Pretty much, yeah.

25         *THE COURT:*  And your job is basically to guard the

prisoners?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Do you carry a firearm?

PROSPECTIVE JUROR:  Only when I'm on outside grounds or doing hospital runs or something.

THE COURT:  So not in the prison?

PROSPECTIVE JUROR:  No.

THE COURT:  All right.  And then what about the rest of the time?

PROSPECTIVE JUROR:  The rest of the time is just you're watching them, make sure they're doing what they're supposed to do, be in the places they're supposed to be in, and correct them if they're not.

THE COURT:  So you're comfortable around firearms?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Obviously.  Anybody not comfortable around firearms?  Okay.  Juror Number 17, good morning.

PROSPECTIVE JUROR:  Good morning.

THE COURT:  I see that you've had no prior jury service.

PROSPECTIVE JUROR:  No.

THE COURT:  But someone close to you was arrested, charged, or convicted.

PROSPECTIVE JUROR:  They were convicted.

THE COURT:  And is that something you can talk about

1  comfortably in open court?

2      *PROSPECTIVE JUROR:*  It was my nephews, two different.

3  One was basically DUI repeating over the years, you know,

4  getting in fights or whatever.  No really serious thing, except

5  for the --

6      *THE COURT:*  He had an alcohol problem?

7      *PROSPECTIVE JUROR:*  Yes.

8      *THE COURT:*  And then?

9      *PROSPECTIVE JUROR:*  The second one was a sexual thing.

10      *THE COURT:*  Okay.

11      *PROSPECTIVE JUROR:*  And then I have a friend that's

12  still pending.

13      *THE COURT:*  The pending case, is it here in the Middle

14  District?

15      *PROSPECTIVE JUROR:*  No.

16      *THE COURT:*  Do you know what the charges are?

17      *PROSPECTIVE JUROR:*  It's called elder abuse.

18      *THE COURT:*  And that is in the county?

19      *PROSPECTIVE JUROR:*  Actually, it's a federal thing.

20      *THE COURT:*  It's a federal charge?

21      *PROSPECTIVE JUROR:*  Um-hum.

22      *THE COURT:*  Do you know whether the U.S. Attorney's

23  Office in this district is prosecuting your friend?

24      *PROSPECTIVE JUROR:*  No, they're not.

25      *THE COURT:*  They're not.  It's somewhere else?

1    *PROSPECTIVE JUROR:*  It's in Williamsport, I believe.

2    *THE COURT:*  Okay.

3    *PROSPECTIVE JUROR:*  And previously in Scranton, you

4    know, in that area.

5    *THE COURT:*  Are you following that case, going to

6    court with your friend?

7    *PROSPECTIVE JUROR:*  Oh, no.

8    *THE COURT:*  You just know about it?

9    *PROSPECTIVE JUROR:*  I have written a letter in his

10   favor.

11   *THE COURT:*  So is he about to be sentenced?

12   *PROSPECTIVE JUROR:*  About to be.  It was pretty hard.

13   *THE COURT:*  All right.  Is there anything about the

14   three cases that you've highlighted here that suggests to you

15   that the people close to you are not getting a fair shake in

16   the system?

17   *PROSPECTIVE JUROR:*  I would have to say yes.

18   *THE COURT:*  Yes?

19   *PROSPECTIVE JUROR:*  Not fair.

20   *THE COURT:*  Which one of the three?

21   *PROSPECTIVE JUROR:*  My nephews.

22   *THE COURT:*  Okay.

23   *PROSPECTIVE JUROR:*  Well, actually, all three of them.

24   *THE COURT:*  You feel they were unfairly prosecuted?

25   *PROSPECTIVE JUROR:*  Um-hum.

1        *THE COURT:* Okay. Thank you. Juror Number 18.

2        *PROSPECTIVE JUROR:* Good morning.

3        *THE COURT:* Good morning. No prior jury service?

4        *PROSPECTIVE JUROR:* Nope.

5        *THE COURT:* But there is a lawsuit?

6        *PROSPECTIVE JUROR:* It's just workman's comp. It was

7 my dad.

8        *THE COURT:* Your dad?

9        *PROSPECTIVE JUROR:* Yeah.

10        *THE COURT:* Did that work out okay for him?

11        *PROSPECTIVE JUROR:* It did.

12        *THE COURT:* Good. I see somebody close to you is a

13 law enforcement official.

14        *PROSPECTIVE JUROR:* I'm an attorney.

15        *THE COURT:* You're an attorney?

16        *PROSPECTIVE JUROR:* Yes.

17        *THE COURT:* Where do you work?

18        *PROSPECTIVE JUROR:* I don't practice. I work at Bank

19 of America. I do mortgages instead.

20        *THE COURT:* I see. Did you practice at any time?

21        *PROSPECTIVE JUROR:* A couple cases, admin court, or

22 just, like, personal family stuff, not an open practice.

23        *THE COURT:* All right. Thank you. Juror Number 19.

24        *PROSPECTIVE JUROR:* Good morning.

25        *THE COURT:* Good morning. Can you tell us about your

prior jury service?

PROSPECTIVE JUROR: A DUI case in Cumberland County Court.

THE COURT: Was that your only service?

PROSPECTIVE JUROR: I'm sorry?

THE COURT: Was that your only service?

PROSPECTIVE JUROR: Yes.

THE COURT: Okay. I see that you served in the military.

PROSPECTIVE JUROR: Yes, ma'am.

THE COURT: Can you tell me about your service?

PROSPECTIVE JUROR: I was in the United States Army for four years.

THE COURT: Were you a member of the military police?

PROSPECTIVE JUROR: No.

THE COURT: Where did you serve?

PROSPECTIVE JUROR: Served mostly in Germany for the U.S. consulate.

THE COURT: All right. Thank you. Juror Number 20.

PROSPECTIVE JUROR: Good morning.

THE COURT: Good morning. No prior jury service?

PROSPECTIVE JUROR: Nothing.

THE COURT: And no positive answers on the reverse of the form, nothing in the affirmative?

PROSPECTIVE JUROR: No.

1          *THE COURT:*  Okay.  Juror Number 21, good morning.  I
2    see that you have a police officer in the family.
3          *PROSPECTIVE JUROR:*  My husband.
4          *THE COURT:*  All right.
5          *PROSPECTIVE JUROR:*  And my brother.
6          *THE COURT:*  Your husband and your brother?
7          *PROSPECTIVE JUROR:*  Um-hum.
8          *THE COURT:*  Okay.  Where do they work?
9          *PROSPECTIVE JUROR:*  My husband was with the state
10   police for 25 years.  He retired, and he's now an officer with
11   North Middleton Township.
12         *THE COURT:*  I'm sorry, could you speak up just a
13   little?
14         *PROSPECTIVE JUROR:*  My husband was with the state
15   police for 25 years, and he retired, and he is now a full-time
16   officer with North Middleton.
17         *THE COURT:*  North Middleton Township.  And your --
18         *PROSPECTIVE JUROR:*  And my brother is with the Delray
19   Police Department in Florida.
20         *THE COURT:*  Delray Beach, Florida.  Good for him.
21   It's a nice, warm place.  A lot of us wish we were there right
22   now.  Okay.  Do you talk to them about their cases?
23         *PROSPECTIVE JUROR:*  They do talk to me, yes.
24         *THE COURT:*  Do you think that would influence your
25   ability to be a fair juror in this case?

1      I'm going to be instructing you on the law of the

2  case, telling you that the burden of proof is always on the

3  government in the case.  The government is the plaintiff, the

4  government has to prove charges that they bring here.

5      As I said to you earlier, the indictment is only a

6  charge.  The defendant in the case has the presumption of

7  innocence, and that stays with him throughout the trial until

8  the government has proved all the elements of the charge.  Any

9  problem following those instructions?

10         PROSPECTIVE JUROR:  No.

11         THE COURT:  Okay.  Good.  You indicated that someone

12  close to you had been a victim?  No, I misread that.  I

13  apologize.  But a witness?

14         PROSPECTIVE JUROR:  Well, I wasn't sure with my

15  husband's --

16         THE COURT:  That maybe the husband was the witness?

17         PROSPECTIVE JUROR:  Yeah.

18         THE COURT:  But not you, you have not witnessed a

19  crime?

20         PROSPECTIVE JUROR:  No, not me.

21         THE COURT:  Good.  All right.  Thank you.  Juror

22  Number 22.

23         PROSPECTIVE JUROR:  Yes, Your Honor.

24         THE COURT:  Are you able to hear me?

25         PROSPECTIVE JUROR:  I am, Your Honor.

1          *THE COURT:* Okay. Terrific. Thank you. You
2     indicated there was a lawsuit in your background?
3          *PROSPECTIVE JUROR:* Well, I'm a lawyer. I was in
4     litigation for 18 years. And I did indicate lawsuits because I
5     have been involved as a party in lawsuits, as well.
6          *THE COURT:* All right. First tell us about your
7     status as a party to a lawsuit.
8          *PROSPECTIVE JUROR:* Well, I was a party to a lawsuit
9     involving a traffic accident, and I've been a party to a legal
10    malpractice claim. My firm, my partner and I, were sued for
11    legal malpractice.
12         *THE COURT:* Are those resolved now?
13         *PROSPECTIVE JUROR:* The accident case was settled.
14    The legal malpractice suit is ongoing, although I have left
15    that firm.
16         *THE COURT:* How many years have you been a lawyer?
17         *PROSPECTIVE JUROR:* Twenty years.
18         *THE COURT:* And how many years have you been in your
19    current job as assistant general counsel?
20         *PROSPECTIVE JUROR:* Nine months.
21         *THE COURT:* Nine months?
22         *PROSPECTIVE JUROR:* Yes.
23         *THE COURT:* All right. Is it going well for you?
24         *PROSPECTIVE JUROR:* It is.
25         *THE COURT:* Okay. Have you ever practiced criminal

1    law?

2            PROSPECTIVE JUROR:  I mean, I've touched or worked on

3    specific items in a criminal case, but that would be a very,

4    very small portion of all the things that I did in private

5    practice.

6            THE COURT:  When you say you touched on it, what kinds

7    of involvement did you have?

8            PROSPECTIVE JUROR:  Draft a motion, show up in court

9    for someone going into ADR, two or three things over the years.

10           THE COURT:  Do you think these experiences would keep

11   you from being a fair juror in this matter?

12           PROSPECTIVE JUROR:  No.

13           THE COURT:  Someone close to you involved in law

14   enforcement?

15           PROSPECTIVE JUROR:  No.

16           THE COURT:  No?  Okay.  Thank you.  Juror Number 23,

17   good morning.  I see that you have served as a juror

18   previously.

19           PROSPECTIVE JUROR:  Yes.

20           THE COURT:  Where was that?

21           PROSPECTIVE JUROR:  Baltimore City.

22           THE COURT:  And there was not a verdict?

23           PROSPECTIVE JUROR:  No.

24           THE COURT:  What kind of case was it?

25           PROSPECTIVE JUROR:  Civil.

1      *THE COURT:* Do you remember what it was about?

2      *PROSPECTIVE JUROR:* No.

3      *THE COURT:* Okay. You indicated that there was a

4 potential for a lawsuit on your behalf.

5      *PROSPECTIVE JUROR:* Well, I'm in the process of

6 seeking a lawsuit.

7      *THE COURT:* And it involves your former employer, did

8 you say?

9      *PROSPECTIVE JUROR:* Yes.

10      *THE COURT:* Can you tell me a little bit about that?

11      *PROSPECTIVE JUROR:* I was assaulted on the job, and I

12 was terminated from employment, assaulted by an inmate, and I

13 plan to seek legal advice.

14      *THE COURT:* Okay. Thank you. I'm going to ask you to

15 speak up just a little bit. All right? I want to ask you

16 about the questions on the reverse of the form.

17      Tell me about the first one, somebody close to you

18 being arrested, charged, or convicted.

19      *PROSPECTIVE JUROR:* My brothers and brother-in-law.

20      *THE COURT:* And what kinds of cases?

21      *PROSPECTIVE JUROR:* Involving drugs, selling drugs.

22      *THE COURT:* Selling drugs?

23      *PROSPECTIVE JUROR:* Yeah.

24      *THE COURT:* Was that in Baltimore County?

25      *PROSPECTIVE JUROR:* In Washington, D.C., and Baltimore

City.

   *THE COURT:* And are those cases resolved now?

   *PROSPECTIVE JUROR:* Yes.

   *THE COURT:* And how did they end?

   *PROSPECTIVE JUROR:* Charged and convicted.

   *THE COURT:* Are they serving time now?

   *PROSPECTIVE JUROR:* Not at this time.

   *THE COURT:* Somebody close to you is employed in law enforcement, as well?

   *PROSPECTIVE JUROR:* Yes, my cousin.

   *THE COURT:* And where is that?

   *PROSPECTIVE JUROR:* Washington, D.C.

   *THE COURT:* Police officer?

   *PROSPECTIVE JUROR:* Yes, ma'am.

   *THE COURT:* How long has he been an officer?

   *PROSPECTIVE JUROR:* Twenty years.

   *THE COURT:* And you indicated that you were the victim of a crime.  Was that the assault that happened?

   *PROSPECTIVE JUROR:* Yes.

   *THE COURT:* And that you were an eyewitness to a crime.  Same event or is there another event?

   *PROSPECTIVE JUROR:* A different event, assault on a minor.

   *THE COURT:* You witnessed that?

   *PROSPECTIVE JUROR:* Yeah.

1          THE COURT:  Were you called to court to testify?

2          PROSPECTIVE JUROR:  Yes, I was.

3          THE COURT:  And that's why you answered yes to the

4    next question.  Okay.  Thank you.

5          When you said that you were assaulted on the job by an

6    inmate, where were you working?

7          PROSPECTIVE JUROR:  Department of Health and Mental

8    Hygiene in Jessup, Maryland.

9          THE COURT:  In Maryland?

10         PROSPECTIVE JUROR:  In Maryland.

11         THE COURT:  All right.  Thank you.  Juror Number 24.

12         PROSPECTIVE JUROR:  Good morning, Your Honor.

13         THE COURT:  Good morning.  You have a lawsuit pending,

14   as well?

15         PROSPECTIVE JUROR:  No, not pending.  I was one of the

16   unfortunate souls who received one of those defective hips that

17   had to be removed and replaced.

18         THE COURT:  Oh, boy.

19         PROSPECTIVE JUROR:  So there was a -- it wasn't a

20   class action.  I can't remember what they called it.  But there

21   was no court, we were just all -- there was a settlement.

22         THE COURT:  But you were compensated?

23         PROSPECTIVE JUROR:  Yes.

24         THE COURT:  Were you satisfied with the compensation

25   you received?

1          PROSPECTIVE JUROR:  Yes.

2          THE COURT:  And your health is good now?

3          PROSPECTIVE JUROR:  Yes.

4          THE COURT:  Good.  Okay.  Thank you.  You indicated

5     that somebody close to you had been arrested, charged, or

6     convicted.

7          PROSPECTIVE JUROR:  A brother for robbery in Florida.

8          THE COURT:  How long ago was that?

9          PROSPECTIVE JUROR:  He did it a couple times, so it

10    was about 20 years ago and maybe about 15 years ago.

11         THE COURT:  So by now he's probably served his

12    sentence?

13         PROSPECTIVE JUROR:  He's deceased.

14         THE COURT:  Oh, okay.  Sorry.  Somebody close to you

15    is employed in law enforcement?

16         PROSPECTIVE JUROR:  A niece who is a correctional

17    officer in North Carolina.

18         THE COURT:  And that you had been the victim of a

19    crime?

20         PROSPECTIVE JUROR:  Pardon me?

21         THE COURT:  You said you had been the victim of a

22    crime or somebody --

23         PROSPECTIVE JUROR:  Just like a push-down robbery when

24    I lived in Philadelphia.

25         THE COURT:  Do you think any of these experiences or

1   associations would keep you from being a fair juror here?

2       *PROSPECTIVE JUROR:* No.

3       *THE COURT:* No?

4       *PROSPECTIVE JUROR:* No.

5       *THE COURT:* All right. Thank you. Juror Number 25.

6       *PROSPECTIVE JUROR:* Good morning.

7       *THE COURT:* Good morning. You served our United

8   States Navy?

9       *PROSPECTIVE JUROR:* Yes.

10      *THE COURT:* In what capacity?

11      *PROSPECTIVE JUROR:* I was an electronics technician

12  and working on the Polaris subs and stationed in Holy Loch,

13  Scotland most of my tour.

14      *THE COURT:* All right. Have you ever served in the

15  military police?

16      *PROSPECTIVE JUROR:* No.

17      *THE COURT:* Okay. Thank you. Juror Number 26.

18      *PROSPECTIVE JUROR:* Good morning.

19      *THE COURT:* Good morning. You have a lawsuit pending?

20      *PROSPECTIVE JUROR:* Yes.

21      *THE COURT:* And where is that suit filed, do you know?

22      *PROSPECTIVE JUROR:* I believe it's in Philadelphia.

23      *THE COURT:* In federal court in Philadelphia?

24      *PROSPECTIVE JUROR:* I believe so. They just came to a

25  settlement.

1    *THE COURT:*  All right.  Have you signed off on that?

2    *PROSPECTIVE JUROR:*  Not yet.

3    *THE COURT:*  Not yet?

4    *PROSPECTIVE JUROR:*  No.

5    *THE COURT:*  Okay.  Can you tell me who close to you is

6    employed in law enforcement?

7    *PROSPECTIVE JUROR:*  I have a couple friends I went to

8    college with that are police officers in Delaware County.

9    *THE COURT:*  Do you speak with them about their work

10   affairs?

11   *PROSPECTIVE JUROR:*  No.

12   *THE COURT:*  No?  Okay.

13   *PROSPECTIVE JUROR:*  And I also have a family friend

14   that's a correctional officer at the Schuylkill penitentiary.

15   *THE COURT:*  All right.  Who close to you was

16   victimized?

17   *PROSPECTIVE JUROR:*  It happened to my wife and I.  Our

18   car was broken into last summer.

19   *THE COURT:*  Was anyone arrested?

20   *PROSPECTIVE JUROR:*  Yes, two young juveniles.

21   *THE COURT:*  Is that why you marked that you were the

22   eyewitness?

23   *PROSPECTIVE JUROR:*  No, I was also an eyewitness to

24   someone stealing wood from builders when our house was

25   next-door to the lot.

1      *THE COURT:*  I see.  And you reported that?

2      *PROSPECTIVE JUROR:*  Our neighbor and I did, yes.

3      *THE COURT:*  Did anything come of it?

4      *PROSPECTIVE JUROR:*  No.

5      *THE COURT:*  When you marked the last question that you

6   were involved in the investigation or litigation, was that the

7   incident you were talking about?

8      *PROSPECTIVE JUROR:*  Yes.

9      *THE COURT:*  All right.  Thank you.  Juror Number 27.

10      *PROSPECTIVE JUROR:*  Yes, ma'am.

11      *THE COURT:*  I see that you've had no prior jury

12   service.

13      *PROSPECTIVE JUROR:*  No.

14      *THE COURT:*  And I also see that there are no

15   affirmative responses on the back of the form.  Is that right?

16      *PROSPECTIVE JUROR:*  That's correct.

17      *THE COURT:*  Is there anything you need to change?

18      *PROSPECTIVE JUROR:*  No.

19      *THE COURT:*  All right.  Thank you.  Juror Number 28.

20      *PROSPECTIVE JUROR:*  Good morning, Your Honor.

21      *THE COURT:*  Good morning.  I see that you have had

22   prior jury service in Carlisle?

23      *PROSPECTIVE JUROR:*  Yes, ma'am.

24      *THE COURT:*  Cumberland County Court.  What kind of

25   case did you serve on?

1          *PROSPECTIVE JUROR:*  Several DUIs, Your Honor.

2          *THE COURT:*  And they all deliberated to verdict?

3          *PROSPECTIVE JUROR:*  They all did, yes.

4          *THE COURT:*  Anything about that experience that would

5     keep you from being a fair juror in this case?

6          *PROSPECTIVE JUROR:*  No, Your Honor.

7          *THE COURT:*  All right.  You also served in the U.S.

8     Army?

9          *PROSPECTIVE JUROR:*  I actually am a civilian,

10    currently employed as a civilian with the United States Army.

11         *THE COURT:*  Have you ever served as a member of the

12    military police?

13         *PROSPECTIVE JUROR:*  No.

14         *THE COURT:*  Someone close to you was arrested,

15    charged, or convicted?

16         *PROSPECTIVE JUROR:*  Yes.

17         *THE COURT:*  Who was that?

18         *PROSPECTIVE JUROR:*  My brother-in-law was convicted of

19    DUI.

20         *THE COURT:*  And you have law enforcement people close

21    to you?

22         *PROSPECTIVE JUROR:*  Yes.

23         *THE COURT:*  Who are they?

24         *PROSPECTIVE JUROR:*  I'm actually involved in

25    supportive township work, and I know a large number of our

1    township police in Lower Allen Township.  Also in my official

2    capacity at Fort Detrick, Maryland, I am very close and work

3    hand in glove with our security department.  Most of those are

4    former state penitentiary in Jessup and other penitentiaries in

5    Maryland, and one police officer from Ocean City, Maryland, who

6    works for me.

7              THE COURT:  All right.  Thank you.  Juror Number 29,

8    are you hearing me?  I see you do what I do sometimes.  Have

9    you been able to hear everything?

10             PROSPECTIVE JUROR:  I don't have good hearing in my

11   left ear.

12             THE COURT:  But are you hearing me okay?

13             PROSPECTIVE JUROR:  Yep.

14             THE COURT:  All right.  I wanted to talk to you about

15   your prior jury service.

16             PROSPECTIVE JUROR:  Actually, I was called but never

17   picked.

18             THE COURT:  Okay.  That makes it easier.  And I see

19   that you have no affirmative responses on the reverse of the

20   form.

21             PROSPECTIVE JUROR:  Right.

22             THE COURT:  Is there anything else that you want to

23   add that would reflect on whether or not you could be a fair

24   juror in this case?

25             PROSPECTIVE JUROR:  No.

1　　　　　　*THE COURT:*　Okay.　Thank you.　Juror Number 30.

2　　　　　　*PROSPECTIVE JUROR:*　Good morning.

3　　　　　　*THE COURT:*　Good morning.　No prior jury service?

4　　　　　　*PROSPECTIVE JUROR:*　No.

5　　　　　　*THE COURT:*　Okay.　Somebody close to you in law

6　enforcement?

7　　　　　　*PROSPECTIVE JUROR:*　Three people.　My uncle, my

8　cousin, and one of my best friends are police officers.

9　　　　　　*THE COURT:*　And where do they work?

10　　　　　　*PROSPECTIVE JUROR:*　My uncle and my cousin, I'm not

11　sure what jurisdiction they're in, but they live in

12　Harleysville, Pa.

13　　　　　　*THE COURT:*　Okay.

14　　　　　　*PROSPECTIVE JUROR:*　And my friend's husband, he works

15　around here in Harrisburg.

16　　　　　　*THE COURT:*　Do you have occasion to talk to them about

17　their work?

18　　　　　　*PROSPECTIVE JUROR:*　No.

19　　　　　　*THE COURT:*　Okay.　Thank you.　Juror Number 31.

20　　　　　　*PROSPECTIVE JUROR:*　Good morning.

21　　　　　　*THE COURT:*　Good morning.　You've had some involvement

22　in the court system with a lawsuit?

23　　　　　　*PROSPECTIVE JUROR:*　I was previously an intern with

24　the prothonotary's office.

25　　　　　　*THE COURT:*　Okay.

1          *PROSPECTIVE JUROR:*  And I have interaction with my job

2     as an auditor.  I haven't been called as a witness, but our

3     work can be used to support anything that would come to a

4     proceeding.

5          *THE COURT:*  Okay.  Has somebody close to you been

6     arrested, charged, or convicted?

7          *PROSPECTIVE JUROR:*  Yes.  My husband pled guilty to

8     DUI.

9          *THE COURT:*  When was that?

10         *PROSPECTIVE JUROR:*  A couple years ago.

11         *THE COURT:*  And somebody close to you is in law

12    enforcement?

13         *PROSPECTIVE JUROR:*  That was where I was interning.

14         *THE COURT:*  All right.  So there's not another person

15    in addition to that?

16         *PROSPECTIVE JUROR:*  No.

17         *THE COURT:*  Okay.  Thank you.  Juror Number 32.

18         *PROSPECTIVE JUROR:*  Good morning.

19         *THE COURT:*  Good morning.  Can you tell us about your

20    prior jury service?

21         *PROSPECTIVE JUROR:*  Yes.  I was called and I was not

22    selected for one time.  It was in the early '90s.  And then a

23    few years later I was called and I -- they dismissed me because

24    it was a criminal case involving Weis Markets and my

25    sister-in-law worked at Weis Markets at the time.

1          *THE COURT:*  I see.  All right.  Thank you.

2          *PROSPECTIVE JUROR:*  And I did forget something --

3          *THE COURT:*  Okay.

4          *PROSPECTIVE JUROR:*  -- when I answered the questions,

5    Your Honor, about household.  I need to update this because I

6    didn't go into nieces and nephews, but I have nieces and

7    nephews that work as police officers and federal agents.

8          And then I also have nieces and nephews that have had

9    DUIs, and also one of my nieces had some type of drug

10   conviction where I know she had to wear an electronic device on

11   her ankle and not leave the house.

12         *THE COURT:*  Okay.  Let's talk about the law

13   enforcement official in your family.  Who is that?  That's a

14   niece or a nephew?

15         *PROSPECTIVE JUROR:*  It's a nephew, and I can't

16   remember which township, but it's a township on the outskirts

17   of Philadelphia.

18         *THE COURT:*  And you think he has a federal position?

19         *PROSPECTIVE JUROR:*  And the other one is an FBI

20   special agent, but she guards the Attorney General.

21         *THE COURT:*  In Washington?

22         *PROSPECTIVE JUROR:*  Yeah.

23         *THE COURT:*  Okay.  And somebody, is it a niece or a

24   nephew -- I think you said a niece -- who had to wear the

25   electronic monitoring?

1          *PROSPECTIVE JUROR:*  Yes.  I have 20 nieces and
2    nephews.
3          *THE COURT:*  It sounded like you had a big family, yes.
4          *PROSPECTIVE JUROR:*  I'm one of eight.
5          *THE COURT:*  All right.  Well, the electronic
6    monitoring, do you know anything about that case?
7          *PROSPECTIVE JUROR:*  No, because that brother-in-law is
8    very secretive, but I showed up for Easter, and there was an
9    electronic device on her ankle.
10          *THE COURT:*  So you don't know whether it was --
11          *PROSPECTIVE JUROR:*  I'm pretty sure it was drugs.
12          *THE COURT:*  Drug distribution do you think?
13          *PROSPECTIVE JUROR:*  I --
14          *THE COURT:*  Don't know?  Okay.
15          *PROSPECTIVE JUROR:*  I love her, but she's sketchy.
16          *THE COURT:*  All right.  So I'm going to conclude from
17    what you have said that none of those things are going to
18    influence your ability to be a fair juror here.  Am I right?
19          *PROSPECTIVE JUROR:*  Yes.
20          *THE COURT:*  Okay.  Thank you.  Juror Number 33.
21          *PROSPECTIVE JUROR:*  Good morning.
22          *THE COURT:*  Good morning.  No prior jury service?
23          *PROSPECTIVE JUROR:*  I've got to change that.
24          *THE COURT:*  Okay.
25          *PROSPECTIVE JUROR:*  Back in, I think it was 1977, I

1 got called to county court, and we were there two days, and

2 they dismissed us.

3     *THE COURT:* Okay. So you didn't have to deliberate?

4     *PROSPECTIVE JUROR:* No.

5     *THE COURT:* All right. Perfect. Thank you. Juror

6 Number 34.

7     *PROSPECTIVE JUROR:* Good morning.

8     *THE COURT:* Good morning. No prior jury service?

9     *PROSPECTIVE JUROR:* No, ma'am.

10     *THE COURT:* But somebody close to you is employed in

11 law enforcement?

12     *PROSPECTIVE JUROR:* Yes, ma'am. My brother-in-law is

13 now retired law enforcement.

14     *THE COURT:* And where did he work?

15     *PROSPECTIVE JUROR:* West York Borough Police.

16     *THE COURT:* West Shore Regional?

17     *PROSPECTIVE JUROR:* West York.

18     *THE COURT:* Oh, West York. Okay. How long was he

19 there?

20     *PROSPECTIVE JUROR:* I'm not quite sure.

21     *THE COURT:* Do you know what kinds of cases he was

22 involved in?

23     *PROSPECTIVE JUROR:* No, ma'am.

24     *THE COURT:* You said you've been the eyewitness to a

25 crime?

1          *PROSPECTIVE JUROR:*  I'm sorry?

2          *THE COURT:*  You witnessed a crime yourself?  Or did

3     you answer that question because you were thinking of your

4     brother-in-law?

5          *PROSPECTIVE JUROR:*  No, I witnessed numerous

6     shoplifting crimes.  I worked in retail.  They were all

7     resolved.  We didn't have to go to court.

8          *THE COURT:*  Okay.  Juror Number 35.

9          *PROSPECTIVE JUROR:*  Good morning.

10         *THE COURT:*  Good morning.  Would you tell us about

11    your grand jury experience?

12         *PROSPECTIVE JUROR:*  It was long, 18 months, every

13    other week for 18 months.  It was interesting.

14         *THE COURT:*  Where were you a grand juror?

15         *PROSPECTIVE JUROR:*  Here in the Middle District.

16         *THE COURT:*  Here in the Middle District.  Okay.

17    During what 18 months did you serve?

18         *PROSPECTIVE JUROR:*  I don't know.  It was at least 20

19    years ago.

20         *THE COURT:*  Okay.  Do you remember what kinds of cases

21    you handled or what U.S. Attorneys came before the grand jury

22    at that time?

23         *PROSPECTIVE JUROR:*  I don't remember the attorneys.  I

24    know one of them was deceased in an auto accident while we were

25    convening, assistant district attorney.  I don't remember his

1   name.

2          THE COURT:  All right.

3          PROSPECTIVE JUROR:  There were drug trafficking cases.

4   There was -- one of the gentlemen, I think at the time, was a

5   Ten Most Wanted bank robber.  There were cases of sending

6   offensive, pornographic material through the mail, things like

7   that.

8          THE COURT:  Okay.  After your service concluded, did

9   you have any other contact with the court?

10         PROSPECTIVE JUROR:  I was called for jury service in

11  Mifflin County and wasn't selected.

12         THE COURT:  All right.  After you concluded your

13  service as a grand juror, looking back on it, would you say it

14  was a positive experience?

15         PROSPECTIVE JUROR:  Yeah, sure.

16         THE COURT:  All right.  Thank you.  You indicated that

17  somebody close to you had been victimized.

18         PROSPECTIVE JUROR:  That would be my wife and I.  We

19  had a burglary.  Some stuff was stolen out of our vehicle right

20  in our own driveway while we were at home.

21         THE COURT:  Was there any investigation?

22         PROSPECTIVE JUROR:  I wasn't involved in any of it.

23  The police just notified us that they had found some -- we knew

24  some stuff was missing, and they notified us that they had

25  found it and that the juveniles involved were in custody.  And

1    we received restitution over the course of, I don't know, eight

2    or nine years it took to pay it off.

3             THE COURT:  Okay.  Thank you.  Juror Number 36.

4             PROSPECTIVE JUROR:  Good morning, Your Honor.

5             THE COURT:  Good morning.  I see no prior jury

6    service.

7             PROSPECTIVE JUROR:  Yeah, but I need to update the

8    back.

9             THE COURT:  All right.  Thank you.

10            PROSPECTIVE JUROR:  My neighbor works for the state

11   police.  I don't know what post they are.

12            THE COURT:  Okay.  How long have you been neighbors?

13            PROSPECTIVE JUROR:  Thirteen years.

14            THE COURT:  Are you friendly enough that you would

15   talk about his cases or the type of work?

16            PROSPECTIVE JUROR:  No.

17            THE COURT:  No?

18            PROSPECTIVE JUROR:  No.

19            THE COURT:  Okay.

20            PROSPECTIVE JUROR:  Also, my brother-in-law is a

21   police officer, but not in this country.

22            THE COURT:  Let me guess, would that be in Ireland?

23            PROSPECTIVE JUROR:  Yes.

24            THE COURT:  Okay.  What county?

25            PROSPECTIVE JUROR:  County Wexford.

1          THE COURT:  That's a pretty place.

2          PROSPECTIVE JUROR:  Yeah.

3          THE COURT:  Thank you.  Anything else you want to

4     update?

5          PROSPECTIVE JUROR:  No, that's it.

6          THE COURT:  All right.  Thank you.  Juror Number 37.

7          PROSPECTIVE JUROR:  Good morning, Your Honor.

8          THE COURT:  Good morning.  No prior jury service?

9          PROSPECTIVE JUROR:  Called, not selected, Adams

10    County.

11         THE COURT:  Adams County?

12         PROSPECTIVE JUROR:  Yes, ma'am.

13         THE COURT:  Okay.  And nothing that you want to update

14    on the back?

15         PROSPECTIVE JUROR:  No, Your Honor.

16         THE COURT:  Thank you.  Juror Number 38.

17         PROSPECTIVE JUROR:  Good morning.

18         THE COURT:  Good morning.  No prior jury service?

19         PROSPECTIVE JUROR:  No.

20         THE COURT:  No lawsuits?

21         PROSPECTIVE JUROR:  No.

22         THE COURT:  No yeses on the back of the form?

23         PROSPECTIVE JUROR:  That's correct.

24         THE COURT:  Okay.  Thank you.  Juror Number 39.

25         PROSPECTIVE JUROR:  Good morning.

1          THE COURT:  Good morning.  You have not served as a

2    juror previously?  Correct?

3          PROSPECTIVE JUROR:  No.

4          THE COURT:  Nor have you been involved in lawsuits?

5          PROSPECTIVE JUROR:  No.

6          THE COURT:  And are your answers still no on the back

7    of the form?

8          PROSPECTIVE JUROR:  Yes.

9          THE COURT:  Juror Number 40.

10         PROSPECTIVE JUROR:  Good morning.

11         THE COURT:  Good morning.  No prior jury service?

12         PROSPECTIVE JUROR:  No.

13         THE COURT:  And all no on the back of the form?

14         PROSPECTIVE JUROR:  Yes.

15         THE COURT:  Is there anything you need to update on

16   your form?

17         PROSPECTIVE JUROR:  No.

18         THE COURT:  Good.  Okay.  Anybody else have any

19   updates to the form now that we've gone through things?  If

20   you'd raise your hand and tell me your juror number.  Okay?  On

21   the front row here.  Juror number?

22         PROSPECTIVE JUROR:  Juror Number 6.

23         THE COURT:  Okay.

24         PROSPECTIVE JUROR:  I forgot to say that my aunt was

25   charged with a DUI maybe, like, ten years ago.

1          *THE COURT:*  All right.  In the front row here.

2          *PROSPECTIVE JUROR:*  I have a --

3          *THE COURT:*  Juror number --

4          *PROSPECTIVE JUROR:*  Fifteen.

5          *THE COURT:*  Thank you.

6          *PROSPECTIVE JUROR:*  It's a question, Your Honor, of

7    semantics.  With the question about a witness in a criminal

8    proceeding, would that also include things that happened at the

9    juvenile level?

10          *THE COURT:*  It could.

11          *PROSPECTIVE JUROR:*  Okay.

12          *THE COURT:*  Can you tell us?

13          *PROSPECTIVE JUROR:*  In that case then, I was a witness

14   to several things in my role as a teacher with fights that were

15   broken up in school and then was called -- they were -- it

16   wasn't -- it's like a local magistrate level.  So working in

17   Steelton, it was Judge Lenker, I believe.

18          *THE COURT:*  Okay.  Thank you.  Other jurors on the

19   front row here.  Juror Number --

20          *PROSPECTIVE JUROR:*  Twenty.

21          *THE COURT:*  Thank you.

22          *PROSPECTIVE JUROR:*  My son, it's been years, was

23   charged with a DUI, but it was dropped later.

24          *THE COURT:*  All right.  Second row.

25          *PROSPECTIVE JUROR:*  Juror Number 25.  I have a nephew

1 that works -- was in the police department at Philadelphia, and

2 now he's working in one of the townships.

3     *THE COURT:* All right. Other jurors? Twenty-six?

4     *PROSPECTIVE JUROR:* I forgot to say I'm a part of

5 other lawsuits with my type of job with snow removal and all

6 that stuff.

7     *THE COURT:* I can see that. All right. Thank you.

8 On the next row.

9     *PROSPECTIVE JUROR:* Twenty-nine.

10     *THE COURT:* All right.

11     *PROSPECTIVE JUROR:* I forgot to mention that I was

12 once called to be a character witness for a customer of mine

13 when I was self-employed. I did some renovation, and there was

14 an issue with the paneling, and I was called to be a witness, a

15 character witness.

16     *THE COURT:* Thank you. Other jurors? Thirty.

17     *PROSPECTIVE JUROR:* My husband, when he was a

18 juvenile, he was arrested, when we were in high school.

19     *THE COURT:* Do you know what the arrest was for?

20     *PROSPECTIVE JUROR:* For marijuana possession.

21     *THE COURT:* Was there a charge in connection with that

22 marijuana possession?

23     *PROSPECTIVE JUROR:* I don't -- I'm not sure.

24     *THE COURT:* But it was a juvenile case?

25     *PROSPECTIVE JUROR:* Yes.

1    *THE COURT:*  Okay.  Other jurors?  Number?

2    *PROSPECTIVE JUROR:*  Thirty-three.

3    *THE COURT:*  Thirty-three.  Okay.

4    *PROSPECTIVE JUROR:*  I think it was 1991, my younger

5    brother, he was arrested and spent six months in jail for

6    assault, and I think he did a year's probation.

7    *THE COURT:*  All right.  Thank you.  Other jurors?  One

8    more hand, yes.

9    *PROSPECTIVE JUROR:*  Juror 31.  I was a victim of a

10   crime.  I had items stolen from my vehicle.

11   *THE COURT:*  Was there an arrest?

12   *PROSPECTIVE JUROR:*  No, just a report filed.

13   *THE COURT:*  Okay.  Anyone else that we missed?

14   Jurors, this is a good time for us to take a little break from

15   the questioning, and I'll introduce you to the lawyers in the

16   case.  And what I'm going to do is ask the lawyers to introduce

17   you to the people at their tables and to share with you a list

18   of potential witnesses who might be called in this case.

19          I want you to listen to that list and be prepared to

20   tell me whether you have any association at all with the people

21   at the tables or with the witnesses who could potentially be

22   called in this case.

23          The government is being represented by Ms. Meredith

24   Taylor.  Ms. Taylor, good morning.

25   *MS. TAYLOR:*  Good morning, Your Honor.  Good morning,

1    ladies and gentlemen.  Also assisting me in this case is

2    Assistant United States Attorney Joe Terz.

3          *MR. TERZ:*  Good morning.

4          *MS. TAYLOR:*  And the back table here, Special Agent

5    Joe Myers from the Drug Enforcement Administration and Special

6    Agent Jonathan Maiolo from IRS.  Does anybody know me or

7    Mr. Terz or any of the agents who are seated here?  I see no

8    response.

9          In the government's case, the witnesses that you may

10   hear from or about will include the following people:

11         Detective Russell Schauer of Springettsbury Township

12   Police Department; Trooper Justin Dembowski of the Pennsylvania

13   State Police; Detective Adam Bruckhart of West Manchester

14   Township Police Department.  From West Hanover Township Police

15   Department, you may hear from or about Sergeant Travis Shearer

16   and Detective Corey Merwede.

17         From that list of officers or detectives, does anybody

18   know any of those folks?  I see and hear no response.

19         Additional witnesses may include Detective David Ennes

20   of the Butte County Sheriff's Office in California; a forensic

21   chemist from the Pennsylvania State Police Bureau of Forensic

22   Services Laboratory, Nicole Blascovich; Ryan Falsone; and Tyler

23   Long.

24         With the addition of those names, does anybody believe

25   they know any of those individuals?  Your Honor, I see no

1  response to those, and that's our list.

2      THE COURT:  Thank you, counsel.  Jurors, the defendant

3  in the case is represented by Ms. Lori Ulrich.  Good morning,

4  Ms. Ulrich.

5      MS. ULRICH:  Good morning, Your Honor.  Would you like

6  me to introduce Mr. Heath?

7      THE COURT:  Please.

8      MS. ULRICH:  This is my client, Christopher

9  Mark Heath.  I will be defending him.  I will be assisted by

10  Richard Garvey, who is an investigator.

11      MR. GARVEY:  Good morning.

12      MS. ULRICH:  Does anybody know Mr. Heath or

13  Mr. Garvey?

14      THE COURT:  Does anybody know Ms. Ulrich?

15      MS. ULRICH:  Oh, that's a good question.  That's a

16  good question, too.

17      THE COURT:  All right.  Thank you, counsel.  Jurors, I

18  just want to go over a couple of things with you before I allow

19  the lawyers to pose any questions that they have following up

20  on your questionnaire.

21      In a criminal case, as some of you may already know,

22  the law presumes that the defendant is innocent until proven

23  guilty.  In this regard, the law requires that the government

24  prove each and every element of the crime charged beyond a

25  reasonable doubt.  The defendants are not required to produce

1 any evidence on their own behalf but rely on the status of the

2 record as presented by the government.  Is there anybody who

3 has been called for service who cannot or will not accept this

4 principle of law?

5 Does everybody understand that if the prosecution, the

6 government, fails to meet its burden of proving the guilt of

7 Defendant Christopher Mark Heath with evidence that amounts to

8 proof beyond a reasonable doubt, as I will explain it to you in

9 my instructions, does everyone understand that if the

10 government cannot meet this burden, the verdict will have to be

11 not guilty?  Is there anyone who cannot follow my instruction

12 on the law in that regard?

13 Counsel, Ms. Taylor, are there questions based on the

14 questionnaire or the voir dire submitted to the court?

15 *MS. TAYLOR:*  No, Your Honor, there are no additional

16 questions from the government.

17 *THE COURT:*  Ms. Ulrich.

18 *MS. ULRICH:*  Yes, Your Honor, I do have a few

19 additional questions.  I know a lot of people shared a lot of

20 personal information today.  Some were victims of crimes,

21 people know people that have been charged, arrested, and

22 jailed.

23 Would any of the experiences in any of those cases,

24 including contact with law enforcement, impact anybody's

25 ability to sit on this case fairly and impartially, anything

about anything in your background?  No response.  Thank you.

A few more questions.  I'm going to tell you that during this trial, Mr. Heath will be acknowledging that he was involved in transporting marijuana from California to Pennsylvania with the co-defendants Tyler Long and Ryan Falsone.  He will be contesting that he possessed a firearm in relation to drug trafficking.

So what I need to know, is there anyone who could not judge him fairly on all the counts knowing that he is actually admitting to some of the conduct in this case?  Anybody at all?

And this is a drug trafficking case, and I guess my question is, is there anyone here who has family or themselves have been impacted by the use of illegal drugs?  Thank you. You will -- oh, I'm sorry, sir.  May I follow up, or did you want to follow up?

THE COURT:  Yes, yes, Juror Number --

PROSPECTIVE JUROR:  Thirty-five.

THE COURT:  Thank you.

MS. ULRICH:  And may I ask, are you able to talk about that in open --

PROSPECTIVE JUROR:  Well, my sister was involved with and eventually married a guy that was heavily into crack cocaine and things of that nature, and she ended up getting pregnant.  And he was into burglary and robbery and all sorts of things.  He ended up doing, I think, seven or eight, nine

1  years in the state, in North Carolina.

2      *MS. ULRICH:*  And I'm sorry to hear that, by the way.

3      *PROSPECTIVE JUROR:*  It was quite an impact on the

4  family.

5      *MS. ULRICH:*  It sounds like it.  And I appreciate you

6  answering that, and I do want to follow up and ask, anything

7  about that, would that impact your ability to sit in on this

8  case fairly and impartially knowing that this, in fact, is a

9  drug case?  It's marijuana, it's not crack, but it is a drug

10 case.

11     *PROSPECTIVE JUROR:*  I don't think so.  I mean, it was

12 a family issue, and we were upset about things going on there,

13 but all in all, I don't think so.

14     *MS. ULRICH:*  Okay.  Thank you.  I appreciate that.

15 Anyone else?  Yes, sir.

16     *PROSPECTIVE JUROR:*  Yes, the assault that took place,

17 the person that assaulted me was under the influence of

18 marijuana.

19     *MS. ULRICH:*  Okay.  And this is a marijuana case, sir,

20 so is there anything about that that would impact your ability

21 to sit on this case fairly and impartially knowing that this is

22 a case involving marijuana?

23     *PROSPECTIVE JUROR:*  I'm really not sure.

24     *MS. ULRICH:*  Okay.  It might, you're just -- you're

25 not sure?

1          *PROSPECTIVE JUROR:*  I don't know.

2          *MS. ULRICH:*  Okay.  Thank you.  Is there anyone else?

3          *PROSPECTIVE JUROR:*  My nephew just died from an

4    overdose.

5          *MS. ULRICH:*  I'm very sorry to hear that.

6          *PROSPECTIVE JUROR:*  I don't know --

7          *MS. ULRICH:*  I'm sorry?

8          *PROSPECTIVE JUROR:*  I don't know if it was crack or

9    heroin.

10         *MS. ULRICH:*  I'm very sorry to hear that.

11         *MR. TERZ:*  The number of the juror, please?

12         *PROSPECTIVE JUROR:*  Eight.

13         *MS. ULRICH:*  Are you Juror Number 8?

14         *PROSPECTIVE JUROR:*  Eight.

15         *MS. ULRICH:*  And, sir, is there anything about that --

16   I know that's pretty powerful -- that would affect your ability

17   to sit in on this case fairly and impartially?

18         *PROSPECTIVE JUROR:*  I don't know.  I don't think so.

19         *MS. ULRICH:*  I'm sorry?

20         *PROSPECTIVE JUROR:*  I don't think so.  I don't know.

21         *MS. ULRICH:*  You don't know or --

22         *PROSPECTIVE JUROR:*  I don't know.

23         *MS. ULRICH:*  I mean, you said you didn't know what

24   type of drug it was, but it was an illegal drug?

25         *PROSPECTIVE JUROR:*  Yes.

1      MS. ULRICH:  Okay.  And obviously it has had a huge

2  impact on the family.  Correct?

3      PROSPECTIVE JUROR:  Yes, it did.

4      MS. ULRICH:  And it's okay, but we just have to make

5  sure that people can be fair and impartial.  Is it fair to say

6  that you're not sure you could be fair and impartial?

7      PROSPECTIVE JUROR:  I think I could.  I think I could

8  be.

9      MS. ULRICH:  You think you could?

10     PROSPECTIVE JUROR:  I think I could.

11     MS. ULRICH:  Thank you, sir.  Anyone else?  All right.

12 You will also hear that Mr. Heath was the sheriff with the Yuba

13 County Sheriff's Department in California at the time that he's

14 alleged to have committed these offenses.  I know a lot of you

15 said you had law enforcement contact, but you will hear that he

16 was a sheriff at the time with the Yuba County Sheriff's

17 Department in California.

18     So my question is this:  Is there anyone who could not

19 judge him fairly knowing that he was a law enforcement officer

20 at the time he is alleged to have committed these offenses?  I

21 see some reactions, but is everybody -- knowing that he was a

22 sheriff, can sit and judge him fairly and impartially?  Your

23 Honor, thank you.  That's all I have.

24     THE COURT:  Thank you, counsel.  Jurors, I have a few

25 final questions for all of you, and then I'm going to ask the

1    lawyers to exercise their challenge.  We'll reduce this panel

2    of 40 down to 14 jurors.

3         First of all, if you're selected to sit on the case,

4    will you be able to render a verdict solely on the evidence

5    presented at the trial and in the context of the law as I will

6    give to you in my instructions, disregarding any other ideas,

7    notions, or beliefs about the law that you may have encountered

8    in reaching your verdict?  Is everyone here going to be able to

9    keep an open mind, hear the evidence, and follow my

10   instructions on the law?

11        Is there any member of the panel who has a special

12   disability or problem that would make it difficult or

13   impossible to serve as a member of this panel over the next

14   several days?

15        Is there anybody who has difficulty in reading or

16   understanding English that would make it difficult for them to

17   follow the evidence, read the instructions that I give you, and

18   render a verdict in the case?

19        Does any prospective juror have any religious,

20   philosophical, or other beliefs that would make him or her

21   unable to act as a judge of the facts of the case and render a

22   verdict for reasons unrelated to the law or evidence?

23        Prospective jurors, is there anything else that you

24   believe should be called to my attention or the attention of

25   the lawyers that you think might interfere with your ability to

1   be a fair and impartial juror in this case?  Anything at all?

2   Would counsel approach the bench.

3       *(The following discussion occurred at sidebar:)*

4           *THE COURT:*  Are there any challenges for cause?

5       *MS. ULRICH:*  I'm going to make one to Juror Number 8.

6   He was not sure he could be impartial, so I really want to

7   strike him for cause.

8           *THE COURT:*  Ms. Taylor.

9       *MS. TAYLOR:*  Your Honor, he did indicate initially

10  that he didn't know if he could be fair and impartial.  That

11  was as far as it went.

12          *THE COURT:*  I don't think that there's enough at this

13  point to excuse him for cause.  I'm willing to inquire of him

14  further, but I'm not sure that would be a positive approach.

15  But I'm happy to inquire if you want me to.  I would simply ask

16  him how long ago it's been since he lost his nephew.

17          *MS. ULRICH:*  Just a little more to get me a sense --

18          *THE COURT:*  About the circumstances.  All right.

19  Anyone else?  Any challenges?

20          *MS. ULRICH:*  Juror Number 23.

21          *THE COURT:*  Twenty-three?

22          *MS. ULRICH:*  Yeah.  He's the one that has been

23  assaulted by someone on marijuana.  I'll strike him for cause.

24          *MS. TAYLOR:*  Your Honor, I don't think he gave any

25  answers that suggested that he couldn't be --

1    *THE COURT:*  No, he didn't.  He indicated that he's had

2    more involvement than most.  He has a brother, a brother-in-law

3    that was convicted and a cousin who is a law enforcement

4    official.  I can inquire of him, as well, if you wish.

5    *MS. ULRICH:*  No, not with him.  Maybe just Juror

6    Number 8.

7    *THE COURT:*  All right.  Juror Number 8, would you come

8    up.

9    *(Prospective Juror Number 8 approaches sidebar.)*

10   *THE COURT:*  Good morning again.  I'm going to ask you

11   to speak into this microphone so the court reporter can take

12   down our conversation.  How long ago was it that you lost your

13   nephew?

14   *PROSPECTIVE JUROR:*  Last summer.

15   *THE COURT:*  So it's pretty recent.

16   *PROSPECTIVE JUROR:*  Yes, it is.

17   *THE COURT:*  Did he live locally?

18   *PROSPECTIVE JUROR:*  Yes.

19   *THE COURT:*  Were you close?

20   *PROSPECTIVE JUROR:*  I didn't get to see him much.

21   These young people, they run around.  He was only 23.

22   *THE COURT:*  Was it your sister's boy?

23   *PROSPECTIVE JUROR:*  My sister-in-law --

24   *THE COURT:*  Your brother's son?

25   *PROSPECTIVE JUROR:*  My wife's sister's grandson.  He

1    was living with her at the time, and she found him.

2         THE COURT:  Okay.  Your wife's sister's grandson.  How

3    close were you?  You said that you didn't get to see him much.

4         PROSPECTIVE JUROR:  No, but, you know, family things

5    when he came.  You know, these young people don't always come

6    to the reunions and things.

7         THE COURT:  Sure.

8         PROSPECTIVE JUROR:  It was a shame.  He was a

9    good-looking kid who just got into drugs.

10        THE COURT:  Before that, had drugs had an impact on

11   your family?

12        PROSPECTIVE JUROR:  No.

13        THE COURT:  Obviously this case is about drugs.

14        PROSPECTIVE JUROR:  I know.

15        THE COURT:  The allegation that drugs have been

16   distributed by someone who at one time was a law enforcement

17   official.  Given the background that you have, do you think

18   that you can hold the government to the test of proving all of

19   the elements beyond a reasonable doubt or do you have some

20   reservation about your ability to weigh the evidence?

21        PROSPECTIVE JUROR:  To be honest, I'd be partial

22   against the drugs.  I mean, I'm not a big drug --

23        THE COURT:  Sure.

24        PROSPECTIVE JUROR:  I don't like drugs.  That's the

25   deal.

1    THE COURT:  If there's any doubt at all about your

2    ability to be fair to both sides, to hold the government to

3    their burden, that's something they would need to know.  It

4    would simply mean you may not be the right juror for this case.

5    PROSPECTIVE JUROR:  Well, that's correct, that's what

6    I think.

7    THE COURT:  Okay.

8    PROSPECTIVE JUROR:  It's sensitive --

9    THE COURT:  Sure, I appreciate that.

10   PROSPECTIVE JUROR:  -- the way I feel about drugs.

11   THE COURT:  Ms. Taylor, do you wish to inquire?

12   MS. TAYLOR:  No, Your Honor.

13   THE COURT:  Thank you.

14   (Prospective Juror Number 8 leaves sidebar.)

15   MS. ULRICH:  I would renew my request that he be

16   stricken.

17   THE COURT:  Yes, okay, I'm going to strike Juror 8 for

18   cause, and then we'll proceed with the peremptory challenges.

19   Okay?

20   MS. ULRICH:  Thank you, Your Honor.

21   (The discussion at sidebar was concluded.)

22   THE COURT:  Prospective jurors, you'll be happy to

23   know that concludes the questioning in this case.  The lawyers

24   are now going to exercise their challenges, and then we will

25   announce the names of those jurors who will be excused from

service in the case.  This will take a few minutes, so all we have to do is sit quietly and wait for the lawyers to do their work.

*(Whereupon, a jury of twelve with two alternates was selected.)*

THE COURT:  Jurors, I'm pleased to tell you that our selection process has concluded.  I'm going to ask Ms. Weida to call the names of -- or the numbers of those jurors who are going to be excused from this case.

If your number is called and you're now seated in the box, I would ask that you leave the jury box and take a seat on the benches on this side of the courtroom.  Ms. Weida.

COURTROOM DEPUTY:  Juror Number 1, Juror Number 2, Juror Number 3, Juror Number 4, Juror Number 6, Juror Number 8, Juror Number 15, Juror 16, Juror 17, Juror 18, Juror 20, Juror 21, Jurors 22 and 23, Juror 26, Juror 28, Juror 30, Juror 31, Juror 32, and Jurors 34, 35, 36, 37, 38, 39, and 40.

THE COURT:  The jurors in the back, you can keep your seats there.  Is the government satisfied with this jury, Ms. Taylor?

MS. TAYLOR:  Yes, Your Honor.

THE COURT:  Ms. Ulrich, is the defendant satisfied with this jury?

MS. ULRICH:  Yes, Your Honor.

THE COURT:  Ms. Weida, would you please swear the

1  jury.

2        COURTROOM DEPUTY:  Please stand and raise your right

3  hand.

4     (Jury sworn.)

5        COURTROOM DEPUTY:  Thank you.

6        THE COURT:  All right.  Jurors, I think it's a good

7  time for us to break for lunch.  It's been a long morning.

8        When you come back, let me tell you what will happen.

9  I'm going to give you some preliminary instructions, an

10  overview of what you'll hear and how the case will progress,

11  and then we'll start right into the case.  We'll hear the

12  opening statements of the lawyers, and we'll begin to hear the

13  evidence.

14        Remaining prospective jurors, I am told that there is

15  not another case in the courthouse today, so your jury service

16  with us will conclude here.  If you need to go back to the jury

17  room, maybe you've left items there or you need to check in

18  with the clerk and get your parking validated, please stop

19  there on seven and see Ms. Campbell, the jury clerk.

20        Otherwise, I thank you and the lawyers thank you for

21  your participation this morning and for your service to the

22  Middle District.  We'll be in recess until 1:30.

23        COURTROOM DEPUTY:  Court is in recess.

24     (Luncheon recess taken.)

25        THE COURT:  Counsel ready to proceed?

1    *MS. ULRICH:* Yes, Your Honor. We would just ask for a
2    sequestration order.

3    *THE COURT:* All right. Are there witnesses now in the
4    courtroom? Any witnesses are excluded.

5    Members of the jury, now that you've been sworn, I
6    have some preliminary instructions that will guide you in your
7    role in this trial. Under our system of justice, the role of
8    the jury is to find the facts of the case based on the evidence
9    presented in the trial. You must decide the facts only from
10   the evidence presented to you in this trial.

11   From the evidence that you will hear and see in court,
12   you'll decide what the facts are and then apply to those facts
13   the law that I will give you in my final instructions. This is
14   how you will reach your verdict. Whatever your verdict, it
15   will have to be unanimous. All of you will have to agree on
16   it, or there will be no verdict.

17   In the jury room, you'll discuss the case among
18   yourselves, but ultimately each of you will have to make up his
19   or her own mind. Therefore, each of you has a responsibility
20   which you cannot avoid, and you should do your best throughout
21   the trial to fulfill this responsibility.

22   I play no part in deciding the facts. You should not
23   take anything that I might say or do during the trial as
24   indicating what I think of the evidence or what I think your
25   verdict ought to be. My role is to make whatever legal

1    decisions have to be made during the course of the trial and to

2    explain to you the legal principles that must guide you in your

3    decisions.

4         You must apply my instructions about the law.  Each of

5    the instructions is important.  You must not substitute your

6    own notion or opinion about what the law is or what the law

7    ought to be.  You must follow the law that I give to you

8    whether you agree with it or not.

9         Jurors, perform these duties fairly and impartially.

10    Don't allow sympathy, prejudice, fear, or public opinion to

11    influence you in any way.  You should also not be influenced by

12    any person's race, color, religion, national ancestry, gender,

13    occupation, economic circumstances, or position in life or in

14    the community.

15         Here are some important rules about your conduct as

16    jurors.  First of all, keep an open mind.  Don't make up your

17    mind about the verdict until you've heard all of the evidence

18    and I've given my final instructions about the law at the end

19    of the trial and until you've discussed the case with your

20    fellow jurors during your deliberations.

21         Do not discuss the case among yourselves until the end

22    of the trial when you retire to the jury room to deliberate.

23    You need to allow each juror the opportunity to keep an open

24    mind throughout the entire trial.  During the trial, you may,

25    of course, talk with your fellow jurors about anything else of

1    a personal nature or of a common interest.

2          During the trial, you should not speak with any of the

3    parties, lawyers, or witnesses involved in the case, not even

4    to pass the time of day.  If a lawyer, party, or witness

5    doesn't speak to you when you pass them in the hall, ride the

6    elevator, or the like, remember that it's because they're not

7    supposed to talk or visit with you, either.

8          Do not talk with anyone else or listen to others talk

9    about the case until the trial has concluded and until you've

10   been discharged as jurors.  It's important not only that you do

11   justice in the case, but that you give the appearance of

12   justice.

13         If anybody should try to talk to you about the case

14   during the trial, please report that fact to me through my

15   courtroom deputy immediately.  Do not discuss this situation

16   with any other juror, however.

17         Do not discuss the case with anyone outside the

18   courtroom or at home, including your family and friends.  You

19   may tell your family or friends that you've been selected as a

20   juror in a case, and you may tell them how long the trial is

21   expected to last.

22         However, you should also tell them that the judge

23   instructed you not to talk any more about the case and that you

24   should not talk about it.  The reason for this is that

25   sometimes other people's thoughts can influence you.  Your

1  thinking should be influenced only by what you learn in the

2  courtroom.

3          Until the trial is over and your verdict is announced,

4  do not watch or listen to any television or radio news programs

5  or reports about the case or read any news or Internet stories

6  or articles about the case or about anyone involved with the

7  case.

8          Also, you must not do any research or make any

9  investigation on your own about any matters relating to this

10 case or this type of case.  This means, for example, that you

11 must not visit the scene, conduct experiments, consult

12 reference works or dictionaries or search the Internet for

13 additional information or use a computer, cellphone, or other

14 electronic device or any other method to obtain information

15 about the case, this type of case, the parties in the case, or

16 anyone else involved in the case.

17         You must decide the case based only on the evidence

18 presented in the courtroom and my instructions about the law.

19 It would be improper for you to try to supplement that

20 information on your own.

21         Do not use a computer, cellphone, or other electronic

22 device while in the courtroom or during your deliberations.

23 These devices may be used during breaks or recesses for

24 personal uses but may not be used to obtain or disclose

25 information about the case.

1    Finally, jurors, you should not concern yourselves

2    with or consider the possible punishment that might be imposed

3    if you return a verdict of guilty in this case.

4    During the trial, it might be necessary for me to

5    speak with the lawyers out of your hearing.  This is called a

6    bench or a sidebar conference.  If that happens, please be

7    patient.  We also ask that you advise me through my courtroom

8    deputy if you're able to hear any of the bench or sidebar

9    conferences, because the purpose is to hold these discussions

10   outside the hearing of the jury for important reasons.

11   I know you may be curious about what we are discussing

12   if that happens.  We're not trying to keep important

13   information from you.  These conferences are necessary for me

14   to discuss with the lawyers objections to evidence and to be

15   sure that the evidence is presented to you correctly under the

16   rules of evidence.  We do what we can to keep the number and

17   length of these conferences to a minimum.  If I think the

18   conference will be long, I'll call a recess for that purpose.

19   I may not always grant a lawyer's request for a bench

20   conference.  Do not consider my granting or denying a request

21   for a conference as suggesting my opinion of the case or of

22   what your verdict ought to be.

23   You'll make your decision in the case based only on

24   the evidence that you see and hear in the courtroom.  You must

25   not let rumors, suspicious, or anything else that you might see

1    or hear outside the court influence your decision in any way.

2              The evidence from which you are to find the facts

3    consists of the following:  The testimony of the witnesses;

4    documents and other things received as exhibits; and any fact

5    or testimony that is stipulated to, that is, formally agreed to

6    by the parties.

7              Jurors, the following things are not evidence:

8    Statements and arguments of the lawyers for the parties in the

9    case; questions by the lawyers and questions that I might ask.

10   You must not assume that a fact is true just because one of the

11   lawyers or I ask a question about it.  It is the witness's

12   answers that are evidence.

13             Of course, you may need to consider the question to

14   know what a witness means by his or her answer.  For example,

15   if a witness answers "yes" to a question, you'll have to

16   consider the question to understand what the witness is saying.

17             Objections by lawyers are not evidence, including

18   objections in which the lawyers state facts.  Any testimony

19   that I instruct you to strike or I tell you to disregard is not

20   evidence.  Anything that you might see or hear outside the

21   courtroom is not evidence.

22             Jurors, you'll use your common sense in weighing the

23   evidence.  Consider it in light of your everyday experience

24   with people and events and give it whatever weight you believe

25   it deserves.  If your experience and common sense tell you that

1   certain evidence reasonably leads to a conclusion, you may

2   reach that conclusion.

3        The rules of evidence control what can be received

4   into evidence.  When a lawyer asks a question or offers an

5   exhibit into evidence and a lawyer on the other side thinks

6   that it's not permitted by the rules of evidence, that lawyer

7   may object.  An objection simply means that the lawyer is

8   asking me to decide whether the evidence should be allowed

9   under the rules.

10       Lawyers have a responsibility to their clients to make

11  objections when they think evidence being offered is improper

12  under the Federal Rules of Evidence.  You should not be

13  influenced by the fact that an objection is made.

14       You should also not be influenced by my rulings on

15  objections to evidence.  If I overrule an objection, the

16  question may be answered or the exhibit may be received as

17  evidence, and you should treat the testimony or exhibit like

18  any other.

19       I may allow evidence, testimony, or exhibits only for

20  a limited purpose.  If I do that, I'll instruct you to consider

21  the evidence only for that limited purpose, and you must follow

22  that instruction.

23       If I sustain an objection, the question will not be

24  answered or the exhibit will not be received as evidence.

25  Whenever I sustain an objection, you must disregard the

1  question or the exhibit entirely.  Do not think or guess what

2  the witness might have said in answer to the question.  Do not

3  think about or guess what the exhibit might have shown.

4      Sometimes a witness may have already answered before a

5  lawyer objects or before I rule on the objection.  If that

6  happens and I sustain the objection, you should disregard the

7  answer that was given.

8      Also, I may order that some testimony or other

9  evidence should be stricken or removed from the record.  If I

10  do that, I'll instruct you to disregard that evidence.  That

11  means when you are deciding the case, you must not consider or

12  be influenced in any way by the testimony or other evidence

13  that I instructed you to disregard.

14      Although the lawyers may call your attention to

15  certain facts or factual conclusions that they think are

16  important, what the lawyers say is not evidence and is not

17  binding on you.  It is your own recollection and interpretation

18  of the evidence that will control your decision.

19      Also, do not assume from anything I do or say during

20  the trial that I have an opinion about the evidence or about

21  any of the issues in the case or about what your verdict should

22  be.

23      There are two types of evidence that may be used in

24  this trial:  Direct evidence and circumstantial evidence.  You

25  may use both types of evidence in reaching your verdict.

1          Direct evidence is simply evidence which, if believed,

2     directly proves a fact.  An example of direct evidence occurs

3     when a witness testifies about something the witness knows from

4     his or her own senses, something the witness has seen, touched,

5     heard, or smelled.

6          Circumstantial evidence is evidence which, if

7     believed, indirectly proves a fact.  It is evidence that proves

8     one or more facts from which you could find or infer the

9     existence of some other fact or facts.

10          An inference is simply a deduction or conclusion that

11     reason, experience, and common sense leads you to make from the

12     evidence.  An inference is not a suspicion or a guess.  It's a

13     reasoned, logical decision to find that a disputed fact exists

14     on the basis of another fact.

15          For example, if someone walked into the courtroom now

16     wearing a wet raincoat and carrying a wet umbrella, that would

17     be circumstantial or indirect evidence from which you could

18     conclude that it was raining.  You would not have to find that

19     it was raining out, but you could.

20          Sometimes different inferences may be drawn from the

21     same set of facts.  The government may ask you to draw some

22     inference, and the defense may ask you to draw another.  You

23     and you alone must decide what inferences you will draw based

24     on all of the evidence.

25          You should consider all the evidence that's presented

1  in this trial, both direct and circumstantial.  The law makes

2  no distinction between the weight that you should give to

3  either direct or circumstantial evidence.  It's for you to

4  decide how much weight to give to any evidence.

5       In deciding what the facts are, you must decide what

6  testimony you believe and what testimony you do not believe.

7  You are the sole judges of the credibility of the witnesses.

8  Credibility refers to whether a witness is worthy of belief.

9  Is the witness truthful?  Is the witness's testimony accurate?

10 You may believe everything a witness says or only part of it or

11 none of it.

12       You may decide whether to believe a witness based on

13 his or her behavior and manner while testifying, the

14 explanations the witness gives, and all the other evidence in

15 the case just as you would in any important matter where you're

16 trying to decide if a person is truthful, straightforward, and

17 accurate in his or her recollection.

18       In deciding the question of credibility, remember to

19 use your common sense, your good judgment, and your experience.

20 In deciding what to believe, you may consider a number of

21 factors:  The opportunity and ability of the witness to see or

22 hear or know the things about which the witness testifies; the

23 quality of the witness's knowledge, understanding, and memory;

24 the witness's appearance, behavior, and manner while

25 testifying; whether the witness has an interest in the outcome

1    of the case or any motive, bias, or prejudice.

2         You may consider any relation the witness may have

3    with the party in the case and any effect that the verdict

4    might have on the witness.

5         You may consider whether the witness said or wrote

6    anything before trial that is different from the witness's

7    testimony in court; whether the witness's testimony is

8    consistent or inconsistent with other evidence that you

9    believe; and any other facts that bear on whether the witness

10   should be believed.

11        Inconsistencies or discrepancies in a witness's

12   testimony or between the testimony of different witnesses may

13   or may not cause you to disbelieve that witness's testimony.

14   Two or more people witnessing an event may simply see or hear

15   it differently.  Mistaken recollection, like failure to recall,

16   is a common human experience.

17        In weighing the effect of an inconsistency, you should

18   consider whether it is about a matter of importance or an

19   insignificant detail.  You should also consider whether the

20   inconsistency is innocent or intentional.  You're not required

21   to accept testimony even if the testimony is not contradicted

22   and the witness is not impeached.

23        You may decide that the testimony is not worthy of

24   belief because of the witness's bearing or demeanor or because

25   of the inherent improbability of the testimony or for other

1    reasons that are sufficient to you.

2           After you make your own judgment about the

3    believability of a witness, you can then attach to that

4    witness's testimony the importance or weight that you think it

5    deserves.  The weight of the evidence to prove a fact does not

6    necessarily depend on the number of witnesses who testify.

7    What is more important than numbers is how believable the

8    witnesses are and how much weight you think their testimony

9    deserves.

10          At the end of the trial, you must make your decision

11   based on what you remember of the evidence.  Although we have a

12   court reporter here, you'll not have a written transcript of

13   the testimony to review during the deliberations.  You must pay

14   close attention to the testimony as it is given.

15          If you wish, you're permitted to take notes to help

16   you remember what witnesses said.  We've made arrangements for

17   pens, pencils, and papers.  If you take notes, please keep them

18   to yourself until the end of the trial when you and your fellow

19   jurors go to the jury room to decide the case.

20          Here are some other specific points to keep in mind

21   about note-taking:  First of all, note-taking is permitted, but

22   it is not required.  You're not required to take notes.  How

23   many notes you want to take, if any, is entirely up to you.  If

24   you do take notes, please make sure that note-taking does not

25   distract you from your duties as jurors.  You must listen to

1  all of the testimony of each witness.

2          You also need to decide whether and how much to

3  believe each witness.  That will require you to watch the

4  appearance, behavior, and manner of each witness while he or

5  she is testifying.  You cannot write down everything that's

6  said, and there's always a fear that a juror will focus so much

7  on note-taking that he or she will miss the opportunity to make

8  important observations.

9          Remember that your notes are memory aids, they're not

10 evidence.  Notes are not a record or a written transcript of

11 the trial.  Whether or not you take notes, you'll need to rely

12 on your own memory of what was said.  Notes are only to assist

13 your memory.  You should not be overly influenced by your notes

14 if you do decide to take them.

15         In your deliberations, you must not give any more or

16 less weight to the views of a fellow juror just because that

17 juror did or did not take notes.  Don't assume that just

18 because something is in someone's notes, that it necessarily

19 took place in court.  It's just as easy to write something down

20 incorrectly as it is to hear or remember it incorrectly.

21         Notes are not entitled to any greater weight than each

22 juror's independent memory of the evidence.  You should rely on

23 your own individual and collective memories when you deliberate

24 and reach your verdict.

25         At the end of the trial, do not take your notes away

1  from the court.  At the end of each day and during breaks,

2  leave your notes in the jury room.  At the conclusion of the

3  case, after you've used your notes in deliberations, a court

4  officer will collect and destroy them in order to protect the

5  secrecy of your deliberations.

6        Jurors, I'm now going to briefly outline the charges

7  brought against the defendant in this case.  The government has

8  charged the defendant, Christopher Mark Heath, with violating

9  federal law, specifically Title 18, United States Code, Section

10  924(c)(1)(A) and 1956(h), and Title 21, United States Code,

11  Sections 841(a)(1) and 846.

12        Count 1 of the indictment charges Christopher Mark

13  Heath with conspiracy to manufacture, distribute, and possess

14  with the intent to manufacture and distribute 100 kilograms or

15  more of marijuana in violation of Title 21, United States Code,

16  Section 846.  Title 21, United States Code, Section 846,

17  provides, in relevant part, that it shall be unlawful for

18  persons to conspire to commit any offense in violation of

19  federal controlled substances law.

20        Count 2 charges Christopher Mark Heath with conspiracy

21  to commit money laundering in violation of Title 18, United

22  States Code, Section 1956(h).  Title 18, United States Code,

23  Section 1956(h), provides, in relevant part, that it shall be

24  unlawful for persons to conspire to commit money laundering.

25        Title 18, United States Code -- Count 18 charges

1  Christopher Mark Heath with manufacturing, distributing, and

2  possessing with the intent to manufacture and distribute

3  marijuana in violation of Title 21, United States Code, Section

4  841(a)(1).

5       Title 21, United States Code, Section 841(a), provides

6  that it shall be unlawful for any person knowingly or

7  intentionally to manufacture, distribute, or dispense or

8  possess with intent to manufacture, distribute, or dispense a

9  controlled substance.

10      Count 19 charges Christopher Mark Heath with

11  possession of a firearm in furtherance of drug trafficking in

12  violation of Title 18, United States Code, Section

13  924(c)(1)(A).  Title 18, United States Code, Section

14  924(c)(1)(A) provides, in relevant part, that it shall be

15  unlawful to possess a firearm in furtherance of a drug

16  trafficking crime.

17      The charges against Christopher Mark Heath are

18  contained in the indictment.  An indictment is just the formal

19  way of specifying the exact crimes a defendant is accused of

20  committing.  An indictment is simply a description of the

21  charges against a defendant.  It's an accusation only.  An

22  indictment is not evidence of anything, and you should not give

23  any weight to the fact that Christopher Mark Heath has been

24  indicted in making your decision in this case.

25      After the evidence has been presented, I'll instruct

1  you on the law in greater detail.  At the end of the trial,

2  I'll also give you final instructions on the elements of the

3  offenses charged and on other matters of law.  Those final

4  instructions will be more detailed.  They will guide you in

5  reaching your verdict in this case.

6         As I mentioned, the defendant, Mr. Christopher Mark

7  Heath, has pleaded not guilty to the offenses charged.  The

8  defendant is presumed to be innocent.  He starts the trial with

9  a clean slate with no evidence against him.  The presumption of

10 innocence stays with the defendant unless and until the

11 government presents evidence that overcomes that presumption by

12 convincing you that Christopher Mark Heath is guilty of the

13 offenses charged beyond a reasonable doubt.

14        The presumption of innocence requires that you find

15 the defendant not guilty unless you are satisfied that the

16 government has proved guilt beyond a reasonable doubt.  The

17 presumption of innocence means that Christopher Mark Heath has

18 no burden or obligation to present any evidence at all or to

19 prove that he is not guilty.  The burden or obligation of proof

20 is on the government to prove that Christopher Mark Heath is

21 guilty, and this burden stays with the government throughout

22 the trial.

23        In order for you to find the defendant guilty of the

24 offenses charged, the government must convince you that

25 Christopher Mark Heath is guilty beyond a reasonable doubt.

1    That means that the government must prove each and every

2    element of the offenses charged beyond a reasonable doubt.  A

3    defendant may not be convicted based on suspicion or

4    conjecture, but only on evidence proving guilt beyond a

5    reasonable doubt.

6        Proof beyond a reasonable doubt does not mean proof

7    beyond all possible doubt or proof to a mathematical certainty.

8    Possible doubts or doubts based on conjecture or speculation

9    are not reasonable doubts.  A reasonable doubt is a fair doubt

10    based on reason, logic, common sense, or experience.

11        A reasonable doubt means a doubt that would cause an

12    ordinary, reasonable person to hesitate to act in matters of

13    importance in his or her own life.  It may arise from the

14    evidence or from the lack of evidence or from the nature of the

15    evidence.

16        If, after hearing all of the evidence, you're

17    convinced that the government has proved Christopher Mark Heath

18    guilty beyond a reasonable doubt, you should return a verdict

19    of guilty.  However, if you have a reasonable doubt as to an

20    element of an offense, then you must return a verdict of not

21    guilty.

22        As you have heard, Christopher Mark Heath is charged

23    with more than one offense.  Each offense is charged in a

24    separate count of the indictment.  The number of offenses

25    charged is not evidence of guilt, and this should not influence

1   your decision in any way.

2        You must separately consider the evidence that relates

3   to each offense, and you must return a separate verdict for

4   each offense.  For each offense charged, you must decide

5   whether the government has proven guilt beyond a reasonable

6   doubt.  Your decision on one offense, whether guilty or not

7   guilty, should not influence your decision on any of the other

8   offenses charged.  Each offense should be separately

9   considered.

10       The order of the trial's proceedings will be as

11  follows:

12       In just a moment, the lawyers will have an opportunity

13  to make opening statements to you.  The prosecutor may make an

14  opening statement at the beginning of the case.  Defendant

15  Christopher Mark Heath's lawyer may make an opening statement

16  after the prosecutor's opening statement or the defendant may

17  postpone the making of an opening statement until after the

18  government has concluded presenting its evidence.  Christopher

19  Mark Heath is not required, through his lawyer, to make an

20  opening statement.

21       The opening statements are simply an outline to help

22  you understand what each party expects the evidence will show.

23  What is said in opening statement, as I indicated prior, is not

24  itself evidence.

25       After opening statements, the government will

introduce the evidence that it thinks proves the charges stated in the indictment. The government will present witnesses, and the defendant's lawyer may cross-examine those witnesses. The government may also offer documents and other exhibits into evidence.

After the government has finished presenting its evidence, which it signals by announcing "rest," the defendant may present evidence, but he is not required to do so. As I have told you, the government always has the burden or obligation to prove each and every element of the offenses charged beyond a reasonable doubt.

The defendant is presumed to be innocent of these charges. Therefore, the law never imposes on a defendant in a criminal case the burden of proving his innocence by calling any witnesses, producing any exhibits, or introducing any evidence.

Within certain limitations, the government may be permitted to again call witnesses or present evidence when the defendant rests during what we call the rebuttal phase of the trial. The government proceeds first and may rebut at the end because the law places the burden of proof upon the government.

After all of the evidence has been presented, the lawyers will have the opportunity to address you again in closing arguments. Closing arguments are designed to present to you the parties' theories about what the evidence has shown

1 and what conclusions may be drawn from the evidence. What is

2 said in closing arguments is not evidence, just as what is said

3 in opening statements is not evidence.

4 After you've heard the closing arguments, I'll give

5 you the final instructions concerning the law that you must

6 apply to the evidence presented during the trial. As I'm doing

7 now, I may also give you instructions on certain aspects of the

8 law throughout the trial, as well as at the end of the trial.

9 After my final instructions to you on the law, you'll

10 retire to consider your verdict. Your deliberations are

11 secret. You will not be required to explain your verdict to

12 anyone. Your verdict, as I said, must be unanimous. All 12

13 jurors must agree to it.

14 Jurors, thank you very much for your patience. Jury

15 trials are the culmination of many months and sometimes years

16 of preparation. The court and the parties have expended

17 significant resources prior to coming here today.

18 Despite the lawyers' and the court's work in preparing

19 the case to present it to you, I want to reemphasize that it's

20 ultimately your role as jurors to determine the facts of the

21 case. You must therefore try to be as attentive as you can be

22 and keep an open mind until all of the evidence has been

23 presented.

24 Don't make up your mind about any of the questions in

25 the case until you've heard each piece of evidence and all of

1    the law that you must apply to that evidence, in other words,

2    until you begin your final deliberations.

3            Our system of justice entrusts you, the jury, with the

4    solemn responsibility of deciding the facts of the case, and,

5    of course, it's your duty now to fulfill that responsibility.

6    So I ask that you now give counsel your attention as I

7    recognize them for the purpose of making their opening

8    statements.  For the government.

9            *MS. TAYLOR:*  Thank you, Your Honor.  May it please the

10   court, good afternoon, ladies and gentlemen.

11           The defendant in this case, Christopher Mark Heath, is

12   a drug dealer.  In December of 2015, he came to the Middle

13   District of Pennsylvania to deliver 18 large duffel bags that

14   were full of marijuana to a customer that he had here in

15   Pennsylvania, along with his co-defendants.

16           Now, this quantity of marijuana was enough to fill up

17   the back of the F250 pickup truck that he was driving, and what

18   you're going to hear is that it was about 89.5 kilograms of

19   marijuana.

20           The evidence will show that he and his co-defendants

21   grew this marijuana in California where they lived.  They

22   harvested it, they packaged it for sale, and they -- they were

23   selling it, and they brought it here to Pennsylvania to

24   distribute it, as well.  But that's not how their organization

25   started out.

1       Initially, they were selling their marijuana to this

2  Pennsylvania customer through the mail.  And you'll hear

3  that -- you're going to hear about that from one of Mr. Heath's

4  co-defendants, Tyler Long, because as you heard Judge Kane

5  explain, the defendant is charged with conspiracy to distribute

6  and possess with the intent to distribute a hundred kilograms

7  of marijuana and more.  And they managed to pull this off for a

8  while, to mail packages from California to Pennsylvania to this

9  customer, and then payment for these packages would be mailed

10  back from Pennsylvania to California.

11       And what you're going to hear is the way they did that

12  was because one of their other co-defendants was a U.S. postal

13  employee.  So that person was able to handle the packages and

14  get them shipped without it being detected that it was

15  marijuana.  But eventually someone caught on, and they had to

16  come up with a new plan.  They had to make a change, and that's

17  when they got caught.

18       So Mr. Heath and the two co-defendants that he was

19  growing with, growing the marijuana with, harvesting it with,

20  and packaging it with decided that they couldn't mail it

21  anymore, so they were going to drive it out to Pennsylvania.

22  They were going to drive the next load from California to

23  Pennsylvania.

24       So what the evidence will show is that two of the

25  co-defendants drove in one truck that had no drugs in it.  And

1    they loaded all the drugs in these duffel bags in the

2    defendant's truck, and he drove that one.  He drove by himself

3    in the truck that had all of the marijuana in it.

4          They arrived here in the Middle District in the York

5    area on December 28th, 2015.  They arrived close to midnight.

6    They were at a house that they had never been before.  They're

7    delivering this shipment of what you're going to hear has a

8    value of just under a half a million dollars.  They're

9    delivering it to a man that the three of them have never met

10   before.  These transactions have been set up via text message

11   in an area that they are unfamiliar with.

12         But there are three of them.  Mr. Heath is in one

13   truck.  There's another truck with his two co-defendants.  And

14   you'll also hear that the defendant has a gun.  And as you've

15   already heard, that's really why we're all here today.  This

16   case is really about the gun charge.

17         As Ms. Ulrich already told you, the drug charges in

18   this case are uncontested.  The fact that --

19         *MS. ULRICH:*  Objection, Your Honor.  If we may

20   approach.  May we approach?

21       *(The following discussion occurred at sidebar:)*

22         *MS. ULRICH:*  There are a couple problems, but, one,

23   they're not supposed to anticipate our defense, although I know

24   you can because in voir dire I did open the door, but I never

25   said that we agreed one hundred percent.  I mean, that's

1  something that I'm expecting the government to prove.  In

2  opening, the government is not supposed to anticipate a

3  defense, but, again, I opened the door in voir dire for that,

4  but I never said anything about one hundred percent.  So that's

5  my objection.

6          MS. TAYLOR:  Your Honor, the voir dire stated to the

7  jury that the drug charges were uncontested.

8          THE COURT:  She said he admits that he dealt drugs.

9  What difference does it make?  I mean, it makes a difference to

10  her, but not to you.  You don't need to say that in your

11  opening.

12          MS. TAYLOR:  Ms. Ulrich and I have had a number of

13  conversations about this, and a number of emails have gone back

14  and forth, and in the voir dire, it has changed.  And what I

15  said to her on a number of occasions is it makes a big

16  difference in terms of what we put on in terms of testimony.

17          THE COURT:  We had that conversation in chambers this

18  morning, and you said you wanted to put on testimony of the

19  drug charges.

20          MS. TAYLOR:  Money laundering charge.

21          THE COURT:  I heard her say prove all the charges.

22          MS. ULRICH:  That's the thing the government does have

23  to prove.  We're putting the government to their burden of

24  proof.  It's improper for the prosecution to anticipate a

25  defense in an opening statement because we have no burden

1   whatsoever.  You just have to argue your case.

2         MS. TAYLOR:  Your Honor, I'm happy to -- Mr. Terz and

3   I have had this conversation, but our understanding, because I

4   certainly would not say it otherwise and I would not have

5   addressed the money laundering charges, is the drug charges

6   were uncontested and that the money laundering and the gun

7   charge were contested.

8         MS. ULRICH:  We're not -- we're in the middle of a

9   trial.  I'm not admitting to anything.  If I were admitting,

10  I'd sign a stipulation.  We're putting the government to the

11  burden of proof.  We're not contesting to a certain extent, but

12  it's still your burden to prove it.  I'm not relieving you of

13  your burden.

14        MS. TAYLOR:  Your Honor, I think I need to take a

15  break, because I'm telling you, Mr. Terz and the agents and the

16  witnesses are under a different impression.

17        THE COURT:  I don't understand what that would

18  accomplish.

19        MS. TAYLOR:  The only thing that Ms. Ulrich and I have

20  discussed is that the issue was that we would not -- she's

21  stipulating that it's marijuana.  The only thing we had an

22  issue on was as to the weight and that we were going to put on

23  Agent Myers about the weight.  That was it.

24        MS. ULRICH:  You have a burden to prove all the

25  elements of the crimes charged.  You should not be relying on

1    what I said we're not contesting.  The burden is always with

2    the government.  That's what you should be arguing in your

3    opening, what you're going to prove, not what we're going to

4    do, what you're going to prove.  It's improper for the

5    government to anticipate a defense in their opening.

6            THE COURT:  So I think we just need to move on.  She's

7    not -- we now have whatever clarification we need.  She's not

8    confessing to any of the charges.

9            MS. TAYLOR:  Your Honor --

10           THE COURT:  She's not conceding the full charges.  The

11   government has to prove everything.

12           MS. TAYLOR:  And I'm happy to amend it and say they're

13   largely uncontested.

14           MS. ULRICH:  Just say what you're going to prove.

15           MS. TAYLOR:  I'll just explain he confessed.  I'll

16   just explain the evidence will show he's confessed.

17           MS. ULRICH:  You can say he gave a statement, this is

18   what he said.  You can talk about a statement he made to

19   police.  That's evidence you're going to present.

20           MS. TAYLOR:  I'm just afraid the record is not clear.

21           THE COURT:  The record is clear.  I don't know how it

22   could be more clear.

23           MS. TAYLOR:  Very well.

24           THE COURT:  Okay.

25        (The discussion at sidebar was concluded.)

1    MS. TAYLOR:  Ladies and gentlemen, what you're going

2  to hear in the evidence is that the defendant is a drug dealer.

3  You're going to hear that he confessed to his drug dealing

4  activities.

5         You're going to hear that he explained that right

6  after the arrest to Detective Schauer, who was present at the

7  time of his arrest and who, after giving him his Miranda

8  rights, spoke with him for a period of just under two hours.

9  And you'll see -- you'll hear from this detective, and you'll

10  see a written statement that the detective took.

11         You'll also hear from that detective that during that

12  statement, the defendant also talked about his engaging in the

13  money laundering activities that he's charged with, and he

14  admitted that the money that he was expecting to be paid for

15  his drug trafficking activities was going to go, in part, to

16  this winery business that he was going to use -- that he had

17  bought for his wife.

18         Now, I want to talk just a minute about the gun

19  charge.  What is charged in this case is possession of a

20  firearm, possession or carrying of a firearm in furtherance or

21  during or in relation to drug trafficking.

22         What the government has to establish for that charge

23  beyond a reasonable doubt are basically three elements:  That

24  the defendant was engaged in drug trafficking, which you'll

25  hear that he himself admitted to; that while he was engaged in

the drug trafficking, that he knowingly possessed a firearm; and, finally, that the possession of that firearm was in furtherance of drug trafficking or in relation to a drug trafficking crime.

Now, Judge Kane, at the end of all the evidence, is going to give you very detailed instructions on what each of these elements mean.  But before you hear from the witnesses and see the evidence, I just wanted to touch on some of these definitions just briefly so you have an idea of what you're looking for.

So possession, in a legal sense, can come in two forms.  You can have actual possession of something where you're physically holding something, or you can have constructive possession.  With constructive possession, you have the power and intention to control an object.  And if the firearm is within the defendant's possession -- within the defendant's control, then he was in possession of it.  For the definition of carrying under this count that the defendant is charged with in the indictment, if he possessed the firearm, then he was carrying it.

Now, in order to know whether the government is going to meet the elements of this charge beyond a reasonable doubt, you need to know the rest of the story.  What the evidence is going to show is that when the defendant and his co-defendants drove this truckload of marijuana out to the York area back in

1　December of 2015 for this Pennsylvania customer, law

2　enforcement was notified and was waiting.

3　　　　The defendant was taken into custody at that time.

4　There was an undercover detective present at the scene.  You're

5　going to hear from him, as well.  He will explain exactly how

6　everything occurred, how both trucks were present, who was in

7　each truck.  You're going to hear from Mr. Heath's

8　co-defendant, who was also in the other truck without the

9　marijuana.

10　　　　You'll hear -- you'll see the physical evidence that

11　was seized as a result of the arrest that night.  You'll see

12　the gun that was recovered, and you'll hear from the detective

13　who recovered it from Mr. Heath's truck.  And it was found in

14　the backseat of his truck in his suitcase, in the outer zipper

15　pocket, just in the backseat right behind the driver's seat.

16　He'll explain where it was found.

17　　　　You'll see the gun, the loaded -- the magazines that

18　were with it, and you'll see at least a sample of the marijuana

19　that was taken out of the truck.  You're going to see how large

20　a box at least a portion of the marijuana fit in.  And you'll

21　hear that the total would fill up, does fill up 27 of those

22　boxes, which, for everyone's sake, we won't be bringing in the

23　courtroom, primarily for the smell.

24　　　　When you hear from Mr. Heath's co-defendant, Tyler

25　Long, he's going to tell you more, though, than just about that

1  particular trip.  He's going to be able to tell you about his

2  relationship with Mr. Heath.  He's going to tell you about

3  other trips where Mr. Heath drove for him, where he delivered

4  other truckloads of marijuana.

5          He's going to tell you about other instances where

6  Mr. Heath brought marijuana to him for him to sell that he had

7  gotten from his employment as a deputy sheriff.  And you'll see

8  and hear a lot of stipulations in this case, because as you've

9  heard, there are a lot of facts that just simply aren't

10  contested.

11          You'll also see that the gun in the case in terms of

12  the possession element was just behind the front seat, in the

13  backseat, where you'll have to make a determination as to

14  whether it was accessible.  And what you'll hear from the judge

15  at the end of the trial is that there are a number of factors

16  that will be given to you that will help you determine whether

17  the possession of this firearm was in furtherance of drug

18  trafficking.

19          And some of those factors are:  The accessibility of

20  the firearm, the type of firearm, the type of criminal act that

21  was occurring, whether it was loaded, the proximity to drugs,

22  and the circumstances where the firearm was found.

23          You'll also see that on this trip, besides the

24  stipulations that indicate that the gun is, in fact, registered

25  to Mr. Heath and owned by him, you'll also see that his badge

1    from his employment as a deputy sheriff with Yuba County was
2    found in the center console of the truck, as well.

3         And as Judge Kane told you, at the end of all the
4    evidence, I'll have an opportunity to stand before you again
5    and discuss what you've heard, discuss all the evidence, the
6    witnesses that you've heard and the evidence that you've seen,
7    and I'll ask you to convict Mr. Heath of all of the charges
8    that he's facing.  Thank you.

9         *THE COURT:*  Ms. Ulrich.

10        *MS. ULRICH:*  Thank you.  May it please the court,
11   Ms. Taylor, Mr. Terz, ladies and gentlemen of the jury, this is
12   a case about mere possession.  And when I say "mere
13   possession," I mean mere possession of the firearm.

14        Mr. Heath -- and by the way, his name is -- I call him
15   Mark Heath, so if I say Mark Heath, I mean Christopher Mark
16   Heath.  Mr. Heath does not dispute that he conspired with Tyler
17   Long to distribute marijuana.  Mr. Heath does not dispute that
18   he took some proceeds from the sale of marijuana and put it
19   into a failed winery business.

20        What he does dispute is whether or not he possessed --
21   what he does dispute is that he possessed a firearm in
22   furtherance of drug trafficking or that he used or carried the
23   firearm during, in relation to drug trafficking.

24        Now, those terms seem pretty straightforward.  Carry,
25   the gun was in the truck, he carried, he possessed it.  I mean,

1    what else is there?  But in the legal definition, it's not just

2    a matter of whether or not he carried or possessed the firearm,

3    and the court will give you the law on this.

4          The standard is that -- the question is whether he

5    possessed the firearm in furtherance of drug trafficking.  Mere

6    presence of a firearm is not enough for a conviction for

7    possession in furtherance of drug trafficking.  That firearm

8    has to be there to promote, advance, and assist the goals of

9    drug trafficking.

10          And there are a number of factors that the court will

11    tell you that you can consider in deciding whether a firearm is

12    possessed in furtherance of drug trafficking.  And Ms. Taylor

13    gave you a few, but there are a few others that you need to

14    consider.  And that is whether the gun was stolen.  In this

15    case, you'll find the gun was not stolen.  In fact, it was

16    registered to Mr. Heath.

17          The other question -- the other factor you can

18    consider is whether it was a lawfully possessed firearm.  And

19    you will hear, through the course of the evidence, that this

20    was a lawfully possessed firearm.  In fact, you can consider

21    all the surrounding circumstances to decide whether a firearm

22    was possessed in furtherance of drug trafficking.

23          The other standard is whether he used or carried a

24    firearm during and in relation to drug trafficking.  And,

25    again, a lot of the factors are the same.  The question is, did

1   it have -- was the purpose or effect in relation to a drug

2   trafficking crime?  Did the firearm facilitate or have the

3   potential of facilitating the drug trafficking crime?

4        And, again, you can consider a number of factors in

5   deciding whether or not that gun was carried in relation to a

6   drug trafficking crime.  The government has the burden, as

7   you've already heard, the burden to prove each and every

8   element of the crime charged beyond a reasonable doubt.

9        The evidence is going to show Mr. Heath is 38 years

10   old.  He grew up in the Midwest.  He went into the Marine Corps

11   in 1998, and he was in the Marine Corps from about 1998 to

12   2002.  And when he was in the Marine Corps, he met his now

13   wife, Tatum Long.

14        Tatum Long is the sister of Tyler Long, an individual

15   that you heard about in Ms. Taylor's opening.  It's actually --

16   he was the one who had the connection in York County.  He's the

17   one that set up the drug transaction with this individual.

18   He's the one that knew the individual in York, Tyler Long.

19   Mr. Heath is married to his sister, Tatum Long.  They met in

20   the Marine Corps.  They have two children, Sydney, who is 14,

21   and Trinity, who is eight.

22        After they got married, they moved to California.

23   That's where the Longs are from.  The other co-defendant in

24   this case is Ramona Long.  She happens to be the mother of

25   Tyler Long and Tatum Long.  They moved to California where the

1    Longs reside.  When he got there, he worked in a sawmill for a

2    time, and then he did start working for the Yuba County

3    Sheriff's Department, and that was in about 2003.

4           And he is not proud of that fact, that this occurred

5    while he was in the sheriff's department.  He knows that's a

6    bad thing.  It gives all police officers bad names, and, of

7    course, he totally regrets it.  He knows he misused the office,

8    he knows he ruined his life, and he knows he ruined his family.

9    But he is taking responsibility for what he did.  He did wrong,

10   and there's no doubt about it.

11          And he admits, of course, I've already told you, that

12   he was dealing in marijuana while he was a sheriff, but it's

13   the firearm that I want you to look at.  It was a .40 caliber

14   Glock.  It was a gun that was lawfully possessed and legally

15   carried.  In fact, the Yuba County Sheriff's Department -- and

16   you will hear this -- had regulations for their sheriffs and

17   what they had to do in order to carry firearms off duty.

18          They had to get certified to carry that gun over the

19   course of their employment with the sheriff, and that's

20   something he did, and that's something you're going to hear.

21   Through the course of his time in the sheriff's department, he

22   qualified to carry this same handgun, this .40 caliber Glock,

23   and you'll see that.

24          They have regs, regulations, regarding carrying off

25   duty, and they're permitted, he followed those regulations,

1    regulations regarding the storage of these firearms at home,

2    regulations concerning the carrying of these firearms out of

3    state.  He complied with these regulations.

4         He had a gun on December 28th, and, yes, there was

5    marijuana in the bed of his truck.  Mr. Heath carried this gun

6    not just when there was marijuana, it was something he did.  He

7    carried this gun when he was off duty.  If that means he was

8    running an errand or he was in California doing personal

9    business unrelated to marijuana, he carried that gun.

10        This gun was not possessed in furtherance of drug

11   trafficking, nor was it carried during, in relation to a drug

12   trafficking crime.  That was not his intent in having that gun

13   with him, and that is what the evidence is going to show.

14        And at the end of this case, after you've listened to

15   all the evidence, considered all the factors, we are going to

16   be asking that you find him not guilty of possessing a firearm

17   in furtherance of drug trafficking and not guilty of carrying

18   that firearm during, in relation to drug trafficking.  Thank

19   you.

20        *THE COURT:*  Thank you, counsel.  The government's

21   first witness.

22        *MS. TAYLOR:*  The United States would call Detective

23   Russell Schauer.

24        *RUSSELL SCHAUER, called as a witness, having been duly*

25   *sworn or affirmed, testified as follows:*

1   *COURTROOM DEPUTY:*  For the record, please state your
2   full name.
3          *THE WITNESS:*  It's Russell Schauer, S-c-h-a-u-e-r.
4          *COURTROOM DEPUTY:*  Thank you.  You may be seated.
5                          DIRECT EXAMINATION
6   BY MS. TAYLOR:
7   Q.  Good afternoon, sir.  Could you tell the ladies and
8   gentlemen of the jury how you're employed?
9   A.  I'm a detective with the Springettsbury Township Police
10  Department.  It's a department in York County, Pennsylvania.
11  Q.  And how long have you been with Springettsbury?
12  A.  I've been there since December of 2003.
13  Q.  Are you affiliated with any task force?
14  A.  I am.  Since March of 2008, I've been assigned as a
15  full-time member to the York County Drug Task Force.  The drug
16  task force primarily investigates drug cases; however, we do
17  get involved with some other crimes, such as thefts and guns.
18  Q.  Now, I don't know if you can see over the podium, but do
19  you recognize anyone at the defense table over here?
20  A.  I do.
21  Q.  And who is that?
22  A.  It's Christopher Mark Heath, the subject seated at the
23  trial table wearing a green shirt and a blue tie.
24  Q.  How do you know Mr. Heath?
25  A.  Through an investigation December 28th, 2015.

1    Q.  Were you involved in arresting the defendant?

2    A.  I was.

3    Q.  Can you explain to the jury how that investigation and

4    Mr. Heath's arrest came about?

5    A.  Sure.  In the middle of December of 2015, myself and Travis

6    Shearer, another police officer, met with a confidential

7    informant who relayed to us that they were obtaining large

8    quantities of marijuana --

9         *MS. ULRICH:*  Your Honor, objection to anything the

10    informant said.  That's hearsay.

11         *THE COURT:*  Sustained.

12    BY MS. TAYLOR:

13    Q.  When you -- you and Sergeant Shearer learned through your

14    investigation that there was an individual receiving marijuana

15    shipments in this area.  Right?

16    A.  Yes.

17    Q.  Did you learn from that informant where the marijuana

18    shipments were coming from?

19         *MS. ULRICH:*  Your Honor, objection.  I mean, she's

20    asking him to do the same thing.  It's hearsay.

21         *THE COURT:*  Sustained.

22    BY MS. TAYLOR:

23    Q.  Based on your investigation with the informant, did you set

24    up a controlled purchase involving marijuana?

25    A.  Yes.

1    Q.   And that was around mid to late December of 2015?

2    A.   Yes, ma'am.

3    Q.   How were those -- how was that transaction set up?

4    A.   It was set up through phone calls and text messages.

5    Q.   Those phone calls and text messages, did you -- the text

6    messages, anyway, were those memorialized?

7    A.   Yes.

8    Q.   Was there a payment that had to be made out to the

9    California source?

10    A.   Yes.

11    Q.   Who was the California source?

12    A.   Tyler --

13        MS. ULRICH:   Objection, unless he's going to

14    explain -- you know, there's no foundation is my objection.

15        THE COURT:   Yes.   Let's have foundation.   First of

16    all, Detective, can you explain the controlled purchase?   What

17    is that?   How does it work?

18        THE WITNESS:   A controlled purchase is just that, the

19    police are controlling the purchase of something, a commodity.

20    In our business, it's drugs.   So we're controlling that by --

21    first off, we take money, we call it official funds.   So we'll

22    take some money and we'll photocopy or photograph or somehow

23    record all the serial numbers of that money.

24        And then we will control the person who is going to

25    purchase those narcotics using our money, our official funds.

1    So the whole process is controlled by police, by us viewing the

2    actual purchase take place.

3              THE COURT:  And how did you apply that here?

4              THE WITNESS:  We applied that here, we knew that

5    $7,000 had to go to California to obtain a large amount of

6    marijuana, so I photographed, myself and Detective Shearer, we

7    photographed the $7,000.

8              The money had to be packaged a specific way.  The

9    money was vacuum-sealed in one bag.  It was then put into

10   another vacuum-sealed bag with dryer sheets.  All the edges

11   were duct-taped.  It was then taken to a post office, put in

12   priority mail, and sent to California using a tracking number.

13   BY MS. TAYLOR:

14   Q.  And at some point were you informed that the marijuana

15   shipment was being delivered here?

16   A.  Yes.

17   Q.  Did you receive a specific date, or were you informed on

18   the date?

19   A.  I was informed on the date, that date being December 28th,

20   2015.

21   Q.  Did you know how much marijuana you were expecting?

22   A.  No.  I knew an approximate weight but not a definite

23   number.

24   Q.  And how was it coming, through the mail?

25   A.  It was being driven -- originally, it was coming through

1    the mail.  But on this particular date, it was being driven

2    from California to Pennsylvania.

3    Q.  And were you yourself expected to take delivery of it?

4    A.  Not me, but an undercover officer posing as a worker for

5    the York County side would have taken possession of it.

6    Q.  For the actual delivery, were you present?

7    A.  I was close to the actual delivery.  I was about a hundred

8    yards away.

9    Q.  What was your role on that evening?

10   A.  My role is what we would consider an eyeball.  I was at a

11   distance away, and I was watching what was taking place.  Like

12   I said, we had an undercover officer, that being Travis

13   Shearer.  He was at the exact location watching what was

14   happening.

15   Q.  Were you able to see the vehicles with the marijuana

16   shipment arrive?

17   A.  I did.

18   Q.  And what type of vehicles did the marijuana arrive in?

19   A.  They were two Ford F250 trucks.

20   Q.  So when they arrived, what happened?

21   A.  When they initially arrived, this kind of sets the stage at

22   the informant's house.  It's a very rural part of York County.

23   This was at 11 o'clock at night in December, and it was

24   raining, very dark.

25           Two trucks were traveling south.  They traveled south

1　past the informant's house in tandem, one behind one another,

2　at a very slow pace.  The informant's house wasn't clearly

3　marked, so we could immediately tell that these trucks were

4　looking for the informant's house.

5　　　　　They traveled about a hundred yards down the road,

6　turned around, came by the informant's house again at the same

7　slow pace.  We saw them turn around again and now go back to

8　the informant's house except this time they turned into the

9　driveway of the informant's residence.

10　Q.  Now, before they arrived, did you know how many people to

11　expect to make the delivery?

12　A.  I knew one for sure.  I suspected two based on text

13　messages that were received.

14　Q.  And did you know who the people would be?

15　A.  No.

16　Q.  When the two trucks pull into the driveway of the

17　residence, what happened then?

18　A.  I received information from Detective Shearer.  He was

19　going to notify me, give me a signal once he observed marijuana

20　in either one of the vehicles.  He observed the marijuana and

21　then gave me that signal.  That signal was him illuminating the

22　lights of his vehicle by the remote.  He gave the signal, and

23　we approached into the informant's residence.

24　Q.  Now, besides Detective Shearer, who was the undercover

25　officer, were you the only other officer present?

A.  No, there were several other officers present as far as
what we would call an arrest team.

Q.  So when Detective Shearer gave the signal that he had
observed the marijuana, you and the other officers on the
arrest team approached the house.  Is that right?

A.  Yes.

Q.  And when you did that, what happened?

A.  As we approached, I detained the informant, who was at that
point directly in front of my vehicle.  I then observed two
trucks, one being a silver Ford F250.  To the right side of the
bed of the truck was Mr. Heath.  I observed Officer Miller
arrest him and Trooper Dembowski obtain property off of him.

    I provided him with Miranda warnings, asked him his
name.  He stated Christopher Heath.  And I moved on to another
person who was identified as Tyler Long.  I arrested him and
provided him with Miranda warnings.

Q.  At the time when you first encountered the defendant on the
scene and gave him his Miranda warnings, did he inform you that
he was employed as a deputy sheriff?

A.  No.

Q.  Did he say anything to you about being there in his
capacity as a law enforcement officer?

A.  No.

Q.  You said that your first action was to take the informant
into custody.  Why did you do that?

1  A.  We arrested the informant to try to make it look good, to

2  try to give the impression at that particular time that the

3  informant has nothing to do with why these subjects are under

4  arrest.

5  Q.  Certainly at the time that you and the other officers are

6  taking the -- what turned out to be three individuals into

7  custody, you want the scene to stay as safe and secure as

8  possible.  Right?

9  A.  Yes, ma'am.

10  Q.  How about the undercover officer, what happened with him?

11  A.  Another officer, a uniformed officer did arrest him, which

12  I wasn't present for.

13  Q.  Why would an undercover officer be taken into custody?

14  A.  For the same reason, it's to give the appearance that these

15  people are not involved with the actual arrest of the people

16  from California, as well as to protect the informant.

17  Q.  So once the three individuals who were driving the vehicles

18  were taken into custody, what happened?

19  A.  We also observed -- when they were being taken into

20  custody, Tyler Long was put into my vehicle.  There were some

21  black bags and some duffel bags that were on the ground.  Those

22  were placed into the silver truck.  Three of them were placed

23  into my truck.  And everybody, to include the vehicles, were

24  all transported to the Penn Township Police Department.

25  Q.  So in terms of going through anything of evidentiary value

1    or trying to determine what was in any of the bags, was any of

2    that done on the scene right there?

3    A.  No.

4    Q.  I think you mentioned before it was raining.  Right?

5    A.  Yes.

6    Q.  And it was what time of day?

7    A.  This would have been almost midnight, I believe 11:50,

8    11:55 p.m.

9    Q.  So everyone and all the items, including the vehicles, were

10   taken back to the station?

11   A.  Yes.

12   Q.  Did you transport Mr. Heath or either of the other

13   co-defendants?

14   A.  I transported Tyler Long.

15   Q.  Once you got back to the station, what did you do?

16   A.  Once we got back to the station, I began interviewing Tyler

17   Long, questioning as far as why he was here, what he was doing,

18   who were the other two people that were with him.  And he just

19   kind of said he was here --

20        MS. ULRICH:  Objection to anything Mr. Long said.

21   That's hearsay.

22        THE COURT:  Counsel.

23   BY MS. TAYLOR:

24   Q.  Now, before you spoke with Mr. Long, did you provide him

25   with his Miranda rights?

1    A. I did.

2    Q. Both when you Mirandized Mr. Heath on the scene and

3    Mr. Long at the station, were these rights given verbally or

4    did you provide them with a Miranda form?

5    A. It was verbally.

6    Q. Is that your standard practice?

7    A. Yes, ma'am.

8    Q. When you interviewed Mr. Long at the station, was his

9    interview recorded?

10    A. No.

11    Q. Any particular reason why not?

12    A. No. I'm not sure if Penn Township has recording devices.

13    I know our agency does not use them.

14    Q. Did you take efforts to memorialize what Mr. Long told you

15    in his interview?

16    A. I did.

17    Q. And how did you do that?

18    A. I began to take notes as far as what Mr. Long was telling

19    me. And at one point -- I believe I only wrote, like, one

20    sentence, and at one point he said that --

21      *MS. ULRICH:* Objection to what Mr. Long said. I don't

22    know if you mean to ask about Mr. Heath, but she's asking what

23    Mr. Long said. That's hearsay.

24      *MS. TAYLOR:* No, I wasn't asking about what Mr. Long

25    said. I was just asking if he memorialized the interview of

1   Mr. Long.

2       *THE COURT:*  All right.

3   BY MS. TAYLOR:

4   Q.  Let me ask it this way, did you do a report about your

5   interview of Mr. Long?

6   A.  I did.

7   Q.  And that was done shortly after the interview.  Right?

8   A.  Yes.

9   Q.  After speaking with Mr. Long for a bit, where did you go

10  next?

11  A.  I stepped out of the interview room to go speak with the

12  other officers to see how the other defendants or other people

13  were responding to the interviews.  I was approached --

14  Q.  Wait, I'm sorry, let me interrupt you.  Could you explain

15  to the jury where the other defendants were?

16  A.  Yes.  I was interviewing Tyler Long in one room.  In a

17  separate room was a subject by the name of Ryan Falsone, and in

18  a third room was Christopher Heath.  All three of them were

19  being interviewed by three different officers.  So when I

20  stepped out of my room, I went to go speak with those other

21  officers to see how they were responding to the questions.

22  Q.  When you got to the room where you knew Mr. Heath was

23  located, what happened?

24  A.  I was approached by Officer Miller.  She stated that she

25  obtained information from Christopher Heath, personal

1   information as far as his name and date of birth, and through

2   that questioning, she realized that he was a police officer or

3   a sheriff in Yuba County, California.

4   Q.  Now, when you first learned that, did you have any initial

5   thoughts about what might be going on?

6        MS. ULRICH:  Objection to relevancy, Your Honor,

7   "thoughts."

8        THE COURT:  Sustained.

9   BY MS. TAYLOR:

10  Q.  Explain what you did at that point and why.

11  A.  I myself went in to speak with Mr. Heath to get a feel if

12  we were maybe stepping on each other's toes, if this was his

13  investigation, that he was actually working an investigation

14  and that we may have stepped on that.  I really wasn't thinking

15  that --

16       MS. ULRICH:  Objection again.  What he's thinking is

17  speculation.

18       THE COURT:  Sustained.

19  BY MS. TAYLOR:

20  Q.  Did you go in to -- at that point did you go in to

21  interview Mr. Heath?

22  A.  I did.

23  Q.  Was he willing to talk to you?

24  A.  He was.

25  Q.  Without the presence of an attorney?

1    A.  Yes.

2    Q.  That interview, was it recorded?

3    A.  No.

4    Q.  But did you memorialize it?

5    A.  I don't believe I memorialized that portion of the

6    interview.  I did go back and interview him later.

7    Q.  Did you do a report that memorialized it?

8    A.  Yes.

9    Q.  When you said you didn't memorialize it, are you referring

10   to a written statement?

11   A.  Yes.

12   Q.  Which we'll get to that later.  But during the first

13   portion of your interview, Mr. Heath, what did he tell you?

14   A.  Kind of some background information.  He identified himself

15   as a sheriff's deputy for the Yuba County Sheriff's Department,

16   Northern California, stated that he's been there for 12 years.

17   He was a narcotics detective.  His primary investigation was

18   marijuana cultivation, identified some agencies that he's

19   worked with before and just kind of general background

20   information.

21   Q.  At any point during the beginning of your interview did he

22   tell you that he was working undercover?

23        *MS. ULRICH:*  Objection to the leading nature, Your

24   Honor.

25        *THE COURT:*  Sustained.

BY MS. TAYLOR:

Q.  What did he tell you about why he was -- in the first portion of your interview, what did he tell you about why he was present in the York area that evening?

A.  He stated that he was just helping out his brother-in-law, Tyler.

Q.  Did he give you any explanation as to why he was doing it?

A.  Yes.  He had stated that through his years of working drug investigations, he was approached by the cartel.  He had a specific investigation against the cartel group, and they had told him to stop or else.  He wasn't able to explain to me what "or else" meant.

He presented this concern to his supervisors, and they looked at the case, looked at the concern, and stated that it looks like a good case, and they told him to just continue on with the investigation.  He felt threatened by the cartel, so he put the case -- he said it was on a notebook, and it's been left on his desk at work ever since.

I had asked him if he had -- if he felt that threatened and his supervisors weren't giving him any relief from it, then why wouldn't he go to a federal agency or ask to be reassigned, instead of doing narcotics work, just go back to patrol and write traffic tickets or something, and he stated that it wasn't that easy, he worked for a 55-man department, and it's just not that easy to move around.

1    He also stated that the threats would still come.  As

2  the threats would continue to come, they then came with a

3  demand of money.  So now the cartel is calling Mr. Heath and

4  demanding him to pay $50,000 or else.  Again, he couldn't

5  substantiate what "or else" meant.

6    So now Mr. Heath has turned to delivering marijuana

7  throughout the United States to obtain $50,000 or more so that

8  he could pay the cartel.

9  Q.  During this portion of your interview with Mr. Heath,

10  describe his demeanor.

11  A.  I did not believe a word that Mr. Heath --

12    *MS. ULRICH:*  Objection to anything he believed --

13    *THE COURT:*  Sustained.

14    *MS. ULRICH:*  -- or didn't believe.

15    *THE COURT:*  Sustained.

16  BY MS. TAYLOR:

17  Q.  Just describe physically what he was doing.

18  A.  As I was talking with Mr. Heath, he had a longer beard at

19  the time, and he just kept kind of stroking his beard.  He

20  would look at his handcuffs and let them fall onto the table

21  repeatedly as we were talking.  I would classify it as

22  dramatic, overexaggerated.

23    *MS. ULRICH:*  Objection, Your Honor.  He continues to

24  offer these gratuitous comments that are not relevant.

25    *MS. TAYLOR:*  Your Honor --

1    *THE COURT:*  It's responsive to the question of his

2    demeanor.  The witness will be permitted to answer, and the

3    answer stands.  Your next question, counsel.

4    BY MS. TAYLOR:

5    Q.  So you can continue, Detective, describing his demeanor

6    while you were --

7    A.  Just to reiterate, it was the continued stroking of his

8    beard, the staring at the handcuffs and letting the hands fall

9    onto the table to kind of make a loud noise.  As we would be

10   talking, his hands would fall into his head like this, and then

11   he would -- as his hands are in his head, he'd kind of peek up

12   and then back down.

13   Q.  Now, at some point in your interview with him, did you

14   actually end speaking with him to go back and talk with

15   Mr. Long?

16   A.  Yes.

17   Q.  About how long do you think that first, first phase, I'll

18   call it, of your interview of Mr. Heath lasted?

19   A.  About a half hour or 45 minutes.

20   Q.  At some point when you -- after you had left and you had

21   gone to speak with Mr. Long, did Detective Shearer come and

22   tell you that Mr. Heath wanted to talk to you again?

23   A.  Yes.

24   Q.  And did you, in fact, go back and speak with the defendant

25   a second time?

1    A.   I did.

2    Q.   During the second phase of your interview with Mr. Heath,

3    what happened?

4    A.   He -- as soon as I entered the room, I asked him what he

5    would like, and he rephrased it back to me and asked what I

6    wanted from him.  And I told him that he's been doing narcotic

7    work, drug investigations for as long as I have, he knows the

8    questions that I have for him, and he knows the answers that I

9    want to them.

10        I said, it's very simple, I want to know why you came

11   to Pennsylvania, why you have drugs in your truck, and I

12   believe I asked him a series of questions which I documented on

13   a piece of paper him answering.

14   Q.   Now, these questions that you documented, did you write

15   them?  Was this something that you wrote or something he wrote?

16   A.   It's something -- the beginning of the statement is

17   something that I wrote.  There is one last question which he

18   wrote.

19   Q.   And this document, did you sign it?

20   A.   Yes, ma'am.

21   Q.   And did Mr. Heath sign it?

22   A.   He did.

23   Q.   I'm going to show you what's been marked as Government's

24   Exhibit 12, hopefully.  While that's coming up, let me ask you

25   this, this second phase of your interview with Mr. Heath, how

1    long did it last?  You said the first portion lasted like a

2    half hour?

3    A.   Yes.

4    Q.   The second portion of your interview with Mr. Heath, how

5    long did it last?

6    A.   I would say 40 minutes, 45 minutes to an hour.

7    Q.   Okay.  Do you see Government's Exhibit 12?

8    A.   I do.

9    Q.   And do you recognize that?

10   A.   I do.

11   Q.   What is it?

12   A.   This is a written statement that I obtained with

13   Christopher Mark Heath.

14   Q.   Now, the handwriting that appears on -- that's Page 1,

15   whose handwriting is that?

16   A.   That's my handwriting.

17   Q.   And if we could advance to Page 2, is your signature on

18   Page 2?

19   A.   It is.

20   Q.   And how about the number that appears there at the bottom,

21   what's that?

22   A.   That's my badge number.  It's directly below my signature.

23   Q.   How about the signature that's above your signature and

24   badge number?

25   A.   That's Mr. Heath's.

1  Q.  And you witnessed him sign it?

2  A.  I did.

3  Q.  Now, you said there was some writing at the end that was

4  not yours.  Can you explain where that is?

5  A.  Yes, it's right above his signature.  It begins about in

6  the middle of the page and then ends at his signature.

7  Q.  And who wrote that portion?

8  A.  Christopher Heath.

9  Q.  So going back to Page 1 of Government's Exhibit 12, are

10  these the questions that you asked, at least some of the

11  questions that you asked Mr. Heath?

12  A.  It is.  The first part you'll see the question that I

13  asked, and then the indent would be his response.

14  Q.  So if you could just go through the statement for us,

15  Detective, and explain what happened as you were preparing

16  this.

17  A.  So my first question to him was, Why did you come to

18  Pennsylvania?  And his response was, To deliver marijuana.  My

19  next was, How much?  He stated, I don't know how much was in

20  the truck.  And I said, Whose truck was it in?  And his

21  response was, Mine.  I said, How did it get there?  And he

22  stated, All three of us put it in.

23  And then I asked, Whose weed is in the truck?  Weed is

24  street terminology for marijuana.  He stated, Some of it was

25  given to me.  My next question was, Who were you going to

1  deliver it to?  And he stated he didn't know.

2  Q.  Now, if I can stop you for a minute.  The question about

3  how did the drugs get in there, and the response was, All three

4  of us put it in, in your conversation with him, did he explain

5  who "all three of us" was?

6  A.  He did.

7  Q.  And who did he indicate that was?

8  A.  He stated it was the original person which I was

9  interviewing, Tyler Long, as well as the other person that we

10  had in custody, Ryan Falsone.

11  Q.  Okay.  So I think I interrupted you at, Who knew the person

12  in Pa. to deliver it to?

13  A.  And his response was, Tyler, as in Tyler Long.  And then my

14  next question was, Did he arrange for this?  Mr. Heath's

15  response was, I don't know.  My next question was, What were

16  you going to get for driving it out here?  And his response

17  was, $100,000.  I asked him, Did you already receive any

18  payments?  And his response was, I was loaned 10,000 before we

19  left.

20  Q.  Moving on to Page 2.

21  A.  I asked him, Who gave you that money?  He stated, Tyler

22  loaned it to me.  My question was, How much weed was given to

23  you to bring to Pennsylvania?  Mr. Heath's response was, I

24  believe 65 pounds.  My question was, Have you made trips for

25  Tyler in the past?  His response was, Yes, with Tyler.  I asked

1  if it was always marijuana, and he said, Yes, never anything

2  else.  And then I asked him, Why were you driving the marijuana

3  from California to Pennsylvania?

4  Q.  Now, the response to that question -- up until this point,

5  has everything been in your handwriting?

6  A.  It was.

7  Q.  The response to that question, is that the response that's

8  in his handwriting?

9  A.  It is.

10  Q.  And can you just read the response that's in Mr. Heath's

11  handwriting?

12  A.  In 2013, shortly after becoming a narcotics officer in

13  California, I was investigating a local marijuana cultivator

14  with ties to Michoacan, question mark, SP, for spelling,

15  cartel.  I received a threat from an associate of the cartel to

16  stop my investigation.

17          The threat was reported to my department, but nothing

18  further was done.  Approximately six months later I was

19  approached by someone who claimed to be associated with my

20  original target.  And then it stops there.

21  Q.  In either the first portion of your interview with

22  Mr. Heath or the second, did you -- he mentions the cartel, at

23  least one cartel in both phases of his interview.  Right?

24  A.  Yes.

25  Q.  And did you note anything about his mention of the cartels?

1  A.  Yes.  I believe he mentioned it at least three times that I

2  could recall during the interviews, and each time it appeared

3  that he pronounced the name of the cartel differently three

4  times.

5  Q.  At the time you were interviewing Mr. Heath had the trucks

6  involved in the delivery already been searched?

7  A.  I believe the second time that I was interviewing him, I

8  believe they had been searched by that point.

9  Q.  During your -- during both phases of your interview of

10  Mr. Heath, did he ever tell you that he was in Pennsylvania in

11  his capacity as a law enforcement officer?

12  A.  No.

13  Q.  Were you involved in the search of the trucks at all?

14  A.  No.

15  Q.  How about in cataloging any of the evidence?

16  A.  I did help with taking some photographs of the marijuana

17  packages, as well as comparing some of the money that was found

18  to the official funds which we had mailed out.

19  Q.  At some point did you need to compile a list of the various

20  strains of marijuana that were in the packages?

21  A.  Yes.

22  Q.  Were you tasked with doing that, or was that someone else's

23  responsibility?

24  A.  It was Detective Shearer's responsibility.  I just helped

25  him with it.

1   Q.  Who actually wrote the list?

2   A.  Detective Shearer.

3   Q.  Now, you mentioned that you had some involvement in

4   comparing the serial numbers from cash.  Was that cash taken

5   from Mr. Heath?

6   A.  No.

7   Q.  Where did that cash come from?

8   A.  It came from Tyler Long.

9   Q.  From his person or his vehicle?

10  A.  That I'm not sure.

11  Q.  And what were you comparing it with?

12  A.  We were comparing the money that was found in his

13  possession to the money which we had mailed out from York to

14  California.

15  Q.  And did you find any serial numbers that matched?

16  A.  Yes, many.

17          *MS. TAYLOR:*  Your Honor, if I could have the court's

18  indulgence for just a moment.  Your Honor, I would ask for the

19  admission of Government's Exhibit 12, which was the written

20  statement.

21          *THE COURT:*  Ms. Ulrich, any objection to 12?

22          *MS. ULRICH:*  No, Your Honor.

23          *THE COURT:*  Twelve is admitted.

24          *MS. TAYLOR:*  And those are all the questions I have.

25          *THE COURT:*  Ms. Ulrich, questions for this witness?

1          *MS. ULRICH:* Yes, Your Honor.

2                     CROSS-EXAMINATION

3    BY MS. ULRICH:

4    Q.  Detective Schauer, you said prior to this December 28th

5    date, you had sent out $7,000 to California.  Is that right?

6    A.  Yes, ma'am.

7    Q.  And that $7,000, that was for marijuana that had already

8    been shipped to Pennsylvania via the mail.  Correct?

9    A.  That's correct.

10   Q.  Okay.  And that 7,000 was shipped to Tyler Long.  That's

11   who received the 7,000.  Is that right?

12   A.  Yes.

13   Q.  In fact, what you were just talking about is on

14   December 28th, when Mr. Long was searched, they found, I think,

15   about $5,000 cash on him.  Is that right?

16   A.  Yes.

17   Q.  And some of that $7,000 was part of that money that was

18   found on Mr. Long.  Is that right?

19   A.  Yes.

20   Q.  And Ms. Taylor was asking you about the serial numbers

21   matching.  So the jury understands, when you sent the $7,000

22   out, you recorded the numbers on each of the bills you sent

23   out.  Is that right?

24   A.  That's right.

25   Q.  And you do that because if you ever recover money, you can

1   compare and say, oh, this was the controlled buy money we sent

2   for those drugs.  Right?

3   A.  Yes, ma'am.

4   Q.  And in this particular case, lo and behold, you do get some

5   of that recorded money, serial number recorded money back,

6   don't you?

7   A.  Yes.

8   Q.  And it was on Tyler Long?

9   A.  Correct.

10   Q.  In fact, you will agree Tyler Long was the connect with

11   your informant in York, wasn't he?

12   A.  Yes, he was.

13   Q.  The informant and Mr. Long were doing the texting back and

14   forth, weren't they?

15   A.  Yes.

16   Q.  Now, were you part of the seizure of the cellphones and the

17   pictures that were taken off the cellphones?

18   A.  I prepared the search warrant for the cellphones.

19   Q.  And you obviously reviewed reports, you've seen some of the

20   screenshots that came off Mr. Long's phone and texts that were

21   sent to the informant.  Correct?

22   A.  Yes.

23   Q.  And I think, and you can correct me if I'm wrong, one of

24   those texts from Mr. Long to the informant said, hey, don't

25   discuss any details of this in front of these two guys I'm

1  with, didn't it?

2  A.  Yes.

3  Q.  In fact, why don't I just show it to you instead of

4  guessing here.  I'm going to show you what's been marked as

5  Defense Exhibit 139.  Okay.  That came off, I take it,

6  Mr. Long's phone or the informant's phone?

7  A.  The informant's phone.

8  Q.  And this is Tyler Long saying, okay, I don't want to talk

9  no details in front of these two guys.  Is that right?

10  A.  Yes.

11  Q.  Now, on the 28th, you said you were there when these two

12  trucks arrived with marijuana.  Is that right?

13  A.  Yes.

14  Q.  And when you approached, you said Mr. Heath was by the

15  silver, the silver van.  Correct?

16  A.  Silver truck, yes.

17  Q.  Silver truck.  And that's where, of course, all the

18  marijuana was.  The marijuana was in the bed of that truck,

19  wasn't it?

20  A.  Yes.

21  Q.  And, of course, both trucks, were they searched at the

22  scene?

23  A.  No.

24  Q.  Now, when you -- you were the one, I think, that pulled

25  Mr. Heath out.  I think you said that you read him his Miranda

1  rights?

2  A.  I read him his rights, yes.

3  Q.  And it's your testimony today that he -- at that time he

4  didn't say, hey, I'm a sheriff with Yuba County?

5  A.  No, not at that time, no.

6  Q.  He didn't say, hey, there's a gun in my car?

7  A.  No, he did not.

8  Q.  There was no discussion at that point, all that happened is

9  you're saying you read him his Miranda rights?

10  A.  Yes.

11  Q.  And the next contact you had with Mr. Heath then was at the

12  station?

13  A.  Correct.

14  Q.  Now, going back to the scene, his truck was searched at the

15  scene, wasn't it?

16  A.  No.

17  Q.  I'm sorry, you did say that.  They were taken -- nothing

18  was taken out of these trucks at the scene?

19  A.  We didn't take anything out of the trucks at the scene.

20  Q.  What do you mean by "we"?  Did somebody?

21  A.  Yes.

22  Q.  Who?

23  A.  Mr. Heath and Ryan Falsone were unloading bags of marijuana

24  from the truck.

25  Q.  Okay.  And that's fair enough.  But I mean after they were

1  arrested, you're saying nobody took anything out of the trucks?

2  A.  That's correct.

3  Q.  Well, let me -- actually, going back to the scene, what you

4  just said, you said that Mr. Heath and Mr. Falsone were taking

5  marijuana out of the truck.  Right?

6  A.  Yes.

7  Q.  Now, you weren't there when that happened, though?  Right?

8  A.  No.

9  Q.  And when you got to the scene, you didn't see Mr. Heath

10  with a gun, did you?

11  A.  With a gun?

12  Q.  Yeah.

13  A.  No.

14  Q.  In fact, he didn't pull out a gun and say, hey, I got this

15  guys, no worries, I have a gun on me, did he?

16  A.  No.

17  Q.  And there was no gun laying out in plain view, was there?

18  A.  No.

19  Q.  In fact, the gun was found in the cab or the front of the

20  truck.  Is that right?

21  A.  Yes.

22  Q.  And it was found in a suitcase in the front of the truck,

23  wasn't it?

24  A.  Yes.

25  Q.  It wasn't found in the bed of the truck with the marijuana,

1  was it?

2  A.  No.

3  Q.  Now, but you -- did you search, are you the one that

4  located that gun initially?

5  A.  No.

6  Q.  But you know that's where it was found, in a suitcase in

7  the truck?

8  A.  Yes.

9  Q.  And when did you learn, by the way, that there was a gun in

10  that truck?

11  A.  Probably before I interviewed him the second time.

12  Q.  Okay.  So you knew there was a firearm in the truck before

13  you talked to Mr. Heath, you say, the second time.  Is that

14  right?

15  A.  Yes.

16  Q.  You didn't ask him anything about the firearm, did you?

17  A.  No.

18  Q.  And, of course, there was -- he didn't say, hey, you know,

19  I brought that gun to protect the drugs, did he?

20  A.  No.

21  Q.  I brought that gun just in case anything went wrong and

22  somebody tried to steal the drugs, did he?

23  A.  No.

24  Q.  There was just no conversation whatsoever about that

25  firearm after he was arrested and after you knew about the gun.

1  Is that right?

2  A.  That's right.

3  Q.  Now, Detective Schauer, you said you have been, I think, a

4  police officer since 2003?

5  A.  Yes.

6  Q.  And you carry guns.  Right?

7  A.  Yes.

8  Q.  And what kind of guns do you carry?

9  A.  I carry a Glock.

10  Q.  Is that on duty or off duty?

11  A.  Both.

12  Q.  Okay.  And let's talk about that.  You carry a Glock on

13  duty, but as a police officer, you also carry a Glock off duty.

14  Correct?

15  A.  Correct.

16  Q.  Okay.  And are there regulations that you have to follow

17  that are in place about carrying firearms off duty?

18  A.  Yes.

19  Q.  And, okay, so -- and that is -- is it York County?

20  Springettsbury?

21  A.  Yes, ma'am.

22  Q.  You work for Springettsbury.  So Springettsbury has rules

23  about what you have to do in order to carry a firearm off duty.

24  Right?

25  A.  Correct.

1  Q.  And let me say, what are some of those rules?  Well, I

2  shouldn't say that.  Let me take that back.  I'm a little all

3  over the place right here.  For instance, you have to get it

4  certified?

5  A.  You, as a person, have to be qualified, meaning that you

6  qualify to shoot that particular firearm accurately.

7  Q.  Thank you.  That's the word I'm looking for.  I'm sorry, I

8  said certified.  I meant qualified.  You have to get qualified

9  to use your off-duty firearm.  Is that right?

10  A.  That's correct.

11  Q.  And so how often do you have to do that?

12  A.  It goes by department, department.  Our department is twice

13  a year.

14  Q.  And when you say "qualified," can you explain to the jury

15  what it means?  What do you have to do to get qualified to

16  carry that gun off duty?

17  A.  To qualify with a firearm, there are daytime and nighttime

18  qualifications.  Essentially you're shooting at a target, and

19  you're required to put so many bullets on target in order to

20  qualify.

21  Q.  And as long as you follow those qualifications then, you

22  have the blessing of the department to carry that gun off duty.

23  Correct?

24  A.  Yes.

25  Q.  Now, when you carry your gun off duty, you carry it when

1  you're taking care of, you know, personal business.  Right?

2  A.  Yes.

3  Q.  And when you carry that gun -- how often would you say you

4  carry your gun off duty?

5  A.  A lot.

6  Q.  And that's normal for law enforcement officers, isn't it?

7  A.  Yes.

8  Q.  And you said that the -- that each department kind of has

9  their own regulations, like each department, about what you

10  have to do to qualify.  Is that right?

11  A.  Yes.

12  Q.  I'm going to show you what's been marked as Defense Exhibit

13  143.  And I know that you haven't seen this before, have you?

14  A.  No.

15  Q.  This is the Yuba County Sheriff Department policy.  Similar

16  to what you were just telling us about Springettsbury, you have

17  a policy.  And I want you to go to -- I had that page.  Hold

18  on.  Could you go to Page 3.  Okay.  So down below on Defense

19  Exhibit 143, you see where it says 306.37?

20  A.  Yes.

21  Q.  And it says, Authorized off-duty firearms?

22  A.  Yes.

23  Q.  And it says there, The carrying of firearms by members

24  while off duty is permitted by the sheriff but may be rescinded

25  should circumstances dictate, and it says, For example,

1  administrative leave.  Members who choose to carry a firearm

2  while off duty based on their authority as peace officers will

3  be required to meet the following guidelines.  Do you see that

4  there?

5  A.  I do.

6  Q.  Okay.  And the first one is, They may use his or her duty

7  firearm or personally-owned firearm that is carried in

8  accordance with this policy.  Let me see.  I'll skip through

9  some of this.  Okay.  It says, of course, in (B), The firearm

10  shall be carried concealed at all times and in such a manner as

11  to prevent accidental, unintentional cocking, discharge, or

12  loss of physical control.  Do you see that?

13  A.  I do.

14  Q.  Is that similar to the policy at Springettsbury?

15  A.  Yes, ma'am.

16  Q.  And, (C), It will be the responsibility of the member to

17  submit the firearm to the firearms instructor for inspection

18  prior to being personally carried.  Thereafter, the firearm

19  shall be subject to periodic inspection by the firearm

20  instructor.  Is that similar to yours at Springettsbury?

21  A.  Yes, ma'am.

22  Q.  It says, Prior -- (D), Prior to carrying any off-duty

23  firearm, the member shall demonstrate to the firearms

24  instructor that he/she is proficient in handling and firing the

25  firearm and that it will be carried in a safe manner.  That is

1  similar to Springettsbury, isn't it?

2  A.  Yes.

3  Q.  And I think that's what you testified to this jury that's

4  kind of what you guys have to do, you've got to get qualified.

5  Okay.  The member will successfully qualify with the firearm

6  prior to it being carried.  Do you see that that's (E)?  Do you

7  see that there?

8  A.  Yes.

9  Q.  Okay.  (F), Member shall provide written notice of the

10  make, model, color, serial number, and caliber of the firearm

11  to the firearms instructor, who will maintain a list of the

12  information.  That's (F).  Is that similar to your requirement?

13  A.  Yes.

14  Q.  That you have to provide the make, model?

15  A.  Yes.

16  Q.  And do you see at (I)?  Do you see (I) there?

17  A.  I do see (I).

18  Q.  It says, When armed, deputies shall carry their badges and

19  Yuba County Sheriff Department identification cards under

20  circumstances requiring possession of such identification.  Do

21  you see that there?

22  A.  I do.

23  Q.  Is that similar to Springettsbury?

24  A.  Yes, ma'am.

25  Q.  So when you're carrying your off-duty gun, you, too, have

1    to carry your badge or identification card showing that you're

2    a police officer with Springettsbury.  Is that right?

3    A.  That's correct.

4    Q.  Could we go to Page 6.  And here are some guidelines on

5    storage at home.  Do you see that?

6    A.  I do.

7    Q.  And I'm not going to -- well, let's go through it.  It

8    says, Members shall ensure that all firearms and ammunitions

9    are locked and secured while in their homes, vehicles, or any

10   other areas under their control.  Do you see that?

11   A.  I do.

12   Q.  Obviously because you want to keep them inaccessible to

13   children and others who should not have access.  Is that right?

14   A.  That's right.

15   Q.  Is that -- I would assume that's similar to what you have

16   to do at Springettsbury?

17   A.  Yes.

18   Q.  And 306, Page 9, if we could.  And here we've got -- do you

19   see down below 306.10?

20   A.  Yes.

21   Q.  Carrying firearms out of state?

22   A.  I see that.

23   Q.  And it says there, Qualified, active full-time deputies of

24   this department are authorized to carry a concealed firearm in

25   all other states subject to the following conditions.  And you

1   see it has a bunch of conditions there?

2   A.  Yes.

3   Q.  Do you also have guidelines you have to follow for carrying

4   your Glock out of state?

5   A.  I don't believe so.

6   Q.  And (A) says, The deputy shall carry -- this particular

7   policy says, The deputy shall carry his or her Yuba County

8   Sheriff Department identification card whenever carrying such

9   firearms.  Do you see that?

10  A.  I do.

11  Q.  So these, like you've already said, these policies are very

12  similar, if not identical, to what you have to follow to carry

13  your Glock off duty?

14  A.  Yes.

15  Q.  Okay.  I'm going to -- now, have you seen the gun that was

16  recovered?  I assume you've seen the gun that was recovered.

17  Right?

18  A.  I did.

19  Q.  It was a Glock 23, Serial Number GMW477.  You agree with

20  that?

21  A.  Yes.

22  Q.  Okay.  I'm going to show you what's been marked as Defense

23  Exhibit 141.  And, of course, I know you haven't seen this.

24  This is Yuba County Sheriff's Department firearms training

25  record, and you see that's for a C. Mark Heath.  Correct?

1   A.  Yes.

2   Q.  And that reminds me, you said when you approached him at

3   the car, he identified himself as Christopher Heath?

4   A.  He might have identified himself as Christopher Heath, Mark

5   Heath, I'm not sure, but it wasn't the person I was looking

6   for.

7   Q.  Right.  He goes by Mark Heath, doesn't he?

8   A.  Yes.

9   Q.  Okay.  And here we have this Yuba County Sheriff's

10   Department firearms training record in the name of C. Mark

11   Heath.  Right?

12   A.  Yes.

13   Q.  And that's dated, it looks like, September 19th of 2004?

14   A.  Yes.

15   Q.  And that refers to the Glock 23, .40 caliber with the

16   Serial Number GMW477.  Do you see that?

17   A.  Yes.

18   Q.  Okay.  And it says below in the comments, Delivered

19   effective -- it looks, fire -- I can't read that all.  But

20   that -- you would agree that that is -- in 2004 he presented

21   that, and this is the training record qualifying him to carry

22   that?

23   A.  Yes, ma'am.

24   Q.  And that's the same gun that was found on December 28th,

25   2015.  Correct?

1    A.  Yes.

2    Q.  So we know that he's had that gun at least since 2004.

3    Correct?

4    A.  Yes.

5    Q.  And I'm going to go to the next page.  Here's another one.

6    It says, Mark Heath.  Now, this one is dated August 10th, 2005,

7    and, again, you see it says the same gun, the Glock 23, .40

8    caliber, GMW477?

9    A.  Yes.

10   Q.  And that's August 10th, 2005.  Is this similar to the

11   qualification records that you get filled out in

12   Springettsbury?

13   A.  It's similar, yes.

14   Q.  All right.  Can we go to the next page.  This one is,

15   again, dated September 28th, 2005.  Do you see that?

16   A.  Yes.

17   Q.  And, again, it's the same gun, the Glock 23, .40 caliber,

18   the same serial number of the gun that was found in 2015?

19   A.  Yes.

20   Q.  Okay.  Next page.  And this is part of the qualification

21   form that's dated June 20th, 2006, and, again, do you see that

22   it's -- well, it's in his name, first off.  You see that.

23   Right?

24   A.  Yes.

25   Q.  And it says it's a handgun.  Right?

1   A.  Yes.

2   Q.  And you see it's a personally-owned gun.  Do you see that?

3   A.  Yes.

4   Q.  And it's the same gun we're talking about, the GMW, serial

5   number, 477, Glock 23, .40 caliber.  Correct?

6   A.  Yes.

7   Q.  Okay.  Next page.  The same thing, September 19th, 2006.

8   And not to belabor the point, but then, again, there we see a

9   qualification form going back to September of 2006 for the same

10  gun that you found in 2015?

11  A.  Yes.

12  Q.  Next page.  Here again, the same thing, it's a firearms

13  training record, January 23rd, 2007, Mark Heath, and, again,

14  once again, qualifying the same gun, the Glock 23, .40 caliber.

15  Do you see that?

16  A.  I do.

17  Q.  And that was in 2007.  Okay.  Next page.  And this one is

18  September 13th, 2007.  Again, a training record for the same

19  gun that was found in 2015, the Glock .40 caliber?

20  A.  I do see that, yes.

21  Q.  Okay.  Next page.  And now we move forward to 2010.  Again,

22  we have a training record.  Once again, in 2010, he's now

23  qualified the same gun that you found in 2015.  Do you see

24  that?

25  A.  I do.

1    Q.  Okay.  Next page.  Again, now, 2012, it looks like

2    February 23rd, 2012, it looks like once again he qualifies the

3    same gun you found in 2015?

4    A.  Yes.

5    Q.  Next page.  And now it looks like -- it looks like -- now

6    that's 2015.  Do you see that, December 22nd, 2015?

7    A.  Yes.

8    Q.  Okay.  So that is actually just six days before you find it

9    on December -- or somebody finds it on December 28th, 2015?

10   A.  Yeah.

11   Q.  And, once again, he has taken that to the county sheriff's

12   department, qualified, and this is the record showing the same

13   gun that was found on December 28th that he was permitted to

14   carry by the Yuba County Sheriff's Department.  Do you see

15   that?

16   A.  I do.

17   Q.  Thank you.

18        MS. ULRICH:  Your Honor, before I forget, I would just

19   move to admit Defense Exhibits 141 and 143.

20        THE COURT:  All right.  Are you moving 139, as well?

21        MS. ULRICH:  Yes, Your Honor, yes.  Thank you.

22        THE COURT:  139, 141, and 143, any objection?

23        MS. TAYLOR:  No, Your Honor.

24        THE COURT:  Those exhibits are admitted.

25   BY MS. ULRICH:

1   Q. Do you know the officer who did recover the gun out of the

2   suitcase? Do you know who that was specifically?

3   A. Bruckhart.

4   Q. Bruckhart?

5   A. Um-hum.

6   Q. And are there pictures of the gun in the suitcase?

7   A. I don't know.

8   Q. And this, of course, you say, was found at the department

9   because that's where the searches took place?

10   A. Yes, ma'am.

11   Q. And there were a lot of pictures taken of the drugs,

12   weren't there?

13   A. I believe so, yes.

14   Q. I mean, that's what you do, you take pictures of the

15   evidence that you seize in a case. Right?

16   A. Yes.

17   Q. Because it's important, on a day like this, for jurors and

18   other people to see what it is you had retrieved. Correct?

19   A. Yes.

20   Q. And it becomes important where things are found. Right?

21   A. It does.

22   Q. And how they're found. Is that right?

23   A. It is.

24   Q. So that's why you take photographs of these things?

25   A. Yes.

Q.  And you're saying there may be photographs of the gun in the suitcase, but you just don't have personal knowledge of that?

A.  That's correct.

Q.  Okay.  But that's something that they would have done, right, they would have taken pictures of the gun in the suitcase?

A.  No.

Q.  Not necessarily?

A.  No.

Q.  Because why?  There was nothing obviously wrong with the gun.  Right?

A.  I don't know the reasoning.

Q.  Okay.  And there were two loaded magazines found.  Right?

A.  I believe so, but I don't know for a hundred percent sure. I didn't find them.

Q.  And you don't know if any pictures were taken of the two loaded in the suitcase?

A.  I don't know.

Q.  Now, you testified in another matter, at a grand jury, it looks like in March of 2016.  Is that right?

A.  Yes.

Q.  And they asked you -- you were asked, what was the approximate weight of the marijuana contained in Mr. Heath's truck, and you said 30,800 grams.  Do you recall that?

1  A.  Yes.

2  Q.  And the 30,800 grams, what does that come out to in terms

3  of kilos then?

4  A.  I believe it's 30.

5  Q.  Okay.  So you testified at a grand jury that what you

6  believed was removed from the truck was about 30 kilos of

7  marijuana.  Correct?

8  A.  Correct.

9  Q.  Just a few things about the statement, Mr. Heath's

10  statement you testified a lot to.  You said it was dramatic,

11  and I think you even put in there -- you could correct me if

12  I'm wrong -- almost like he was in shock, is that right, that

13  he had been arrested?

14  A.  I guess you could use that word.

15  Q.  And he did tell you, he did admit to you that he assisted

16  in delivering the marijuana to York, Pennsylvania.  Correct?

17  A.  Yes.

18  Q.  But he told you that he did not know who they were

19  delivering the marijuana to.  Is that right?

20  A.  That is.

21  Q.  And, in fact, that is true, it was Tyler Long who was

22  delivering -- I mean who had the connection in York, as you

23  stated earlier.  Correct?

24  A.  Yes.

25          MS. ULRICH:  That's all I have.  Thank you.

1    THE COURT:  Anything else for the witness?

2                    REDIRECT EXAMINATION

3    BY MS. TAYLOR:

4    Q.  Detective, Ms. Ulrich just asked you a question about the

5    marijuana weight.  Can you explain how you came up with that

6    weight?

7    A.  I believe it was a figure which the Pennsylvania State

8    Police crime lab had.

9    Q.  And do you know how the lab would have come up with that

10   weight?

11            MS. ULRICH:  Objection, Your Honor.  I don't believe

12   he would have knowledge of how the lab report was completed,

13   done.  That would be way outside of his area of knowledge.

14            MS. TAYLOR:  Well, Your Honor, Ms. Ulrich asked him

15   about his grand jury testimony.  I'm asking him what the basis

16   of that testimony was.  And if it was based on the lab report,

17   he should be able to --

18            THE COURT:  All right.  I'll allow him to answer.

19   BY MS. TAYLOR:

20   Q.  Was your testimony in the grand jury based on the lab

21   report?

22   A.  It would have either been based on the lab report or

23   Detective Shearer weighing the marijuana prior to grand jury.

24   I did not personally weigh the marijuana.

25   Q.  Did you ever talk with the chemists about what they

1 actually tested or weighed, the Pennsylvania state chemists?

2 A.  I know they took a sample.

3      *MS. ULRICH:*  Your Honor, he's speculating, so I'm

4 objecting, and it's hearsay.

5      *THE COURT:*  Sustained.

6 BY MS. TAYLOR:

7 Q.  Ms. Ulrich asked you some questions about Mr. Heath's Yuba

8 County Sheriff's Department employment.  When you were talking

9 with him for the total of, let's say, a little under two hours,

10 did he ever tell you that he was in Pennsylvania acting in his

11 capacity as a police officer, not dealing drugs?

12 A.  No.

13 Q.  Can you show him Defense Exhibit 143, and Page 3, the

14 306.37.  This is the section that Ms. Ulrich showed you.

15 A.  What section do you want me to look at?

16 Q.  Starting at the very bottom, 306.37, do you see that

17 portion --

18 A.  I do.

19 Q.  -- that talks about authorized off-duty firearms?

20 A.  I do.

21 Q.  And going to the next page, do you recall Ms. Ulrich's

22 questions about -- going through the Section (A) through (H) or

23 (I)?  These are the policies from the Yuba County Sheriff's

24 Department.  Do you recall those questions?

25 A.  I do.

1   Q.  Just directing your attention to the very first section

2   where it indicates that while off duty, based on their

3   authority as police officers, did you see anything in there

4   while Ms. Ulrich was reviewing that with you that talks about

5   Mr. Heath's ability to carry his firearm while he's acting as a

6   peace officer and a drug dealer?

7   A.  I do not see that anywhere.

8   Q.  And I won't belabor it by going through the other sections

9   of the sheriff's department manual, but in any of the sections

10  that she went through, did you see anything in there that

11  talked about his ability to carry off duty while acting as a

12  deputy sheriff and a drug dealer?

13  A.  No, I did not.

14  Q.  When you spoke with Mr. Heath on December 28th, do you

15  recall some questions about if he was getting paid anything?

16  A.  I do.

17  Q.  And if he had gotten any advance payments?

18  A.  I do.

19  Q.  What did he tell you initially?

20  A.  He told me that he was to -- he did receive $10,000 prior

21  to leaving California, and this was a loan or a down payment

22  from Tyler Long prior to leaving California coming to

23  Pennsylvania.

24  Q.  That was his response, but did he have a different answer

25  initially, or was his answer consistent the whole time?

1    A.  I don't recall.  I believe there was, but I don't recall.

2    Q.  Would it help if you took a look at your report?

3    A.  It would.

4         MS. TAYLOR:  May I approach, Your Honor?

5         THE WITNESS:  Okay.  After reading my report, it does

6    refresh my memory.

7    BY MS. TAYLOR:

8    Q.  When you first asked him if he had gotten any advanced

9    payments, what was his initial answer?

10   A.  He initially told me no.  And then I asked him if he was

11   telling me the truth, based on my conversations with another

12   subject, and he then told me about the $10,000 that he received

13   prior to leaving California.

14        MS. TAYLOR:  Those are all the questions I have, Your

15   Honor.

16        THE COURT:  Anything else for the witness?

17        MS. ULRICH:  No, Your Honor.

18        THE COURT:  All right.  Thank you.  You may step down.

19   Government's next witness.

20        MS. TAYLOR:  Your Honor, at this time the government

21   would call Sergeant Travis Shearer.

22      TRAVIS SHEARER, *called as a witness, having been duly sworn*

23   *or affirmed, testified as follows:*

24        COURTROOM DEPUTY:  For the record, please state your

25   full name.

1      *THE WITNESS:*  Travis Shearer.

2      *COURTROOM DEPUTY:*  Could you spell your last name,

3  please.

4      *THE WITNESS:*  S-h-e-a-r-e-r.

5      *COURTROOM DEPUTY:*  Thank you.  You may have a seat.

6                        DIRECT EXAMINATION

7  BY MS. TAYLOR:

8  Q.  Good afternoon, sir.  Could you tell the jurors how you're

9  employed?

10 A.  I'm a sergeant with the Penn Township Police Department

11 down in York County.

12 Q.  And how long have you been with Penn Township?

13 A.  Almost 12 years now.

14 Q.  Are you -- or back in December of 2015, were you affiliated

15 with any task force?

16 A.  Yes, from June of 2012 until April of last year I was

17 assigned full-time duty to the York County Drug Task Force.  In

18 that duty, I was a sworn special county detective authorized to

19 conduct narcotics investigations throughout York County.

20 Q.  I don't know if you can see over the monitor and the

21 podium, but do you recognize anybody sitting over at the

22 defense table?

23 A.  Yes, the gentleman in the teal green shirt and blue tie.

24 Q.  And who is that?

25 A.  Mr. Heath, Christopher Mark Heath.

1   Q.  And what do you recognize him from?

2   A.  An individual who I was involved in a case that I worked

3   undercover on.

4   Q.  Was that back in -- involving December, 2015?

5   A.  Yes, it did.

6   Q.  Was that a case that you worked in conjunction with

7   Detective Schauer?

8   A.  Yes, we worked the case together.

9   Q.  Now, you mentioned that you worked in an undercover

10  capacity.  Is that correct?

11  A.  That is correct.

12  Q.  Your undercover role, did that occur on December 28th of

13  2015?

14  A.  Yes, it did.

15  Q.  Explain to the jury what happened on that particular date

16  in terms of your involvement.

17  A.  Okay.  In my involvement, we had an investigation that led

18  us to believe there would be a quantity of marijuana being

19  shipped to specifically York County, Pennsylvania, within the

20  area of West Manheim Township.

21        Through that investigation, we determined that -- when

22  the date and time that it should arrive at the location.  At

23  that point I was assigned the undercover for the operation.  As

24  the undercover, I was in plain clothes.  I was unshaven.  I

25  didn't look as a police officer during that time period.

1    My specific duties were to meet with the confidential
2  informant.  At that time I would search the informant and their
3  vehicle for any drugs or contraband, which I did not find.
4  Once we got to the meet location, I did search the rooms at the
5  area of the residence and also quickly searched the perimeter
6  of the house to ensure that there were no drugs or contraband
7  located in the area, and I did not find anything.
8    And then at that point I stayed with the confidential
9  informant, they stayed within my view and basically within
10  arm's reach of me the entire time while we -- the informant
11  conducted text conversations and a short phone conversation
12  with the individual that was to be delivering or was scheduling
13  the delivery of the marijuana.  And I remained with that
14  individual until the subject showed up with the marijuana.
15  Q.  Now, you were expecting the marijuana delivery to occur to
16  a residence.  Right?
17  A.  That is correct.
18  Q.  And you stayed with the informant at that residence the
19  entire time?
20  A.  Yes, I did.
21  Q.  About what time of day were you expecting the delivery to
22  occur?
23  A.  We were expecting, based off of the text conversations, it
24  was going to happen around 2330, 2350 hours, which is 11:30,
25  11:50 at night.

1    Q.  The weather that particular day, what was the weather like?

2    A.  It was rainy, it was like a drizzle, steady rain throughout

3    that whole day and the night.

4    Q.  Did the delivery actually arrive?

5    A.  Yes, it did.

6    Q.  How did it arrive?

7    A.  Two vehicles pulled into the driveway of the residence we

8    were located at.  The first vehicle was a white F150 pickup.

9    The second vehicle was a silver pickup truck.  F250 I believe

10   it was.  And I walked down to the second vehicle.

11          At that time the driver of the vehicle stepped out.  I

12   made contact with the driver, who was Mr. Heath, who is seated

13   over there.  We briefly spoke about the weather, how it was

14   raining and I was glad it wasn't snowing, asked if they ran

15   into bad weather, which he advised it wasn't bad.

16          At that point we opened the individual's -- Mr. Heath

17   opened the back of the vehicle, which is where I saw that the

18   packages which I believe contained the marijuana were located.

19   Q.  Once the -- now, you're referring to the back of the

20   vehicle.  Are you talking about the --

21   A.  The bed of the pickup truck.

22   Q.  Once the tailgate of the truck was opened, what happened

23   next?

24   A.  Once the tailgate was opened, one of the individuals stated

25   that we were to remove the packages -- inside the bed of the

1    truck were garbage bags and black duffel bags, pretty large

2    black duffel bags.  When those bags were opened, inside were

3    additional garbage bags tied in a knot.

4              Inside there I could feel that there was a large

5    package of vacuum-sealed marijuana inside each package, at

6    which point we were instructed to put ten of the packages into

7    our garbage bags.  So we were to unload the vehicle, count ten

8    for each garbage bag that we loaded, and we put those bags into

9    my vehicle.

10   Q.  Now, you said you were instructed to do that.  Who was

11   giving you those instructions?

12   A.  That was Mr. Long, Tyler Long.

13   Q.  So you had indicated that Mr. Heath had gotten out of his

14   truck, but there was another truck?

15   A.  Yes.

16   Q.  How many people were in that?

17   A.  There were two individuals in the first truck, the white

18   truck.

19   Q.  Okay.  And who did those two people turn out to be?

20   A.  The driver of the white truck was Tyler Long, and the

21   passenger of the truck was Ryan Falsone, I believe it's

22   pronounced.

23   Q.  And by this point when you are unloading the packages at

24   the back of Mr. Heath's truck, are Mr. Long and Mr. Falsone --

25   they're out of the other truck, as well?

1   A.   They are out of the truck, and they are assisting in --
2   Mr. Tyler -- or Mr. Long, Tyler Long, was actually helping
3   count the bags as they were coming out.  Mr. Falsone was right
4   there at the rear of the truck with Mr. Heath, myself, and the
5   informant as we were unloading into garbage bags.
6   Q.   Now, in terms of at the residence, were you the only law
7   enforcement officer there?
8   A.   In the vicinity of the residence, there were law
9   enforcement officers to the rear of the residence in some
10  vehicles, abandoned vehicles in the back of the residence.
11  They were there as a rear security team, but they were not
12  visible.
13  Q.   So what happened after you unloaded the bags?
14  A.   The first bag that I loaded I put nine in because I thought
15  it felt like the bag would rip at that point.  I took that bag
16  to my vehicle, opened the rear hatch of it, threw the bag in.
17  At that point I waited for the informant to come over to my
18  vehicle with their bag which they had placed ten in.
19        At that point I had the informant, directed them with
20  me to behind the engine block of my vehicle.  At that time I
21  hit the door locks on my vehicle, which caused the lights to
22  flash which was the signal for the arrest teams to move in.
23  Q.   And what were you waiting for to give that signal?
24  A.   Two things.  First and foremost, I wanted to verify that it
25  was marijuana that was being delivered, and, number two, I

1    wanted to get myself and the informant to the safest position I

2    possibly could for the arrest teams to move in.

3    Q.  When you gave that signal and flashed your lights, what

4    happened?

5    A.  The arrest teams from across the street and behind the

6    residence moved in, took the three individuals into custody.

7    The informant was placed in custody, as well as myself.

8    Q.  Now, why were you placed into custody?

9    A.  It's done for two reasons.  Number one, it helps preserve

10   the case.  It doesn't lead on that I am involved in the

11   planning or I'm actually a police officer at all.  Number two,

12   it provides safety for myself and for the informant.

13   Q.  So obviously you wouldn't have been involved in the arrest

14   of Mr. Heath or the other two individuals?

15   A.  No, I was not.

16   Q.  Were you actually taken back to the station?

17   A.  I was.  I remained on scene where the takedown took place,

18   myself and the informant with a couple other officers.  Once

19   the three individuals that arrived to deliver the marijuana

20   were gone and out of the area, we were both removed from the

21   vehicle, unhandcuffed.  I did re-search the informant, as

22   procedurally I always do, to make sure there were no drugs or

23   contraband on the informant.  At that point then I was driven

24   back to headquarters, the Penn Township's headquarters, to the

25   station.

1    Q.  Did you participate at all in any of the interviews of

2    Mr. Heath or the co-defendants?

3    A.  I did not.

4    Q.  How about in processing or cataloging any of the evidence

5    in the case?

6    A.  I was present to process and catalog most of the evidence.

7    Q.  Who would have helped you with that?

8    A.  Detective Merwede.

9    Q.  And what's his role?

10   A.  He is one of the two detectives within our department.  His

11   role is, he's in charge of the evidence, the evidence room.  He

12   is one of the -- only one of two people in our department that

13   has access to the evidence locker and is able to put the items

14   into the computer, document, and maintain the storage of those

15   items.

16   Q.  When the evidence was collected in this case, was it turned

17   over to you and Detective Merwede?

18   A.  Yes, it was.

19        *MS. TAYLOR:*  Your Honor, this might be an appropriate

20   time, there is a stipulation in terms of Detective Merwede's

21   testimony and the photographs.

22        *THE COURT:*  Okay.

23        *MS. TAYLOR:*  Detective Corey Merwede from West Hanover

24   Township Police Department did take the photographs that will

25   be offered as Government's Exhibits 5, 6, 13 through 27, and 30

1    through 34.  Detective Merwede, who is the evidence custodian

2    for the West Hanover Township Police Department, assisted

3    Sergeant Travis Shearer in processing the evidence collected in

4    this matter and did sign some of the evidence envelopes that

5    you're going to see.

6           *THE WITNESS:*  If I may, just one second, it's the Penn

7    Township Police Department.

8    BY MS. TAYLOR:

9    Q.  I'm sorry, it is Penn Township.  So, Sergeant Shearer, I'm

10   just going to -- let me ask you this, the gun that was

11   recovered in this case, was it turned over to you?

12   A.  Yes, it was.

13   Q.  And how about the magazines?

14   A.  Yes.

15   Q.  What about the other things that were found in

16   Mr. Heath's -- the console of Mr. Heath's truck, the badge and

17   his wallet and ID and things, were those --

18   A.  Yes, all of those items were turned over to me.  I was at a

19   desk inside the detective's office at that time.

20   Q.  How about all of the drugs that were found in the back of

21   the truck, how were those things removed?

22   A.  They were all brought into the detective's office and

23   placed on the floor.  We did a very brief count, myself and

24   Detective Merwede, of approximately what we had, and at that

25   point it was immediately placed into the secured evidence

1  locker.

2  Q.  Why don't we start with those photos.  I'm going to show

3  you what's been marked as Government's Exhibit 18.  What's that

4  a photograph of?

5  A.  This is a photograph of the bags, plastic bags, garbage

6  bags and the zipper bags, I should say, they are carbon zipper

7  bags that contained the individual packages of marijuana that

8  came from the rear of Mr. Heath's truck.

9  Q.  And how about Government's Exhibit 19?

10 A.  This picture shows one of the carbon bags which I opened

11 up, and it shows that there are three individually wrapped

12 packages there.  You can see three garbage bags to the left and

13 in the front of the black duffel bag.

14       And then all the way to the right you'll see a garbage

15 bag that's torn open.  And what you see there, that is the

16 double vacuum-packed, sealed bag that contained the actual

17 marijuana.  So it shows the large bag, the in-between bags

18 between the two, and then the actual packaged product in the

19 third bag.

20 Q.  So in Government's Exhibit 19, the smaller packages that

21 are in the black garbage bags, did those come out of the larger

22 black duffel bag?

23 A.  Yes, they did.

24 Q.  And then showing you what's in Government's Exhibit 20.

25 A.  That's a closeup of the same photograph.  And what you see

1    is, this is the bag that I tore open to show the contents.

2    You're looking at a vacuum-sealed bag, much like used in meat

3    processing and things like that.

4          The different coloration, you see the marijuana

5    underneath, it's typically a bag, or this one was, a bag

6    vacuum-sealed with the marijuana inside.  A second bag was

7    placed over that bag.  Dryer sheets were placed in between,

8    which, as you see, the color pattern change, and then that bag

9    itself was sealed.  So it was two vacuum-sealed bags.

10    Q.  In processing or cataloging the evidence in this case, did

11    you have any reason to actually open any of the vacuum-sealed

12    bags of marijuana?

13    A.  There were two bags that were opened, one of which was

14    opened to do a field test, and the other bag that was opened

15    was because it showed that there were other packages inside or

16    some other type items inside.  That was cut open to see exactly

17    what it was.

18    Q.  At some point were you -- did you unwrap all of the

19    packages from the black garbage bags down to the vacuum-sealed

20    bags?

21    A.  Yes, yes, that was a few days afterwards.

22    Q.  I'm showing you what's been marked as Government's Exhibit

23    21.  Do you recognize this?

24    A.  Yes.  This is actually me holding one of the vacuum-sealed

25    bags that came out of the bigger black bags.  I put a notecard

1  on, a number seven.  That's what I had designated as bag seven

2  when we were identifying each bag.

3          Then there's writing on it which shows the words

4  "Green Crack" and three X's.  At that point we assumed that

5  that was the name of the variety or type of marijuana that was

6  in it.  But we were unsure exactly what each note said.  There

7  were multiple names and multiple bags with the same markings.

8  Q.  For example, showing you what's been marked as Government's

9  Exhibit 22, is that an example of what you were just referring

10 to?

11 A.  Yes, correct.  These are from bag eight.  These are three

12 examples of the Black Lime with two X's.  And those marks were

13 on the bags as we unpackaged them.

14 Q.  So these clear bags and the way they're packaged, is this

15 the way the marijuana was packaged once you unwrapped it from

16 the black garbage bags?

17 A.  Yes.  They were either in a black duffel bag or black

18 garbage bag like in picture, I believe, 20 or 19.  And then at

19 that point each package, as you see three different packages

20 here, each one of those was wrapped in a black garbage bag

21 which was tied shut.  You opened that bag, and then you had one

22 of each of these in each bag, so there was multiple packaging

23 for each small package.

24 Q.  Showing you what's been marked as Government's Exhibit 23.

25 Is this another example of one of the vacuum-sealed bags?

1   A.   Yes.   This is a bag that was marked "Sour Diesel," bag

2   eleven.

3   Q.   Now, you mentioned one bag that was cut open to see exactly

4   what the contents were.   I'm showing you what's been marked as

5   Government's Exhibit 24.   Do you recognize this?

6   A.   Yes.   This is what one of the bags contained.   Obviously

7   when we looked at the vacuum-sealed bag, we could see that

8   there were various colors and other items in there.   So we cut

9   that bag open to see exactly what was in there, if it was

10   another type of contraband or something like that.

11        It appeared that they were THC lollipops and some

12   possible marijuana cigarettes and some different varieties of

13   what was called medical marijuana.   We were not exactly sure

14   why that was there, if it was a sample or what the purpose was.

15   Q.   But these are obviously much smaller quantities than -- in

16   these smaller bags than what's in the larger vacuum-sealed bag?

17   A.   Correct, yes, this was just a small, very small portion.

18   Q.   At some point did you compile -- did you go through all of

19   the bags, all of the black duffel bags, count all the packages

20   and make a list of all the different variations, the named

21   variations that were on the packages?

22   A.   Yes, I did do that.

23   Q.   And did you write out that list?

24   A.   Yes, I did.

25   Q.   I'm showing you what's been marked as Government's Exhibit

1  4.  Now, that's just Page 1, but looking at Page 1, do you

2  recognize that?

3  A.  Yes, that's the list that I made.

4  Q.  So that's -- is that your handwriting?

5  A.  Yes, it is.

6  Q.  So if you could just explain to the jury how you -- how the

7  list is set up.

8  A.  So what I did, under the first section, bag one, when we

9  brought the bags in, we labeled each bag, bag one, bag two, bag

10  three with duct tape and a marker.  The reason to do that is

11  because they all look the same, so we could distinguish what

12  was bag one, bag two, bag three.  So at the top you see bag

13  one.  Underneath you'll see five names, the Purple Kush,

14  Blueberry Diesel, Larry OG, Big Kush.  Those were the names of

15  the variety or strain of the marijuana.

16      And then you'll see some have two, some have three

17  X's, and I believe there's some that have one X.  We were not

18  sure exactly what that signified.  And then in parentheses

19  behind each name and X's, you'll see the number one, three,

20  two.  That's how many packages of each were in each bag.  So of

21  the Larry OG, triple X, there were actually three packages in

22  bag one of that specific variety.

23  Q.  So if we could just fast-forward to the last page of

24  Government's Exhibit 4, your list does indicate that there are

25  18 duffel bags?

1  A.  Correct, duffel bags and some of which were actually just

2  heavy garbage bags, but most of them were the duffel bags

3  themselves.

4  Q.  It was a combination of the duffel bags and the trash bags?

5  A.  Correct.

6  Q.  But each of them contained some combination of

7  vacuum-sealed individual packages of marijuana with these

8  different names on them?

9  A.  Yes, that's correct.

10      MS. TAYLOR:  Your Honor, we also have a stipulation

11  regarding the Pennsylvania state lab report.

12      THE COURT:  All right.

13      MS. TAYLOR:  The lab report actually appears as

14  Government's Exhibit 8.  And the stipulation indicates that the

15  suspected marijuana from the December 28th, 2015 seizure, which

16  is now contained in 27 Drug Enforcement Administration evidence

17  boxes and will be represented here by one sample box at

18  Government's Exhibit 7, was submitted for testing and did

19  contain the Schedule I controlled substance marijuana,

20  according to Nicole Blascovich, a forensic scientist employed

21  by the Pennsylvania State Police, Bureau of Forensic Services

22  Laboratory.

23      Ms. Blascovich's results are documented in

24  Government's Exhibit 8, the Pennsylvania State Police, Bureau

25  of Forensic Services, Drug Identification Report.

BY MS. TAYLOR:

Q.  How about any of the cash, did you assist Detective Schauer

in cataloging any or comparing any cash that was seized?

A.  Yes, we did.  A few days later we sat down and compared the

cash that was located on each individual subject of the three

subjects that we arrested that night and compared that to the

official funds that we had sent out previously in the case.

Q.  And from the $7,000 that was sent out, there was a

significant amount seized from Mr. Long's truck that matched

the serial numbers?

A.  Correct.  I can't remember the exact number.  I believe it

was like 2,049 or something like that, 2,014, $2,014 worth of

documented funds that were sent to California.

Q.  You said that the gun and the magazines that were recovered

were turned over to you for processing, as well.  Right?

A.  That's correct, to enter into the evidence.

Q.  I'm going to show you what's been marked as Government's

Exhibit 1 and 2.

        *MS. TAYLOR:*  Your Honor, may I approach?

        *THE COURT:*  You may.

BY MS. TAYLOR:

Q.  The exhibit that's marked Government's 1, Sergeant, what is

contained in that?

A.  This is the handgun, a Glock handgun and a holster that was

located in a suitcase in the rear seat of the silver F250,

1 Mr. Heath's vehicle.

2 Q.  Now, you're not the officer who actually located it.

3 Right?

4 A.  No, I am not.

5 Q.  And to make it a little bit easier, I'm showing you what's

6 been marked as Government's Exhibit 13.  Is that -- what is

7 that a photograph of?

8 A.  That is this same handgun holster and the magazines, which

9 are in a different set of packaging.

10 Q.  Government's Exhibit 2 --

11 A.  That's correct.

12 Q.  -- does that contain the two magazines?

13 A.  That's the two magazines, yes.

14      *MS. TAYLOR:*  I'm sorry, if I could have the court's

15 indulgence for just a moment.

16 BY MS. TAYLOR:

17 Q.  Sir, I'm going to show you what's been marked as

18 Government's Exhibit 3.

19      *MS. TAYLOR:*  Your Honor, may I approach?

20      *THE COURT:*  You may.

21 BY MS. TAYLOR:

22 Q.  Sir, what's contained in Government's Exhibit 3?

23 A.  These are items that were removed from the vehicle being

24 Mr. Heath's pickup truck.  It's a Yuba County deputy sheriff's

25 badge that was found in the center console.  There's a small

1  brown wallet that contains two IDs from the State of California

2  and a Yuba County Sheriff's Department identification badge.

3        There was a key which did fit the lock that closed up

4  the tailgate of the pickup truck, and then a United States

5  Marine Corps souvenir -- or a challenge coin, I believe they're

6  called.

7  Q.  And showing you what's been marked as Government's Exhibit

8  14, is this a photograph of all the items you just described?

9  A.  Yes, that's correct.

10  Q.  Sir, I'm going to show you what's been marked as

11  Government's Exhibit 5.

12        MS. TAYLOR:  Your Honor, may I approach?

13        THE COURT:  Yes.

14  BY MS. TAYLOR:

15  Q.  In Government's Exhibit 5, Sergeant Shearer, essentially is

16  it a bunch of paperwork?

17  A.  Yes, it is.  It's paperwork that was located within the

18  glove depart -- glove compartment, I'm sorry, of the silver

19  F250, Mr. Heath's vehicle.

20  Q.  I won't ask you to go through all the paperwork, but is

21  there one piece of paper in there that looks like it's from a

22  Best Western hotel?

23  A.  Yes, it's a crinkled piece of paper that has some writing

24  on it.  It appears to be some figures possibly that match the

25  names of the packaging of marijuana that was located within the

pickup truck.

Q. I'm showing you what's been marked as Government's Exhibit 5. Is that a photo of the piece of paper you're holding in your hand?

A. Yes, that's the same.

    *MS. TAYLOR:* Your Honor, if I could have the court's indulgence for just a moment.

BY MS. TAYLOR:

Q. Sir, I'm going to show you what's been marked as Government's Exhibit 7. And Agent Myers is going to take that up there for me. Now, I know that you're seeing that in packaging that is not -- that's not packaging that you did. Right?

A. That is correct.

Q. Do you know what's contained in that box, though?

A. This is one of the packages that contains some of the marijuana that was sent to the state police lab for analysis.

Q. Your department did not maintain custody, though, of all of the marijuana. Right? Ultimately, you turned it over to DEA?

A. That's correct.

Q. And there is a stipulation regarding this, but it was ultimately packaged in 27 DEA boxes?

A. Yes, that's my understanding.

Q. So that's just one of the 27?

A. Yes.

1    Q.  And it's marked -- I believe it's Government's Exhibit 7.

2    Right?

3    A.  Yes, it is.  That's correct.

4    Q.  And can you open that?

5    A.  Sure.  I'm going to need a scissors or something.  I'm not

6    exactly sure how many are packed in this bag, but these are

7    some of the bags that were located in the rear of the vehicle

8    inside the black duffel bags and the black garbage bags we saw

9    pictures of.

10   Q.  At some point do you recall -- we saw a photograph of

11   the -- of at least some of the bags, the outer bags stacked up.

12   At some point do you recall a photograph being taken of all of

13   the -- of those vacuum-sealed bags stacked up against a wall?

14   A.  Yes, we did have one or two photos of that.  One was at a

15   press conference and one was within the detective's office.

16   Q.  I'm showing you what's been marked as Government's Exhibit

17   25.  Is this a picture of the -- what's this a picture of?

18   A.  This is a picture of all of the bags of marijuana in the

19   detective's office at the Penn Township Police Department.  On

20   the right is Detective Schauer and on the left is myself.

21   Q.  So that's you as you were back in 2015 --

22   A.  Yes, that's correct.

23   Q.  -- when you were working undercover operations?

24   A.  Yes.

25          MS. TAYLOR:  Your Honor, there is an additional

1  stipulation.  It is with regard to the gun, and it does relate

2  to Government's Exhibit 9.

3          *THE COURT:*  Do you want to present it now?

4          *MS. TAYLOR:*  Yes, Your Honor, with the court's

5  permission.  The Glock .40 caliber Model 23 semiautomatic

6  pistol bearing Serial Number GMW477, which is Government's

7  Exhibit 1, recovered from the silver Ford 250 truck on

8  December 28th, 2015, was registered to Christopher Mark Heath.

9          The Firearms Trace Summary Report, which is

10  Government's Exhibit 9, completed by Special Agent Ryan

11  Anderson from the Bureau of Alcohol, Tobacco, Firearms and

12  Explosives, establishes that Mr. Heath purchased that firearm,

13  what is Government's Exhibit 1, on September 13th, 2004, and it

14  remained registered to him from that date until his arrest date

15  of December 28th, 2015.

16          And, Your Honor, at this time I'd ask for the

17  admission of Government's 1 through 5, 7 through 9, 13 and 14,

18  and 18 through 25.

19          *THE COURT:*  Any objection, Ms. Ulrich?

20          *MS. ULRICH:*  No, Your Honor.

21          *THE COURT:*  They will be admitted.

22          *MS. TAYLOR:*  Those are all the questions I have for

23  Sergeant Shearer.

24          *THE COURT:*  All right.  Ms. Ulrich.

25                      CROSS-EXAMINATION

BY MS. ULRICH:

Q.  Sergeant Shearer, by the way, you've had a promotion,
haven't you?  Because you were patrolman in 2015, weren't you?

A.  Correct.

Q.  Okay.  Congratulations on the promotion.

A.  Thank you.

Q.  Sergeant Shearer, you had testified that -- it looks like
those bags are about -- packaged a pound each?

A.  Approximately a pound to a pound and a half.

Q.  And I think in the end it came out to 165 pounds -- or 165
bags.  Correct?

A.  Correct.

Q.  And now my math is not the best, but there's about -- like
500 grams in a pound.  Is that right?  It's like .457 grams?

A.  Approximately.

Q.  Okay.  So if you have -- if you do the math and you have
165 bags, 165 bags each containing roughly a pound, and we
don't know that each bag was absolutely a pound, that's about
75 kilos of marijuana.  Is that right?

A.  I believe.  I didn't do the math, but it sounds about
right.

Q.  I had to double-check that because my math isn't very good,
either.  Okay.  Sergeant Shearer, then going back to December
of 2015, you said you were the undercover.  So you were
actually present when these three individuals arrived.  Is that

1  right?

2  A.  Yes, I was.

3  Q.  When Mr. Heath arrived, he was in the silver truck.  Is

4  that right?

5  A.  Correct.

6  Q.  Mr. Falsone and Mr. Long were in the white truck?

7  A.  That is correct.

8  Q.  And so you were there.  Now, by the way, you, of course,

9  you were with the informant.  Right?

10  A.  Correct.

11  Q.  His name is like Chip Conrad, I think, Chip.  Right?

12  A.  Yes.

13  Q.  So you're with him and these guys come, they jump out of

14  the car, and you don't see Mr. Heath get out of the car with a

15  gun, do you?

16  A.  No.

17  Q.  And Mr. Heath gets out of the car, and he doesn't say, hey,

18  I got a piece in my car, just so you know, did he?

19  A.  No, he did not.

20  Q.  He didn't tell you or anyone at that scene that there was a

21  gun in that truck at that point, did he?

22  A.  No, he did not.

23  Q.  And you did not know there was a gun in that truck when you

24  were unloading the marijuana, did you?

25  A.  No, I did not.

1  Q.  Now, after -- you said after you were unloading the

2  marijuana is when, of course, everyone came in, you're taken

3  off the scene, then you end up back at the station.  Correct?

4  A.  That is correct.

5  Q.  And I think what you said was, when you were back at the

6  station then, you counted the bags.  And I think you showed us

7  your notes.  Is that right?

8  A.  The notes were from, like, two days later, two or three

9  days later.  We did an initial count that night just real quick

10 and then secured everything in the locker.

11 Q.  Okay.  So you do an initial count that night, that night

12 being December 28th, 2015.  Correct?

13 A.  Correct, to give an estimated number.

14 Q.  And what was -- do you recall what your estimated number

15 was that night?

16 A.  No, I don't.

17 Q.  Was it a lot different than what the actual count came out

18 to?

19 A.  I think it was less, I think because we were approximating

20 that each bag contained so many, where as some bags contained

21 more, some bags contained less.  They weren't -- each big bag

22 didn't contain, like, ten.  Some had fifteen, some had twelve.

23 We assumed a lot of them had ten, so we came up with a quick

24 figure.

25 Q.  And when did you nail it down, the number of bags?

1    A.  That was a few days later when we were able to sit down and

2    actually look through each bag --

3    Q.  So --

4    A.  -- and make a count.

5    Q.  I'm sorry.

6    A.  When we were able to make a count the day I made that list.

7    Q.  Because I -- and I'm going to ask, of course, you charged

8    these three individuals locally with distributing that

9    marijuana.  Is that right?

10   A.  That is correct.

11   Q.  And when I say "locally," they were charged in York County.

12   Correct?

13   A.  That's correct.

14   Q.  And you completed an affidavit to support the charge,

15   didn't you?

16   A.  Yes, I did.

17   Q.  And in that affidavit, you --

18        MS. TAYLOR:  Objection, Your Honor, to the relevance

19   of the local charges.

20        MS. ULRICH:  It's the number of packages.

21        THE COURT:  Is it foundational to the statement that

22   he made?

23        MS. ULRICH:  Yes, Your Honor.

24        THE COURT:  Okay.  I'll allow it.

25   BY MS. ULRICH:

1  Q.  In that affidavit of probable cause, you note that there

2  were approximately 122 packages of marijuana.  Is that right?

3  A.  That's correct.

4  Q.  Now, when you were at the scene, you were taken, so you

5  didn't search the cars there at the scene.  Correct?

6  A.  No, I did not.

7  Q.  Did you search the cars later when they were taken to the

8  station?

9  A.  I did not, no.

10  Q.  You weren't there at all?

11  A.  I was at the station but did not search any vehicle.

12  Q.  Because you were talking about these Best Western notes you

13  referred to.  That's Government Exhibit 5.

14  A.  Yes.

15  Q.  Do you need to see that again?

16  A.  No, I have it.

17  Q.  You made the comment that it was found in Mr. Heath's

18  truck.  Is that right?

19  A.  Yes.

20  Q.  But you didn't find it in Mr. Heath's truck, did you?

21  A.  Nope, I did not.

22  Q.  So you're saying somebody told you that.  Correct?

23  A.  Correct.

24  Q.  Who told you that's where it was found?

25  A.  Adam Bruckhart.

1  Q.  And is he -- did he take pictures of where he found it, in

2  which car?  Are there any other pictures other than what we've

3  seen here?

4  A.  No, we didn't take pictures.  As far as I know, they didn't

5  take any pictures of the vehicle as they found items.

6  Q.  And those Best Western notes, did you ever ask Mr. Long

7  about those notes?

8  A.  I had no conversation with Mr. Long.

9  Q.  Or Mr. Heath.  Is that right?

10 A.  I spoke to Mr. Heath, but it was a very brief, brief

11 conversation.  It was not an interview.

12 Q.  All right.  And so you don't even know whose handwriting

13 that's in, do you?

14 A.  No, I do not.

15 Q.  I'm going to pull that up again, Government Exhibit 5, our

16 100.  Okay, hold on.  I'm going to call it Defense Exhibit 100.

17 Okay.  Now, there's a 65 and an XX.  Correct?

18 A.  Yes.

19 Q.  Let's assume that's 65 bags.  Right?

20 A.  Okay.

21 Q.  The XX, that indicates -- you may not know this, does that

22 indicate who that 65 pounds belonged to, if you know?

23 A.  I do not know.

24 Q.  Okay.  So we've got 65.  You see that.  Right?

25 A.  Yes.

1   Q.  And then we've got the number ten, the number eight, the

2   number 32.  Correct?

3   A.  That's correct.

4   Q.  And that comes -- that says 115.  Right?

5   A.  Yes.

6   Q.  So that's 115 bags.  Right?

7   A.  Correct.

8   Q.  And that's -- and times that by pounds, that comes out to

9   how much?  About 50, 60 kilos of marijuana?  If that one

10  hundred -- I'm sorry, I'm probably totally confusing you.  I'm

11  confusing myself at this point.

12          Let's assume for a minute that 115 refers to

13  115 pounds of marijuana.  Okay?

14  A.  Okay.

15  Q.  All right.  So if that's 115 and let's say there's

16  .457 grams in a pound, that comes out to what, 50, 60 kilos?

17  Let me get a calculator.  Let me do the math.  Do you know what

18  that is off the top of your head?

19  A.  No.

20  Q.  Okay.  Let me do -- but you agree if that 115 is pounds, we

21  times that by .457.  Right?  Right?  Because that's how many

22  grams are in a pound.  Right?

23  A.  Yes.

24  Q.  Okay.  Would you agree with me that comes out, if that is

25  115 pounds, comes out to about 52 kilos of marijuana?  Is that

1   right?

2   A.   Would probably be about right.

3   Q.   Now, going back to the scene a little bit -- and I think

4   you testified to this. When you were at the scene, you said it

5   was, in fact, Mr. Long, when you got out, who gave you guys the

6   instructions. Is that right? Tyler Long?

7   A.   I'm sorry, what was the question again?

8   Q.   Going back to at the scene when these two trucks first

9   arrived.

10   A.   Okay.

11   Q.   You testified that it was Mr. Long who gave instructions.

12   Is that right?

13   A.   That is correct.

14   Q.   And it was Mr. Long who was counting the bags. Is that

15   right?

16   A.   Yes, that's correct.

17   Q.   And it was, in fact, as you know, Mr. Long who was

18   communicating with your informant, Chip Conrad. Is that right?

19   A.   That's correct, as far as I knew, yes.

20   Q.   And you work for York County? Did you say York County

21   police?

22   A.   I work for the Penn Township Police Department.

23   Q.   Penn Township. Okay. And you've been a police officer for

24   quite a long time. Is that right?

25   A.   Almost 12 years.

1    Q.  And in terms of carrying firearms, you carry guns on duty

2    and off duty.  Is that right?

3    A.  Yes.

4    Q.  And what kind of gun do you carry off duty?

5    A.  A lot of times I carry a revolver.

6    Q.  And are there specific regulations at Penn Township dealing

7    with your carrying firearms off duty?

8    A.  Not specifically one way or the other, no.

9    Q.  But in carrying that revolver, you carry it for personal

10   reasons and professional.  Is that right?

11   A.  Correct.

12   Q.  And when you carry it personally, how often would you say

13   that you happen to have that gun on you?

14   A.  Probably 75, 80 percent of the time.

15   Q.  It's not uncommon for law enforcement to carry their guns

16   off duty, is it?

17   A.  No.

18        *MS. ULRICH:*  I have nothing further.  Thank you.

19        *THE COURT:*  Anything else for the witness?

20                     REDIRECT EXAMINATION

21   BY MS. TAYLOR:

22   Q.  Sergeant, Ms. Ulrich asked you some questions about whether

23   it was Mr. Long who was communicating with the informant and

24   Mr. Long who was counting the bags.

25   A.  That is correct.

Q.  But it was Mr. Heath who you saw get out of the truck that was loaded with all the marijuana?

A.  Yes, the silver F250.

MS. TAYLOR:  That's all I have, Your Honor.

THE COURT:  All right.  May the witness be excused?

MS. ULRICH:  Yes, Your Honor.

THE COURT:  Thank you.  You may step down.  Thank you, Sergeant.

THE WITNESS:  Should the evidence stay up here?

THE COURT:  Yes.  Thank you.  Counsel approach.

(Discussion held off the record at sidebar regarding scheduling.)

THE COURT:  Jurors, we have another witness, but we concluded that because you worked so hard today without an afternoon break, we're going to call it a day here and bring that witness tomorrow morning.

The first day is always the longest and the hardest, so I'm going to ask Ms. Weida to escort you.  I'd just ask one thing of you, and that is, keep with you the reminders that I gave you early in the case about your own conduct as jurors. It's so important that you keep an open mind until you've heard all of the evidence in the case.

The only way you can do that is to follow my instructions.  Don't talk to anybody about the case.  Just tell people at home that you're sitting on a case, you'll tell them

1    all about it on Wednesday.  Okay?  All right.  Have a good

2    evening.  We'll see you back at 9:30.

3        *(Whereupon, the proceedings were adjourned at 4:40 p.m.)*

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF OFFICIAL COURT REPORTER


        I, Lori A. Shuey, Federal Certified Realtime Reporter, in
and for the United States District Court for the Middle
District of Pennsylvania, do hereby certify that pursuant to
Section 753, Title 28, United States Code, that the foregoing
is a true and correct transcript of the stenographically
reported proceedings held in the above-captioned matter and
that the transcript page format is in conformance with the
regulations of the Judicial Conference of the United States.

        Dated in Harrisburg, Pennsylvania, this 15th day of
December, 2017.


                        **/s/ Lori A. Shuey**
                        Lori A. Shuey
                        Federal Certified Realtime Reporter