1          IN THE UNITED STATES DISTRICT COURT
         FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
2
UNITED STATES OF AMERICA        :
3                               :  Case No. 1:16-CR-075
                                :
4              vs.              :  (Judge Kane)
                                :
5 CHRISTOPHER MARK HEATH,        :
                 Defendant      :
6

7          TRANSCRIPT OF JURY TRIAL PROCEEDINGS
                      VOLUME 2
8               PAGES 179 THROUGH 410

9          BEFORE THE HONORABLE YVETTE KANE
           UNITED STATES DISTRICT COURT JUDGE
10            MAY 9, 2017; 9:35 A.M.
              HARRISBURG, PENNSYLVANIA
11

12 FOR THE GOVERNMENT:

13    Meredith A. Taylor, Assistant United States Attorney
      Joseph J. Terz, Assistant United States Attorney
14    United States Attorney's Office
      228 Walnut Street, Second Floor
15    Harrisburg, PA  17101

16 FOR THE DEFENDANT:

17    Lori J. Ulrich, Assistant Federal Public Defender
      Federal Public Defender's Office
18    100 Chestnut Street, Suite 306
      Harrisburg, PA  17101
19

20

21                      Lori A. Shuey
22          Federal Certified Realtime Reporter
              United States Courthouse
23        228 Walnut Street, P.O. Box 983
             Harrisburg, PA  17108-0983
24                 717-215-1270
           lori_shuey@pamd.uscourts.gov
25 Proceedings recorded by mechanical stenography; transcript
          produced by computer-aided transcription.

I N D E X

GOVERNMENT WITNESSES

TYLER LONG                                                    PAGE

Direct Examination by Ms. Taylor                              181
Cross-Examination by Ms. Ulrich                               228
Redirect Examination by Ms. Taylor                            279
Recross-Examination by Ms. Ulrich                             282

ADAM BRUCKHART                                                PAGE

Direct Examination by Ms. Taylor                              293
Cross-Examination by Ms. Ulrich                               302
Redirect Examination by Ms. Taylor                            307

JONATHAN MAIOLO                                               PAGE

Direct Examination by Mr. Terz                                308
Cross-Examination by Ms. Ulrich                               316

JOSEPH MYERS                                                  PAGE

Direct Examination by Ms. Taylor                              321
Cross-Examination by Ms. Ulrich                               328


CLOSING ARGUMENTS                                             PAGE

By Ms. Taylor                                            348, 368
By Ms. Ulrich                                                 359

JURY INSTRUCTIONS                                             PAGE

By The Court                                                  372

1    THE COURT:  Good morning, jurors.  We return to the

2  government's case.  Is the government ready to proceed?

3    MS. TAYLOR:  We are, Your Honor.  The next witness the

4  government would call is Tyler Long.

5    TYLER LONG, called as a witness, having been duly sworn or

6  affirmed, testified as follows:

7    COURTROOM DEPUTY:  For the record, please state your

8  full name.

9    THE WITNESS:  Tyler Neil Long.

10    COURTROOM DEPUTY:  Thank you.

11                  DIRECT EXAMINATION

12  BY MS. TAYLOR:

13  Q.  Good morning, sir.  Could you tell the jury how old you

14  are?

15  A.  I'm 33 years old.

16  Q.  And what state do you live in?

17  A.  California.

18  Q.  Do you know the defendant who is seated over here to my

19  left?

20  A.  I do.

21  Q.  How do you know him?

22  A.  He's my brother-in-law.

23  Q.  Approximately how many years have you known him?

24  A.  15.

25  Q.  Were you indicted in this case for committing drug

1  trafficking, conspiring to commit drug trafficking of

2  marijuana, and conspiring to commit money laundering with the

3  defendant and several other people?

4  A.  Yes, I was.

5  Q.  Have you pled guilty in connection with this case?

6  A.  Yes, I did.

7  Q.  Do you recall how many counts in the indictment you were

8  charged with?

9  A.  18.

10  Q.  How many counts have you pled guilty to?

11  A.  Two.

12  Q.  Did you plead guilty pursuant to a written plea agreement?

13  Was there a document that you actually signed about your plea?

14  A.  Yeah.

15  Q.  I'm going to show you what's been marked as Government's

16  Exhibit 11.  Tell me if something comes up on your screen

17  there.  Do you have a document there?

18  A.  Yes, I do.

19  Q.  Now, you're only seeing Page 1, but scrolling down to

20  Paragraph 1, do you recognize -- I'm sorry, that's the wrong --

21  it should be Document 10, Government's Exhibit 10.  Looking at

22  Paragraph 1, do you recognize at least Page 1 of this document?

23  A.  Yes, I do.

24  Q.  And what is this document?

25  A.  This was the plea agreement that I ended up pleading guilty

1   to.

2   Q.   And in Paragraph 1, does it indicate what charges you pled

3   guilty to?

4   A.   Yeah.  It got bigger.

5   Q.   It zoomed in.

6   A.   Yes, yeah.

7   Q.   Zoom out.

8   A.   Yes, please.  Yep.

9   Q.   And what charges did you plead guilty to?

10   A.   Pled guilty to the conspiracy to distribute over a hundred

11   kilos or more of marijuana.

12   Q.   And then that paragraph continues on to Page 2.  And what

13   was the second charge that you pled guilty to?

14   A.   The conspiracy to commit money laundering.

15   Q.   Now, do you know what the maximum penalties are for those

16   charges?

17   A.   Yes, 20 years on the money laundering and 40 years on the

18   conspiracy to distribute the marijuana.

19   Q.   Now, does your plea agreement indicate that at sentencing,

20   the government will withdraw the remaining counts in your

21   indictment?

22   A.   Yes.  These are the two that I pled to.

23   Q.   You've agreed to cooperate with the government pursuant to

24   your plea agreement.  Is that right?

25   A.   Correct.

1  Q.  Do you know what sentence you're going to receive for the

2  charges that you've pled guilty to?

3  A.  I do not.

4  Q.  Your plea agreement actually states that the sentencing

5  guidelines will apply as determined by the court.  Is that

6  right?

7  A.  Correct.

8  Q.  Does anything in your plea agreement promise you a certain

9  sentence?

10 A.  No, it does not.

11 Q.  In fact, does your plea agreement state that the government

12 may make a recommendation it considers appropriate up to and

13 including the maximum sentence?

14 A.  Correct.

15 Q.  Did I make any promises to you or anyone else from the U.S.

16 Attorney's Office about what your sentence will be?

17 A.  No, you did not.

18 Q.  Who makes your sentencing decision, do you know?

19 A.  Judge Kane.

20 Q.  In this plea agreement, does it address what you're

21 required to do under your cooperation agreement?

22 A.  No, my cooperation is just to come testify.

23 Q.  Did I tell you what to say here today or Mr. Terz?

24      *MS. ULRICH:*  Objection.  She's really leading the

25 witness through this.

1          *THE COURT:*  Sustained.

2     BY MS. TAYLOR:

3     Q.  What are you required to do under your cooperation

4     agreement?

5     A.  Come here today and tell the truth.

6          *MS. TAYLOR:*  Your Honor, I'd ask for the admission of

7     Government's Exhibit 10.

8          *THE COURT:*  Any objection to ten, Ms. Ulrich?

9          *MS. ULRICH:*  No, Your Honor.

10         *THE COURT:*  Ten is admitted.

11    BY MS. TAYLOR:

12    Q.  Now, you said you have known the defendant for 15 years.

13    Is that right?

14    A.  Correct.

15    Q.  Did you know how he was employed?

16    A.  Yes.

17    Q.  And tell the jurors about that.

18    A.  The end of the 15 years or from the beginning or --

19    Q.  The end.

20    A.  Okay.  We were -- he was employed by the drug task force

21    in -- it's based out of Yuba City, but it is NET-5.  It's a --

22    like I said, it's a drug task force there.

23    Q.  Now, you said NET-5.  Is that the name of the drug task

24    force?

25    A.  Yeah, that's what they go by.

1  Q.  Do you know how long he was working with the drug task

2  force?

3  A.  He worked for the sheriff's department for quite awhile,

4  but at least a few years.  I would say two years at least.

5  Q.  You indicated he was your brother-in-law?

6  A.  Correct.

7  Q.  You are -- are you married to his sister?

8  A.  No, he's married to my sister.

9  Q.  Okay.  Now, in terms of pleading to the drug trafficking

10  charges in this case, did you admit to growing and distributing

11  marijuana?

12  A.  Yes.

13  Q.  How did you get involved in that?

14  A.  It started when I left the sawmill and needed a job.  There

15  wasn't many jobs at that time.  That's when everything had

16  crashed.  And a cousin of mine, he wanted -- needed a trimmer,

17  and so I started trimming and cultivating marijuana with my

18  cousin.

19  Q.  And approximately what year was that?

20  A.  That was in '09.

21  Q.  Back at that time were you living close to the defendant?

22  A.  Yes.  We had always pretty much lived on a family ranch, so

23  within a mile of each other.

24  Q.  Can you explain your family property?

25  A.  Yeah.  It's a 240-acre ranch.  They have just cattle.

1    There are some ponds and whatnot.  And my grandfather and great

2    grandfather bought the property and moved out there from

3    Wisconsin.  It has two houses at the bottom, two old cabins,

4    and it had a trailer at one time.  It's no longer there.  Then

5    later on there was a trailer put up probably three-quarters of

6    a mile up the road.

7            And then from there, when my grandparents built their

8    new house, it was built on the back side of the 240 acres.  The

9    240 acres eventually got split into a 200-acre parcel, a

10   14-acre parcel, a six-acre parcel that ended up Mark and Tatum

11   had owned, my sister and brother-in-law, and then I owned a

12   five-acre parcel, and my mom had the 15-acre parcel where she

13   lives.

14   Q.  This ranch that you're describing, where is it located?

15   A.  It's up in the foothills.  It is, I would say, an hour and

16   45 minutes northeast of Sacramento.

17   Q.  In what town and state is it?

18   A.  Well, it's in Bangor, California.  It's a small, rural

19   town.  I think -- it used to be like 500 people.  Now it's like

20   700-ish.

21   Q.  You indicated you owned five acres, and your mother owned

22   fifteen?

23   A.  Correct.

24   Q.  What's your mother's name?

25   A.  Ramona Long.

1   Q.  Is she one of the co-defendants in the case?

2   A.  She is.

3   Q.  You also indicated Mark and Tatum owned six acres?

4   A.  Correct.

5   Q.  Tatum, is that -- that's your sister?

6   A.  Correct.

7   Q.  And when you say "Mark," who are you referring to?

8   A.  The defendant.

9   Q.  After you got involved with your cousin's marijuana

10  operation, did you start your own operation?

11  A.  Yeah.  It kind of -- I got burnt on the whole deal and

12  didn't get what was owed to me from him, and I ended up

13  eventually just doing my own thing.  So that's kind of where it

14  all started for me as far as growing marijuana.

15  Q.  And where did you grow it?

16  A.  I grew on my five-acre parcel that was the five that was

17  split off my mom's twenty.

18  Q.  At some point did you get other people involved in your

19  grow operation?

20  A.  Yeah, we -- I started growing.  It wasn't anything that --

21  I don't know.  To me, it wasn't -- I wasn't proud in it.  I had

22  always worked in a sawmill and did, you know, what my family

23  and my dad and my grandpa and my dad's uncle and my uncle, they

24  all did.  So it was -- you know, I just had a little thing.  It

25  was up in the trees, up in the five acres, real low key.  Then

1   it just became more and more acceptable by everybody, and then

2   everybody wanted a part and partake in it.

3   Q. Well, once you started growing on your five acres, who else

4   became involved in your family?

5   A. At that time my parents, and it led into eventually Mark

6   coming and trimming, and that's where it started.

7   Q. Describe for the jury how big one of your -- one of the

8   marijuana plants would get.

9   A. I've measured them just over 13 feet wide and probably

10   close to that in heighth.

11   Q. And when you -- you're using the term "trimming,"

12   indicating that's what you started doing for your cousin and

13   that the defendant would come and trim for you. What does that

14   mean, "trimming"?

15   A. Trimming is the harvesting process of weed. So you're

16   cutting out all the stem, the leaf, anything that isn't of the

17   quality for smoke, for smoking.

18   Q. And is the trimming process a one-time thing?

19   A. If you green trim or dry trim, it's two separate things.

20   So there's a way that you can go and you can cut everything

21   down on a plant. You're going to -- you know, you're going to

22   leave the root ball and main stems out, and then you're just

23   going to hang the marijuana upside down. And you hang it and

24   you let it dry. And then you'll come back and you can trim it

25   at that point and then it's kind of a one and done.

1    If you trim green, you pretty much -- you'll go in,

2   you'll top it.  You'll leave a -- and you'll trim off the water

3   leaf and then you can come back and do a final trim and break

4   it down from there.

5   Q.  So do you recall about what year the defendant started

6   helping in your operation?

7   A.  It wasn't immediately.  I would like to say it was in --

8       *MS. ULRICH:*  Your Honor, may we approach?

9       *THE COURT:*  Yes.

10      *(The following discussion occurred at sidebar:)*

11      *MS. ULRICH:*  I'm just asking for an offer of proof

12  because the indictment is September, 2014, and I'm not sure

13  what he's about to say about when he got involved, if it's,

14  like, years before.

15      *THE COURT:*  What is it?

16      *MS. TAYLOR:*  I believe what he's going to say is in

17  around 2012.

18      *MS. ULRICH:*  Which is two years before the indictment.

19  I had asked for 404(b) evidence.  I would think that's 404(b)

20  evidence.  The government did not -- said there was no 404(b)

21  evidence.

22      *MS. TAYLOR:*  Your Honor, I don't believe it's 404(b)

23  evidence.  He's just providing background.  He's a family

24  member.  He's providing background on his knowledge of how the

25  defendant got involved.

1    The indictment is specifically limited to a time

2  period that includes the parcels that were delivered and the

3  weights that were included, but the fact that the defendant

4  started trimming marijuana for him at some point a year or two

5  before is just background evidence of when he became involved.

6    THE COURT:  Why do we need to put the date in then?

7  We've already heard how he got involved by becoming a trimmer.

8    MS. TAYLOR:  I'm just trying to establish the

9  chronology.

10    THE COURT:  Okay.  We don't need the date to do that.

11  He first became involved by trimming, and then I assume he's

12  going to tell us the rest.

13    MS. TAYLOR:  He is.

14    THE COURT:  Okay.  So we'll limit it to the dates of

15  the indictment.

16    MS. TAYLOR:  That's fine.

17    (The discussion at sidebar was concluded.)

18  BY MS. TAYLOR:

19  Q.  Mr. Long, at some point did Mr. Heath become more involved

20  in your operation and start growing on the properties that your

21  family owned?

22  A.  Yes, he did.

23  Q.  What year was that?

24  A.  That was in 2015.

25  Q.  How about your mom, what was her involvement?

1  A.  My mom, she trimmed, she grew.  She basically partaked in

2  the entire operation, as they did, you know, along with

3  everybody else.

4  Q.  Besides her involvement in the marijuana operation, where

5  did she work?

6  A.  She worked at the United Postal Service.

7  Q.  Through her work at the post office, did she help you ship

8  packages that way?

9  A.  Yes, she did.

10  Q.  And where were you shipping them?

11  A.  They were being shipped from her work in -- at the Ophir

12  Station is where it ended up being.

13  Q.  And these packages contained what?

14  A.  Marijuana.

15  Q.  Some of those packages were going to customers where?

16  A.  In Florida and Pennsylvania.

17  Q.  Now, you said that Mr. Heath started growing on the family

18  property in 2015.

19  A.  I think the actual year that he grew was '14, but it

20  goes -- the seasons for marijuana aren't calculated from

21  January to January.  It's more -- the season is -- it's going

22  to start you in one year and end you in another by the time

23  you're done trimming and everything else.  So the whole thing

24  was probably from '14 to '15.

25  Q.  So the season that he started growing in '14 that ended in

1   '15, whose property, whose parcel of land were his plants on?

2   A.   That was my mother's.  It was Ramona.

3   Q.   And was he permitted to grow there for free, or was there

4   some payment involved?

5   A.   He -- we got rid of hers for her, and then she got her

6   money from the sale of it.

7   Q.   When you say "got rid of hers for her," what are you

8   talking about?

9   A.   So after we made the trip to Florida and we got back from

10  selling all the weed, then she was paid.

11  Q.   And how much money did she receive?

12  A.   I believe it was sixty to sixty-five thousand in total.

13  Q.   For that season, do you know how many plants Mr. Heath

14  would have grown?

15  A.   I don't know exactly how many were there.  It was, you

16  know, twenty something to thirty something plants, I would say.

17  Q.   And who tended those plants?

18  A.   Mark did.

19  Q.   And what's involved in tending those plants?

20  A.   The feeding and watering and you have to clean out the

21  plant from all the -- the innards of the plant.  It's just all

22  the water leaf.  And it gets dry and they'll fall off and you

23  have to rake -- you know, get those out of there, or else you

24  can get bugs and, you know, spider mites or russets or

25  different types of mites or mold or anything like that.

1    So you have to go in there and you have to clean

2  out -- anything that isn't going to produce, you cut out the

3  inside of the plant, so any small branches because that's just

4  sucking nutrients.  So you want all your nutrients to go to

5  your buds.  Your ultimate goal is yield, the amount of weight

6  you pull off a plant.

7  Q.  So Mr. Heath took care of his plants?

8  A.  Correct.

9  Q.  Do you know approximately how much processed marijuana his

10 plants yielded during that 2014-15 season?

11 A.  It was 102 pounds.

12 Q.  And where did that 102 pounds of processed marijuana go?

13 A.  To Morriston, Florida.

14 Q.  Who took it to Florida?

15 A.  Mark -- we put it in Mark's vehicle and he drove and then I

16 followed him in a separate vehicle.

17 Q.  And what year did that trip occur in?

18 A.  That was in the end of '15.

19 Q.  And do you recall what type of vehicle the defendant was

20 driving at that time?

21 A.  It was an '05 gray -- it's a Dodge Cummins pickup.

22 Q.  Now, the 102 pounds of marijuana from the defendant's

23 plants, was that the total of what you took down to your

24 Florida customer on that trip?

25 A.  Well, there were two different trips.  And there was

1   actually one, I want to say it was -- it was at the end.  It

2   was at the tail end.  It was in the end of December, so that

3   would be '14.  And then there was a trip in early '15, I want

4   to say in January.  So just to correct that, it was '14 and

5   '15 because there were two trips.

6   Q.   Two trips to Florida?

7   A.   To Morriston, Florida.

8   Q.   And were both these trips to deliver marijuana to a

9   customer?

10  A.   Correct.

11  Q.   And on both of those trips, who went?

12  A.   The defendant and myself.

13  Q.   And you had indicated that you both drove in separate

14  vehicles.  Is that the case for both trips?

15  A.   Correct.

16  Q.   And who transported the marijuana on each trip?

17  A.   Mark did, the defendant.

18  Q.   How much marijuana did you take on each trip?

19  A.   It was approximately -- it was over a hundred, but it

20  was -- they were equal loads to what went to -- ended up going

21  to Pennsylvania.  So I'd have to say, numbers-wise, somewhere

22  right around that 150 mark, take or give.

23  Q.   And when you say "150," do you mean --

24  A.   150 pounds of processed.

25  Q.   All that marijuana, was it marijuana that you or Mr. Heath

1  had grown?

2  A.  Not all of it.  Some of it was stuff that he had acquired.

3  Q.  Well, tell the jurors about that.

4  A.  Well, it all started when the defendant had called me over

5  to the house.  It was before Christmastime.  He had two pounds

6  of marijuana in a brown paper bag and asked me to get rid of it

7  for him, help him out, he needed the money or whatnot.  So he

8  was acquiring this marijuana from an unknown source to me, you

9  know.  And it just steamrolled from there as far as where he

10 was coming up with the other marijuana.

11 Q.  In terms of the Florida trip, though, it wasn't just a

12 two-pound quantity that he gave you to get rid of?

13 A.  No, it was -- there was a larger amount there.

14 Q.  How much?

15 A.  Whatever it was made up on the difference.  So I think I

16 had pulled off approximately 130-some-odd pounds.  He had 102.

17 So that's 230.  And so, I mean, we're still short a lot of weed

18 to make a full trip out there.  So the math being done there,

19 you know, there's 70 to 100 pounds that he acquired from

20 somewhere.

21 Q.  Well, do you recall what kind of containers he provided it

22 to you in?

23 A.  Sometimes it would be -- you know, flat out, some of it

24 came from busts he did.  Some of it came from he was making a

25 dump run for his work and that's where they were supposed to be

1    getting rid of it and then it would come to me and I would sell

2    it.  But various containers, totes, barrels, different -- I

3    guess little things that they used to keep it in in their

4    evidence room, I would assume, because he had to have it back

5    at some point.

6           But, yeah, that was multiple times.  And that wasn't

7    all the stuff that had went to Florida, that was some of the

8    stuff, like I said, he grew.  So the stuff that he was

9    getting -- you know, getting and bringing to me cut down during

10   that time, and then it picked up again after, after the trips

11   to Florida.

12   Q.  Before one of the Florida trips, did he provide you with

13   two 50-gallon barrels --

14   A.  Correct.

15   Q.  -- that were full of marijuana?

16   A.  Correct.

17          MS. ULRICH:  Your Honor, I'm going to object.  She

18   keeps leading.  I understand where they're going, but she's --

19          THE COURT:  Sustained.

20   BY MS. TAYLOR:

21   Q.  How much would you pay Mr. Heath per pound of marijuana?

22   A.  It would vary.  The quality of it wasn't very good, so at

23   times -- the most would be 2,000 a pound.  Sometimes it was,

24   you know, around the 15 range.  Whatever I could get rid of it

25   for.

1  Q.  Do you recall how much you charged your Florida clients per

2  pound?

3  A.  So our Florida guy, he would pay anywhere from 18 to 2250.

4  Q.  How about the Pennsylvania client?

5  A.  He bought some that -- he was the only one that could get

6  rid of it that I knew, so he got some lower quality stuff.  So

7  he would get stuff anywhere from around the 15 range, 15, 16,

8  to 2,000, 2200.

9  Q.  Was anybody else with you on the two Florida trips?

10 A.  No, there wasn't.

11 Q.  Why did the defendant drive the marijuana on those trips?

12 A.  No one else would.  But he was -- I assume was comfortable

13 with it and knew that if he were to be pulled over, he wouldn't

14 be stopped.

15 Q.  You said he drove a Dodge pickup truck for the first

16 Florida trip.  Right?

17 A.  Both the Florida trips.

18 Q.  That was my question.

19 A.  Yes.

20 Q.  Did he drive the same truck for the second trip?

21 A.  Yes, he did.  The one time he was pulling a small camper

22 trailer that was full of it, but he was pulling it with that

23 truck.  And then the second time -- or the one time it was just

24 a tonneau cover, and it was all placed in there, under there.

25 Q.  And did that vehicle have any law enforcement insignia on

1  the outside of it?

2  A.  Yeah, he had placed a sticker on there that's a black flag

3  with a blue band in the middle of it to just kind of, you know,

4  give a slight nod to law enforcement so that he wouldn't be

5  pulled over.

6  Q.  Was that already on the truck, or when did that sticker get

7  put on?

8  A.  Just prior to a trip he had put that on there.

9  Q.  And how did you know what it was for?

10  A.  Well, I had noticed, when we were just getting ready to

11  leave, the sticker.  I didn't know what that meant, so I had

12  asked him, and that's what he stated it was for.

13  Q.  What did he say?

14  A.  He said that it was -- I don't know if it was for fallen

15  officers or -- it had to do something with law enforcement, and

16  they would know what it meant.  It didn't mean anything to me,

17  so I didn't follow it up with any further questioning.

18  Q.  During either of the two Florida trips, were you ever

19  stopped by the police?

20  A.  We had just left --

21  Q.  No, were you?

22  A.  Oh.

23  Q.  I'm just asking while you were driving, were you stopped?

24  A.  No, no, I was not.

25  Q.  How about the defendant, did you see whether he was

1   stopped?

2   A.  Yes.  He was speeding a little, and he had gotten pulled

3   over just after we made a drop to our guy in Florida.

4   Q.  Was that in connection with the first Florida trip or the

5   second?

6   A.  That was -- it was the second.

7   Q.  So when that stop happened, you had already made the

8   delivery?

9   A.  Correct.

10  Q.  And what happened?

11  A.  Mark was able to be let off due to what he told the

12  officer.

13  Q.  But you weren't present for the traffic stop.  Right?

14  A.  No, I was following him, and I had pulled over because

15  there was a cop behind me with his lights on.  And so I pulled

16  over, and he went blazing by me and ended up pulling over Mark.

17  So I pulled out and I went by him and seen the officer

18  approaching Mark's vehicle.

19  Q.  Did you talk to the defendant about it afterwards?

20  A.  It was just a small, little -- a slight, you know, hey,

21  man, I mean, good thing it was after, or something to that, you

22  know.  But, you know, it was just a -- just another stop for

23  him.

24  Q.  And what did he tell you?

25  A.  That -- you know, that it was just -- like I said, it was

1    more just a nonchalant kind of, you know, that -- about him not

2    getting -- he's not going to get a ticket.  Anytime you have

3    law enforcement, they can say, well, hey, buddy, you know, hey,

4    I'm not from around here, and they have a good old boy rule,

5    and they let you go on your way.

6    Q.   Why did you go on the two Florida trips?

7    A.   The guy that we sold to was a guy that I had met through

8    the dogs.  And I knew him, and I needed to be there for the

9    exchange, and so I followed him.  I'm not going to ride in a

10   vehicle full of weed across the country, so I decided to

11   follow.

12          Then if anything ever were to happen with the vehicle,

13   we have another vehicle to either -- you could pull the other

14   vehicle that had the weed in it to get it off the road or

15   change a tire or go get whatever it was that that truck had

16   broke or, you know, something along those lines as far as, you

17   know, why I needed to go.

18   Q.   Now, you made a reference to knowing him through the dogs.

19   Can you explain to the jury about what that means?

20   A.   Yeah.  So prior to me leaving the sawmill, I had acquired a

21   bluenose pit bull.  She ended up being really just a phenomenal

22   female.  Her parents were on a show, *The Real Housewives of*

23   *Orange County*, which was the original one, and a lot of people

24   wanted pups and whatnot from her.

25          So I got into -- I ended up breeding pit bulls, and it

1  kind of went hand-in-hand with the marijuana scene, you know,

2  because everybody wants to have that facade of either having

3  the pit bull as a protection or, hey, look, I can afford, you

4  know, a $5,000 dog, a $15,000 dog, a $20,000 dog, and, you

5  know, a dog that's on TV shows and whatnot.

6          So the guy from Florida, he had been out to Cali for

7  shows, which we didn't meet at, but it was just like our common

8  thing, and then he hustled weed.

9  Q.  How did you meet your client in Pennsylvania?

10 A.  Everybody I ever sold to or did business with, it was all

11 through the dogs.  So our guy out in Pennsylvania that we sold

12 to was a customer of mine.  He was infatuated with my dogs, and

13 it went from there.

14 Q.  Did he buy one of your puppies?

15 A.  Yes, he did.

16 Q.  Did you ever meet that person face-to-face?

17 A.  Because of being across the United States, most of them I

18 didn't.  And I kind of -- I liked it that way because -- just

19 for the purpose of being a drug dealer, being a hustler, but

20 not always -- that wasn't something that I ever wanted to do

21 long term or be a career drug dealer.

22          So not having people know really who you are, what you

23 look like, anything about you, where you live, it was pretty

24 nice.  We had -- the only exception to that rule is there was a

25 contact in California that we sold to out of Mark's home at 20

1  Century Court.

2  Q.  So this particular person in Pennsylvania who bought the

3  puppy, who bought one of the puppies, did you meet him

4  face-to-face?

5  A.  For a brief moment before the bust happened.

6  Q.  I should have been more clear.  Prior to December 28th,

7  2015, had you met him?

8  A.  No, I had not.

9  Q.  Before December 28th, were you selling marijuana to that

10  person?

11  A.  Yes, I was.

12  Q.  How were you getting the marijuana to him?

13  A.  It was sent through the USPS from the Ophir Station.

14  Q.  And who would help facilitate that process?

15  A.  So the whole process with the Pennsylvania client was

16  slightly different than some of the others.  But the need for

17  that client was because of the low quality weed that I was

18  being asked to sell.  The only place and the only person that

19  had said that they could sell that was the client in

20  Pennsylvania.

21  Q.  And when you're talking about the low quality weed you were

22  being asked to sell, where were you getting that from?

23  A.  From my co-defendants.

24  Q.  You need to be more specific.  Who?

25  A.  I can name them?

1   Q.  Sure.

2   A.  Okay.  Ryan Falsone, Ramona Long, and Mark Heath.

3   Q.  Some of that low quality weed, was it weed that was

4   being -- was it marijuana that was being grown by your

5   co-defendants?

6   A.  Some of it.  Ramona grew hers, Ryan grew his, and Mark

7   acquired his through work.

8   Q.  In terms of mailing it to Pennsylvania, did Ramona Long

9   help facilitate that?

10   A.  Yes, she did.  She worked at the Ophir Station.  She wasn't

11   there for all of them, but she was there.

12   Q.  How would you receive payment from the Pennsylvania client?

13   A.  It was being shipped through the United States post office.

14   Q.  And how would he pay you, in what form of payment?

15   A.  In cash.

16   Q.  And who did that cash get distributed to?

17   A.  So whoever had -- either Mark bringing me the weed or the

18   dealings that I had with Ryan and then I would throw in some of

19   mine, so it was -- he needed a blend, basically, so he needed

20   some of my higher quality weed that I had grown myself so that

21   he could hustle off the seeded, moldy weed that my

22   co-defendants had, you know, came up with.

23   Q.  Was that customer the only one that you mailed marijuana

24   shipments to?

25   A.  No, it was not.

1  Q.  I'm going to show you what's been marked as Government's

2  Exhibit 37.

3      MS. TAYLOR:  Your Honor, there is a stipulation

4  regarding this exhibit.

5      THE COURT:  Would you like to read it into the record

6  now?

7      MS. TAYLOR:  Yes, Your Honor.  The stipulation between

8  the parties reads:  The summary chart, Government's Exhibit 37,

9  accurately summarizes marijuana shipments mailed by Tyler Long

10 from California to Pennsylvania from September, 2015, through

11 December, 2015.  This chart lists gross weights which do

12 include the packaging materials.

13 BY MS. TAYLOR:

14 Q.  Now, Mr. Long, did the exhibit come up on your screen?

15 A.  Yes, it did.

16 Q.  You've had a chance to review this chart before today.

17 Right?

18 A.  Yes.

19 Q.  This chart shows just dates from September to December,

20 2015.

21 A.  Right.

22 Q.  Do you see that?

23 A.  Right.

24 Q.  And it indicates packages that were mailed from California

25 to Pennsylvania, gives weights and prices per pound.

1    A.  Correct.

2    Q.  Does this chart look like the approximate number of

3    packages and weight -- and the approximate weights of what you

4    shipped during that time period?

5    A.  It does.  There might have been a couple prior to that,

6    but this is pretty accurate to the amounts and the frequency of

7    it.

8    Q.  So this doesn't represent the universe of packages that you

9    sent, it's not necessarily all of them, but this is certainly

10   some of them, a selection?

11   A.  Correct.

12   Q.  Do you have any idea approximately how much money you would

13   have received from your Pennsylvania client over the time that

14   you dealt with him?

15   A.  I can't argue with the figures that you have provided here.

16   The math is there.  You know, I never really sat down and would

17   tally up and keep track and keep a note of how much money I've

18   ever -- that has came through my hands, so to speak.  So I

19   cannot argue with the math that you've provided, though.

20   Q.  So that indicates that it's almost $300,000, and you're not

21   disputing that?

22   A.  No.

23   Q.  When the packages would be shipped, who would pay for the

24   shipping costs?

25   A.  Almost entirely with everything, just to save the arguing

1   and the grief of it because everybody was so hungry and needed

2   it so bad, I would cover the costs of -- most times everything,

3   shipping, boxes, vacuum seal, anything that I used to disguise

4   the smell of the shipping.

5   Q.  You're saying you paid for it?

6   A.  Correct.

7   Q.  And where did that money come from?

8   A.  Drug money.

9   Q.  You mentioned Ryan Falsone just a minute ago, and we really

10  haven't talked about him.  Who is that?

11  A.  Ryan Falsone is -- he was purchasing Mark's house from him

12  at 20 Century Court.  He was the guy that grew on my mom's

13  property.  So where Mark had his grow, he then grew there and

14  expanded it even more than Mark's grow itself.

15  Q.  Do you have any idea how many plants Mr. Falsone would have

16  grown?

17  A.  I think at one time there were -- Ramona's were down there,

18  too, but, I mean, it was seventy-some-odd plants.

19  Q.  And did he tend to his plants like you described Mr. Heath

20  tending to his?

21  A.  Yes and no.  I mean, Ryan was up there, but Ryan had --

22  would either, a lot of times, have help or his wife up there,

23  where Mark took care of his more -- better on his own.

24  Q.  Did Mr. Falsone help out with anyone else's plants?

25  A.  If any, he would go sprinkle some water on my mom's plants

1    because she wasn't home a lot.  She was -- she had taken some

2    different jobs or changed title in the post office, because she

3    was out of the Palermo office and then she went to Oroville

4    Main.

5          And then every once in a while she'd bounce over to

6    the Ophir Station, which that's -- once she found out that I

7    was sending through Ophir Station, then that's when she wanted

8    me to get rid of hers and, you know -- just the more people

9    knew about how or when I was getting rid of weed, then they

10   wanted more and they wanted more into it, more -- well, get rid

11   of mine.

12   Q.  Mr. Falsone's growing in the operation, was it in the same

13   time period that you've been describing?

14   A.  Yeah, it was the 2015 grow season.

15   Q.  So is that the season that started in '14 into '15?

16   A.  Mark's was the '14 grow season, but by the time you sell

17   it, usually it's into the next year, you know, because you're

18   harvesting marijuana from September, October, early November.

19   So by the time you get done drying and curing your weed, then

20   it's normally being sold December, January, February, if you

21   have connects.  If you don't have the connections, then your

22   weed is sold, you know, as late as June, you know, May, June.

23   Q.  At some point you stopped shipping packages to your

24   Pennsylvania client.

25   A.  I did.

1  Q.  Then how did you decide to make delivery?

2  A.  Well, the whole reasoning behind the Pennsylvania client

3  was to help everybody that had the low quality weed.  Falsone,

4  my mom, they were more or less arguing over, you know, whose --

5  because Falsone was supposed to be paying my mom.

6       You know, Mark had his low quality stuff that he had

7  brought to me.  He thought it was over a hundred pounds.  Only

8  65 of it, after spending two days -- I spent, like, two 12-hour

9  days trying to sort through it and make something of it, and it

10  was just of the low quality that everybody knew you cannot sell

11  that quality in California.

12       We are in the heart and soul of the marijuana outdoor

13  industry.  It is huge.  It's not like out here.  Everybody's in

14  on it in some sort of fashion.  But the lower quality weed has

15  to come somewhere.  It used to be the entire east coast.  Now

16  it's not that way.  It used to be you could get rid of any weed

17  in, you know, Texas, the lower -- you know, Texas because it is

18  so illegal there, it was a good spot.  I never sold there,

19  Falsone did.  But the east coast was huge.

20       Now it's not that way.  Florida requires good quality

21  weed.  Atlanta, New York, Philadelphia, they have good quality

22  weed there.  So it ended up being all the way up in

23  Pennsylvania that -- is where we had to go to get rid of their

24  weed.

25  Q.  So what was the new delivery method going to be?

1    A.  We were just -- it's not really new.  We just reverted back

2    to, hey, you want money for this, everybody -- I kind of got

3    tired of the whole packaging it and trying to figure out how I

4    can get -- and then I kind of had to come down on my price to

5    get rid of their stuff that wasn't so good and everything.

6            So I said enough is enough.  Mark had a large amount

7    that he wanted to get rid of.  Like you said, it was supposed

8    to be over a hundred pounds.  Anything over a hundred pounds

9    you can have.  There were so many times with Mark that it was,

10   oh, you know, you'll get over -- you know, whatever is over

11   that, and then it comes to only 65 pounds being good.

12           You know, I got shorted so much by dealing with Mark

13   and Ryan.  And it was because no one wanted to put in the work

14   or effort that I did to grow the quality of weed that I could

15   sell in California anywhere, any dispensary, any -- anywhere.

16   You know, my strains, I put in the time, the work, the effort.

17           And, you know, I'm not here to put blame on anybody.

18   I took my part of the blame and my faults and whatnot.  So to

19   get rid of their low quality stuff, that's where it had to go.

20   We reverted back to the method of, okay, you drive, which he

21   was fine with.

22           So we packaged his boutique -- he said it himself

23   after the bust.  You know, he's like, joke is on them, they got

24   all that boutique stuff.  But, I mean --

25   Q.  So you were going to drive it out here?

1   A.  Yeah, that's what it came down to.  That's what was going

2   to have to be done, because I wasn't going to ship all Ryan's

3   seeded weed, all Ramona's seeded weed, and all Mark's moldy,

4   seeded shwag, just low quality weed.

5   Q.  So when was that delivery going to take place?

6   A.  The sooner the better.  He wanted it ASAP.

7   Q.  Wanted what?

8   A.  Our guy in Pennsylvania, he wanted it -- he couldn't get

9   enough.  You know, Pennsylvania, they want what they can get

10   their hands on out here.

11   Q.  So when did you set that delivery up for?

12   A.  It ended up being the end of December, is when Mark could

13   get the time off from work and it wouldn't look suspicious.

14   And that's why we did both trips right there around

15   Christmastime, because, hey, you know, I got family out east,

16   it's not going to look like anything.

17   Q.  Who came out on that trip?

18   A.  Mark drove, and then Ryan Falsone and myself were in my

19   F250.

20   Q.  What was Mark driving?

21   A.  His -- well, it was actually in my sister's name, it was

22   her new F250.

23   Q.  What color was your truck?

24   A.  It was white.

25   Q.  And what color was the truck the defendant was driving?

1    A.   Silver.

2    Q.   Did anybody else ride with the defendant?

3    A.   No, they did not.

4    Q.   Who was involved in loading the marijuana on the California

5    end of things?

6    A.   I brought it out for them, and then Mark and Ryan, they

7    stacked it in there.  I think because Ryan was the skinniest

8    dude with the longest arms, he went under the tonneau cover and

9    started stacking it in there.  You know, some of it was in bags

10   and then some of it wasn't and we just -- to try to get it to

11   fit in there.

12   Q.   And where was it being loaded?

13   A.   At 97 Gold Mountain Road.

14   Q.   I mean where -- which truck and where?

15   A.   It was at my residence that I have forfeited to the

16   government, and it was -- it was being loaded into the silver

17   F250.

18   Q.   Into the defendant's truck?

19   A.   Correct.

20   Q.   Now, you said some of it was in bags and some of it wasn't.

21   Can you describe how the marijuana was packaged?

22   A.   Pretty much just like the standard, how I would ship it

23   through the post office was in a vacuum seal, which you can get

24   at Walmart.  You go and you get a vacuum sealer, it sucks all

25   the air out of it and brings it down so it cuts down on odor.

1    And then you can either throw dryer sheets or something of that

2    nature in there just to help cut that smell.  And then you

3    double bag that, so it's double vacuum-sealed.  And then I'd

4    throw it in a trash bag, and those were scented, as well.

5          And then the other bags that they got put in were

6    actually just inserts, because for the industry, they have --

7    you know, people want to move their marijuana discreetly, so in

8    California, this is where I've seen them primarily, is they're

9    called Funk bags.  They're just -- they're double

10   charcoal-lined so it just really cuts the smell.

11         And we just used the liners of the bags because they

12   have them to where they look like a gym bag, but you don't --

13   we didn't need all that.  You know, it was going to be under a

14   tonneau cover.  We were just looking for something to cut the

15   smell.  And then if someone did see it, it just looked like

16   maybe some luggage or something from somebody.  So it was a

17   charcoal-lined, odor preventative bag.

18   Q.   I'm going to show you what's been marked as Government's

19   Exhibit 33.  What's that a picture of?

20   A.   That is a pound of marijuana.

21   Q.   Now, you say a pound.  How much would you typically package

22   in each of the bags?

23   A.   Typically it would be 1.04 ounces.  So it's -- basically

24   you're going to throw in a couple nugs over -- and when I talk

25   about a nug, it's, you know, a few nugs of marijuana, because

1    you are squishing it and kind of damaging it.  And when they do

2    dump the weed out and baggie it and sell it -- because we're

3    selling in bulk.  They would take it, they would break it down

4    into halves, quarters, or whatever so that they could make

5    their money.  So, you know, we were bulk sellers.

6    Q.  So were you overfilling the bags a little bit more than a

7    pound?

8    A.  Correct.

9    Q.  I'm showing you what's been marked as Government's Exhibit

10   32.  Do you recognize that?

11   A.  Yes, I do.

12   Q.  Now, other than the Post-It note with the 18 on it, I want

13   to direct your attention to the writing that's on it.  What

14   does the writing signify?

15   A.  The Purple Kush is the strain of marijuana.  The last one,

16   I could tell it said Lamb's Breath.  So there's literally

17   thousands of names for strains of marijuana.  And I really feel

18   like that's probably why it hasn't been legalized yet.

19   Q.  And did you make these names up that are on the bags?

20   A.  No.  There are several different companies that breed

21   strains of marijuana, and Purple Kush has been around for a

22   very long time.  Kush is big.  It's from the Afghan hills.

23   Q.  How about on the right side of the photo, what does that

24   writing depict?

25   A.  It's hard to see, but that's two X.  So that was some of

1    the stuff that I had gotten from Mark that was -- it was pretty

2    green.  It had some purple tint to it.  It didn't have much

3    smell, which a lot of times with the stuff that I got from

4    Mark, it wasn't marked any certain strain or whatever.  So

5    basically I would just throw on something that would sell, you

6    know, whether it would be -- you know, you just throw on, you

7    know, what my best guess would be.

8    Q.  You said that the two X's, though, that appear in

9    Government's Exhibit 32 indicate that this came from the

10   defendant.  How do you know that?

11   A.  So we're bagging it all -- when I say "we," it was Ryan

12   Falsone and I -- and he's like, yeah, how are we going to know

13   who had what and whatever, because it was, you know, Ryan's

14   first time and he had a bunch of questions about, you know,

15   well, how do I get paid, you know, I really need the money,

16   yada, yada, yada, you know.

17          And I said, all right, you know, well, you'll get paid

18   as it sells.  Well, how are we going to figure it out and who

19   knows who's selling, you know, what, which I would always take

20   the money last.  Everybody else would get paid first.  I'd get

21   my cut last.

22          So to come up with that system, Mark had driven, you

23   know, two different years, so he became known as two X.  Ryan,

24   this was his first year driving with us.  Like I said, he had

25   stated that he had been to Texas before delivering weed, not

1    with Mark or myself, and he was one X.  And because of my

2    Triple Cross pit bulls brand, I became three X.

3    Q.  Now, you made some reference earlier to receiving some

4    amount of marijuana from the defendant that you had to work on

5    for two days and it ended up only being 65 pounds.  Was that

6    marijuana that went into this shipment to Pennsylvania?

7    A.  Yes, it was.

8    Q.  Do you know how much marijuana the defendant gave you to

9    begin with?

10   A.  He thought it was, you know -- he said, well, it's over a

11   hundred, anything over a hundred is yours.  Hey, you know,

12   look, there could be 140 there.  I mean, it was kind of one of

13   those, you know, hey, you know, kind of incentive for me to

14   have to deal with the mess that was dropped on me.

15   Q.  Why didn't you just bag it all up?

16   A.  It would have became an issue when we got out here to where

17   someone would have been -- felt like they were being ripped

18   off, and then possibly I could have not gotten paid for the

19   whole load.

20   Q.  So out of the quantity that the defendant provided you, how

21   much did you determine was salable?

22   A.  It was the 65 pounds.  I went through it.  I had to dump it

23   all out.  I sat there and I divided it all out into what seemed

24   like it was similar types or strains or could pass as the same,

25   you know, because some of it was starting to brown and not look

1  so great.  Others was -- had seed.

2          So then it just became this whole process of trying to

3  figure out, like, what I could put together and what I could

4  salvage from it, because, I mean, the long and short of it was,

5  there was only 65 pounds that I came up with.  The rest of it

6  was either given back or offered back to him for me or him to

7  get rid of it, and the 65 of it got packaged and brought to

8  Pennsylvania.

9  Q.  Do you know how much marijuana Mr. Falsone put into what

10  came to Pennsylvania?

11  A.  We had a list somewhere of it all, but basically, I mean,

12  whatever was marked one X was his.

13  Q.  I'm going to show you what's been marked as Government's

14  Exhibit 5.  Do you recognize that?

15  A.  Yeah, I do.  And what this was, because of -- like I said,

16  I brought it out to them, and they were shoving it in the

17  truck.

18  Q.  You brought out what?

19  A.  I brought out the marijuana to Mark and Ryan to be placed

20  in the truck.  No one ever counted what was going in, you know.

21  So what -- when Mark and I made a trip, it went smoothly and

22  there wasn't the errors that we were having by bringing Falsone

23  into the fold, so to speak.

24          So this was trying to figure out exactly what was in

25  that truck, which it came -- this here is 115 and then a total

1  of 30 over here, so that puts us at 145.

2  Q.  Well, can you just explain what the double X next to the 65

3  is a reference to?

4  A.  That's what Mark had.  And then I was trying to figure out

5  whatever -- I'm pretty sure this was me jotting it down trying

6  to figure it out for Mark and Ryan, you know, because it was a

7  concern of, like, well, now when we drop it, now then we're

8  going to have to count it, we're going to have to be there

9  longer, figure out who had what.  So --

10  Q.  Well, again, I'm just trying to make it clear for the

11  record, the double X at the top is a reference to who?

12  A.  The two X, 65 pounds, is Mark, Mark's weed.

13  Q.  And how about towards the middle, the 32 and the single X?

14  A.  The single X and the 32 was -- for sure that was what Ryan

15  had brought along.  And then there were some others that -- you

16  know, Ryan got a few pounds from a coworker, or a coworker's

17  mom is what it was.  And she had grown weed, and he was trying

18  to help them out.  So he got some pounds from there and --

19  Q.  Where is that documented?

20  A.  It would be under the RPA, the eight, I think, is what was

21  going on there.  This was just a scribble note that was

22  supposed to -- should have been probably thrown away, but I

23  guess it was found in Mark's truck, is what I --

24  Q.  Is there any reference on here to any that came from Ramona

25  Long?

1  A.  Yeah, the Mo seed and the Mo Larry.  So the seed was the --

2  so she had 18 pounds in this trip.

3  Q.  Are all the numbers representing pounds?

4  A.  Yes, they are.

5  Q.  Now, there's no triple X listed there.

6  A.  On the side here was stuff that I had gotten.  Ryan owed a

7  debt to a guy because he borrowed $10,000 for a grow.  And I

8  paid that $20,000 because the guy wanted what was owed to him,

9  and so that would be the 13 there.  So basically that wasn't

10  a -- recoup my money.

11  Q.  But what's in Exhibit 5 you indicated was you guys trying

12  to figure out how many you each had?

13  A.  Correct.

14  Q.  And then you were going to try to count them once you got

15  to the drop location?

16  A.  Yeah.  No one could even figure out who had what and

17  whatever because everybody -- you know, other than Mark's 65

18  that we were nailed in on, then it was like, well, I got a

19  couple from this guy to help him out and he got a couple from

20  his buddy's mom and so then it was a cluster.  I mean, the

21  whole trip was that way.

22  Q.  For the 65 pounds that Mr. Heath had contributed, had he

23  been paid for that up front?

24  A.  They had seemed to be pretty hard up for money, and Mark

25  had asked me about some money and whatnot, so that's why the

1    whole expense of this whole trip, the tonneau cover, the tires,

2    whatever, was paid for by me that was on my sister's truck.

3    Then -- can you repeat that?

4    Q.  Well, had he been paid -- had Mr. Heath been paid --

5    A.  Okay, so where I was getting to on that was, so they needed

6    $10,000 for whatever reason, and ultimately I didn't like the

7    whole arguing and confrontation of it all.  I did have the

8    money, so I went and dropped $10,000 off at their house.

9    Q.  For his portion of -- or his 65 pounds, was that all the

10   payment that he was expecting to receive?

11   A.  Absolutely not.

12   Q.  So what was he expecting to receive after the delivery?

13   A.  So then it would have been Chip selling it, sending the

14   money to me, and then I would distribute it out to everyone

15   else.

16   Q.  And how much were you charging the Pennsylvania customer

17   per pound at that time?

18   A.  It was going to be around the 2,000 mark.  Some of it, I

19   had discussed briefly with him, because it was a little bit

20   better, it was going to be more.  And then some of it was going

21   to be negotiable if he couldn't sell it at that price.

22   Q.  So the defendant would have gotten essentially $2,000 a

23   pound for his 65 pounds?

24   A.  Correct.

25   Q.  And Mr. Falsone would have gotten --

1    *MS. ULRICH:*  Your Honor, I'm going to object.  She's

2    leading the witness.  If he's charging the connect 2,000 a

3    pound, I think he needs to testify as to who was making what

4    instead of her leading.  I think it's getting a little

5    confusing.

6            *THE COURT:*  Okay.

7    BY MS. TAYLOR:

8    Q.  Would you have passed that money on to Mr. Heath and

9    Mr. Falsone?

10   A.  Yes.

11   Q.  Did you take a cut out of their proceeds?

12   A.  No, I did not tax them on their cut.

13   Q.  Why did the defendant drive alone in the truck with all the

14   drugs for this trip?

15   A.  It was kind of a little bit of an unspoken thing, but, I

16   mean, he did -- I think Ryan may have --

17           *MS. ULRICH:*  Your Honor, I'm going to object unless he

18   knows for sure.  I don't want him to speculate.

19           *THE COURT:*  Sustained.

20           *THE WITNESS:*  We talked about it at his winery.

21   That's what he asked for.  That's what he wanted, and that's

22   why we did it.

23   BY MS. TAYLOR:

24   Q.  Did you and Mr. Falsone and the defendant have a meeting

25   where you discussed this trip?

1   A.  We did.

2   Q.  And when you had that meeting, did you talk about who would

3   do what?

4   A.  Yes.  It was at Tatum's winery in Bangor.  We all sat there

5   and discussed how, when, where, why we would go.  They didn't

6   ask for his name, is the only thing.  But other than that, they

7   knew where they were going and what they were doing and --

8   Q.  When you say "they" didn't ask for his name, who is "they"?

9   A.  Mark didn't really care of the guy's name or whatever.  He

10  just wanted the address and wanted to know if, hey, did you

11  know him and have you done business with him prior.  Yes, I

12  had.  He seemed pretty legit.  He had a bunch of different

13  connects in different states that he had stated.

14          He had sent me multiple pictures of operations that he

15  had himself, and that's why -- but ultimately the risk was

16  theirs.  It was -- Ryan and I had a guy that was coming to 20

17  Century Court.  I didn't have to go anywhere to get rid of my

18  weed.  This whole problem was because people were greedy,

19  people got comfortable, and this is the result of it.

20  Q.  And when you were at that meeting, did the defendant say

21  that he would drive the drugs by himself?

22  A.  That's what he wanted.

23  Q.  Did he specifically say he didn't want anybody else in the

24  car?

25  A.  Yeah, because then if he gets pulled over and he were to do

1  his cop MO, then they still got to worry about the two scary
2  looking dudes sitting next to him.  You know, well, do they
3  have priors, do they have this, do they -- you know what I
4  mean?  So it was better for us to ride in my truck.
5        There was -- Ryan is a mechanic, so he could fix
6  anything on Mark's truck that would go wrong.  But, I mean, it
7  was a brand-new truck.  But if we had to change a tire, if we
8  had to pull that vehicle, we had another vehicle capable there
9  to do that.  And then the whole reason why everybody went was
10  because, one, no one else would drive it, so Mark offered up
11  that to this process, and everybody was getting something out
12  of it.
13  Q.  On the trip from California to Pennsylvania, how many days
14  did it take?
15  A.  We stopped two nights, so it was our third day.  Well, it
16  was into the third night, but we just pushed and finished out
17  that night.  So it was a total of two nights, three days.
18  Q.  The nights, did you stop and stay --
19  A.  Yeah, we stayed at a hotel where Mark and Ryan always --
20  they shared a room.  There were two beds in each room.  I
21  wasn't going to sleep on a cot or -- and to be quite honest, I
22  needed a break from Mr. Falsone, and I had got my own room.
23  Q.  So during this trip, did you personally ever see the
24  defendant with a gun?
25  A.  No, I did not.

1    Q.  Did you ever have any discussions with the defendant about

2    a gun?

3    A.  No, I did not.

4    Q.  Now, just a few minutes ago you mentioned that you had a

5    meeting with the defendant and Mr. Falsone at Tatum's winery.

6    Do you know how the defendant and his wife purchased that

7    winery?

8    A.  It was bought with proceeds from the Florida trip.  And I

9    actually can't say that the property itself was, and I don't

10   know about that arrangement, but as far as the building, the

11   power pull, the dozer that was out there, the engineers, the

12   people that were erecting the building, because I did deliver

13   money so that he could pay those people, I can say that, yes,

14   that was from that money.

15   Q.  You're talking about the drug money that was paid as a

16   result of the Florida trips to deliver marijuana?

17   A.   That's what started it.  But there was other money from

18   other instances where I would go and drop money.  It was stuff

19   that he had gotten, I had sold, and I'd go deliver the money

20   there so that he could pay the people that were working at

21   their property.

22   Q.  When you say "there," where are you talking about?

23   A.  It was a little bit closer to Bangor itself.  We live a

24   little bit farther out in the foothills, so it was down Avocado

25   Road, and then it was a road off of Avocado.  And I want to

1  say -- I don't know, they fought the road name, and I think it

2  was Orange Avenue.

3  Q.  You're talking about Tatum's winery?

4  A.  Correct.

5  Q.  That's where you would drop money for him to pay people?

6  A.  Correct.

7  Q.  What did you do with the money that you made from selling

8  marijuana?

9  A.  I purchased properties.  I paid for my F250, and I had

10  numerous different performance things done to it.  And that's

11  part of where I met Ryan, through -- I had built a '91 4Runner.

12  I had built a Dodge pickup.  I had -- but primarily I would put

13  money -- I bought a house.  It had two modulars of 15 -- or it

14  was a ten-acre parcel for 225,000.  It was paid for all in drug

15  proceeds.

16  Q.  Did you use proceeds from your drug operation to pay for

17  expenses for the grow operation?

18  A.  Oh, absolutely.

19  Q.  Can you give us some examples?

20  A.  So every year I'd amend my soil.  So I would add either new

21  soil to it, because when you pull up the old root ball --

22  because we grow in grow bags, so it's a tan bag.  They're

23  approximately two feet high.  They sit above the ground because

24  then you don't have to worry about overwatering as much or

25  anything of that nature.

1    Any excess water will bleed out the sides, is how

2    they're designed, and to allow air into the roots, because

3    marijuana plants are just like humans.  They need the same

4    things.  They need the same vitamins, they need -- they need

5    everything.  So I would go to the grow stores that we have and

6    purchase the top-of-the-line nutrients so that I could produce

7    as good a quality of marijuana that I could.

8    Q.  How about improvements on your property, did you use drug

9    proceeds to --

10   A.  Yes, I did.  So when I first started, it was up in the

11   trees, low key.  It was -- I didn't have a well.  I had to get

12   well water from my parents' house.  And then over the years I

13   had different operators come in to clear different pads.  The

14   one was used primarily for growing.  The other one was just in

15   case I sold the property, it was prepped for a house already.

16       So I paid, you know, cash for operators to come up and

17   do different work there, tree trimming.  I did several

18   different fences because there were different rules and stuff

19   that had been enforced in our county.  So different fencing,

20   different -- I put buildings so the guys that came up and

21   trimmed and worked for me were in a better working environment.

22   You know, I had air conditioning.

23       It was -- it was just a metal building on the outside,

24   so when you seen it, it just looks like something someone paid

25   4500 bucks for.  It was on a $4,000 slab of cement.  And then

1  from there, it was all insulated and drywalled better than most

2  people's houses.

3  Q.  Do you know how your brother-in-law spent the money he made

4  besides on the winery, which you've already told us about?

5  A.  His wife is pretty high maintenance.

6  Q.  That would be your sister?

7  A.  Yeah.  So, I mean, he bought a lot of nice jeans and

8  tattoos and breast augmentation and cars.

9  Q.  Did you ever ask your brother-in-law for money advice?

10 A.  No.  You know, when we sat around trimming, you know, hey,

11 don't have over $10,000, you know, it's -- or, you know --

12 Q.  That's something you told him?

13 A.  No, it's something that he would tell me, you know, as kind

14 of be careful, you know, this is -- this is what I've seen, you

15 know.  And, two, you know, hey, watch how much you have going

16 in the bank and whatnot.  So early on I had put money in the

17 bank, and the last several years it was just, just cash.

18 That's all I would deal in.  I wouldn't do bank transactions

19 any longer.

20 Q.  Now, given that you've explained that this is largely a

21 cash business, is it fair to say that you've certainly, in the

22 past couple of years, made in excess of a half million dollars

23 in cash?

24 A.  Yeah.

25 Q.  And more than that?

1   A.  Yes.

2          MS. TAYLOR:  Your Honor, if I could have the court's

3   indulgence for just a moment.

4          THE COURT:  Yes.

5          MS. TAYLOR:  Your Honor, I'd ask for the admission of

6   Government's Exhibits 32 and 33.

7          THE COURT:  Ms. Ulrich, any objection?

8          MS. ULRICH:  No, Your Honor.

9          THE COURT:  Thirty-two and thirty-three are admitted.

10          MS. TAYLOR:  And I have no further questions for this

11   witness.

12          THE COURT:  All right.  Let's take a 15-minute recess

13   here, jurors, and then we'll come back and hear the

14   cross-examination of the witness.  Ms. Weida, would you escort

15   the jury, please.

16      (Jury leaves courtroom.)

17          THE COURT:  We'll be in recess until 11:35.

18      (Recess taken.)

19                      CROSS-EXAMINATION

20   BY MS. ULRICH:

21   Q.  Good morning, Mr. Long.

22   A.  Good morning.

23   Q.  It's hard to see with that screen there.  I want to talk to

24   you a little bit about your own family.  I understand that

25   you're married?

1   A.  Correct.

2   Q.  You're married to Marisa Long?

3   A.  Correct.

4   Q.  And I understand she's in the courtroom today?

5   A.  Correct.

6   Q.  And the two of you have three children?

7   A.  Correct.

8   Q.  And how old are they?

9   A.  They are five, nine, and twelve.

10  Q.  And, of course, you all live in California.  Is that right?

11  A.  Correct.

12  Q.  Now, you met Mr. Heath through your sister.  Is that right?

13  A.  That's correct.

14  Q.  Mr. Heath was in the Marine Corps, wasn't he?

15  A.  Correct.

16  Q.  And he would have been in the Marine Corps from about 1998

17  to 2002.  Is that right?

18  A.  Yeah.  I met him in 2002, and he was getting out of the

19  Marines, so I can't tell you his Marine history.

20  Q.  But your sister was in the Marine Corps.  Is that right?

21  A.  Correct.

22  Q.  And your sister is Tatum?

23  A.  Correct.

24  Q.  It was Tatum Long at the time.  Correct?

25  A.  I'm not sure.  She was previously married before that, so

1    I'm not sure if it was his last name or --

2    Q.  Okay.  But the two of them met because they were both in

3    the Marine Corps.  Is that right?

4    A.  Correct.

5    Q.  And after they got out of the Marine Corps, they got

6    married.  Is that right?

7    A.  I never met Mark before they got married.  I couldn't

8    honestly answer that.

9    Q.  But you know they're married.  Right?

10   A.  Correct.

11   Q.  And they moved to California.  Is that right?

12   A.  Correct, which I did help them move.

13   Q.  Pardon?

14   A.  I helped them move from Carolina to there, yes.

15   Q.  Is that where he moved from, did you say North Carolina?

16   A.  I didn't say which one because I get them mixed up.  I've

17   been to both, but --

18   Q.  Okay.  So after they got out of the Marine Corps, they got

19   married.  I guess you say you don't know much about that, but

20   the two of them moved to California.  Is that right?

21   A.  Correct.

22   Q.  And when they moved to California or even before, they have

23   a few children, don't they?

24   A.  Correct.

25   Q.  And do you want to tell the jury who their children are?

```
1    A.  It's Sydney and Trinity Heath.

2    Q.  And how old -- Sydney, you would agree she's about 14 now?

3    A.  Yes.

4    Q.  Trinity is about eight?

5    A.  Correct.

6    Q.  And out in California, that's really where your family is

7    from.  Is that right?

8    A.  It is.

9    Q.  Are you and Tatum the only children?

10   A.  We are.

11   Q.  And your mother is Ramona Long?

12   A.  Correct.

13   Q.  Okay.  So you and Tatum are the only two children, and it

14   sounds like your great grandfather had this property out there,

15   your grandfather had this property out there.  Is that right?

16   A.  Correct.

17   Q.  What you called the ranch.  Is that right?

18   A.  Yes.

19   Q.  And at some point your mother, who is Ramona Long, got

20   about 20 acres.  Is that right?

21   A.  That is correct.

22   Q.  And you said, I think, you got about five acres?

23   A.  Five of that 20, yes.

24   Q.  Now, when you were out in California, your family was out

25   there, Mr. Heath's family was out there.  I assume that in the
```

1  years that you were out there together, the families got along?

2  I mean, they got together for birthdays and holidays, things

3  like that?

4  A.  We tried to.

5  Q.  Pardon?

6  A.  We tried to.

7  Q.  Okay.  And that's why you know he has two children, Sydney

8  and Trinity, because your kids all play together.  Right?

9  A.  I was there when they were born.

10  Q.  Okay.  That's nice.  And that was California.  Correct?

11  A.  Correct.

12  Q.  And the families would go out to dinner together.  Is that

13  right?

14  A.  That is.

15  Q.  Now, you said that he worked at a saw -- well, no, you said

16  you worked at a sawmill.  Is that right?

17  A.  As did Heath.

18  Q.  Okay.  And your father owned that sawmill.  Is that right?

19  A.  He what?

20  Q.  Your father owned the sawmill?

21  A.  Owned?

22  Q.  Or operated?

23  A.  No, he worked there, correct.

24  Q.  Okay.  So you -- not only did you -- was he married to your

25  sister, but the two of you worked together at the sawmill.  Is

1   that right?

2   A.  Yeah, for a time.  The sawmill itself is also 240 acres.

3   There's several different departments.  I started as cleanup

4   and worked up all the way into a supervisor role.  Mark started

5   as a forklift operator at the dry kilns.  So being a vast

6   operation with multiple shifts and different things, I didn't

7   see him for periods of time, even though we both lived at 21

8   Century Court when they first did move out from --

9   Q.  Okay.  And you said they moved out in 2002.  Is that right?

10  Or give or take.

11  A.  What was that?

12  Q.  2002.

13  A.  That he moved out?

14  Q.  Is that when you met them, when they moved out to --

15  A.  Yes, yes, correct.

16  Q.  Is that about the year that they came out?

17  A.  Correct.

18  Q.  Okay.  The two of you worked at the sawmill, but at some

19  point I think you had some sort of injury and had to leave the

20  sawmill?

21  A.  Yeah, I had broken my collarbone racing.

22  Q.  And Mr. Heath left the sawmill, and he became a sheriff.

23  Is that right?

24  A.  Correct.  He -- I think he went into being -- working in

25  the jail for Yuba County.

1  Q.  You would agree with me that he was a Yuba County sheriff

2  probably -- well, not saying probably, but he worked with the

3  Yuba County Sheriff's Department since 2003 up until this

4  arrest.  Is that right?

5  A.  Correct.

6  Q.  And as a sheriff, of course, he carried a firearm.

7  Correct?

8  A.  Correct.

9  Q.  I mean, you knew he carried a firearm.  Right?

10  A.  On duty, yes.

11  Q.  And when you were out and about, like when you were going

12  to dinner, running errands, did you ever see the firearm?

13  A.  No.  It wasn't -- it wasn't my thing.  I don't like

14  handguns.

15  Q.  No, no, I'm not asking if you were carrying, but you're

16  saying that you never saw Mr. Heath carry a gun in California?

17  A.  One time we did.  We were going into court because I was

18  adopting my stepdaughter, and he tried to bring it into the

19  court, and they told him, no, you can't bring that in there.

20  And he had an argument, well, I'm a deputy, blah, blah, blah,

21  and I think they ended up making him go put it in the vehicle.

22  Q.  Okay.  So you saw it, you said that you were at a court

23  proceeding to adopt your third child?

24  A.  It was my wife's first.  She was a year old when I got

25  together with my wife.  I then later adopted her after I had

1   already had my children.

2   Q.  Sure, but he was coming to the court proceeding with you.

3   Is that right?

4   A.  Correct.

5   Q.  He was coming there in support of you?

6   A.  Correct.

7   Q.  And he wasn't on duty at that time, was he?

8   A.  I'm not sure if he was, like, headed to work or not.

9   Q.  But he was there on a personal matter with you for the

10  adoption of your child.  Correct?

11  A.  Correct.

12  Q.  And you know, actually you know his -- you had known his

13  family pretty well.  You know his father, Earl Hall.  He's

14  sitting in the courtroom.  Right?

15  A.  Yeah.

16  Q.  And you've known him for a long time?

17  A.  I only met him briefly.  I know his mother Lori a lot

18  better.

19  Q.  And his mother Lori Coogan is in the courtroom.  Is that

20  right?

21  A.  Correct.

22          MS. TAYLOR:  Your Honor, I'm going to object to these

23  questions as not being relevant.

24          THE COURT:  Ms. Ulrich.

25          MS. ULRICH:  Your Honor, what this is going to get to

1  is that their relationship became, like, nonexistent after the

2  arrest, that it ruined the family, the arrest.

3      *MS. TAYLOR:*  I'm not sure how that's relevant to the

4  charges in the indictment.

5      *THE COURT:*  How is that relevant?

6      *MS. ULRICH:*  Your Honor, it just goes to Mr. Heath's

7  state of mind.

8      *THE COURT:*  I'm going to sustain the objection.

9  BY MS. ULRICH:

10  Q.  You were -- they didn't live in California, Mr. Heath's

11  family.  Is that right?

12  A.  No, they did not.  I believe his father to have lived on

13  the east coast somewhere, possibly Carolina, maybe.  But his

14  mother, she is a great lady, and she lives in Ohio.

15  Q.  Since this arrest, have you talked to his mother?

16  A.  No, I have not.

17  Q.  And let's talk about the arrest.  Of course, your world was

18  turned upside down on December 28th, 2015, wasn't it?

19  A.  For the better, yes.

20  Q.  And on December 28th, 2015, of course, is when you got

21  arrested in York County.  Is that right?

22  A.  Correct.

23  Q.  And you had a ton of marijuana that you had transported

24  from California to Pennsylvania.  Is that right?

25  A.  Yes, we did bring the marijuana to Pennsylvania.

1  Q.  And after that arrest, you lost a lot of properties.  Is

2  that right?

3  A.  Correct.

4  Q.  I take it you and your mother Ramona -- how is that

5  relationship?  Did that kind of fall to pieces?

6  A.  She was divorced from my father and --

7  Q.  She was divorced?

8  A.  Yeah.  And the guy that she got with, I think now they

9  might be married.  I don't have contact with them because of

10  his behaviors and his just constant enabling.  You know, this

11  was all a learning process, and I'm kind of embracing it and

12  taking my punishment.

13  Q.  Sure.  Well, you're going to go to jail.  You're facing a

14  mandatory five years' imprisonment, aren't you?

15  A.  That's correct, that's what it states, but it also states

16  in there that the judge could go below that.

17  Q.  Well, it's a mandatory sentence.  There's only one way she

18  can go below a mandatory sentence.  Is that right?

19  A.  Correct.

20  Q.  And that's if the prosecutor asks the judge to go below the

21  mandatory minimum.  Is that right?

22  A.  I'm new to this all, but I believe that is correct.

23  Q.  And the only reason the government would do that is based

24  on your testimony today.  Is that right?

25  A.  Correct.

1  Q.  I mean, you're not just testifying out of the goodness of

2  your heart, you're testifying because you want to get a really

3  good break at sentencing, don't you?

4  A.  There's two parts to that.  And, yes, and I had originally

5  said I would never testify against my brother-in-law, but I was

6  approached by two different gentlemen that Mark --

7  Q.  Well, I would -- I don't know where this is going.  That's

8  not responsive to my question.

9  A.  It is because that is why I'm here.

10      MS. ULRICH:  Your Honor, I would ask you to instruct

11  the witness not to answer.

12      THE COURT:  Counsel approach.

13    (The following discussion occurred at sidebar:)

14      THE COURT:  He was approached by two people?

15      MS. TAYLOR:  I don't know.

16      MR. TERZ:  Do you know anything about this, Lori?

17      MS. ULRICH:  I don't know a thing about this.

18      MS. TAYLOR:  He seems like he's just trying to answer

19  the question of why he's here to testify.

20      MS. ULRICH:  Your Honor, I would ask that we do it out

21  of the presence of the jury in case he says something that's

22  going to cause a mistrial here.

23      MS. TAYLOR:  Like what?

24      MS. ULRICH:  Like, I don't know, he was threatened

25  with a gun.  I mean, I don't know what he's going to say.  He

1    could say something that could cause a mistrial.

2         MR. TERZ:  It would be a mistrial on your question.

3         THE COURT:  So the point is that he's testifying

4    because the government is going to do something for him.

5         MS. ULRICH:  Right.

6         THE COURT:  Okay.  We'll just leave it at that.

7         MS. TAYLOR:  Well, Your Honor, he obviously has some

8    further response.

9         THE COURT:  If you know what it is -- nobody has had

10   greater access to him than you have.  I think you need to just

11   move on.  You made your point.

12        MS. ULRICH:  Yes.

13        THE COURT:  If you want to explore that on your

14   redirect, we'll deal with it then.  But the objection is

15   sustained.

16      (The discussion at sidebar was concluded.)

17   BY MS. ULRICH:

18   Q.  Okay.  So, Mr. Long, December 28th you get arrested.

19   Correct?

20   A.  Correct.

21   Q.  The first time you've been arrested in your life.  Is that

22   right?

23   A.  Correct.

24   Q.  You lose a lot of your properties.  Is that right?

25   A.  All of them.

1  Q.  And you lost a lot of money?

2  A.  Correct.

3  Q.  Facing five years in jail?

4  A.  Correct.

5  Q.  And so basically this has all ruined your life.  Is that

6  right?

7  A.  Through the process, I don't take it that way.  It got me

8  out of the game, so for that I don't feel that it ruined my

9  life.  It's allowed me to regain who I used to be and get back

10 into the workforce and be a positive role model for my

11 children.

12 Q.  And that's actually a very good goal, and I appreciate

13 that.  That's --

14        THE COURT:  Ms. Ulrich, excuse me.  I'm sorry to

15 interrupt you, but it's just been called to my attention that

16 there's an issue with one of the jurors, so I'm going to call a

17 recess and ask Ms. Weida to escort all of the jurors out except

18 Juror Number 8, and then we'll resume in just a moment, but I

19 want to have a word with Juror Number 8.

20        (Jury leaves courtroom.)

21        (The following discussion occurred at sidebar:)

22        THE COURT:  I don't know what exactly is going on

23 here, but our jury clerk got a call and said that your husband

24 has taken ill at work.  So it's up to you, we're getting close

25 to the lunch hour, we can recess and you can come back or I can

1  excuse you now.  It says that he was not feeling well, that the

2  employer, I don't know where he works, called a pastor and that

3  he was taken home.

4          *JUROR NUMBER 8:*  I need to go.

5          *THE COURT:*  Okay.

6          *MS. ULRICH:*  I'm sorry.

7          *THE COURT:*  Has he been sick?

8          *JUROR NUMBER 8:*  No.

9          *THE COURT:*  I'm so sorry.  Can we do anything to help

10  you get on your way?  Do you have everything you need with you?

11          *JUROR NUMBER 8:*  Yeah, I just need to go get my stuff

12  out of there.

13          *THE COURT:*  Okay.  Ms. Weida, would you help Juror

14  Number 8.

15      *(The discussion at sidebar was concluded.)*

16      *(Jury enters courtroom.)*

17          *THE COURT:*  All right.  Ms. Ulrich, I apologize for

18  the interruption.  Sometimes we have family emergencies that

19  just have to be tended to.  All right, go ahead.

20          *MS. ULRICH:*  Thank you.

21  BY MS. ULRICH:

22  Q.  Mr. Long, I want to talk about the trips to Florida.  You

23  said there were two trips to Florida.  Is that right?

24  A.  Correct.

25  Q.  And that was you and Mr. Heath?

1   A.  Correct.

2   Q.  And this individual in Florida, what was his -- oh,

3   actually, I want to go back.  You started -- before the trips

4   to Florida, you started dealing -- or I think growing

5   marijuana, I think you said in 2009.  Is that right?

6   A.  Correct.

7   Q.  And you started on a property that you had gotten from your

8   mother or your grandparents?

9   A.  Correct.

10  Q.  And did you have a legitimate job at that time?

11  A.  At that time, no, I was on unemployment.

12  Q.  And were you on unemployment the whole time until after

13  this arrest?

14  A.  Oh, no.

15  Q.  What kind of income did you have from 2009 to your arrest

16  besides unemployment?

17  A.  I raised pit bulls and sold drugs.

18  Q.  Okay.  So a lot of your income was both from the drugs and

19  from the pit bull business.  Is that right?

20  A.  Which went hand-in-hand, correct.

21  Q.  How successful was your pit bull business, by the way?

22  A.  I had some pretty good clients.

23  Q.  How much money a year were you making in the pit bull

24  business, do you think?

25  A.  That is not a quick, easy answer.  There's a lot of expense

1  to breeding.

2  Q.  But just an average, just average.

3  A.  I can't throw -- I'd have a better guess at how many cups

4  of coffee I had last year.

5  Q.  Would it be fair to say that it wasn't enough to support

6  the family of five?

7  A.  Oh, no.

8  Q.  So that's why, in part why you got involved in selling

9  drugs, because you needed to make extra money for the family.

10  Is that right?

11  A.  Yes and no.  But yeah.

12  Q.  What was the other reason?

13  A.  Go ahead.

14  Q.  You said yes and no?

15  A.  Well, I mean, I did make enough to just do the dogs, but

16  for everything, the family's needs and goals for the ranch,

17  splitting the property, the cost of fixing and living in my

18  grandparents' old house that had been there for centuries --

19  Q.  You needed money, right, to do all those things?

20  A.  Correct.

21  Q.  Okay.  Prior to 2009, was anybody selling -- I should ask,

22  were you the first in the family to start selling on those

23  properties in 2009, or cultivating?

24  A.  Yeah, yeah, correct.

25  Q.  And I think you said you started -- first you got started

1  with a cousin.  Is that right?

2  A.  I did.

3  Q.  Who was that, Jeb Jenkins or something?

4  A.  Jenkins.

5  Q.  Jenkins.  Is that kind of how you got started, with

6  Mr. Jenkins, your cousin?

7  A.  It was.

8  Q.  So you got started in about 2009 through a family member?

9  A.  Correct.

10  Q.  And you were using property that you got from your family.

11  Is that right?

12  A.  When I first got started, it was -- with Jeb, it was in

13  trimming his weed for him.  And then we did a greenhouse and

14  outdoor grow on two pieces of property, but it was the -- on

15  Jeb's property, which he has lost since then, and the property

16  next to that we had rented.

17  Q.  So he kind of trained you in this, Jeb Jenkins kind of told

18  you how to do it?

19  A.  Yeah, they taught me a fine trade.

20  Q.  And then 2009 is when, of course, you already established

21  that you started doing your own thing on your property.  Is

22  that right?

23  A.  It was in 2010.

24  Q.  And your mother Ramona, she also started growing marijuana

25  on her land.  Is that right?

1   A.   That was in, I want to say '11 or '12.

2   Q.   Okay.  But it was a family thing, you and your mother were

3   growing marijuana on your -- this family-owned property.

4   Right?

5   A.   Yeah.

6   Q.   In fact, I think, like, a lot of the stuff -- you had

7   storage sheds there where you processed the marijuana.  Is that

8   right?

9   A.   Yeah, I had buildings.

10   Q.   Okay.  Now, then moving forward to, I think it was 2014,

11   you said there were these two trips to Florida.  Is that right?

12   A.   Correct.

13   Q.   And you were delivering to a gentleman in Florida.  What

14   was his name?

15          *MS. TAYLOR:*  Objection, Your Honor.  Relevance.

16          *MS. ULRICH:*  Your Honor, he's already -- it's part and

17   parcel of the offense.

18          *THE COURT:*  Overruled.  Go ahead.

19   BY MS. ULRICH:

20   Q.   You were delivering to a gentleman in Florida.  Who was it?

21   A.   Robert Funk.

22   Q.   And that's somebody you had met through your dog training

23   business.  Is that right?

24   A.   Dog breeding, yes.

25   Q.   And how long had you known Mr. Funk?

1  A.  Years.

2  Q.  Years prior to 2014?

3  A.  Yes.  I did business with him since the first year I grew.

4  He was my first customer.

5  Q.  2010?

6  A.  I would say yes.

7  Q.  So prior to 2014, you were dealing with Mr. Funk in Florida

8  from 2010 to 2014.  Right?

9  A.  Correct.

10  Q.  And that was -- you were selling him marijuana.  Correct?

11  A.  Correct.

12  Q.  And is that -- you were selling that through -- sending

13  that through the mail to him.  Is that my understanding?

14  A.  Correct.

15  Q.  Okay.  And that was all the stuff that you were growing on

16  your property?

17  A.  It was for several years until Mark started --

18  Q.  Sure, but I'm talking about pre-2014.  This was your

19  connect, somebody you knew that you were selling marijuana to

20  in Florida.  Correct?

21  A.  Yes, but if I --

22  Q.  You made all the --

23  A.  If I can't testify and --

24       *MS. TAYLOR:*  Your Honor, if Ms. Ulrich could let the

25  witness finish his answer.

1    *THE COURT:*  You may finish your answer.

2    *THE WITNESS:*  All right.  Well, there's -- that was

3    the second time.  But at any rate, the first -- Mark was

4    getting stuff from work, and it was being sold to him prior to

5    the trips to Florida.

6    BY MS. ULRICH:

7    Q.  Okay.  But I'm talking about prior to the trips to Florida.

8    I want to know what you did with Mr. Funk before Mr. Heath got

9    involved.  You were selling Mr. Funk marijuana.  Is that right?

10   A.  Correct.

11   Q.  And that was marijuana that you grew on your property.  Is

12   that right?

13   A.  That is correct.

14   Q.  And that was marijuana that you were sending him through

15   the mail.  Is that right?

16   A.  Correct.

17   Q.  And Mr. Heath didn't know anything about that marijuana you

18   were sending to Mr. Funk.  Is that right?

19   A.  He helped me trim it.

20   Q.  Well, did he know Mr. Funk?

21   A.  I would assume not.

22   Q.  Okay.  He didn't know you were putting marijuana in the

23   packages and sending them to Mr. Funk, did he?

24   A.  No.

25   Q.  Okay.  That was your connect, wasn't it?

1     A.   Yep.

2     Q.   And you set the prices.  Right?

3     A.   Correct.

4     Q.   You set the amounts, didn't you?

5     A.   It went as -- the price goes as what the seller, he can

6     sell it for, what he can buy it for.  So it would vary, yes.

7     Q.   But it was you and Mr. Funk establishing prices and

8     quantities.  Right?

9     A.   Yeah, correct.

10    Q.   Okay.  And you were sending them through the mail.  Was

11    that through the same post office that your mother worked at?

12    A.   No, not at that time.

13    Q.   What post office were you using?

14    A.   When it was just me and Funk?

15    Q.   Yes.

16    A.   Anywhere from Brownsville, Loma Rica, anywhere but my mom's

17    work.

18    Q.   Did you know people inside those post offices, too?

19    A.   Nope.

20    Q.   So you were just doing all that, and you got away with it.

21    Right?

22    A.   Correct.

23    Q.   Never got busted?

24    A.   Nope.

25    Q.   Okay.  So you're dealing with Mr. Funk.  You also dealt

1   with another individual by the name of Matthew McDonald.  Is

2   that right?

3   A.  That was one of Beau's customers, and then, yeah, he dealt

4   in the same circle.

5   Q.  Mr. McDonald was a connect of yours, also, wasn't he?

6   A.  In a roundabout way, yes, he ended up being one of my

7   customers.

8   Q.  You sold him marijuana.  Right?

9   A.  I sold him mine and Mark's marijuana, yes.

10  Q.  And he sent you the money.  Is that right?

11  A.  That is correct.

12  Q.  And you mailed that marijuana through the mail?

13  A.  Correct.

14  Q.  Now, you said Mr. Heath, he started growing in 2014.  Is

15  that right?

16  A.  That is correct.

17  Q.  And you would agree it's because, like you, he became

18  desperate for money, didn't he?

19  A.  He wasn't desperate, he was making good wages.

20  Q.  As a sheriff?

21  A.  Correct.

22  Q.  Well, you said your sister he was married to was high

23  maintenance.  Is that right?

24  A.  That is correct.

25  Q.  Okay.  They weren't living real high on his salary as a

1    sheriff, were they?

2    A.   Nope.

3    Q.   I mean, and I think you even said earlier in your

4    testimony, it was greed that motivated all of you.  You guys

5    wanted money, didn't you?

6    A.   Well, I did it because I never had been without a job since

7    the time I had left high school.  For six and a half years I

8    worked night shift working at Sierra Pacific in Lincoln, which

9    was over an hour away.  And there wasn't work for me, so, yes,

10   I did start selling weed.  And how it continued and escalated

11   was people seeing me -- I ended up in a deal where I bought a

12   house and a property and had vehicles.  They wanted that,

13   but --

14   Q.   You had a lot more than they did, didn't you, and they were

15   jealous, weren't they?

16   A.   At the beginning, yeah.  I worked hard.  I mean, it's not

17   that I'm proud in being a good drug dealer.  But, yes, I

18   produced high quality marijuana that people wanted.  And I did

19   produce weed, and I did sell it to people, various people.

20          And, no, no one was involved really at that time until

21   they wanted to be -- they wanted the money from it, but they

22   didn't want to use it like I did.  I purchased a house for my

23   family.  I bought a piece of property and cleaned a marijuana

24   grow off of it so I wouldn't have a marijuana farm across the

25   street from my house, so my kids wouldn't have to be around it.

1  I only grew up on a five-acre parcel that was three-quarters of

2  a mile away on the other side of the hill.

3  Q.  Mr. Long, you're not suggesting that what you did with your

4  drug money is better than what anybody else did with their drug

5  money, are you?

6  A.  I think I used it in a fashion that could be more

7  respectable than being a cop and stealing people's weed and

8  putting them away in jail and then selling it.

9  Q.  Right, and there's no doubt -- and that is shameful, isn't

10 it?

11 A.  It is.

12 Q.  And he lost his job as a sheriff, didn't he?

13 A.  As he should have.

14 Q.  Right.  He lost everything when he got arrested for this,

15 didn't he?

16 A.  He didn't lose as much as I did.

17 Q.  Well, yeah, you lost a lot, but he lost a lot, didn't he?

18 A.  Can you just tell me what he lost, he forfeited?

19 Q.  Well, he didn't have much, did he?  What did he lose?  The

20 winery, you said there was a winery.  Do they still own that

21 winery?

22 A.  I don't know how they were able to sell it.  I don't look

23 into anyone else's deals.  I guess they had sold it.

24 Q.  Do you even talk to your sister anymore?  Do you even talk

25 to Tatum?

1 A. Absolutely not.

2 Q. That's right, because of this arrest. Right? After this

3 arrest, that was the end of it. The family fell apart, didn't

4 it?

5 A. Mark sent Tatum to talk to me and basically put a threat

6 out there, you don't throw heat my way, I won't throw it yours,

7 drop the mic type of deal, walked out, turned her back on me,

8 didn't want to hear what I had to say, how I had to say it, as

9 she didn't for years, because I told her multiple times that I

10 was getting too complacent and comfortable in what I was

11 doing --

12 Q. Right.

13 A. -- and that's how you do get caught slipping.

14 Q. And I absolutely agree with all of that. This tore your

15 family apart, didn't it, this arrest? You have no relationship

16 with your sister and Mr. Heath anymore, do you?

17 A. They --

18   *MS. TAYLOR:* Your Honor, I'm going to object to the

19 relevance of these questions.

20   *THE COURT:* Overruled.

21   *THE WITNESS:* They chose to move across the United

22 States and leave me with the mess that he had made, so --

23 BY MS. ULRICH:

24 Q. Everything is one big mess after this arrest. It's all a

25 big mess, isn't it?

1   A.  Well, I had, you know, people that he had ripped off come
2   approach me, and that's part of the reason why I'm here to
3   testify, as well.
4   Q.  You're really angry at Mr. Heath, aren't you?
5   A.  No, but anytime -- he knows me, too, I've had his back.
6   When he was at the sawmill and grabbed a guy by the neck that
7   was half his size and then his gangbanger cousin was going to
8   handle him, I went out there and I dealt with it.  I will stand
9   up for anything I believe in.  I don't believe in this fight
10  that he is doing.  I believe in what I'm here to do.  You know,
11  it's a big scary thing over here.
12  Q.  You don't believe in his fight, is that what you just said?
13  A.  Yeah, you know --
14  Q.  His fight, like this trial?
15  A.  Yes.
16  Q.  You don't believe he has a Sixth Amendment right to a
17  trial?
18  A.  I do, but I don't agree in trying to blame everybody else
19  when we were caught red-handed with drugs.  He had a gun in his
20  truck and everything else.
21  Q.  Do you know he's admitting to trafficking in marijuana?  Do
22  you know that?
23  A.  I don't know any of his things.  I was just told to come
24  here, and I'm asked questions and trying to answer them as
25  honestly and truthfully as I can.

1    Q.  And you're angry because you think basically he's saying, I

2    had nothing to do with this?  That's why you're angry at Mr.

3    Heath?

4    A.  I'm not angry with him at all.

5    Q.  Okay.  Well, it certainly sounded like it a minute ago,

6    that you were not happy.

7          MS. TAYLOR:  Objection, Your Honor.  Is that a

8    question?

9          THE COURT:  Sustained, sustained.

10   BY MS. ULRICH:

11   Q.  Now, going back to your trips to Florida, Mr. Long, you

12   said you took two trips to Florida to your connect, Mr. Funk.

13   Is that right?

14   A.  That is correct.

15   Q.  And Mr. Heath wanted that because he needed money, so he

16   was bugging you to sell this marijuana because he needed the

17   money.  Right?

18   A.  Yeah, he decided to grow it, and that's correct.

19   Q.  Okay.  So the two of you travel in tandem to Florida.  Is

20   that right?

21   A.  That is correct.

22   Q.  Now, just so we're clear, did you supply any of the

23   marijuana on those two trips?

24   A.  Yes, I did.  It was partially from my grow.

25   Q.  And partially his grow, his work?

1   A.  Yes.

2   Q.  Okay.  You make those two trips, I think you said late

3   2014, 2015, but that -- is that right?

4   A.  Yes.

5   Q.  Are you absolutely sure it was 2015, the second trip?

6   A.  No.

7   Q.  Okay.  Would you agree the two trips were probably the end

8   of 2014?

9   A.  They could have possibly have been both in the end of 2014.

10  It was -- I know it was winter, and it was -- like I said, it

11  was -- this is years ago, but I know it was in either the end

12  of '14, early '15, or both in the end of '14, correct.

13  Q.  Now, when you were going to Florida, how much did Mr. Heath

14  supply on the first trip?

15  A.  Part of being a drug dealer, you don't write things down

16  and keep track and notes and stuff that any law enforcement

17  could then find.  So I know he sold 102 pounds because that's

18  what he had produced, and we took approximately -- the same

19  amount we brought to Pennsylvania because it was a truckload,

20  thereabouts.  So it was, you know, in the 150-pound range each

21  time.

22  Q.  Now, you just said you didn't write things down, drug

23  dealers don't write things down, but didn't you testify on

24  direct that you wrote those numbers on Government Exhibit 5?

25  And if you need to see it again, I'll show it to you.  That was

1  your writing, you wrote those numbers.  Right?

2  A.  Yes.  Mark asked me about the load that was there, and we

3  tried to jot down what was in the vehicle.  And why he wadded

4  it up and put it in his truck is beyond me.

5  Q.  Well, that was your -- let's look at Defense Exhibit 100.

6  This is your writing.  Right?

7  A.  Yep.

8  Q.  Okay.  Sixty-five with the two X's means that was

9  Mr. Heath.  Right?

10  A.  Correct.

11  Q.  Because he, you said, had gone on the trip two times to

12  Florida?

13  A.  Correct.

14  Q.  Who came up with that double X, you or Mr. Heath?

15  A.  It was something that Falsone and I had talked about and

16  discussed to differentiate or figure the differences in between

17  each other's weed.

18  Q.  Okay.  It says, 10 Mo, slash, seed.  What does that mean?

19  A.  That is Mona's weed that was seeded.  It was marked "seed"

20  on the bags.  It was OG, but it was seeded.  Mo Larry is Larry

21  OG.

22  Q.  So you knew that your mother supplied ten.  Right?

23  A.  18.

24  Q.  18.  So both the ten and the eight was your mother's.  Is

25  that right?

1   A.  That is correct.

2   Q.  And your mother gave it to you, didn't she?

3   A.  Correct.

4   Q.  Okay.  And the 32, the X was Mr. Falsone.  Right?

5   A.  Correct.

6   Q.  And so the three, the four of you --

7   A.  But just so it is noted, this is -- we were trying to

8   figure it out.  There was 165 in total, I believe, and there's

9   not 165 on here.  So this isn't going to be accurate.  This was

10   us trying to brainstorm and be like, dude, what is actually

11   here, who has what, and --

12   Q.  And that reminds me, you said 165.  It was approximately a

13   pound in each of those packages, correct, a little over?

14   A.  Slightly over, yes.

15   Q.  You said one -- what was it, like --

16   A.  1.04 was the goal.

17   Q.  Okay.  Now, going back to this list, these are all -- this

18   is all your handwriting, your numbers.  Correct?

19   A.  Yeah.

20   Q.  And, in fact, I think even the one bag, it said something

21   like Purple Kush.  You wrote that on the bag.  Right?

22   A.  I wrote everything on most -- well, on most bags.  Ryan

23   Falsone wrote some of them, too.

24   Q.  It says, 2 Rich.  What does that "2 Rich" mean below?

25   A.  That was from a gentleman.

1   Q.  Who?

2   A.  There were two.

3   Q.  Who?

4   A.  Rich.

5   Q.  Who is Rich?  Is that a friend of yours?

6   A.  He worked for me.

7   Q.  Okay.  So that's somebody that you knew that gave you two

8   pounds of marijuana for this trip?

9   A.  Yeah.  He worked for me trimming, he needed money, he had a

10  little thing of his own on the side.  I helped him out by

11  purchasing those.

12  Q.  And then it has, 8 RPM.  What does that mean?

13  A.  That's RPA, so -- which is Ryan's Performance Automotive,

14  but I don't recall what that was to, what that referenced.

15  Q.  But that's your handwriting?

16  A.  This upper part seems to be.  The bottom part looks

17  slightly different.  And I can't recall -- like I said, it

18  was -- we all were trying to figure out who had what in the

19  truck.

20  Q.  Well, Rich is your guy.  Right?  Rich is your guy, he's

21  your friend?

22  A.  But Ryan knew, yes.

23  Q.  Ryan knew?

24  A.  Yeah.

25  Q.  And then we have, 13 Monty.  Who is Monty?

1   A.  That's my cousin.

2   Q.  Okay.  So that's another guy, that's your guy.  Monty is

3   your guy.  Right?

4   A.  That was who Ryan owed, yes.

5   Q.  So Monty gave you 13 pounds for this trip?

6   A.  No, he did not.

7   Q.  What does that 13 pounds mean for Monty?

8   A.  It just represented the -- what Ryan -- Ryan owed money.  I

9   paid it, and I was getting reimbursed by the stuff that he owed

10  him.  But like I said, I don't know that I wrote this on the

11  bottom right.  It looks way different than the upper, upper

12  thing to me.

13  Q.  But --

14  A.  So I don't know if this -- this is something that Ryan and

15  Mark could have done, as well.

16  Q.  And I appreciate that, but I'm not asking you to speculate.

17  So you're saying the top part is yours, the bottom is not.

18  Right?  Is that what you're saying?

19  A.  Well, you're asking me to speculate on this note that I

20  told you I didn't really remember.  It was just something -- we

21  all drove several days, several hours, and were really tired.

22  We all talked about it and whatever.

23  Q.  And I'm fine with that.  I'm not trying to trip you up.  I

24  just want to know, is that your handwriting at the bottom or

25  not?

1    A.  I'd have to speculate to give you an answer.

2    Q.  You don't recognize your own handwriting?

3    A.  I do, and that doesn't -- that could be Ryan's, for all I

4    know, because I don't know Ryan's hand -- those look like two

5    different things.

6    Q.  Well, that's okay.  I just -- that's all I'm asking, is it

7    or is it not.  So it's not your handwriting.  Right?

8    A.  They appear to be different to me, and I cannot recall

9    whether I wrote that, Ryan wrote that, Mark wrote that.  It was

10   found in his possession, so I don't know what he wrote on it

11   afterwards or what they were trying to figure out, as well.

12   Q.  And that's fair.  The top part is your writing.  Right?

13   A.  Yep.

14   Q.  Okay.  We can agree on that.  So you say -- going back a

15   couple steps here, you said you didn't -- drug dealers don't

16   write down their information.  You wrote that.  Right?

17   A.  Yeah.  I didn't write down that I was getting hundreds of

18   thousands of dollars or making millions over years of time.

19   That was at the moment when we got busted within 24 hours.

20   Q.  Okay.  So you got these two trips to Florida.  On each

21   trip, you supplied some of the marijuana, Mr. Heath supplied

22   some of the marijuana.  Is that fair?

23   A.  Yeah.

24   Q.  And you were in two cars.  Right?

25   A.  Correct.

1  Q. And on neither of those occasions I believe your testimony

2  was you never saw a gun?  Is that right?

3  A. No.

4  Q. Now, fast-forwarding then to the trip to Pennsylvania and

5  this guy in Pennsylvania, Chip Conrad.  Is that right?  Right?

6  A. I was told not to say names but --

7  Q. Well, now it's cross-examination, and I think we've heard

8  that name, Chip Conrad.

9  A. Okay.

10  Q. Yes?  I'm not asking -- yes?  His name was Chip Conrad,

11  wasn't it?

12  A. Yes.

13  Q. Okay.  And that was your connect, wasn't it?

14  A. Yes.

15  Q. And how did you -- how long had you known Mr. -- I don't

16  even know if his last name is Conrad.  What did you know him

17  as?

18  A. Chip.

19  Q. Okay.  How long did you know Chip?

20  A. Since he had purchased the dog.  And I can't remember the

21  exact date on that because it was several years ago.

22  Q. Okay.  So you knew him for several years?

23  A. No.  Well, it was several years ago that I met and sold him

24  a dog.  This all went down at the -- this has been -- this

25  wasn't last week.

1   Q.  No, I understand.  You knew Chip for a few years before you

2   got arrested?

3   A.  No.  I knew him approximately six months.

4   Q.  It was just recent that you had met Mr. --

5   A.  Yeah.  The whole reason I had to get Chip and do what I did

6   is because of the low quality weed that was provided to me but

7   forced on me to sell, you know, and people demanding money and

8   needing money because they can't afford what they have.

9   Q.  Right, I understand.

10  A.  Whether it was a shop by RPA or it was a winery by Mark.

11  Q.  I get that they needed money.  And not to belabor the

12  point, how long did you know Chip before your arrest?

13  A.  They had shown the thing where I had shipped, and like I

14  said, it was -- it was months, it wasn't years.

15  Q.  Okay.  So you got arrested December 28th, 2015.  Really

16  what you're saying is, you just met him just before you started

17  shipping the marijuana to him?

18  A.  Yes.

19  Q.  And you met him, you said, because of your Triple Cross

20  Kennels business.  Is that right?

21  A.  Yeah, through the pit bulls.

22  Q.  And the two of you just struck up a conversation,

23  obviously, about marijuana.  Is that right?

24  A.  Yeah.  Pretty much everybody that I sell dogs to in the

25  United States, they automatically, hey, you know, you're from

1    Nor Cal, what's up?

2    Q.   It kind of goes hand-in-hand, dog breeding --

3    A.   It does go --

4    Q.   -- and marijuana?

5    A.   Not dog breeding, pit bulls in general, which I was getting

6    out of, but yes.

7    Q.   All right.  So you send packages to Florida, you take the

8    trips to Florida, you meet Chip, and then you're charged in the

9    indictment for a package on September 11th, 2015, a package

10   that was containing marijuana that was shipped from the

11   Oroville Main Post Office in Oroville, California, to York.

12   That's a package you sent to Chip.  Is that right?

13   A.   From Oroville Main?

14   Q.   No, Oroville Main Post Office in Oroville, California.

15   A.   I believe them all to be through the Ophir Station, but the

16   Ophir Station, the mother part of it -- because the Ophir

17   Station is just a small, little station, so that's -- yeah, I

18   think all the packages go from Ophir to Oroville Main, I think

19   is what you're getting at.

20   Q.   And by the way, you and your mother had decided that these

21   packages were going to be shipped through the post office.

22   Right?

23   A.   No.

24   Q.   You and your mother never talked about these packages being

25   shipped through the post office?

1    A.  Prior to purchasing my house and having to grow a large

2    marijuana -- a lot of marijuana, she didn't know that I was

3    shipping out of state.

4    Q.  Well, at some point she learned that you were shipping out

5    of state because she helped you.  Right?

6    A.  Yeah, she wanted me to -- I was going to move off the ranch

7    and not be around, and to keep me around, she worked a deal

8    with someone that she had known for a very long time, Tony, and

9    worked that deal.  So I ended up paying a large amount of money

10   in lump sums and paying a mortgage payment of $8500 a month

11   until it was paid off.

12   Q.  But my question is, you and Ramona conspired to mail these

13   packages from California to Pennsylvania to Chip.  Right?

14   A.  No.

15   Q.  Your mother Ramona Long did not conspire to send these

16   packages with you to Pennsylvania?

17   A.  Well, I mean, she then -- at the beginning, no.  And then

18   she was supposed to be working at Oroville Main.  I went into

19   Ophir Station, and she was there.  Obviously she didn't say

20   anything.  But then obviously then she wanted me to get her her

21   money and sell her seeded weed, which then ended up in Mark's

22   truck and then headed out to Pennsylvania.

23   Q.  And she was getting a cut of these packages you were

24   mailing to Chip.  Right?

25   A.  No.

1  Q.  She wasn't getting any money?

2  A.  No, you only get paid if you provide weed.

3  Q.  But she was letting the weed get through the post office

4  without detection.  She was a part of that, wasn't she?

5  A.  Yeah.

6  Q.  And she's pled guilty to that.  Right?  She pled guilty to

7  conspiracy.  Right?

8  A.  I think so.

9  Q.  So that was her employment, she was working there and she

10  was letting these packages get through for you.  Correct?

11  A.  Correct.

12  Q.  And you're saying she didn't get any money for that?

13  A.  No.  She got money, though, when her stuff was sold.

14  Q.  So in those packages, it's a combination of your stuff?

15  Yes?

16  A.  Yes.

17  Q.  Mr. Heath's stuff?

18  A.  Yes.

19  Q.  Mr. Falsone's stuff?

20  A.  Yes.

21  Q.  And your mother's stuff?

22  A.  No.  Her stuff, she -- most of her stuff got ruined.

23  You're talking about the year that Pennsylvania happened?

24  Q.  2015.

25  A.  All right.  In 2015, that's all she ended up with because

1  almost all her weed -- I tried to get her to throw it all away,
2  and she didn't do it.
3  Q.  But the packages, you're saying then, were just you,
4  Mr. Heath, and Mr. Falsone?
5  A.  Correct.
6  Q.  And she wasn't getting any cut for letting this go through
7  the post office?
8  A.  No.
9  Q.  And so we can agree -- and by the way, Mr. Heath didn't
10  know Chip, did he?
11  A.  No.
12  Q.  That was strictly your connect?
13  A.  Correct.
14  Q.  You set the prices with Chip.  Right?
15  A.  It was to be determined because of the quality of the weed,
16  yes.
17  Q.  In fact, I think you said you had a conversation with Chip
18  that what you were bringing on your behalf was better than what
19  these other guys were providing?
20  A.  Yeah.
21  Q.  Okay.  So, in fact, you were setting -- you wanted more for
22  your weed than the other three.  Is that right?
23  A.  Yes, because I did inherit some of Mr. Falsone's weed in
24  trades for vehicles, wheels and tires, different things.  And
25  it was in there, and I was going to recoup my money from all

1  the money that I had to pay out.

2  Q.  Okay.  So for your weed, how much were you getting?

3  A.  I didn't get anything, but if I would have, it would have

4  been 2250.

5  Q.  And for Mr. Heath's, what were you expecting or hoping for?

6  A.  He was going to see what he could do with it, but, I mean,

7  Heath was hoping for 2,000 a pound.

8  Q.  But that was going to come through you.  Right?  He wasn't

9  negotiating with Chip, was he?

10  A.  It ended so abruptly that no one got to converse anything.

11  Q.  Well, they didn't even know where they were going in

12  Pennsylvania until about an hour out from the trip when you

13  told them.  Right?

14  A.  I followed him all the way, so, yes, he knew where he was

15  going.

16  Q.  So you're saying that you gave him the address before you

17  left?

18  A.  I told him we were going to Harrisburg.  He said, hey, when

19  we get close, I'll get the address from you and follow me in.

20  Q.  And, actually, let's talk about that meeting.  I think you

21  testified on direct that there was some meeting between you,

22  Mr. Falsone, and Mr. Heath before you left.  Is that right?

23  A.  Yeah.

24  Q.  And I assume at that meeting you were working out all the

25  details of the trip.  Right?

1  A.  Correct.

2  Q.  Okay.  Now, during that meeting, you didn't discuss that

3  Mr. Heath had to carry a gun.  Is that right?

4  A.  Correct.

5  Q.  You didn't discuss that he had to bring a gun to assist

6  with this delivery.  Is that right?

7  A.  Correct.

8  Q.  You didn't tell him to bring the gun to facilitate this

9  delivery.  Is that right?

10  A.  Correct.

11  Q.  You didn't tell him to bring the gun to promote the

12  delivery.  Is that right?

13  A.  Correct.

14  Q.  You didn't tell him to bring it to accomplish the delivery.

15  Is that right?

16  A.  Correct.

17  Q.  You didn't tell him to bring the gun to advance the

18  delivery, did you?

19  A.  Correct.

20  Q.  In fact, your testimony was that not only did you never

21  discuss the gun, you didn't even know he was carrying a gun on

22  December 28th, 2015.  Correct?

23  A.  Correct.

24  Q.  Now, you're saying that there were discussions with

25  Mr. Heath and Mr. Falsone regarding Chip and what he wanted.

1    Is that what your testimony is?

2    A.  Can you repeat that?

3    Q.  Okay.  That was a bad question.  Let me just say, you did

4    all the negotiations with Chip leading up to that trip and

5    during the trip.  Is that right?

6    A.  Yeah.

7    Q.  In fact, I'm going to show you Defense Exhibit 139.  This

8    is a text from you to Chip saying, Okay, I don't want to talk

9    no details in front of these two guys.  Is that right?

10   A.  Correct.

11   Q.  That was you telling Chip, don't discuss this in front of

12   Mr. Heath and Mr. Falsone.  Correct?

13   A.  Correct.

14   Q.  Now, Mr. Long, of course, you guys get here.  Now, you

15   didn't know, of course, that Chip had been arrested for

16   marijuana prior to December 28th.  You had no knowledge of

17   that?  Right?

18   A.  No.

19   Q.  And you didn't know on December 28th he was working with

20   law enforcement, did you?

21   A.  No, I did not.

22   Q.  And so when you got there, soon after your arrival is when

23   you all got arrested.  Correct?

24   A.  Correct.

25   Q.  And you, after your arrest, of course, you were taken into

1  custody.  Is that right?

2  A.  Yes, I was.

3  Q.  And you were questioned by different police officers.  Is

4  that right?

5  A.  Yes.

6  Q.  And you would agree that you lied to them about many of the

7  details of this venture.  Correct?

8  A.  No, I did not.

9  Q.  Well, didn't you initially tell Detective Schauer that it

10  was Heath and Falsone that supplied all the marijuana?

11  A.  No, I did not.

12  Q.  Didn't you tell Detective Schauer that they're the ones

13  that knew bigger drug dealers?

14  A.  Yeah.  He wanted me to give up people and whatnot, and I

15  directed him, I said -- I directed him to people that would

16  know more.

17  Q.  Right, but all these connects were yours.  Right?

18  A.  Yeah, which is pretty low level compared to the people

19  around Northern California.

20  Q.  The people that you were selling to?

21  A.  No.

22  Q.  You didn't tell him about Mr. Funk, did you?

23  A.  I wasn't asked about Mr. Funk.

24  Q.  You didn't tell him about Mr. McDonald, did you?

25  A.  I wasn't ever asked about Mr. McDonald.

1  Q.  And didn't you deny that Chip was sending you money?  You

2  denied that when you were arrested, didn't you?

3  A.  No, I did not.  I was asked for a written statement because

4  Mr. Heath had given one, and I wanted a phone call and was in

5  a -- I was sick, I was throwing up, but yeah.

6  Q.  You denied receiving money in the mail.  Right?  You're

7  saying you didn't?

8  A.  I do not remember any conversation other than a law

9  enforcement officer coming telling me that I didn't need to say

10  a word, that he knew that I was the kingpin, Mark was just the

11  driver because he could get out of it because of a badge, and

12  that Ryan was the muscle.  And when I -- I left and he said,

13  oh, well, you know what I mean, he's there to do the stuff you

14  don't want to do.

15  Q.  Listen, you told him that Mr. Heath was in financial

16  trouble, didn't you?

17  A.  That was a long time ago, and I cannot tell you for certain

18  what exactly transpired, except for I didn't give any written

19  statements.

20  Q.  I understand you didn't give written statements, but you

21  lied to the officers after you were arrested, didn't you?

22  A.  I didn't.

23  Q.  Pardon?

24  A.  No, I did not.

25  Q.  You're absolutely denying that you lied to these officers?

1  A.  I don't feel that I did.

2  Q.  So if they lied -- if they say you lied to them, they would

3  be lying?

4  A.  Some officers do lie.

5  Q.  You also told them that you had given Mr. Heath 30,000

6  before the trip.  Is that right?

7  A.  That is incorrect.  I paid 20,000 for a debt of Ryan's and

8  10,000 to Mr. Heath's wife.

9  Q.  I'm just asking whether you told the officers after your

10  arrest, did you tell them that you gave Mr. Heath 30,000 before

11  the trip?

12  A.  No.

13  Q.  Okay.  Did you tell them Mr. Heath was in financial

14  trouble?  Yes or no.

15  A.  I think there was some sort of thing.  I think he asked me

16  if that's why he was doing it, because I think he was a little,

17  maybe, disgusted of Heath's whatever.  But it was -- at that

18  point I did want my phone call, and I was not going to talk to

19  them or give them any written statements.

20  Q.  But you did talk to them, and you lied to them?

21  A.  No, I did not.

22  Q.  Okay.  You told them that Mr. Heath paid your mother

23  $60,000, didn't you?

24  A.  I was falling asleep and sitting handcuffed to a small

25  bench for hours on end.  I cannot recall -- I don't know

1  what -- I know that the officer that was in with me left.  I

2  only talked to one officer.  He left, he went in with Heath.

3  Then he'd come back to me and say, well, he said this, blah,

4  blah, blah, blah, blah.  And when I wouldn't give him anything,

5  he would then go back to Mr. Heath.

6  Q.  I understand, Mr. Long.  Bottom line is, you're saying you

7  did not lie to these officers when you were arrested, period.

8  Right?  That's what you're telling the jury.  Right?

9  A.  Yeah.

10  Q.  Okay.  Now, moving forward, you said you were charged in 18

11  counts of this indictment.  Is that right?

12  A.  That is correct.

13  Q.  In fact, you were charged -- you and your mother were

14  charged with most of the counts involving the delivery of the

15  packages.  Is that right?

16  A.  I'm not sure what she was charged with, but --

17  Q.  Let's talk about what you were charged with then.  Let's go

18  through.  You were charged in Count 1 with conspiracy.  Right?

19  A.  Correct.

20  Q.  And you had a copy of the indictment.  Right?  You don't

21  have it there, but you were given a copy?

22  A.  Yeah, yes.

23  Q.  And you were charged in Count 2 with conspiracy to commit

24  money laundering.  Is that right?

25  A.  Correct.

1    Q.  You alone were charged in Count 3 with sending a package of

2    marijuana to Pennsylvania on September 11th, 2015.  Right?

3    A.  Yeah.

4    Q.  You alone were charged in Count 4 with sending a package to

5    Pennsylvania on September 23rd, 2015.  Is that right?

6    A.  Right.

7    Q.  September 29th, you alone were charged with sending a

8    package to Pennsylvania to Chip.  Is that right?

9    A.  Correct.

10   Q.  In Count 6, you were charged with sending a package to

11   Pennsylvania to Chip on October 7th, 2015?

12   A.  Correct.

13   Q.  And you and your mother were charged in Count 7 with

14   sending a package on October 9th, 2015.  Is that right?

15   A.  Correct.

16   Q.  And by the way, these are counts in which Mr. Heath is not

17   named.  Right?

18   A.  Okay.

19   Q.  These are just you and your mom?

20   A.  Okay.

21   Q.  Count 8 -- you agree with me --

22   A.  Yeah.

23   Q.  -- that that is, in fact, true?

24   A.  Yes.

25   Q.  Okay.  Count 8, it says that you and your mother, again,

1   distributed marijuana on October 9th, 2015, by putting a

2   package of marijuana in the mail to Chip.  Right?

3   A.  Correct.

4   Q.  Count 9, another count, is just you and your mom sending a

5   package to York on October 9th, 2015.  Is that right?

6   A.  Correct.

7   Q.  And then in Count 10, again, you and your mother are the

8   only two charged with sending a package to Pennsylvania on

9   October 9th, 2015.  Is that right?

10  A.  Correct.

11  Q.  Count 11, you alone are charged with mailing a package on

12  October 28th, 2015, to Pennsylvania.  Right?

13  A.  Correct.

14  Q.  Count 12, you were charged with mailing a package on

15  October 28th, 2015, to Pennsylvania?

16  A.  Correct.

17  Q.  Count 13, again, you and your mother are the only two

18  charged with sending a package to Pennsylvania on November 4th,

19  2015.  Is that right?

20  A.  Correct.

21  Q.  And in Count 14, a second charge of sending a package to

22  York on November 4th, 2015.  Correct?

23  A.  Correct.

24  Q.  Again, Count 15, you and your mother are charged with

25  sending a package to York on December 4th, 2015.  Is that

1  right?

2  A.  Correct.

3  Q.  And again on December 4th, 2015, you and your mother are

4  the only two charged with sending a package to York?

5  A.  Correct.

6  Q.  Count 17, you and your mother are the only two charged with

7  sending another package on December 4, 2015, to York.  Is that

8  right?

9  A.  Correct.

10  Q.  Okay.  And despite all those counts, you pled guilty to

11  only two counts in this indictment.  Is that right?

12  A.  That is correct.

13  Q.  And Count 1 is conspiracy.  Is that right?

14  A.  Correct.

15  Q.  And that is a mandatory minimum sentence of five years,

16  isn't it?

17  A.  Correct.

18  Q.  And you pled to Count 2, the money laundering.  Right?

19  A.  Correct.

20  Q.  And you were never charged with carrying a firearm in

21  relation to drug trafficking, were you?

22  A.  No.

23  Q.  And, of course, you know that that would have been a

24  five-year consecutive to the five-year mandatory on Count 1?

25  A.  Okay.

1    Q.  And the government never charged you with that gun, did

2    they?

3    A.  I never had a gun.

4    Q.  And you didn't know about it?  Right?

5    A.  No.

6    Q.  Now, you signed a plea agreement in this case agreeing to

7    cooperate with the government.  Is that right?

8    A.  Correct.

9    Q.  And the government agreed if you provide substantial

10   assistance, they can ask for a downward departure at the time

11   of sentencing.  Is that right?

12   A.  Correct.

13   Q.  And, of course, that is what you're hoping, is that when

14   this is all said and done and you go before this judge, you get

15   something less than five years.  Is that right?

16   A.  That is correct.  Along with everybody else that Mark had

17   ripped off, I don't want them to hold me accountable and come

18   to me for money or any other thing, so this is my way of kind

19   of separating myself from his colleagues and himself.

20   Q.  I get that you've had it with Mr. Heath, but you want a

21   sentence of less than five years.  Is that right?  Yes or no.

22   A.  I do care about my children.

23   Q.  Yeah.

24   A.  Yes.

25   Q.  You want to do less than five?

1    A.   Obviously.

2    Q.   Just a few more questions.  I know it's getting close to

3    lunch.  I just want to show you Government Exhibit 5 again.

4    And could I ask the government for Government Exhibit 5?  I

5    need the package.

6         Mr. Long, this is Government Exhibit 5.  If I could

7    ask the government to pull that out.  And, of course, we've

8    talked about that, and we're not going to rehash that.  But

9    they're, of course, claiming that was found in Mr. Heath's

10   glove compartment.  I think that's what you said, too.  Is that

11   right?

12   A.   I think that's what they said.

13   Q.   Now, there are a bunch of papers, of course, in Government

14   Exhibit 5.  It's not just that receipt.  And there are things

15   in here that belong to Mr. Heath.  But there is also this.

16        *MS. ULRICH:*  May I approach the witness, Your Honor?

17        *THE COURT:*  You may.

18   BY MS. ULRICH:

19   Q.   What is that?

20   A.   That is my registration card.

21   Q.   For your white Ford truck that you were driving.  Is that

22   right?

23   A.   Yep, correct.

24   Q.   And there would be no reason for this to be in Mr. Heath's

25   glove compartment, is there?

1  A.  No.

2          MS. ULRICH:  That's all I have.  Thank you.

3          THE COURT:  All right.  Any redirect?

4          MS. TAYLOR:  Just briefly, Your Honor.

5                   REDIRECT EXAMINATION

6  BY MS. TAYLOR:

7  Q.  Mr. Long, Ms. Ulrich asked you a bunch of questions towards

8  the end of your testimony about your plea agreement and the

9  counts that you pled guilty to.  Do you recall those questions?

10  A.  Yes.

11  Q.  You understand that although you did not plead guilty to

12  Counts 3 through 17 or Count 18, all the packages that --

13          MS. ULRICH:  Your Honor, objection.  She's leading the

14  witness.

15          THE COURT:  I'll allow her to finish the question.  Go

16  ahead.

17  BY MS. TAYLOR:

18  Q.  All the packages that Ms. Ulrich went through, which I

19  won't belabor by reading through again.

20  A.  Correct.

21  Q.  But is it your understanding that each of those is listed

22  in Count 1 of the indictment?

23  A.  Yeah.

24  Q.  And did you plead guilty to Count 1 of the indictment,

25  which specifically -- the conspiracy count, which specifically

1  lists each of those packages and dates?

2  A.  Correct.

3  Q.  Ms. Ulrich also asked you a number of questions a couple of

4  different times about why you were cooperating.  Can you

5  explain to the jury why you're cooperating?

6  A.  You know, obviously I would appreciate, since I've never

7  been in any other trouble prior to this, you know, a downward

8  sentence, you know, less than five years.  And like I said, you

9  know, I was approached by a gentleman --

10         MS. ULRICH:  Your Honor, objection.  May we approach?

11         THE COURT:  We're going to leave the answer where it

12  stands.  You're not allowed to convey any information that

13  someone else told you, and the objection relates to that.  It

14  appears that you're about to quote someone else.  Is that part

15  of your answer?

16         THE WITNESS:  It was people that I had --

17         MS. ULRICH:  Your Honor, this is hearsay.

18         THE WITNESS:  -- dealt with, but yes.

19         THE COURT:  All right.  Then let's move on.

20         THE WITNESS:  Okay.

21  BY MS. TAYLOR:

22  Q.  Ms. Ulrich also asked you some questions about seeing a gun

23  on the trip that you and Mr. Heath and Mr. Falsone took out to

24  Pennsylvania to deliver the marijuana in December of 2015.  Do

25  you recall those questions?

1    A.   Yes, I do.

2    Q.   Did you see a gun on that trip?

3    A.   No, I did not.

4    Q.   You were also asked about whether you saw Mr. Heath carry a

5    gun regularly when you would see him in California when he was

6    on duty during the time that he worked as a deputy sheriff.

7    A.   Correct.

8    Q.   Did you see him carry a gun regularly then?

9    A.   No.  He had -- his concealed weapons permit and stuff

10   allowed him to carry it, but it's always under clothing, so you

11   wouldn't know that he had it.

12   Q.   So typically if he was carrying, you were not aware of it?

13   A.   Correct.

14   Q.   Was whether he had a gun or not a topic that you discussed

15   with Mr. Heath?

16   A.   No, it wasn't.

17   Q.   Ms. Ulrich also asked you a number of questions about the

18   Florida trip, Florida trips, and whether you saw Mr. Heath with

19   a gun on those trips.  Do you recall those questions?

20   A.   I do.

21   Q.   At any time did you see Mr. Heath with a gun then?

22   A.   No.

23   Q.   Did you discuss a firearm with Mr. Heath during those

24   trips?

25   A.   No, I did not.

1    MS. TAYLOR:  Those are all the questions I have, Your

2  Honor.

3    MS. ULRICH:  Just a few.

4                    RECROSS-EXAMINATION

5  BY MS. ULRICH:

6  Q.  Mr. Long, I get the sense that -- you said you never saw

7  him regularly carrying a gun in California.  Correct?

8  A.  He was an officer there undercover.  He was dressed just in

9  plain clothes.  And, you know, I mean, you would assume that he

10 had it, but, no, I never witnessed it.

11 Q.  You didn't see it.  Correct?

12 A.  Correct.

13 Q.  So, in other words, you're not saying he wasn't carrying

14 it; if it was under his clothes, you didn't know that it was

15 under his clothes.  Right?

16 A.  Correct.

17 Q.  But you're not saying he wasn't carrying the gun then.

18 Right?

19 A.  Correct.

20 Q.  Okay.  Now, just briefly back to the indictment, she asked

21 you that, you know, all those packages are included within the

22 conspiracy.  That was 15 counts that were -- that will be

23 dismissed at sentencing.  Correct?

24 A.  It was the -- I pled to the conspiracy of everything under

25 a whole, is how I take it, and that it's just beating a dead

1  horse to sit there on each count because it wouldn't give me

2  any more or less time for me to do that.

3  Q.  Well, you're facing a maximum sentence of 60 years right

4  now.  Right?

5  A.  Well, if it was ran concurrent or consecutive.

6  Q.  But the maximum penalty for those two offenses is up to 60

7  years' imprisonment.  Right?

8  A.  One is 20 and one is 40, correct.

9  Q.  That's 60.

10  A.  But would they be ran concurrent or consecutive?

11  Q.  I get to ask the questions.

12  A.  Okay.

13  Q.  But nice try.  And each count that was dismissed carried a

14  maximum penalty of 20 years.  Is that right?

15  A.  Wait.  Go ahead.

16  Q.  Each count that was dismissed carries a maximum penalty of

17  up to 20 years' imprisonment.  Correct?

18  A.  I didn't look them over.  I couldn't tell you.

19  Q.  You would have been advised of that at your initial

20  appearance, the maximum penalty for each offense.  Right?

21  A.  Probably.

22  Q.  And you're not going to dispute that in dismissing, it

23  looks like 15 counts, that would have added an additional,

24  like, 200 years' maximum sentence that you were facing or more?

25  A.  Okay.

1    *MS. ULRICH:*  That's all I have, Your Honor.

2    *THE COURT:*  May the witness be excused?

3    *MS. TAYLOR:*  Yes.

4    *THE COURT:*  All right.  Thank you.

5    *THE WITNESS:*  Thank you.

6    *THE COURT:*  Jurors, we're going to break here for

7    lunch.  We'll come back at 2 o'clock.  Ms. Weida will escort

8    you.  I'm going to have a word with the lawyers about

9    scheduling, and when you come back, we'll be able to tell you

10   what the schedule looks like for the rest of the day.

11   *(Jury leaves courtroom.)*

12   *THE COURT:*  Mr. Terz, are you taking it from here?

13   *MR. TERZ:*  I just have one very brief witness.

14   *THE COURT:*  There are other witnesses?

15   *MS. TAYLOR:*  We have three witnesses remaining, Your

16   Honor, that should all be extremely brief.

17   *THE COURT:*  All right.  And then Mr. Terz has his

18   witness, which should also be brief?

19   *MR. TERZ:*  Right.

20   *MS. TAYLOR:*  We have three total.  Mr. Terz will

21   handle one, and I'll handle two.

22   *THE COURT:*  Okay.

23   *MS. ULRICH:*  I have a problem now.  Detective Schauer,

24   is he around?  I need to prove up statements that Long denied

25   making.  So I'm going to have to subpoena him unless the

government wants to admit that he made those statements to
Detective Schauer when he was arrested.  They're in Schauer's
police report.  So they can stipulate if they want.  If not,
I'm going to have to subpoena him.  Sorry.

THE COURT:  So how much testimony do you have?  An
hour?

MR. TERZ:  We figure Agent Maiolo will be five
minutes, at the most.

MS. TAYLOR:  I'd say an hour on the outside, Your
Honor.  Maybe not even an hour.

THE COURT:  Okay.  So by 3 o'clock you'll have
concluded your witnesses, and then, Ms. Ulrich, what is it you
need?

MS. ULRICH:  I'm going to have to issue a subpoena to
get Detective Schauer back here, unless the government wants to
stipulate to those statements.  I don't know if we can come up
with a stipulation.  If not, I'm going to physically, I guess,
have to get a subpoena, draft one and get him subpoenaed and
get him back up here.  I have to prove up the statements.

THE COURT:  All right.  Specifically, what is it you
want the government to stipulate to?

MS. ULRICH:  Okay.  So I asked him -- I think it's
just one or two.  But he says he didn't lie.  He says -- and I
specifically asked him if he denied receiving money in the
mail.  He said he did not.  I asked him --

1    MS. TAYLOR:  If Ms. Ulrich could direct -- if she

2  could direct me specifically to where she's --

3    MS. ULRICH:  Well, I'm looking at my cross-examination

4  right now.

5    THE COURT:  So in cross-examining Mr. Long --

6    MS. ULRICH:  I asked him if he told them that Heath

7  and Falsone supplied all the marijuana.  I asked him if he told

8  them Chip just -- that Chip just gave him -- I said Chip just

9  gave you the money.  He denied receiving money in the mail.

10 Well, he denied telling.  I shouldn't say that.  The problem

11 is, when he got arrested and they asked him if he received

12 money in the mail, he denied it, and that was a lie.  And, of

13 course, he said he didn't lie to these officers.

14    I said, you told them that you gave Heath 30,000

15 before the trip?  I didn't.  You told them Heath was in

16 financial trouble?  I didn't.  Initially said Heath and Falsone

17 supplied all the marijuana.

18    I mean, we can narrow it down.  Basically I just need,

19 you know, Schauer to say, yeah, you know, he lied to me about

20 some of this stuff.  The big one is probably receiving the

21 money in the mail.

22    MR. TERZ:  I'm going to object.

23    THE COURT:  He's not going to say that he lied to you.

24    MS. ULRICH:  We don't have to say lied, no, no, no.

25    THE COURT:  He's going to say that here's what he told

1   me.

2          MS. ULRICH:  Right, that's what I want.

3          THE COURT:  And the jury will conclude that he later

4   changed his story.  Here he's told us something different.

5          MS. ULRICH:  Correct.  So I don't know if we can

6   stipulate, or do you want me to get a subpoena and get Schauer

7   back here?  Do you want to come up with a stip or not?

8          THE COURT:  I think they want to stipulate.

9          MS. ULRICH:  We can work on that.

10          MS. TAYLOR:  We'll take a look at it, Your Honor.

11          MS. ULRICH:  We can work on that.

12          THE COURT:  I can ask the court reporter to give you a

13   rough transcript of that portion of the cross-examination.

14          MR. TERZ:  That would be great.

15          MS. ULRICH:  That would be great.

16          THE COURT:  Very rough, but --

17          MS. ULRICH:  That would be helpful.

18          THE COURT:  It will all be right there.  Okay.  Let's

19   do that.  Counsel, I know last night we emailed the proposed

20   jury charge.  Did you have a chance to examine that?

21          MS. ULRICH:  I did.  There were two problems that I

22   picked up on.

23          THE COURT:  Good.  What are they?

24          MS. ULRICH:  Okay.  The problem is that the 924(c),

25   that they charged possession, use, and carry.

1          *THE COURT:*  Right.

2          *MS. ULRICH:*  And so the instructions don't capture use

3     and carry.  And the Third Circuit has, like, two separate

4     instructions for it.

5          *THE COURT:*  Right.

6          *MS. ULRICH:*  One is two elements, one is three

7     elements.  In our instruction, we're saying there's only two

8     elements, and it doesn't describe what use is, being active

9     employment, it doesn't describe what carry is.  If you give me

10    a second, I printed out -- that was one problem.

11         The other problem was the paragraph saying the fact

12    that these guys pled guilty can't be used against Mr. Heath is

13    not in there.  It's my -- I submitted it -- let me give you

14    mine.

15         *MS. TAYLOR:*  Your Honor, while Ms. Ulrich is looking

16    for that, I also, I did notice that -- the way I would phrase

17    it is that the definition of use or carry was the only thing

18    that was missing from the 924(c), which we also submitted in

19    our jury instructions for -- it was in our Proposed Number 7.

20    The definition appears on our Page 15.  And it looks like just

21    that definition for use and -- use or carry was omitted, but

22    everything else was in there.

23         *MS. ULRICH:*  And I agree with that.  It was just the

24    definition of use and carry are not in this proposed

25    instruction.

1     THE COURT:  All right.  Can you reference a page?

2     MS. ULRICH:  On yours or mine?  Yours, it looks like

3 Page 16.  No, no, that's the other one.  Page 46.  It's Page

4 46, Page 46.  Page 47 you have the during and in relation to,

5 and while in the page before that, there's just no definition.

6     If you look at the standard jury instruction, which I

7 brought, the use and carry prong, during and in relation to,

8 there are actually three elements in the standard jury

9 instruction.  And it includes the definition of use and carry,

10 which that's what's missing from here.  I have the standard --

11     MS. TAYLOR:  I'm not sure what page -- our Page 46 is

12 in the middle of the conspiracy.

13     MS. ULRICH:  The judge's?

14     MS. TAYLOR:  Yes.  So I don't know how yours printed

15 out, but --

16     THE COURT:  I have Page 48.  Is that where we're

17 looking?

18     MS. ULRICH:  Forty-six, it says Count 19, possession

19 of a firearm in furtherance of drug trafficking.

20     MS. TAYLOR:  That's not how --

21     THE COURT:  Okay.  It must just be something with how

22 it --

23     MS. ULRICH:  How it printed.

24     THE COURT:  Yeah, because I have -- so we're talking

25 about Count 19.

1          MS. ULRICH:  Correct.

2          THE COURT:  All right.  And it says, Count 19 charges

3   possessing a firearm and with using and carrying a firearm and

4   in relation to drug trafficking.  Right?

5          MS. ULRICH:  Yes.

6          THE COURT:  And you're saying that it doesn't include

7   all the elements?

8          MS. ULRICH:  No.  Well, if you look at the standard

9   jury instruction from the Third Circuit, it says that they have

10  to prove three elements beyond a reasonable doubt.  First, that

11  they committed the drug trafficking crime; second, that during

12  and in relation to.

13         And then it says in the standard instruction, Third

14  Circuit, Use means more than mere possession of a firearm by a

15  person who commits a crime.  To establish use, the government

16  must show active employment of the firearm.  If the defendant

17  did not either disclose or mention the firearm, actively employ

18  it, the defendant did not use the firearm.  Carry means that

19  the defendant had the firearm on his or her person or, in

20  parens., possessed the firearm.

21         MS. TAYLOR:  Well, actually, in the Third Circuit

22  model, all of those things are in parentheses.  You can select

23  either had the firearm on -- for the definition of carry, it

24  says, Carry means the defendant had the firearm on his or her

25  person, is in parentheses, and then possessed the firearm is

1  also in parentheses.

2  So we submitted exactly what Ms. Ulrich just read in

3  our proposed instructions, selecting, of course, in order to

4  fit the facts of this case, carry means that the defendant, we

5  selected possessed the firearm because, obviously, had the

6  firearm on his person absolutely does not fit the facts of this

7  case.

8  MS. ULRICH:  The bottom line is, the Third Circuit

9  pattern instruction has three elements for the use and carry

10  prong.

11  THE COURT:  Right.  So the government is saying

12  they're not proceeding on the use and carry prong.

13  MS. ULRICH:  Are you saying that?  Okay.  Right?

14  MS. TAYLOR:  No, no.

15  MS. ULRICH:  Because it's in the indictment.

16  MS. TAYLOR:  No, no, I'm just indicating we submitted

17  that instruction.  I think that definition is missing, but that

18  for the definition of carry, we submitted that carry means that

19  he possessed it.

20  MS. ULRICH:  I can hand you the Third Circuit

21  instruction.  The confusion is that the Third Circuit has two

22  separate instructions for a 924(c).

23  THE COURT:  Right.

24  MS. ULRICH:  One is if it's possessed, because it has

25  to be possessed in furtherance to.  If it's use and carry,

1  during and in relation to.  And --

2          MS. TAYLOR:  Which the court has -- Your Honor, you

3  have in your instructions.

4          MS. ULRICH:  And they have three elements.  They just

5  write theirs out as three elements.  I think it's just a matter

6  of explaining use and carry, including that.

7          MS. TAYLOR:  That's the only definition that's

8  missing.

9          THE COURT:  Okay.  I want to give you, if you'll wait

10  here, a verdict slip to look at.  So I'll review the proposed

11  jury instruction.  Is there anything else?

12          MS. ULRICH:  Yes.  In my Instruction Number 8, what I

13  had submitted, the last paragraph, I didn't see it in your

14  instructions.  It's Standard Instruction 4.19, you must not

15  consider Ms. Long's and Mr. Falsone's guilty pleas as any

16  evidence of Mr. Heath's guilt, et cetera.  I did not see that

17  in your instruction anywhere.

18          THE COURT:  Okay.

19          MS. ULRICH:  And in the Third Circuit, it's with how

20  you receive their testimony with great care and caution.

21          THE COURT:  Yes.

22          MS. ULRICH:  It just looks like that paragraph got

23  eliminated in the jury instruction.

24          THE COURT:  Okay.  So just those two points?

25          MS. ULRICH:  Yes.

1          *THE COURT:*  Not that they're insignificant, when I say

2    "just."  So you have two issues and the government has one.

3    Right?

4          *MS. TAYLOR:*  Yes.

5          *THE COURT:*  All right.  We're going to get you a

6    verdict slip to look at so that we can keep this thing moving.

7    And obviously you'll need to talk about the stipulation, and

8    I'll ask the court reporter to help you with that.  So if you

9    just wait here a few minutes, you'll have everything you need.

10         *(Luncheon recess taken.)*

11         *THE COURT:*  Government's next witness.

12         *MS. TAYLOR:*  Your Honor, at this time the government

13   calls Adam Bruckhart.

14         *ADAM BRUCKHART, called as a witness, having been duly sworn*

15   *or affirmed, testified as follows:*

16         *COURTROOM DEPUTY:*  For the record, please state your

17   full name.

18         *THE WITNESS:*  My name is Adam Bruckhart,

19   B-r-u-c-k-h-a-r-t.

20         *COURTROOM DEPUTY:*  Thank you.

21                        DIRECT EXAMINATION

22   BY MS. TAYLOR:

23   Q.  Good afternoon, sir.  Could you tell the jurors how you're

24   employed?

25   A.  Yes.  My name is Adam Bruckhart.  Good afternoon.  I'm

1  employed as a police officer with West Manchester Township

2  Police Department in York County, Pennsylvania.  And currently

3  the County of York pays West Manchester for me to work for the

4  county as a county detective assigned full time to the York

5  County Drug Task Force.

6  Q.  Now, how long have you been with West Manchester as a

7  police officer?

8  A.  About nine years.

9  Q.  And how long have you been affiliated with the task force?

10  A.  Six years.

11  Q.  The jury has heard a lot about this case involving

12  Mr. Heath.  What was your involvement in Mr. Heath's case?

13  A.  Originally the evening that Mr. Heath was arrested, I was

14  part of an arrest team.  I was staged in a nearby neighborhood

15  in the dark waiting for an arrest signal.

16        Once we received that arrest signal, I had some

17  partners with me, we moved into the deal location, and I took

18  Mr. Falsone into custody, provided him with Miranda warnings.

19  All of the suspects were then secured, and we transported

20  everybody back to the Penn Township Police Department that

21  evening.

22  Q.  At the arrest location, did you have anything to do with

23  taking Mr. Heath into custody?

24  A.  Other than containment, no.  We moved our vehicles behind

25  his vehicle so that it couldn't leave, but my attention went to

1  Mr. Falsone.

2  Q.  Once you got back to the Penn Township station, what was

3  your responsibility?  Did you interview any of the individuals?

4  A.  Initially I talked to Mr. Long.  We talked about why he had

5  been taken into custody.

6  *MS. ULRICH:*  Objection to anything Mr. Long said,

7  unless it is the statement that we've been talking about.

8  BY MS. TAYLOR:

9  Q.  Let me ask you this, sir.  Did you ask Mr. Long for consent

10  to search his truck?

11  A.  I did.

12  Q.  Let me show you what's been marked as Government's Exhibit

13  34.  Do you recognize that document?

14  A.  Yes.  This is the Penn Township Police Department's

15  permission to search form.  This is the form I would have

16  reviewed with Mr. Long asking him for his permission to search

17  his 2013 Ford F250.  Mr. Long signed and printed at the bottom

18  granting us permission to search the car.

19  Q.  And did you witness him actually signing the form?

20  A.  I did.  I also signed the form and put the date and time on

21  it.

22  *MS. TAYLOR:*  Your Honor, I'd ask for the admission of

23  Government's 34.

24  *THE COURT:*  Any objection?

25  *MS. ULRICH:*  No, Your Honor.

1      THE COURT:  Thirty-four is admitted.

2           MS. TAYLOR:  Your Honor, in addition, there's a

3      stipulation as it relates to Government's Exhibit 35.  If I

4      could read that to the jury.

5           THE COURT:  Okay.

6           MS. TAYLOR:  Government's Exhibit 35 is the permission

7      to search form signed by Christopher Mark Heath and Trooper

8      Justin Dembowski of the Pennsylvania State Police providing law

9      enforcement with Mr. Heath's consent to search his Ford F250

10     truck bearing California License Plate 73539001 on

11     December 29th, 2015.  Your Honor, I'd ask for the admission of

12     Government's 35.

13          MS. ULRICH:  No objection, Your Honor.

14          THE COURT:  Thirty-five is admitted.

15     BY MS. TAYLOR:

16     Q.  Now, sir, were you actually involved with the search of the

17     two trucks in this case?

18     A.  Yes, I was.

19     Q.  I'm showing you what's been marked as Government's Exhibit

20     16.  Do you recognize the silver truck that's pictured here?

21     A.  Yes, I do.

22     Q.  And was this one of the trucks that was driven from the

23     arrest scene to the police station that night?

24     A.  Yes, ma'am.

25     Q.  Now, I guess I should have asked you this before, but were

1    the trucks searched at the residence where the arrest took

2    place or at the police station?

3    A.  At the police station.  They were driven directly from the

4    arrest scene to the police station.  The photo here is a

5    picture of Penn Township's secured lot.  There's a gate that

6    goes around it and a camera system.

7    Q.  And the silver truck that's pictured there in Government's

8    Exhibit 16, who did you learn was driving that truck?

9    A.  Mr. Heath.

10           MS. TAYLOR:  Your Honor, I'd ask for the admission of

11   Government's 16.

12           MS. ULRICH:  No objection, Your Honor.

13           THE COURT:  Sixteen is admitted.

14   BY MS. TAYLOR:

15   Q.  So, sir, did you and other officers participate in the

16   search of this vehicle?

17   A.  Yes, ma'am.

18   Q.  Can you tell the jury what you found in Mr. Heath's truck?

19   A.  Yes.  Originally I searched the front portion of the truck.

20   There's two rows of seats.  It's a king cab.  In the center

21   console of the truck, I remember locating Mr. Heath's

22   departmental badge, sheriff's badge from California.  There

23   were some other identity type documents in the center console.

24           And then directly behind the driver's seat in the

25   second row, there was a large suitcase on the floor that I also

1   located.  The suitcase I took inside to where it was well lit
2   and searched that, as well.
3            Within the suitcase, the front zipper pocket, there
4   was a handgun which was in a holster and some additional
5   ammunition for the gun.  The suitcase contained men's clothing
6   and toiletries.
7   Q.  Sir, I'm going to show you what's been marked and
8   previously admitted as Government's Exhibits 1 and 2.
9            *MS. TAYLOR:*  Your Honor, may I approach?
10           *THE COURT:*  You may.
11  BY MS. TAYLOR:
12  Q.  Looking first at Government's Exhibit 1, do you recognize
13  that item?
14  A.  Yes.  This is the handgun that was in the front pocket of
15  the suitcase.  This is a holster that the handgun was in.  When
16  I found the gun, the magazine had ammunition in it, and there
17  was a round chambered.  Also in here is a Ziploc bag which I
18  placed everything in after I found it.  And I wrote a note that
19  it came from the silver F250, the front suitcase pocket, rear,
20  and I put chambered, meaning there was a round of ammunition in
21  the chamber of the gun.
22  Q.  So that Ziploc bag that's inside the DEA evidence bag, the
23  handwriting that's on that Ziploc bag, do you recognize it?
24  A.  Yes, that's my handwriting.  And it's basically just a note
25  to Officer Shearer to let him know where I found this.

1  Q.  Now, how about Government's Exhibit 2, what's in

2  Government's Exhibit 2?

3  A.  Sure.  Number 2 is the magazines from the handgun.  They're

4  both loaded with, it looks like .40 caliber ammunition.  I

5  think both of these magazines holds 12 rounds.  And one of

6  these magazines would have been in the gun at the time we found

7  it.

8  Q.  Now, for court purposes here today, they're packaged in two

9  separate DEA envelopes.  That's obviously not how you found

10 them or packaged them.  Right?

11 A.  Right.  I believe they're packaged this way for safety.

12 Q.  On Government's Exhibit 2, the two magazines, are there

13 any -- not on the packages but on the actual magazines, are

14 there any stickers on there?

15 A.  Yes.  I don't know if you can see this, but on this

16 magazine, there's a little label maker tab that says, CMH.  I

17 don't see any markings on the second one.

18 Q.  And do you have any idea what that sticker is about?

19 A.  I'd have to guess those are Mr. Heath's initials.  I know

20 that on my duty magazines I put my badge number.

21 Q.  Is it common for police officers to label their magazines

22 with their initials?

23 A.  It is.  We spend time at the range with other officers, and

24 all our guns and magazines look the same, so we have to label

25 our equipment as to not get it confused.

1  Q.  Now, you said that the -- can you just read exactly what

2  the Ziploc bag, what you labeled the Ziploc bag in Government's

3  Exhibit 1 with?

4  A.  Right.  It says, Silver F two zero, indicating an F250, FT

5  pocket, which was indicating front pocket, suitcase in rear,

6  and then in parentheses, chambered, referring to the round of

7  ammunition in the handgun chamber.

8  Q.  So when you located the firearm, it was loaded and had one

9  round chambered?

10  A.  Correct.

11  Q.  And when you say it was in the zipper pocket, are you

12  talking about a zipper pocket inside the suitcase or on the

13  outside?

14  A.  On the outside.  This was a typical large suitcase.  I

15  don't remember it being unique in any way.  On the outside,

16  there's kind of a U-shaped zipper pocket, and it was tucked

17  into that.

18  Q.  And can you describe a little bit more of the location of

19  the suitcase?

20  A.  Sure, sure.  Again, this is an F250, it's a king cab where

21  there's two rows of seats.  So if this is the driver's seat

22  here and this is the second row, the suitcase is on the floor

23  behind the driver's seat.

24  Q.  Now, that firearm that's in Government's Exhibit 1, you're

25  aware that is a Glock?

1  A.  Yes, I believe that it is.  I think it's the Model 23.

2  It's hard to see as it's packaged here, but that's what it

3  appears to be, yes.

4  Q.  The way it's packaged in Government's Exhibit 1, is that

5  essentially how you found it?

6  A.  No.  The way that I found it was the magazine would have

7  been inserted at the bottom, the action would have been closed,

8  and the gun itself was in this leather holster.

9  Q.  The gun wasn't taken apart in any fashion, was it?

10  A.  No.  When I located it, it was fully operational, appeared

11  to be fully operational.

12  Q.  Sir, I'm going to show you what's been marked as

13  Government's Exhibit 3.

14      MS. TAYLOR:  Your Honor, may I approach?

15      THE COURT:  You may.

16  BY MS. TAYLOR:

17  Q.  I'm sorry, it's already been admitted, sir.  You can take a

18  look at the contents.

19  A.  Okay.

20  Q.  Now, do you recognize what's in Government's Exhibit 3?

21  A.  Yes.  This is the deputy badge that was in the center

22  console of the truck.  This is just a little ID wallet.

23  There's, it looks like three IDs here.  This is the sheriff's

24  department, sheriff deputy ID for Mr. Heath.  This is a

25  California driver's license for Christopher Mark Heath.  And

1    this is another California driver's license for, it looks like

2    a Donald Gilt with Mr. Heath's picture on it.  There's two

3    other items in here.  One is a small key.  The other is a,

4    looks like a Marine Corps coin.

5    Q.  Specifically drawing your attention to the badge, you

6    located that?

7    A.  Yes.  This was what was in the center console of the truck.

8    Q.  All those items, the things in Government's Exhibit 1, 2,

9    and 3, once you recovered them, what did you do with them?

10   A.  I would have placed them all in a Ziploc bag similar to the

11   gun and wrote "center console" and put my initials on it so

12   that Officer Shearer knew where I found them.  It looks like

13   the bag has since been removed.

14   Q.  But even the gun and the magazines that are in 1 and 2 and

15   the items in 3, all those things were turned over to now

16   Sergeant Shearer?

17   A.  Yes, ma'am.

18       MS. TAYLOR:  Those are all the questions I have for

19   Detective Bruckhart, Your Honor.

20       THE COURT:  Ms. Ulrich.

21                    CROSS-EXAMINATION

22   BY MS. ULRICH:

23   Q.  Detective Bruckhart, how long have you been a police

24   officer?

25   A.  Just about nine years.

1  Q. And, of course, as a police officer, you know that the

2  reports you make of various incidents are really very

3  important, they kind of memorialize what's happened, your

4  police reports. Is that right?

5  A. Yes, ma'am.

6  Q. Police reports are generally made at or near the time of

7  the event. Is that right?

8  A. Correct.

9  Q. And usually your memory is more accurate at the time you

10  record those things in a police report. Is that right?

11  A. I agree.

12  Q. And, of course, where things are found is very important,

13  isn't it?

14  A. Correct.

15  Q. You know, because a year and a half later when you're

16  trying to explain where things are found, you want to be able

17  to say, this is what my report says this is where it's found.

18  Right?

19  A. Yes, ma'am.

20  Q. Okay. And do you have a report that says where you found

21  everything?

22  A. No, ma'am.

23  Q. So what you're saying is, when you found this stuff, you

24  made a note on what?

25  A. I packaged the items in bags.

1    Q.  Okay.

2    A.  And I wrote on the bags where I had located the item,

3    usually put my initials on them so that as Officer Shearer does

4    his report, he knows where these items were found.

5    Q.  And so you're saying that the wallet and the key -- did you

6    testify about the wallet and the key and the Marine coin?

7    A.  I did.

8    Q.  And you're saying it's your recollection that you found

9    that in the console and not on Mr. Heath?

10   A.  That's correct.

11   Q.  You didn't search Mr. Heath, you just searched the car.

12   Right?

13   A.  That's correct.

14   Q.  And do you have any independent memory of that, or are you

15   just relying on what that bag says?

16   A.  I do have an independent memory of it.

17   Q.  And, incidentally, how much money was in that wallet?

18   A.  I'm not sure.

19   Q.  So you say you remember where you found it, but you don't

20   remember what was in the wallet?

21   A.  I don't think there was any money in the wallet.

22   Q.  You don't think, but you're not sure?

23   A.  That's correct.

24   Q.  Okay.  Now, you say this gun, your recollection, of course,

25   is that it was in the zipper part of a suitcase.  Is that

1  right?

2  A.  That's right.

3  Q.  And do you have pictures of the suitcase?

4  A.  I do not.

5  Q.  Did you take pictures of the suitcase?

6  A.  I would not have.

7  Q.  You didn't take pictures where the suitcase was found in

8  the car or the truck?

9  A.  That's correct.

10  Q.  And a lot of times -- and you're a detective.  Right?

11  A.  That's right.

12  Q.  A lot of times when something happens, you do, in fact,

13  take pictures of where things are found in a house, in a car?

14  I mean, that's not uncommon, is it?

15  A.  For a situation like that, it would be very uncommon for me

16  to photograph a suitcase in the back of a car.

17  Q.  Well, have you done drug investigations?

18  A.  Many, many times.

19  Q.  And have you done like -- you've done a lot of car stops, I

20  take it?

21  A.  Yes, ma'am.

22  Q.  And you're saying you've never photographed where, like,

23  drugs are found in a car?

24  A.  I didn't say never, I said it would be unusual.

25  Q.  But you do do it, don't you?

1   A.  Not that I can recall, but it's possible.

2   Q.  Okay.  Officer Bruckhart -- or, sorry, Detective, so you

3   find this suitcase, it's in the back.  Now, it's not in the bed

4   of the truck.  Right?

5   A.  That's correct.

6   Q.  It's in the cab.  Right?

7   A.  Yes, ma'am.

8   Q.  And it's a suitcase behind the driver's seat.  Is that

9   right?

10   A.  That's correct.

11   Q.  Now, this particular gun would fit in the glove

12   compartment.  Right?

13   A.  Yes, it would.

14   Q.  It would have fit in and around the console.  Right?

15   A.  Yes, ma'am.

16   Q.  And it could have been on the floor of the truck.  Is that

17   right?

18   A.  Sure.

19   Q.  It could have been on the passenger seat.  Right?

20   A.  Absolutely.

21   Q.  There was room in that truck that that gun could have been

22   accessible.  Right?

23   A.  Yes, ma'am.

24   Q.  But where you say you found it was in a zipper part of the

25   suitcase.  Correct?

1    A.   That's correct.

2    Q.   And, incidentally, you carry firearms off duty.  Right?

3    A.   Sometimes.

4    Q.   And that's not uncommon for law enforcement officers.

5    Right?

6    A.   I can't speak to other law enforcement officers, but I do

7    sometimes.

8    Q.   And when you carry yours, it's loaded, isn't it?

9    A.   Yes, ma'am.

10            *MS. ULRICH:*  That's all I have.  Thank you.

11            *THE COURT:*  Any redirect?

12            *MS. TAYLOR:*  Just briefly, Your Honor.

13                        REDIRECT EXAMINATION

14   BY MS. TAYLOR:

15   Q.   Sir, Ms. Ulrich asked you about the gun being in the cab of

16   the truck and not in the bed of the truck.  Do you recall those

17   questions?

18   A.   Yes, ma'am.

19   Q.   The gun being in the cab of the truck, was it accessible to

20   the front seat?

21   A.   Yes.  I think you could, in theory, reach around behind the

22   seat, unzipper the pocket, and access the gun.

23   Q.   And Ms. Ulrich asked you about the gun not being in the bed

24   of the truck.  If the gun was in the bed, is the bed of the

25   truck accessible from the back -- from the front seat?

1    A.  I guess it's possible.  It had a sliding glass window.  It

2    might be inconvenient, but you could certainly access something

3    in the bed, depending on how much time you had.

4    Q.  She also asked you some questions about whether you carry

5    your gun off duty.  Do you recall those questions?

6    A.  Yes, ma'am.

7    Q.  When you're carrying off duty and your gun is loaded, are

8    you committing felonies?

9    A.  No, ma'am.

10            *MS. TAYLOR:*  That's all I have, Your Honor.

11            *MS. ULRICH:*  Nothing else, Your Honor.

12            *THE COURT:*  Thank you.  You may step down.

13            *MS. TAYLOR:*  Your Honor, may I retrieve the exhibits?

14            *MR. TERZ:*  Your Honor, the government's next witness

15    is Special Agent Jon Maiolo.

16    *JONATHAN MAIOLO, called as a witness, having been duly*

17    *sworn or affirmed, testified as follows:*

18            *COURTROOM DEPUTY:*  For the record, please state your

19    full name.

20            *THE WITNESS:*  Jonathan Maiolo, M-a-i-o-l-o.

21            *COURTROOM DEPUTY:*  Thank you.

22                          DIRECT EXAMINATION

23    BY MR. TERZ:

24    Q.  Special Agent Jon Maiolo, where do you work?

25    A.  I'm a special agent with IRS criminal investigation.

1    Q.  And what is it you do for that law enforcement agency?

2    A.  I conduct financial investigations.

3    Q.  And how long have you been employed there?

4    A.  Approximately four and a half years.

5    Q.  It's correct, isn't it, that you have been involved in the

6    investigation of the defendant in this case?

7    A.  That's correct.

8    Q.  And could you tell the ladies and gentlemen of the jury

9    what role you provided in your capacity as an IRS agent?

10   A.  So generally when we conduct financial investigations, one

11   of the statutes we have jurisdiction over is money laundering

12   and tax offenses and other related financial offenses.  So we

13   do a financial analysis to see if any of those statutes were

14   violated.  In addition, we help locate assets for the potential

15   forfeiture if those statutes have been violated.

16   Q.  And you just described generally what you do.  In this

17   particular case, what did you do?

18   A.  This case is a little different because it's a mostly

19   cash-based case.  So the majority of my investigation was in

20   regards to witness statements, taking witness statements and

21   how the cash was received, drug proceeds were received, how

22   cash was spent, expenses related to the drug trafficking, and

23   so forth.

24   Q.  Now, if you could, I'm going to call up Government Exhibit

25   Number 37.  And do you see Government Exhibit 37 on your

1  screen?

2  A.  Yes, I do.

3  Q.  And what is this document?

4  A.  That's a summary spreadsheet of shipments that were

5  identified of marijuana from California to Pennsylvania.

6  Q.  And who prepared this chart?

7  A.  I prepared it.

8  Q.  And for what purpose?

9  A.  To detail out the shipments that the United States postal

10  inspectors were able to identify.

11  Q.  And you have this chart broken down in several columns.  Is

12  that correct?

13  A.  That's correct.

14  Q.  And the first column is the date?

15  A.  Correct.

16  Q.  Does that refer to the date of the shipment?

17  A.  Yes.

18  Q.  And the next column is a parcel number?

19  A.  Yes.

20  Q.  Then there is weight in pounds.  Is that correct?

21  A.  Yes.

22  Q.  And, now, the weight in pounds, is that the gross weight

23  including packaging material?

24  A.  Yes, it would be.

25  Q.  And then the next column, what does the next column

1  designate?

2  A.  The next column is a calculation, which is the weight in

3  pounds multiplied by 2150.

4  Q.  And the dollar amount there, $2,150 per pound, is that what

5  it's designated?  Is that correct?

6  A.  Yes.

7  Q.  Where did you get that number?

8  A.  That's from witness statements.

9  Q.  And that makes reference to the amount being charged per

10  pound?

11  A.  Correct.

12  Q.  And the next column is designated as postage?

13  A.  Correct.

14  Q.  And that's the amount of postage paid?

15  A.  To ship the box, correct.

16  Q.  The next column is the "shipment from" date?

17  A.  Yes.

18  Q.  And that's Oroville, California?

19  A.  Correct.

20  Q.  And, finally, the last ship, the last column refers to the

21  location to which the package was shipped?

22  A.  Correct.

23  Q.  And you have that information from the date of shipment of

24  9/11/2015.  Correct?

25  A.  Correct.

1   Q.   Down to December 4th, 2015?

2   A.   Correct.

3   Q.   And towards the bottom, Agent, you have a total weight?

4   A.   Correct.

5   Q.   And what is the total weight that you tallied there?

6   A.   132.51 pounds gross weight.

7   Q.   And that's something you would have added up?

8   A.   Correct.

9   Q.   Okay.  And there is also a dollar amount tallied there at

10  the bottom.  What is that?

11  A.   The first dollar amount you see is 284,885.75, and that is

12  the total price for the gross weight as being $2,150 per pound.

13  Q.   And, again, that dollar amount of $2,150 is an amount you

14  derived from witnesses?

15  A.   Correct.

16  Q.   And last, there is a tally amount there for the total

17  postage, which was $757.50.  Is that correct?

18  A.   That's correct.

19  Q.   Now, let me draw your attention to Government Exhibit 29.

20  And could you identify this government exhibit?

21  A.   That's another summary chart I created based on U.S. postal

22  inspector information that details out cash shipments from

23  Pennsylvania to California.

24  Q.   Okay.  So the first chart we saw, the Exhibit 37, was

25  marijuana shipments from California to Pennsylvania.  Correct?

1    A.  Correct.

2    Q.  And now what we're seeing here is records based upon --

3    postal service records that show shipments of money --

4    A.  Correct.

5    Q.  -- from Pennsylvania to California?

6    A.  That's correct.

7    Q.  And, again, your chart here is with a date.  9/23 is the

8    first column?

9    A.  Yes, it is.

10    Q.  And what is that date, the shipment?

11    A.  Yes, it would be.

12    Q.  Okay.  And it's sort of set up just like the other exhibit,

13    Exhibit 37, with a parcel number?

14    A.  Correct.

15    Q.  A postage amount?

16    A.  Yes.

17    Q.  Shipment from?

18    A.  Yes.

19    Q.  And shipment to?

20    A.  Yep.

21    Q.  Okay.  Next let me draw your attention to Government

22    Exhibit 38.  Now, do you have Exhibit 38 in front of you?

23    A.  I do.

24    Q.  And did you prepare this chart?

25    A.  I did.

1    Q.  And could you tell the jury what this chart entails?

2    A.  This is a summary chart of cash deposits that I identified

3    going into Tatum's Winery, Umpqua Bank Account Number

4    993097013.  And I'd like to correct a typo on there.  The date

5    of 6/30/2016 should actually be 6/30/2015.

6    Q.  Okay.  So let's take care of that first.  That's the one,

7    two, three, fourth entry down?

8    A.  Yes, it is.

9    Q.  Instead of 6/30/2016, it should be 6/30/2015?

10   A.  That's correct.

11   Q.  Okay.  Now, you indicated you prepared this chart.  What

12   documents or what information did you use to prepare this

13   chart?

14   A.  I used bank records for the Tatum Winery Umpqua bank

15   account.

16   Q.  Okay.  And based upon your investigation, who owned the

17   Tatum Winery?

18   A.  Christopher Mark Heath and Tatum Heath were both signers on

19   the account.

20   Q.  And Tatum Heath being the defendant's wife.  Is that

21   correct?

22   A.  Correct.

23   Q.  The date column, let's take the first one, December 1st,

24   2014, there was a cash deposit?

25   A.  Yes.

1  Q.  And the date indicates the date of the deposit.  Is that

2  correct?

3  A.  That's correct.

4  Q.  And how much money was -- on the right-hand column, there

5  is a -- under credits, there's an amount.  Is that the amount

6  of the cash?

7  A.  That's correct.

8  Q.  And is that consistent all the way down?

9  A.  Yes, it is.

10 Q.  From December 1st, 2014, down to January 15, 2015?

11 A.  That's correct.

12 Q.  Is that correct?

13 A.  Yes.

14 Q.  And what is the total amount of cash deposits during those

15 months?

16 A.  25,366.25.

17      MR. TERZ:  Your Honor, at this time the government

18 would like to read in two stipulations regarding two of these

19 exhibits that have been reached with the defense.

20      THE COURT:  Thank you.

21      MR. TERZ:  Stipulation:  The first one is, The summary

22 chart, Government's Exhibit 29, accurately summarizes cash

23 shipments received by Tyler Long in California from September,

24 2015 -- excuse me, yeah, from September, 2015, through

25 December, 2015.

1       The next stipulation pertains to Exhibit 38.  That

2  stipulation provides that the summary chart, Government Exhibit

3  38, accurately summarizes the cash deposits made in the Tatum's

4  Winery bank accounts in -- I'm going to mispronounce this,

5  Umpqua Bank, U-m-p-q-u-a.

6       The records from the bank account of Tatum's Winery,

7  Government Exhibit 36, provide the supporting documentation for

8  the chart at Government's Exhibit 38 and are kept in the

9  regular course of the Umpqua Bank's business.

10      So, Your Honor, at this time the United States would

11  move to introduce Government's Exhibits 37, 29, and 38.

12      *MS. ULRICH:*  No objection, Your Honor.

13      *THE COURT:*  Thirty-seven, twenty-nine, and

14  thirty-eight are admitted.

15      *MR. TERZ:*  One moment, Your Honor.  And, Your Honor,

16  finally, the supporting documentation as I referenced in that

17  stipulation is Government 36, which is the raw data from the

18  banks.  I'd move to admit those, as well.

19      *MS. ULRICH:*  No objection.

20      *THE COURT:*  Thirty-six is admitted.

21      *MR. TERZ:*  That's all I have, Your Honor.

22      *THE COURT:*  Ms. Ulrich.

23      *MS. ULRICH:*  I just have a few questions.

24                    CROSS-EXAMINATION

25  BY MS. ULRICH:

1   Q.  Agent Maiolo, if I could pull up Government Exhibit 37.

2   Thank you.  First off, the weight you said is gross weight.

3   That would include the weight of any packaging material that

4   was inside the box.  Right?

5   A.  That's correct.

6   Q.  It also includes the weight of the box.  Right?

7   A.  Correct.

8   Q.  So that 132.51 is not the weight of just the marijuana, is

9   it?

10  A.  That's correct.

11  Q.  Okay.  And per pound you have that you calculated the price

12  of $2,150 per pound.  Is that right?

13  A.  My spreadsheet is based on that number, correct.

14  Q.  Mr. Long had testified today that he charged anywhere

15  between 1500 up to 2,000 and sometimes for the better it was

16  $2,150.  So if that were true, then every pound of marijuana

17  was not being -- was not worth $2,150.  Is that right?

18  A.  Correct.

19  Q.  And so this number $284,885.75 may just overstate the

20  amount of the funds on this chart.  Right?

21  A.  Or may be under.

22  Q.  Or could be under --

23  A.  Correct.

24  Q.  -- if he's charging more than what you're saying, $2,150.

25  Right?

1    A.  I believe he said up to 2200.

2    Q.  Were you here in the courtroom?

3    A.  Yes.

4    Q.  You also heard him say 1500 to 2,000.  Right?

5    A.  Correct.

6    Q.  Okay.  You can take that down.  Thank you.  So you

7    testified that you identified $25,366.28 in cash deposits going

8    through the Tatum Winery.  Is that right?

9    A.  I believe that's the number I gave.

10   Q.  I'm sorry?

11   A.  I believe that's the number I gave.

12   Q.  Okay.  Now, you also have up there with you a report by

13   David Ennes, E-n-n-e-s, from the Butte County Sheriff's Office.

14   Right?

15   A.  I do not have that report in front of me.

16   Q.  Oh, you said you were going to take it with you.  Do you

17   have it?  You said you had it?

18   A.  It's sitting back on my desk.

19           MS. ULRICH:  Your Honor, can he retrieve that?

20           THE COURT:  Sure.

21           MR. TERZ:  I'll provide it to him, Your Honor.

22           MS. ULRICH:  Thank you.

23           THE WITNESS:  Thank you.

24   BY MS. ULRICH:

25   Q.  And this is a report that -- you don't know David Ennes, do

1  you?

2  A.  I believe I met him once during one interview.

3  Q.  Okay.  So you do know him?

4  A.  Yeah, I believe --

5  Q.  He's a law enforcement --

6  A.  I believe I met him once.

7  Q.  He's a law enforcement officer.  Right?

8  A.  Yes.

9  Q.  He's a law enforcement officer with the sheriff's office in

10 the County of Butte, State of California.  Right?

11 A.  Correct.

12 Q.  And this report is his report.  He reviewed the records of

13 Marisa and Tyler Long, their bank records.  Right?

14 A.  Yes.

15 Q.  Okay.  So I want to go through with you -- just go to the

16 second page.  And you see there from January of 2012 to

17 January 30th of 2012, he has there the 30-day period with cash

18 deposits of $26,550.  Right?

19 A.  Yes, I see that.

20 Q.  So that's already more than the 25,000 you identified for

21 Mr. Heath.  Right?

22 A.  Absolutely.

23 Q.  Okay.  Then you see then it goes to July, to July 18th, so

24 that's just what, a seven-day period with cash deposits of

25 $5,500?

1    A.  Correct.

2    Q.  Then we got August 9th, there's a one-day period with a

3    cash deposit of $6,650.  Right?

4    A.  Correct.

5    Q.  And it looks like September 4th, 2012, a one-day cash

6    deposit of 6,000?

7    A.  Correct.

8    Q.  Then we go to September of 2012 through November 5th of

9    2012, we have a 30-day period with cash deposits of $40,200?

10   A.  Correct.

11   Q.  In 2013, a seven-day -- or I should say March 19th to

12   March 20th, just in a 24-hour period it says seven-day -- well,

13   it says seven-day period there with cash deposits of $9,600?

14   A.  Correct.

15   Q.  We could keep going through these, but you will agree that

16   these numbers are -- there's a lot more cash being deposited in

17   these accounts than the 25,000 you testified for Mr. Heath.  Is

18   that right?

19   A.  Absolutely.

20           MS. ULRICH:  That's all I have, Your Honor.

21           THE COURT:  Anything else for the witness?

22           MR. TERZ:  No redirect, Your Honor.

23           THE COURT:  Thank you.

24           MS. TAYLOR:  Your Honor, at this time the government

25   would call Special Agent Joe Myers.

1      *JOSEPH MYERS, called as a witness, having been duly sworn*
2   *or affirmed, testified as follows:*
3           *COURTROOM DEPUTY:* For the record, please state your
4   full name.
5           *THE WITNESS:* Joseph A. Myers, M-y-e-r-s.
6           *COURTROOM DEPUTY:* Thank you.
7                        DIRECT EXAMINATION
8   BY MS. TAYLOR:
9   Q.  Good afternoon, sir.  Could you tell the jurors how you're
10  employed?
11  A.  Sure.  I'm employed as a special agent with the Drug
12  Enforcement Administration assigned to the Harrisburg Resident
13  Office here in Harrisburg, Pa.
14  Q.  And how long have you been with DEA?
15  A.  Just over 27 years now.
16  Q.  Are you the lead case agent assigned to Mr. Heath's case?
17  A.  From the Drug Enforcement Administration, I am.
18  Q.  When the drugs in this case were initially seized by the
19  local detectives, you're aware that they were sent to the
20  Pennsylvania State Police lab for analysis.  Right?
21  A.  Yes, they were.
22  Q.  I'm going to have you take a look at Government's Exhibit
23  8, which is the Pennsylvania State Police lab report which has
24  been stipulated to.  You've had a chance to look at this
25  report.  Right?

1    A.  I have.

2    Q.  Can you tell from looking at this report, which I know you

3    can only see Page 1 there, but it is a multi-page document, how

4    many containers of varying types were submitted to the state

5    police lab initially?  And you might need to advance to Page 2.

6    A.  It goes from 1 to 20 on this list.  And Number 20 states,

7    One sealed box with 24 vacuum-sealed plastic packages

8    containing vegetable matter originally containing gross Items

9    Number 1 through 8.

10   Q.  And the Items 1 through 19 that are listed above it, if we

11   could just zoom in maybe on Page 2 just as an example to show

12   Numbers 10 through 19, what do 10 through 19 represent?

13   A.  The different plastic bags with -- in each bag, there were

14   a number of packages of marijuana contained in each of these

15   bags submitted to the lab, except for Number 19 was a sealed

16   envelope that had, like, six green lollipops and a little bit

17   of vegetable matter.

18   Q.  Does the report at the bottom of Page 2 indicate whether

19   all of these items that were submitted to the state lab, does

20   the report indicate whether they were all analyzed?

21   A.  It reports that only a number of the items were analyzed

22   and weighed.

23   Q.  And in the conclusion section, where does it indicate that?

24   A.  The first paragraph there under conclusions.  Basically one

25   through eight, there was a total weight given for those

1  submissions, and it was analyzed and repackaged back into Item

2  Number 20, which is here today in court.

3  Q.  And then what does conclusion two state?

4  A.  It says -- basically for the rest of the submissions made

5  in this case, there was no analysis performed at all and no

6  weights.

7  Q.  And conclusion two actually says these items were neither

8  opened, nor analyzed?

9  A.  Correct.

10  Q.  So for those packages, would the report reflect any weights

11  at all?

12  A.  No, there's no weights reflected for those particular

13  packages, items.

14  Q.  That would be everything inclusive of 9.1 through 18.1?

15  A.  Correct.

16  Q.  So given that, when you and DEA became involved in the

17  case, did you submit the marijuana to the DEA lab?

18  A.  Just one of the boxes went, and the remaining packages of

19  marijuana were sent to a different location for storage only.

20  The one box that did go containing the marijuana to our

21  laboratory was sent there for storage only, no analysis, since

22  I already knew that the state crime lab had analyzed the drugs

23  already.

24  Q.  So basically you needed a determination that it was

25  marijuana and a separate determination about the weight.

1  Right?

2  A.  Yes.

3  Q.  I'm going to show you what's been marked as -- well, let me

4  ask you this, did the DEA lab give you a report that stated the

5  gross weight of the marijuana?

6  A.  Yes.

7  Q.  Now, when we're using the term "gross weight," what does

8  that include?

9  A.  Basically when all this marijuana was turned over to the

10  custody of DEA for storage, we put all the packaging, the

11  original packaging and the drug evidence into evidence boxes,

12  DEA evidence boxes.  They had to be sealed up and signed to

13  show that the box has never been opened other than when it was

14  originally packaged in that evidence box.

15       Gross weight then, we take that entire sealed box, we

16  weigh each box.  That is called gross weight.  And the weight

17  goes on our -- it's called a DEA-7 report.  And I did make a

18  report for 27 DEA evidence boxes that went to our storage

19  facility, and that is -- the gross weight would be the weight

20  of the drugs, as well as the weight of the evidence boxes.

21  Q.  I'm going to show you what's been marked as Government's

22  Exhibit 39.  Now, this is a two-page document, also.  But just

23  looking at the first page of Government's Exhibit 39, what is

24  this?

25  A.  This is documenting the drug evidence received in this

1   case.  I'm reporting it as this is the bulk portion.

2   Twenty-seven DEA evidence boxes filled and sealed containing

3   marijuana that I received from the York County District

4   Attorney's Office in Penn Township in this case.  And the

5   weight, the gross weight for these 27 boxes containing the drug

6   evidence is 97.95 kilograms.

7   Q.  Mine is highlighted, so I can read it a little bit better.

8   The block under the 16, does that indicate that what we're

9   talking about here are the 27 sealed DEA evidence boxes?

10  A.  Yes.

11  Q.  And the weight is listed under the Blocks 17 and 19?

12  A.  Correct.

13  Q.  Now, who came up with that weight?  Who actually weighed

14  those items?

15  A.  I did.

16  Q.  And where did you do that?

17  A.  In the DEA office.  We have an evidence processing room in

18  Harrisburg.

19  Q.  And what did you use to weigh all these boxes?

20  A.  We have two electronic digital scales.  One scale is rather

21  large to weigh larger items like in this case, and we have

22  another scale that any other smaller amount drugs that we might

23  seize, we use that scale for smaller amounts.

24  Q.  In this case, obviously, you used the larger scale?

25  A.  Correct.

1    Q.   That scale, is it calibrated for accuracy ever?

2    A.   Yes, it is.

3    Q.   And tell us about that.

4    A.   I don't know the name of the company, but annually, we have

5    a company that comes in that ensures that both our scales are

6    calibrated correctly.

7    Q.   If we could take a look at the second page of Government's

8    Exhibit 39.  And it would help if we could zoom in on that same

9    middle portion of the second page.  What's reflected on the

10   second page of 39?

11   A.   It's referring to the box that is present here in the

12   courtroom of -- I describe it as a green leafy substance

13   contained in sealed vacuum-packed bags, and it's sealed inside

14   a cardboard box.  When I received this cardboard box, it was

15   sealed by the Pennsylvania State Police lab.  I then put my

16   seal around it, as well, and we submitted this box again for

17   storage only at our laboratory.

18   Q.   And how much did -- what's the gross weight of that box and

19   the marijuana contents?

20   A.   What's written here is 12,529.6 grams or basically 12 and a

21   half kilograms.

22   Q.   So the total gross weight for the seizure in this case, is

23   it the combination of Pages 1 and 2?

24   A.   Yes.

25   Q.   But that doesn't -- does that give us an accurate weight of

1   what the marijuana is?

2   A.  No.

3   Q.  Why not?

4   A.  It is including the weight of the DEA, there's 27 DEA

5   evidence boxes, as well as this one evidence box.  So the

6   weight reflected on these reports also include those weights.

7   Q.  So did you make a determination of what the weight of just

8   the marijuana would be?

9   A.  Yes.

10  Q.  And how did you do that?

11  A.  Our DEA evidence boxes are the same size.  All I had to do

12  was weigh one box.  I also cut the tape used to seal the box,

13  each box, and I came up with a weight for each evidence box.

14  Q.  And how much did each box -- I mean, how much did one box

15  with evidence tape on it weigh?

16  A.  I calculated -- I weighed it on the same scale I weighed

17  these boxes -- .75 kilograms, so roughly over a pound per

18  evidence box.

19  Q.  So to determine how much the marijuana weighed, how did you

20  do that calculation?

21  A.  I just took the weight of the box and the tape and

22  multiplied it times 28.  I took that figure and deducted it off

23  my gross weight.

24  Q.  And when you did that, what was the total that you got for

25  just the marijuana?

A.  Originally it was 110 and a half kilograms.  It came down
to 89 and a half kilograms.

Q.  When you say the original weight would be 110 and a half,
that's -- you're giving the gross weight.  Right?

A.  Correct.

Q.  Then when you subtract out the weight of the boxes and the
tape, the final number is what?

A.  Eighty-nine and a half.  I think my final figure was
89.48 kilograms.

        MS. TAYLOR:  Your Honor, I'd ask for the admission of
Government's Exhibit 39.

        MS. ULRICH:  No objection, Your Honor.

        THE COURT:  Thirty-nine is admitted.

        MS. TAYLOR:  Those are all the questions I have for
Agent Myers.

                    CROSS-EXAMINATION

BY MS. ULRICH:

Q.  Agent Myers, hello.

A.  Hi.

Q.  I'm going to ask a few questions.  Let's assume that there
are 165 packages of marijuana.  Work with me on the math.  In
each one of those packages, there was about 1.04 pounds of
marijuana in it.

A.  Okay.

Q.  Okay?  That comes out to -- and if you need a calculator,

1 let me know -- 471.7 grams per package.  Is that right?

2 A.  I don't know.

3 Q.  Would you like a calculator?

4 A.  Sure.

5 Q.  I can understand.

6      *MS. ULRICH:*  May I approach, Your Honor?

7      *THE COURT:*  Yes.

8 BY MS. ULRICH:

9 Q.  So we're assuming 165 packages.  In each package, there is

10 1.04 pounds of marijuana.

11 A.  1.04?

12 Q.  Yes.  And roughly, what's in a pound in terms of grams?  Is

13 it about, like, 457, 450?

14 A.  I do it sort of backwards.  A kilogram is 2.2 pounds.

15 Q.  Well, let's do -- it's about 500 grams, give or take, a

16 pound of marijuana.  Right?

17 A.  I'm sorry, it's 500 grams --

18 Q.  In a pound.  457?

19 A.  Close, yeah.

20 Q.  Okay.  Well, all right, let's use 457.  That's close.

21 Right?

22 A.  Yeah.

23 Q.  So you've got 165 packages with 1.4 -- 1.04 pounds.  So

24 times that by --

25 A.  It's 171.6.

1    Q.  What's that?

2    A.  171.6.

3    Q.  And that's -- I'm not sure you're doing it right.  Are you

4    doing 457 grams, 457?

5    A.  No.

6    Q.  Do 1.04 times 457.

7    A.  475.

8    Q.  Okay.  I hope this works.  And times that by a hundred

9    and -- still not right.  I'm still doing something wrong.  All

10   right.  So that's 400 roughly, 475.  Multiply that by 165, and

11   what does that come out to in terms of grams, total grams?

12   A.  That's 78,421.

13   Q.  Okay.  And what does that come out to then in terms of

14   kilos?  78 kilos.  Right?

15   A.  78 kilos.

16   Q.  Okay.  So that's 78 kilos.  So if there were 165 packages,

17   roughly 457 grams in a pound, that comes out to about 70,

18   75 kilos, right, give or take?

19   A.  78.

20   Q.  78 kilos.  And that's about 11 kilos less than what you're

21   coming up with so far.  Right?

22   A.  Correct.

23   Q.  Okay.  And then we have the Pennsylvania State Police lab

24   report that you testified to.  Do you need to see that again,

25   Government Exhibit 8?

1    A.   Sure.

2    Q.   And as you recognized, they didn't test all the packages.

3    Right?

4    A.   That is correct.

5    Q.   And by the way, these packages, these packages were the

6    packages as they were received the night of December 28th.   In

7    other words, somebody didn't open these packages and combine

8    marijuana.   Right?

9    A.   Correct.

10   Q.   Okay.   So then at the lab, they tested, it looks like Items

11   1 through 8 were about 66 bags of marijuana.   Right?

12   A.   66?

13   Q.   66 bags is about what they tested?

14   A.   Do you want me to add them on the calculator?

15   Q.   If you need to, sure.   And you're only adding through 8.1

16   because that's all they tested, just so you know.

17   A.   Okay.   66 is what I get.

18   Q.   Okay.   So they weighed 66 packages.   Right?   And that came

19   out, according to the lab's calculation, at 30,163 grams.   Is

20   that right?

21   A.   Correct.

22   Q.   But they have, it looks like a plus or minus margin of

23   28 grams.   So it could be more, it could be less.   Right?

24   A.   Yep.

25   Q.   So if you take that number, 30,163, divide it by 66 --

1   A.  I get around 454.

2   Q.  Okay.  So that would be basically grams per package of the

3   66 packages they tested.  Right?

4   A.  Right.

5   Q.  So take that 454 and multiply it by 165.

6   A.  Okay.

7   Q.  And what did you come up with?

8   A.  It's about 75,000.

9   Q.  And what does that come out to in terms of kilos then?

10  A.  75.

11  Q.  And that's 14 kilos lower than what you've estimated.  Is

12  that right?

13  A.  Yes.

14  Q.  Okay.  Now, let's talk about your estimate.  We can agree

15  that nobody has weighed just this loose marijuana, have they?

16  A.  No, no one has.

17  Q.  All of these are basically -- it's kind of guesswork, isn't

18  it?

19  A.  No, it's not guesswork.  It's sealed inside plastic.

20  Q.  Okay.  Well, let's talk about -- okay, so you talked about

21  these big, large boxes.  Right?

22  A.  Um-hum.

23  Q.  And then you deducted the weight of the big, large boxes.

24  Right?

25  A.  Correct.

1  Q.  Okay.  But in those big, large boxes wasn't loose

2  marijuana, was it?

3  A.  It's compressed inside plastic.

4  Q.  Each pound of marijuana was in some sort of packaging

5  material.  Right?

6  A.  Correct.

7  Q.  So even though you deducted the weight of the box, you

8  still have packaging material around all that marijuana.

9  Right?

10  A.  Correct.

11  Q.  And if there were 165 bags in there, that means there were

12  165 bags in your calculation that were weighed.  Correct?

13  A.  Yes.

14  Q.  The weight of the bags.  And that wasn't deducted from your

15  calculation.  Right?

16  A.  Correct.

17  Q.  Okay.  And what about duffel bags or garbage bags, were

18  there also garbage bags and duffel bags in those big, large --

19  A.  No.

20  Q.  But we can agree then that the marijuana was packaged and

21  that your calculation doesn't include that packaging material.

22  Correct?

23  A.  You're talking about the original packaging the drug

24  trafficker would --

25  Q.  Yes.

```
 1   A.  Correct.

 2              MS. ULRICH:  That's it.  Thank you.

 3              MS. TAYLOR:  No questions, Your Honor.

 4              THE COURT:  Thank you, Agent.

 5              MS. TAYLOR:  Your Honor, if I could have the court's

 6   indulgence for just a moment.

 7              THE COURT:  Okay.

 8              MS. TAYLOR:  Your Honor, I think there was just one

 9   additional stipulation, although the exhibits have already been

10   admitted by the defense, that we didn't put on the record for

11   completeness.

12              THE COURT:  Okay.

13              MS. TAYLOR:  The parties did stipulate that the

14   documents contained at Defense Exhibit 141 and 143 are true and

15   correct copies of the Yuba County Sheriff's Department policy

16   manual documenting the policy that was in effect as to

17   employees carrying firearms on December 28th, 2015.

18         And, Your Honor, with that, I would ask for the

19   admission of Government's Exhibit 28, which is a signed copy of

20   all the stipulations that the government has read into the

21   record that's signed by both parties.

22              THE COURT:  Ms. Ulrich.

23              MS. ULRICH:  No objection, Your Honor.

24              THE COURT:  Twenty-eight is admitted.  Anything else

25   by the government?
```

1    MS. TAYLOR:  Your Honor, I believe we've asked for the
2  admission of all our exhibits, at least if I've been keeping
3  proper track of it, and with that, the government would rest.
4          THE COURT:  Ms. Ulrich.
5          MS. ULRICH:  Your Honor, I have a motion I need to
6  make.
7          THE COURT:  All right.  Ms. Weida, would you take the
8  jury out so that I can hear the motion.
9      (Jury leaves courtroom.)
10          THE COURT:  Ms. Ulrich.
11          MS. ULRICH:  Your Honor, at this point I'm moving for
12  a judgment of acquittal on Count 19 of the indictment.  The
13  government has charged that on or about December 28th, that
14  Mr. Heath intentionally, knowingly, and unlawfully possessed,
15  used, and carried a firearm, this Glock, two loaded magazines,
16  in furtherance of drug and in relation to drug trafficking.
17  And there's a lot of reasons for that.
18          One, the government, all they presented was that there
19  were drugs, a lot of drugs, and I'm not going to deny that, a
20  lot of drugs in the bed of a truck and that this gun was in a
21  suitcase, in a zippered part of the suitcase, loaded, and there
22  was, apparently, a second loaded magazine.
23          Their witness, Tyler Long, really the mastermind of
24  this whole thing, the one who had the connect in Pennsylvania,
25  the one who had the connect in Florida, said they had a meeting

1    before they even went to Pennsylvania, and no one, no one

2    discussed bringing a gun, that that gun was -- in fact, in his

3    own words, I asked him, did you discuss, you know, the gun to

4    assist with the delivery?  No.  Did you discuss using the gun

5    to advance the delivery?  No.  To promote the delivery?  No.

6    Their own witness who set up this whole transaction had no idea

7    there was a gun in that truck.

8          What that says is, number one, that gun was not

9    possessed in furtherance of drug trafficking.  Was it

10    possessed?  Yeah, it was his gun.  It was his lawfully owned

11    gun that he has had since 2004, that the sheriff's department,

12    Yuba County, was well aware of.  He followed all the

13    regulations in carrying it, carrying it concealed, carrying his

14    badge.  And he qualified it from 2004, and just days before

15    this trip it was qualified by the Yuba County Sheriff's

16    Department.

17          It was a lawfully owned, lawfully carried firearm, and

18    there was absolutely no reference to this gun during any of the

19    trips to Florida, during the trips to Pennsylvania.  In the

20    ordinary sense, was it possessed?  Yes.  In the ordinary sense,

21    was it carried?  Yes.  But that's not enough for a conviction

22    for possession of a firearm in furtherance of drug trafficking.

23          It has to have -- for in furtherance of, it has to

24    have -- you know, it has to be in relation to the trafficking,

25    bolster it.  I can't remember the exact language.  It has to

advance or promote the goals of drug trafficking, and the
government presented no evidence of that.

All they had were the fact that the drugs were found
and that the gun was found.  Their own witness didn't say
anything about the gun.  And the officers who found the gun on
December 28th found the gun, and they never even asked
Mr. Heath about the gun.  That's how insignificant it was to
him.

And so, I mean, just because there is a gun doesn't
mean there's a 924(c), which is why the government charged it,
but it's their burden to prove that it was possessed in
furtherance of drug trafficking or that it was used -- well, it
definitely wasn't use, because for use, you have to have the
active employment of the firearm, which I think it's clear
there's definitely no use here.

So it comes down to whether he carried it during and
in relation to or whether he possessed it.  And if you look at
all the factors, including accessibility, was it accessible, I
mean, sure, he had to reach around, unzip it, and get the gun.
But when they got to Pennsylvania, at the time when probably
the risk was the highest, that gun never came out of that
suitcase, and there was never even a reference to the gun.

I asked the officer, the officer, Agent Shearer who
was there at the scene, did he say, hey, don't worry, I got
this, I got a gun, like, this is all safe, no worries.  Nobody,

1  not one single person during any of this drug trafficking knew

2  anything about this gun.

3       It was not a stolen gun, it was a lawfully possessed

4  firearm, Your Honor.  We are asking for a judgment of acquittal

5  on Count 19 for those reasons.

6       *THE COURT:*  All right.  Ms. Taylor.

7       *MS. TAYLOR:*  Your Honor, certainly the fact that the

8  officers, once the defendant was arrested, did not ask him

9  about it is irrelevant to the defense's motion.  They didn't

10  ask him about it because they're local officers, to which those

11  questions are irrelevant for the local charges.

12       This wasn't a federal case when the defendant was

13  arrested and a 924(c) wasn't contemplated.  For local charges,

14  those questions weren't at the forefront of their mind, and so,

15  no, those questions weren't asked.

16       But in terms of what Mr. Long said, he certainly said

17  that he did not discuss whether the defendant had a gun at the

18  time of the Pennsylvania trip, but what Ms. Ulrich failed to

19  mention is that what he actually testified to was that he was

20  an officer and he carried it concealed and I always assumed he

21  had it.  That's what he said.

22       So, no, he had no reason to talk to him about it

23  either at that meeting, at an earlier time, or, quite frankly,

24  when they were traveling to Pennsylvania or once they got here.

25  I mean, there's no reason to believe that he would have any

1   type of conversation like that with him.

2          In terms of the facts that were presented as to the

3   factors that the court can give the jury, a wealth of

4   information was provided that the jury can consider as to that.

5   Detective Bruckhart did testify as to how accessible it was to

6   the defendant.  It was not in the very back of the truck in the

7   bed, in the inside of a suitcase where it would not have been

8   easily accessible.

9          He even demonstrated for the jury how it was in the

10  rear floorboard portion of the backseat of the truck where he

11  could reach around from the driver's seat and access the

12  suitcase.  It was in the outer pocket of the suitcase, not in

13  the inner portion.  I think it was clearly accessible and

14  within the defendant's power to control it.

15         Obviously it wasn't stolen.  I mean, I don't think

16  Mr. Heath is your typical drug dealer given that he was a law

17  enforcement officer who was transporting a truckload full of

18  marijuana across the country.  I mean, it was his duty weapon

19  that he had.  You wouldn't expect it to be stolen.

20         Mr. Long gave plenty of information about his

21  involvement with Mr. Heath on a variety of trips, not just the

22  Pennsylvania trip, but the trips to Florida where he's

23  delivered marijuana on other occasions.

24         And I think that based on not only where the gun was

25  found, the fact that it was loaded at the time, the fact that

1    there was one round in the chamber, that there were two loaded

2    magazines with it, that it was in close proximity to Mr. Heath,

3    that he was the only one in the truck, that the other two

4    individuals with him purposely did not ride with him, rode in a

5    different vehicle, there was no marijuana in that truck, I

6    mean, all of these things are -- all of these circumstances are

7    factors that the jury could consider in making a determination,

8    using their common sense, as to whether this gun, whether he

9    was a deputy sheriff at the time or not, is something that he

10   possessed in furtherance of drug trafficking.  I'd ask the

11   court to deny the motion.

12       *THE COURT:*  I do think we have a jury question here.

13   Obviously there's no direct evidence on this point, and we

14   wouldn't expect that there would be direct evidence on the

15   issue of possession in furtherance.

16       All we know is that the defendant made a conscious

17   decision to take control of the drugs, that he preferred to fly

18   solo.  Even though he had two defendants accompanying the trip

19   to Pennsylvania, he chose and announced that he was comfortable

20   and preferred to ride alone because of his law enforcement

21   status.  It's unspoken that he may also have preferred to ride

22   alone because he was armed.

23       But we know, also, from the testimony that the gun was

24   loaded and accessible, and from those facts, I believe a

25   reasonable jury could conclude that the gun was possessed in

1  furtherance of drug trafficking.  So I will allow the count to

2  go to the jury, along with the others.

3      Counsel, before we call the jury back, I want to make

4  sure that we have agreement on the verdict form and the jury

5  charge.

6      *MS. ULRICH:*  We're in agreement.  I mean, I agree.  I

7  have no issues.

8      *THE COURT:*  All right.  We've made revisions to the

9  jury charge at Page 47, I believe.  The gun charge has been

10  revised.  Forty-eight.

11     Ms. Ulrich, would you take a quick look at that and

12  make sure it's satisfactory to the defendant.  I know you had

13  concerns.

14     *MS. ULRICH:*  Your Honor, no, we -- they're good,

15  they're good.

16     *THE COURT:*  Okay.  Ms. Taylor?

17     *MS. TAYLOR:*  We had no objection, as well, Your Honor.

18     *THE COURT:*  All right.

19     *MS. ULRICH:*  I have another matter I need to bring to

20  the court's attention.

21     *THE COURT:*  Please.

22     *MS. ULRICH:*  The government has represented throughout

23  this trial that Government Exhibit 5 was found in the glove

24  compartment of Mr. Heath's truck, and they never introduced a

25  witness that said that they found it in the glove compartment

1    of the truck, and that's something that's been represented

2    throughout this trial.  So I am going to have a problem with

3    Government Exhibit 5, and I want the parties to know that.

4           THE COURT:  What is five?

5           MS. ULRICH:  It's the Best Western notes.  They had a

6    couple people testify or I think it was Trooper, Agent Shearer

7    testified it was found in the glove compartment, although he

8    acknowledged he wasn't the one that found it.  And they never

9    put on the officer who did, in fact, say that's where it was

10   found.

11          There's definitely a problem with Exhibit 5.  They

12   represented it was found in Mr. Heath's truck, and there is no

13   evidence that it was found in Mr. Heath's truck.

14          MS. TAYLOR:  Well, Your Honor, that exhibit was

15   admitted -- I mean, it was admitted, and there was no objection

16   to any of that when Sergeant Shearer testified about it.  I

17   mean, we've rested, and I'm not sure what we're supposed to do

18   with that at this point.

19          THE COURT:  Mr. Long identified the exhibit.

20          MS. ULRICH:  Well, no, it was identified, but nobody

21   testified as to where it was found.  That's definitely a chain

22   of custody, a chain of custody problem.

23          MS. TAYLOR:  Well, Your Honor, at this point --

24          THE COURT:  It's not a chain of custody problem.  It's

25   not something that's perishable.  Mr. Long identified it.

1          MS. ULRICH:  But we don't know where it was found.

2    The government --

3          THE COURT:  It doesn't matter where it's found.  He's

4    acknowledged that he wrote it.

5          MS. ULRICH:  Well, he did, but it's a matter of --

6          THE COURT:  The significance of it is not where it was

7    found, but it's that it's related to this case, and one of the

8    co-conspirators has acknowledged that it's related to this

9    case.

10          MS. ULRICH:  All right.  Well, Your Honor, then I'll

11    just keep an objection on the record, and I'll argue to the

12    jury that the government represented it was in the glove

13    compartment, but no one testified to it.

14          MS. TAYLOR:  Well, Your Honor, I would object to that,

15    especially given that if there was going to be a chain of

16    custody issue, Ms. Ulrich should have raised that when she got

17    the exhibit list or certainly at the time that the witnesses

18    testified, not after we've rested.

19          THE COURT:  Well, I think you're right, the practice

20    order does require the chain of custody be raised, but I don't

21    think it's a chain of custody issue.

22          MS. ULRICH:  It may not be.

23          THE COURT:  But you can make your record.

24          MS. ULRICH:  The government represented that that's

25    where it was found, and they didn't put any testimony in to

1   that effect.

2          THE COURT:  Who first testified to the Best Western

3   note?

4          MS. ULRICH:  I have Shearer.  Mr., Detective, Sergeant

5   Shearer testified.  But he also testified that he did not find

6   the Best Western notes.  But he's the one that authenticated

7   it.  He testified that he did not find those Best Western

8   notes.

9          I fully expected Detective Bruckhart to get up there

10  and do that because he's the one that searched -- he's the one

11  that said he searched Mr. Heath's car, but they didn't ask

12  Detective Bruckhart to identify where that was found.

13         THE COURT:  All right.  Well, I take your point.  It's

14  admitted, however, and it's been testified to by two witnesses,

15  most importantly Mr. Long.  And I believe the evidentiary value

16  is not in the location of the item, but in the fact that there

17  is a document that purports to summarize the contents of the

18  truck made by somebody involved in the transportation of the

19  illegal substances.

20         MS. TAYLOR:  I mean, Your Honor, Ms. Ulrich had a

21  chance to take a look at this exhibit in detail yesterday.  I

22  don't know what to tell the court, except that on the outside

23  of the evidence envelope it says, Paperwork from the silver

24  F250.

25         THE COURT:  Right.  Well, I think we've put it to bed.

1    I don't think there's anything left to be said on the record on

2    this point.  I would like to make a record on the verdict form.

3    On the verdict form, counsel.

4              *MS. TAYLOR:*  Yes, Your Honor.

5              *THE COURT:*  Ms. Taylor, have you reviewed it?

6              *MS. TAYLOR:*  Yes, Your Honor.

7              *THE COURT:*  Do you have any objection to the verdict

8    form?

9              *MS. TAYLOR:*  No, not from the government.

10             *THE COURT:*  All right.  Ms. Ulrich.

11             *MS. ULRICH:*  I did not.

12             *THE COURT:*  You did not what?

13             *MS. ULRICH:*  When I looked at it.  No, I have it here.

14             *THE COURT:*  Did you review it?

15             *MS. ULRICH:*  I did, yes.

16             *THE COURT:*  Oh, okay.

17             *MS. ULRICH:*  I did.

18             *THE COURT:*  I wasn't sure if you were saying you

19   didn't review it or -- all right.  Do you have any problem with

20   the verdict form?  We talked a little bit about it in chambers,

21   but I just want to verify on the record that no revisions are

22   necessary.  Ms. Ulrich.

23             *MS. ULRICH:*  We are going to rest.  We're not going to

24   present any evidence, so I guess I'm wondering, you know, what

25   the expectations are.  Are we going to just bring the jury in

1    and I'm going to rest and then we're going to go into closings?

2        *THE COURT:*  Yes.

3        *MS. ULRICH:*  Okay.

4        *THE COURT:*  But first I'll give you a short break.

5        *MS. ULRICH:*  I was going to say, I need that.  Good,

6    yes, I need a short break.

7        *THE COURT:*  All right.

8        *MS. ULRICH:*  Thank you.

9        *THE COURT:*  Ms. Taylor.

10       *MS. TAYLOR:*  I was going to ask for the same thing.

11       *THE COURT:*  Okay.  I hate to close this late in the

12   day, but we will.  Let's come back at -- we'll bring the jury

13   back at 4 o'clock, we'll close, and we'll submit that long jury

14   charge.

15       What I do is, when we close this late in the day, I

16   let the jurors go back to the jury room and deliberate until

17   they tell me they want to leave.  Usually that happens around

18   5:30 when we turn off the heat.  So I would -- but sometimes

19   they want to go until 6:30, 7 o'clock.  Whatever it is they

20   want to do, we wait to hear from them.  Okay?

21       So we should be able to at least get them started.

22   And have you talked about -- is there agreement except for the

23   gun and the drugs that everything will go to the jury?  All the

24   exhibits will be --

25       *MS. ULRICH:*  Well, aside from my objection to

1    Government Exhibit 5, too.  I just want that objection on the

2    record.

3         THE COURT:  That objection is noted and preserved, but

4    all the exhibits then will go out.  Does that include the

5    stipulations?

6         MS. ULRICH:  That's fine.

7         THE COURT:  Okay.  So just so you know for purposes of

8    closing, these instructions are very long, and especially when

9    they're long like this, I think it's really helpful to the jury

10   to have them in their hands so they can read along if they want

11   to and they can make notes on their copies.  So we're copying

12   the instructions now so that they can have them, and we'll get

13   it going at 4 o'clock.  Okay?

14        MS. ULRICH:  Thank you.

15        MS. TAYLOR:  Your Honor, can I just have one moment

16   with Ms. Ulrich?

17      (Counsel confer.)

18        MS. TAYLOR:  Thank you, Your Honor.

19        THE COURT:  All right.  We'll be in recess.

20        COURTROOM DEPUTY:  Court is in recess.

21      (Recess taken.)

22        THE COURT:  Ms. Ulrich, the government has rested.

23        MS. ULRICH:  Your Honor, we will not be presenting

24   evidence.

25        THE COURT:  All right.  Thank you.  Jurors, you've

1  heard all the evidence in the case.  Now we're going to

2  conclude with the closing arguments of the lawyers, and then

3  I'll be instructing you on the law.

4       Depending on what time it is, you may or may not be

5  able to begin your deliberations at the conclusion of my

6  instructions, but we've set aside tomorrow just in case you do

7  need to come back for that purpose.  All right.  First we hear

8  from the government.

9       MS. TAYLOR:  Thank you, Your Honor.  Your Honor, I

10  would also ask to reserve time for rebuttal.

11       THE COURT:  How much time would you like?

12       MS. TAYLOR:  Just briefly.

13       THE COURT:  Five minutes?

14       MS. TAYLOR:  Five minutes.

15       THE COURT:  Okay.

16       MS. TAYLOR:  Good afternoon, ladies and gentlemen.  I

17  know you've heard a lot of information compressed into a short

18  amount of time, but I wanted to begin today sort of where we

19  started just yesterday with what you heard in opening

20  statements.

21       Defense counsel told you in her opening statement that

22  you were going to hear about how the defendant had misused his

23  position as a deputy sheriff, that he knew he had done a bad

24  thing while he was working at the sheriff's office, and that he

25  knew that he had ruined his life.

1     And if we take a look at Government's Exhibit 12,

2 which is the statement that -- hopefully it will come up --

3 that was admitted with Detective Schauer, you'll have a chance

4 to review this once you go back to deliberate, and when you

5 review the written statement of Detective Schauer's notes and

6 the defendant's handwritten portion at the end, I see nothing

7 in this and I recall nothing from the detective's testimony

8 that states anything about that evidence at all.

9     I'd like to talk to you about the charges in this case

10 and what the evidence has shown you, what the government has

11 put on as evidence in this case to support the charges in this

12 case.

13     Now, you've heard that the defendant is charged with

14 conspiracy to distribute and possess with intent to distribute

15 100 kilograms and more of marijuana and then the substantive

16 drug count of distribution and possession with intent to

17 distribute marijuana.

18     And as you've seen in Government's Exhibit 12, the

19 defendant has admitted to that.  He's admitted to being in

20 Pennsylvania to deliver marijuana.  In addition, on

21 December 28th of 2015, he was caught red-handed doing just

22 that, with a truckload full of marijuana.

23     You also heard from Tyler Long, his co-conspirator,

24 who told you that that's exactly what they were here to do.

25 And not only did Mr. Long tell you about that incident, he told

1   you about other incidents where the -- he and the defendant had

2   distributed marijuana, not only distributed it, but grown it on

3   the property that they owned in California, and then

4   distributed it to the various places, to the customer here in

5   Pennsylvania and the two trips to Florida.

6   But you don't have to take Mr. Long's word for it,

7   because here in Government's Exhibit 12, if you take a look at

8   the second page, the defendant himself confirms, about a

9   quarter of the way down the page, that he has made other trips

10   for Tyler in the past.  And it says, yes, with Tyler.  So the

11   defendant himself corroborates exactly what Mr. Long testified

12   to.

13   In addition, what you're going to hear from Judge Kane

14   when she gives you her instructions -- can we just leave

15   Exhibit 12 up, please.  What Judge Kane is going to tell you in

16   her instructions, when she gives you her instructions as to the

17   conspiracy counts, both the conspiracy for the drug trafficking

18   and the money laundering, is that acts of -- acts and

19   statements of a co-conspirator, in other words, Mr. Long or

20   Ryan Falsone or Ramona Long, those acts and statements of a

21   co-conspirator are attributed to the defendant during the

22   period of the conspiracy.

23   The real issue in terms of Count 1, I would submit to

24   you, is likely to be -- that you'll need to decide is likely to

25   be the weight.  It's charged as a hundred kilograms or more.

1    And the evidence has shown that there's been more than enough

2    provided to show that the defendant has distributed a hundred

3    kilograms or more of marijuana during the period that's charged

4    in the indictment, which covers from September, 2014, through

5    periods in 2015.

6         You heard just at the end of today Agent Myers

7    explaining the weights from the drugs that were seized in

8    December of 2015, 89 and a half kilograms.  That one truckload,

9    subtracting out the boxes and the tape and all that, gets us to

10   almost a hundred kilograms right there.  That doesn't account

11   for any other acts of any of the other co-conspirators, any

12   other trips, any of the other mailings, nothing.

13        If you look at the Pennsylvania state lab report, I

14   know it has a different number on there.  That's why I asked

15   Agent Myers about it.  That was to explain that they didn't --

16   not only did they not test it all, they didn't weigh it all.

17   They didn't even open half the packages.  So that number would

18   not be accurate in looking at it as to a weight.

19        Ms. Ulrich asked questions of Agent Myers and a couple

20   of other witnesses about hypothetical weights and various

21   weights.  We're not dealing with hypotheticals, though.  I'm

22   asking you to consider the evidence that you've heard and

23   consider the best and most accurate weight that we could

24   possibly present to you, and I would submit to you that that is

25   the weight that was provided by Agent Myers from DEA for the

1  seizure that happened in December, 2015.  That doesn't get us

2  to a hundred kilograms, though.  But if you -- you can leave

3  Exhibit 12 off.  Mine is blinking on and off.  I don't know if

4  everybody's is.  Maybe it's just mine.

5           In order to get over a hundred kilograms, consider

6  Mr. Long's testimony when he talks about the two Florida trips,

7  which the defendant admits that he did other trips for Mr. Long

8  in his written statement, in the written statement that

9  Detective Schauer does.  He says -- Mr. Long testifies that the

10  defendant delivered basically the same amount of marijuana down

11  to Florida the two times in late 2014 or maybe one of them was

12  early 2015.  And I think he gives an estimate of 100 to

13  150 pounds.

14           If you add those two trips to the one trip in

15  Pennsylvania, you're well over a hundred kilograms, again, not

16  factoring in anything to do with the mailings or -- the

17  mailings to the Pennsylvania customer, much less any other

18  customer that Mr. Long talked about.

19           So I think based on the evidence that you've heard,

20  the government has proved beyond a reasonable doubt that the

21  defendant was involved certainly with a conspiracy with

22  Mr. Long and the other co-defendants to grow, manufacture,

23  distribute marijuana, and during that time period, he's well

24  over a hundred kilograms of marijuana.

25           In terms of the money laundering count, in a way it's

1    a similar charge, because it's also a conspiracy count, as

2    well.  And the same instructions will apply that you'll hear

3    from Judge Kane.  The acts and statements of co-conspirators

4    will, for Mr. Long and Mr. Falsone and Ramona Long, those will

5    be attributed to the defendant.

6         But, again, you heard Detective Schauer explain the

7    defendant admitted that he was supposed to get $100,000 from

8    that marijuana delivery that he was here doing in Pennsylvania

9    and that $50,000 of it was going -- supposed to go to the

10   winery.  And Mr. Long explained that the cash that he had

11   gotten previously, that the defendant had gotten previously

12   from some of the other marijuana trips is what he had used to

13   buy -- what the defendant had used to buy the winery for his

14   wife to begin with.

15        In addition, on Government's Exhibit -- I believe it's

16   37.  Take a look at that.  No, that's not it.  Thirty-eight.

17   I'm sorry, 38.  On 38, Agent Maiolo testified about the cash

18   deposits in 2015 that were going into the winery account that

19   amounted to almost $26,000.

20        Now, you also heard that there were a lot more cash

21   deposits going into Mr. Long's account, accounts, which is

22   true.  But, again, Mr. Long is a co-conspirator of the

23   defendants and this is a conspiracy charge and those actions,

24   for the time period of the conspiracy, are attributed to the

25   defendant, or you can certainly consider them that way, and

1    that's a factor that you should consider.  You can take that

2    one down.

3          And the charge that's really most at issue, as you

4    know, is the gun count, possession of a firearm in furtherance

5    of drug trafficking, which is, of course, the charge that

6    you've heard the most evidence about.

7          Now, I mentioned in my opening statement and Judge

8    Kane will, of course, give you very detailed instructions

9    shortly on some of these definitions, but possession of a

10   firearm in furtherance of drug trafficking requires that you

11   get the definition of -- the legal definition of possession,

12   because in this case, constructive possession and understanding

13   it is important because you've heard the facts now, you've

14   heard from Detective Bruckhart where the gun was found.  It was

15   found in the defendant's silver F250 in the backseat, in the

16   suitcase, obviously not on the defendant.

17         So this is not an actual possession case.  It's a

18   constructive possession case.  And what constructive possession

19   requires is that someone have the ability and power to control

20   something.  Here, you heard Detective Bruckhart explain it was

21   in the backseat.  The suitcase was not on the seat but was in

22   the floorboard.  It was not inside the suitcase, in a zipper

23   pocket.  It was not -- the gun was not broken down.  It was in

24   the outer pocket.  The gun was put together.  It was loaded.

25   There was a loaded magazine in it.  There was an extra loaded

1    magazine with it.  Not only was the gun loaded, but there was a

2    round in the chamber.

3         The gun was in the cab of the truck, not way back in

4    the bed where it would have been, at best, inconvenient to try

5    to get it.  But if you're the driver and you've got something

6    behind you in the floorboard of the backseat, it's accessible

7    to you.  And that's where this suitcase was according to the

8    detective who found it, and that's where this gun was.

9         And accessibility is one of the factors that you'll

10   hear from the court is something that you can consider in

11   determining the "in furtherance" prong, whether the gun was

12   possessed in furtherance of drug trafficking.  Because you've

13   heard a stipulation, this was the defendant's gun.  There's no

14   question about that.  The real issue is, did he have it in

15   furtherance of drug trafficking.  He certainly had it in a

16   truck full of drugs.  But the circumstances of the possession

17   are important, also, and that's a factor.

18        Proximity to drugs or drug proceeds is another factor

19   you'll hear about.  Well, it's pretty close to drugs.  I mean,

20   there's only, I don't know, a couple of feet between the gun

21   and almost a half a million dollars of marijuana.  And we know

22   the circumstances because obviously you've heard from Mr. Long,

23   he's explained what happened.  You've heard from the undercover

24   detective, now Sergeant Shearer who was there.  You saw the

25   defendant's statement.  Clearly they were there to commit a

1   huge drug delivery, enough to fill up the back of his F250

2   truck.

3        And you can consider the other circumstances

4   surrounding what was going on. They're there to deliver this

5   almost half a million dollars of marijuana. It's almost

6   midnight. They're coming to do it at a house of a person

7   they've never met, in an area they're not familiar with. And

8   they've traveled across the country. They've spent two nights

9   in hotels. You heard that from Mr. Long. The drugs have

10  stayed locked in the back of the defendant's truck.

11       And, ladies and gentlemen, what you're also going to

12  hear from the court is that you're not required to check your

13  common sense at the door when you're asked to come and be

14  involved in jury service. In fact, you're asked to use your

15  common sense and your life experiences and apply those to the

16  facts that you hear in the courtroom to help determine what has

17  happened here.

18       And I would submit to you that if you do that in this

19  case, you consider all the facts and circumstances here and you

20  apply your common sense and you consider what you know in your

21  life experiences, that you can really reach only one conclusion

22  as it relates to that one charge, and that's that that

23  defendant possessed that gun in furtherance of drug

24  trafficking.

25       Now, defense counsel asked a number of the police

officers who testified about whether they carried a firearm

when they were off duty.  And I think they all said that they

did some of the time.  Now, your recollection will control, of

course, but I think all of them that she asked, at least, said

that they did.

And she even showed Detective Schauer the Yuba County

Sheriff's Department manual on their policy for carrying their

firearms off duty, which was stipulated to.  That's certainly

the policy for Yuba County.  And it absolutely says that Yuba

County deputy sheriffs can carry, are permitted to carry their

firearms when they're off duty, and they are permitted to carry

their firearms when they're out of state.

And defense counsel even drew the detective's

attention to the section of the manual that states that if

you're carrying your firearm when you're off duty, you have to

carry your badge.

And I would submit to you that the point of those

questions was to submit -- I'm sorry, to suggest to you that

the defendant possessed this firearm not in furtherance of drug

trafficking, but in his capacity as an off-duty sheriff's

deputy, and therefore it was okay on December 28th, 2015, for

him to have that gun in his suitcase, in that truck, with all

that marijuana, that it wasn't the crime that we've charged him

with.

But what I would submit is there's one glaring problem

1  with that argument, and that's that that presupposes that the
2  defendant was acting in his capacity as a law enforcement
3  officer, a law enforcement officer who is charged with
4  upholding the law, not someone who is out there breaking it,
5  committing felonies over and over.
6  Now, when he received his badge, which is part of
7  Government's Exhibit 3 that was found in his truck that day,
8  all those years ago, he took an oath. And what he did in
9  December of 2015 and on the dates you heard about before that,
10  his conduct on that date and before that, it dishonored this
11  badge with his drug trafficking, with his stealing evidence
12  from the evidence lockers and then giving it to Mr. Long to
13  distribute.
14  And I would suggest that he's still doing that,
15  because now he's sitting in a federal courtroom and he's still
16  using his position claiming that because he was a deputy
17  sheriff, that he could possess that gun and he shouldn't be
18  convicted of this charge.
19  But he wasn't above the law then, not when he grew
20  that marijuana, not when he stole that evidence, not when he
21  distributed that marijuana, and not when he brought that gun
22  along on those drug deals, because no law enforcement officer
23  is above the law. Once he crossed that line, he wasn't a
24  deputy sheriff anymore. I don't care what it said on his ID,
25  and I don't care what it said on his badge. He wasn't a law

1   enforcement officer, he was just another drug dealer.  And the

2   time for dishonoring this badge ends now.

3           The evidence has established the defendant for what he

4   was back on December 28th, 2015, and for a while before that.

5   He was a marijuana trafficker.  He was growing and distributing

6   and helping others do that as part of the conspiracy.  He was

7   stealing marijuana evidence from the sheriff's office, and he

8   was a courier who drove truckloads of marijuana to Florida and

9   Pennsylvania.  And he got paid huge sums of money to do it, and

10  he spent that money on things like clothes and buying a winery.

11          And despite bringing that badge along on

12  December 28th, 2015, he wasn't acting as a law enforcement

13  officer that night.  He wasn't an off-duty sheriff's deputy, he

14  was just another drug dealer.  And just like drug dealers, he

15  kept his gun close, accessible, right there where he could

16  reach it, loaded, ready to go, not where it could be seen by

17  others, in the zipper pocket of that suitcase, but it was

18  ready.  And that's possession in furtherance of drug

19  trafficking, and I'd ask you to convict the defendant of all of

20  the charges.  Thank you.

21          THE COURT:  Thank you, counsel.  Ms. Ulrich.

22          MS. ULRICH:  May it please the court, Ms. Taylor,

23  Mr. Terz, ladies and gentlemen of the jury, Ms. Taylor is

24  absolutely right, he did dishonor that badge, and he gave a lot

25  of good police officers a bad name that night, and we do not

1    dispute that.  But that doesn't relieve the government of their

2    burden of proving each and every element of the crime charged

3    beyond a reasonable doubt.

4            In my opening, I told you this was a case about mere

5    possession of a firearm.  Possession and carry in furtherance

6    of drug trafficking is not the ordinary definition of

7    possession.  Did he possess the firearm on December 28th?

8    Sure, he possessed it.  He constructively possessed it.  It was

9    his gun.  We're not saying it was somebody else's gun.  He

10   possessed that gun, but that is not where this case ends.  Did

11   he carry the gun?  Sure, the ordinary definition of carry is,

12   you know, I'm carrying my bag.  That's carry.  But that's not

13   what this case -- that's not where this case ends.

14           In order to find that he possessed it in

15   furtherance -- you have to find that he possessed it in

16   furtherance of drug trafficking and that he carried and used it

17   or that he carried and used it during and in relation to a drug

18   trafficking crime.

19           And possession in furtherance of means more than mere

20   possession.  Mere possession of this gun is not enough.  This

21   gun has to be used to assist with the drug trafficking, promote

22   the drug trafficking, accomplish the drug trafficking, and

23   advancing the goals or objectives of drug trafficking.  And

24   these are all words you're going to hear from Judge Kane during

25   jury instructions.

1        On the carry and use and whether -- the question of

2    whether he carried or used the firearm during and in relation

3    to drug trafficking, the judge is going to tell you that the

4    gun had to have some purpose or effect with respect to the drug

5    trafficking crimes.  It must have facilitated or had the

6    potential of facilitating the drug trafficking crimes.

7        And she's going to tell you that you have to consider

8    all the circumstances surrounding the presence of the firearm.

9    And some of those are whether or not it was a stolen firearm,

10   whether it was possessed legally or illegally, the

11   accessibility of the firearm, the type of firearm, the type of

12   the criminal activity, and the usefulness of the firearm.

13       So what are our circumstances?  What are our factors?

14   We know that he was in the Marine Corps, married, two kids, and

15   we know that he had been a sheriff for quite a long time, and

16   that as a sheriff, he was permitted to carry this gun.  But it

17   wasn't that he was just permitted, he had to jump through a lot

18   of hoops to carry this gun.  And that's why they had a policy

19   or regulations in effect in Yuba County, the sheriff's

20   department he worked for.

21       I'm going to show you Government -- or Defense Exhibit

22   143, Page 3.  I'm not going to read all of this to you.  This

23   is something that you'll get with the evidence at the end of

24   the case.  306.3.7, it says that carrying of firearms by

25   members while off duty is permitted by the sheriff but may be

1    rescinded should circumstances dictate, that is, like

2    administrative leaves.  Members who choose to carry a firearm

3    while off duty based on their authority as a peace officer will

4    be required to meet the following guidelines.

5         And you'll go through there, if you want to, in your

6    deliberations.  And it says, The firearm shall be carried

7    concealed at all times and in such a manner as to prevent

8    accidental or unintentional cocking, discharge, or loss of

9    physical control.  It is the responsibility of the member to

10   submit the firearm to the firearm instructor for inspection

11   prior to personally carrying.

12        And I'm not -- like I said, I'm not going to read

13   through all of this.  Members shall provide written notice of

14   the make, model, color, serial number.  And then if you go to

15   Page 6, you'll see there are policies regarding storage at home

16   and in their vehicle.  And then I'm going to direct you to Page

17   9.  Again, these are all regulations that you'll be able to

18   read during your deliberations.

19        And 306.10, which deals with carrying firearms out of

20   state, that they are, in fact, authorized to carry firearms out

21   of state.  The qualifications -- and I'm going to show you

22   Defense Exhibit 141.  Now, he bought this gun, he's had this

23   gun since 2004.  He didn't buy this gun to facilitate any drug

24   trafficking.  This is a gun he's had since 2004, a gun that he

25   let his sheriff's department know that he was carrying off

1   duty, and he went through all the qualifications.

2          And if you scroll through all these, you'll see almost

3   every year -- and we're not going to do it right now.  Again,

4   you'll have it in deliberations.  But the last one, if we could

5   go to the last page, was December 22nd, if I recall, 2015, just

6   before this arrest on December 28th of 2015.  So he was getting

7   qualified with this gun as directed by his department.

8          But beyond that, you heard from a number of police

9   officers.  One was Detective Schauer.  You know, I asked about

10  photos of important evidence, and he said, yeah, they do take

11  photographs of important evidence.  But it strikes me that

12  there were no photographs shown to you about where that

13  suitcase was in this truck.  So we're all kind of assuming how

14  this all played out based on the officer's testimony.

15         But he told you that he knew that a firearm had been

16  found in the car when he was talking to Mr. Heath, and it was

17  so not important to him that he didn't even ask Mr. Heath about

18  the firearm while he was questioning Mr. Heath.

19         But what else did Mr. -- or Detective Shearer tell us?

20  He's been a police officer for quite some time, and he carries

21  a Glock, the same gun, type of gun found in this case, off

22  duty.  And we went through the regulations of Yuba County and

23  said all of them were very similar to the regulations he must

24  abide by, but that he, too, carried a firearm off duty and it

25  was, in fact, a Glock.

1      You also heard from now Sergeant Shearer, and if you

2  remember, Sergeant Shearer is the undercover who was on the

3  scene with the informant, Chip Conrad, when Mr. Heath,

4  Mr. Falsone, and Mr. Long arrived.  He was there from the

5  get-go.  And he never even saw a gun.  There was no reference

6  about a gun.  There was no talk at all about the gun.

7      And we're going to get to accessibility in a moment,

8  but Ms. Taylor made a point to say that it wasn't in the bed of

9  the truck with the drugs.  That's right.  And if it was really

10  there to protect the drugs, wouldn't it have been better if it

11  were there, right there in the bed of the truck with the drugs

12  so if something went down, he could grab it right out of the

13  bed when they were unloading the marijuana and use it?

14      That's not where it was.  It was in the cab of the

15  truck where nobody knew it was and nobody saw it.  And wouldn't

16  you think if something was going to go down, that would be the

17  moment when they get there and they're unloading the drugs?

18  That didn't happen.  Nobody even knew there was a gun there.

19      What else did Sergeant Shearer tell you?  He, too,

20  carries a gun off duty.  Apparently this is very common among

21  law enforcement officers.  He said he carries his 75 to

22  80 percent of the time.  And I didn't ask those two about

23  whether it was loaded or not loaded, but I asked Detective

24  Bruckhart if he carried his loaded, and he's like, yeah, I

25  carry my gun loaded off duty.  I mean, these law enforcement

1    officers aren't carrying guns that are not loaded when they're

2    off duty, they're carrying loaded firearms.

3            Now, you heard from Tyler Long, and the government may

4    be suggesting that Mr. Long didn't want to be in the car

5    because there was a gun in the car.  But that is just an

6    assumption.  Mr. Long said that he didn't want to be in that

7    car because Mr. Heath insisted that he had to be in that car

8    alone and that's what this is all about and because maybe there

9    was a gun in the car, which is something that is an assumption.

10           But Mr. Long didn't want to be in that car because he

11   didn't want to get busted with the drugs.  And no doubt he

12   would have left Mr. Heath high and dry if Mr. Heath had gotten

13   stopped and they found the drugs in the car.  Mr. Tyler Long

14   would have been long gone.  It had nothing, nothing to do with

15   the fact that there might have been a gun in that car.  He

16   didn't want to be in the same car as the drugs.

17           Did you see how upset he was that -- blaming Mr. Heath

18   and Mr. Falsone for getting these bad drugs and wanting money?

19   Mine was better; if I hadn't listened to them, I wouldn't be in

20   this position today.  That all came from Mr. Long, the big guy,

21   the guy that was in charge, the guy that had the connects in

22   Florida, in other places, the guy that knew Chip Conrad, the

23   guy that texted him and said, listen, don't talk any details in

24   front of these two guys.  That's Mr. Long.

25           And if you heard from Agent Shearer, when they got

1    there, it was Mr. Long who was barking out the instructions,

2    Mr. Long who was doing the counting.  He was the big guy.  And

3    what did he tell you?  They had a meeting before they came to

4    Pennsylvania.  So don't you think he would have been on top of

5    everything that was going to go down?  There was absolutely,

6    positively no discussion about a gun in that meeting.  That gun

7    was never to play a role, because if it was, Mr. Long would

8    have known about it.

9         And I asked him specifically if it was there to assist

10   drug trafficking.  He goes, no, we didn't talk about that.  Did

11   you talk about it accomplishing the goals of drug trafficking?

12   No, we didn't talk about that.  Did you talk about that gun

13   advancing the goals of drug trafficking?  Mr. Long is like, no,

14   I never saw a gun, I had no idea he was carrying a gun.  And

15   this is the guy that's in charge.  This is the guy that set all

16   this up.

17        And what's interesting and Ms. Taylor said a number of

18   times in her closing, that co-conspirators are liable for the

19   acts and statements of their co-conspirators.  And I agree with

20   that.  But yet Mr. Long wasn't charged with a 924(c).  When I

21   say the 924(c), I mean Mr. Long wasn't charged with possessing

22   or carrying that firearm in relation to drug trafficking.

23        He wasn't charged with conspiring to carry that gun

24   during and in relation to drug trafficking.  And he wasn't

25   charged because there is no evidence that that gun was

possessed in furtherance of drug trafficking or that it was
used or carried during and in relation to drug trafficking.

So let's look at the factors again.  And, now, this is
a drug trafficking crime.  There's no doubt it's marijuana.
And there's no doubt that it was probably worth close to half a
mill, what was in the bed of the truck.  I get that.  We don't
dispute that was the underlying crime.

But let's look at the factors.  Was the gun stolen?
No.  Was it possessed legally or illegally?  It was a lawfully
possessed gun.  Was it accessible?  And let's talk about the
accessibility factor for a moment.  That gun was found in a
zippered pocket in a suitcase behind the driver's seat of this
truck.

Now, there's no evidence as to whether Mr. Heath is
right-handed or left-handed, but if that was accessible, it
would be probably better if he were left-handed.  He'd have to
reach around that seat, unzip that pocket, reach in and grab
that gun.  That's going to take some time, and that's assuming
he's left-handed.  If he's right-handed, that's going to be
even harder to grab that gun in the event of an emergency.

That gun could have been kept in a number of places
that were actually accessible.  It could have been in the glove
compartment.  It could have been on the floor of the truck so
he could have just grabbed it and pulled it.  It could have
been in the glove -- or the console.  It could have been right

1    there on the passenger seat or right down beneath the passenger

2    seat.  If he wanted that gun accessible to those drugs, he

3    could have found a much better location than in a zippered

4    pocket in a suitcase.

5         The type of gun is another consideration.  It was a

6    Glock.  Police officers carry Glocks off duty, and you know

7    that because Detective Schauer told you that's exactly what he

8    carries, is a Glock.  Usefulness.  There was absolutely no use,

9    no usefulness to this gun whatsoever.

10        So if you look at all the circumstances, all the

11   factors that the judge is going to tell you about, there is

12   only one conclusion:  Mr. Heath did not possess that firearm in

13   furtherance of a drug trafficking crime, and he did not use or

14   carry that firearm in relation to drug trafficking, and we are

15   asking you to find him not guilty of Count 19.  Thank you.

16             *THE COURT:*  Ms. Taylor.

17        *MS. TAYLOR:*  Thank you, Your Honor.  Ladies and

18   gentlemen, Ms. Ulrich just talked to you a little bit about the

19   accessibility factor and talked about where the gun was located

20   based on the testimony and suggested that there might have been

21   a more accessible location.  I can't really disagree with her.

22   Maybe there was a more accessible location.

23        But what you won't hear from Judge Kane is that in

24   order to find the defendant guilty, the gun has to be in the

25   most accessible location possible.  I mean, I'm sure there was

1    a more accessible location than right behind the driver's seat.

2    There might have been.

3          But that's not what's required here.  What's required

4    is for you to consider or at least one of the factors you may

5    consider is whether the firearm was accessible.  And the

6    evidence here is that it was in the outer pocket right behind

7    the -- of the suitcase right behind the driver's seat, which is

8    an accessible location to the person sitting in the driver's

9    seat.

10          I have no doubt there were other places it could have

11   been.  That's not the evidence, though.  I don't -- you know,

12   drug dealers aren't that smart.  They could have put it

13   somewhere else.  They didn't.  I'm sure there was a reason, but

14   we don't know that.

15          Ms. Ulrich also talked about Mr. Long and said that,

16   you know, he was the big guy, and even though he was the big

17   guy, there was no evidence that there were any conversations

18   about him knowing about the gun or that he saw the gun.  That's

19   right, there were no conversations about the gun, and he got on

20   the stand and testified truthfully that at least as far as that

21   Pennsylvania trip, he didn't see the gun with the defendant.

22          But what he also told you when he was on the stand --

23   and, again, your recollection of the evidence is what controls,

24   but what he also told you was that -- and I believe this was on

25   cross-examination by Ms. Ulrich, Mr. Long said, well, he was an

1   officer, I assumed that he had it, when being questioned about
2   whether they had talked about it at that meeting at the winery.

3        Defense counsel also made reference to the fact that
4   there were no photos of the gun in place the way that the
5   officers found it.  They candidly admitted to you that there
6   weren't.  They explained the circumstances of that evening, how
7   everything went down at the time of the arrest, the time of
8   night it was, the fact that it was raining, the number of
9   people that they took into custody, and that when the gun was
10  found in the suitcase, no, they simply brought all the evidence
11  in the police department and searched it there.

12       But Ms. Ulrich just said that we're assuming that is
13  how it played out as though we don't really know where the gun
14  was found and we're just taking the detective's word because we
15  don't have any photos.  I would submit to you that is not
16  entirely the case.

17       We don't have any photos, that is absolutely accurate.
18  But you have more than that to rely on.  You heard Detective
19  Bruckhart explain in Government's Exhibit 1 that while this is
20  packaged in a DEA bag now for federal court, that there's a
21  manila evidence envelope in here, but inside that manila
22  evidence envelope, there was this clear plastic bag, and that's
23  what Detective Bruckhart told you when he found the gun he
24  first placed it in.

25       And he didn't just throw it in this Ziploc bag and

1     toss it to Detective Shearer and hope for the best, he wrote on

2     it.  And he identified that as his handwriting, and he wrote on

3     it where he found it.  So he doesn't just have to remember,

4     hope he remembers where he found it.  He wrote on it that he

5     found it in the silver F250, which he explained was the 250, FT

6     pocket, front pocket, suitcase in rear, chambered, and he told

7     you exactly what those notations meant.

8          So you have more than just his recollection and the

9     fact that there are no photos.  He clearly notated at the time

10    that he found it that night where it was.  Then Sergeant

11    Shearer sealed it in the manila evidence envelope, and that's

12    where it stayed.  Now, of course, it's additionally packaged in

13    a DEA evidence envelope.

14         And, finally, Ms. Ulrich again showed you the Yuba

15    County sheriff's manual.  And I won't pull it up again.  I just

16    want to make this point, if you want to look at it.  When you

17    look at it, you should consider a couple of things.  One, you

18    know it does not say that anybody at the Yuba County Sheriff's

19    Office can carry their gun off duty while they're trafficking

20    narcotics.  There's nothing in there about committing felonies

21    or trafficking narcotics.

22         In fact, it actually says you can carry your gun off

23    duty, and the language says, in the portion Ms. Ulrich showed

24    you on Page 3, the quote is, "based on their authority as peace

25    officers."

1          What part of what happened on December 28th, 2015, or

2     anything you've heard that the defendant did had anything to do

3     with his authority as a peace officer?  That is not what this

4     case is about.  This case is about him being a drug dealer, and

5     that's why he had that gun on December 28th.

6          Based on all the evidence you've heard, we'd ask you

7     to find him guilty of all counts.  Thank you, Your Honor.

8          *THE COURT:*  Thank you, counsel.  Jurors, we're going

9     to power through the jury instructions now.  That way you'll

10    have heard everything you need to hear from the court and the

11    case will be in your hands.  You'll decide whether you want to

12    deliberate this evening or tomorrow.

13          I find that, especially as the hour gets late, it's

14    easier to follow jury instructions if you have a copy of those

15    instructions in your hands.  So I'm going to ask Ms. Weida to

16    provide you with a copy of what I am about to present to you.

17    You can follow along if you wish, or if you hear better and you

18    think you'll comprehend better just listening than you will

19    reading along, that's fine, too.

20          Sometimes jurors like to make notes.  If you do make

21    notes on your copy of the jury charge, please make sure that

22    you put those notes in the pile with the notebooks so that any

23    notes that you might make on the jury instruction could be

24    destroyed at the end of the case, along with your notebooks.

25    All right, Ms. Weida.

1          Members of the jury, you have seen and heard all the

2    evidence and the arguments of the lawyers.  Now I will instruct

3    you on the law.  You have two duties as a jury.  The first duty

4    is to decide the facts from the evidence that you've heard and

5    seen in court during the trial.  That is your job and yours

6    alone.  I play no part in finding the facts.  You should not

7    take anything I may have said or done during the trial as

8    indicating what I think of the evidence or what I think about

9    what your verdict should be.

10          Your second duty is to apply the law that I give you

11   to the facts.  My role now is to explain to you the legal

12   principles that must guide you in your decisions.  You must

13   apply my instructions carefully.  Each of the instructions is

14   important, and you must apply all of them.  You must not

15   substitute or follow your own notion or opinion about what the

16   law is or ought to be.  You must apply the law that I give you

17   whether you agree with it or not.

18          Whatever your verdict, it will have to be unanimous.

19   All of you will have to agree on it or there will be no

20   verdict.  In the jury room, you will discuss the case among

21   yourselves, but ultimately each of you will have to make up his

22   or her own mind.  This is a responsibility that each of you has

23   and that you cannot avoid.

24          Perform these duties fairly and impartially.  Don't

25   let sympathy, prejudice, fear, or public opinion influence you

1    in any way.  You should also not be influenced by any person's

2    race, color, religion, national ancestry, gender, sexual

3    orientation, profession, occupation, economic circumstances, or

4    position in life or in the community.

5           You must make your decision in this case based only on

6    the evidence that you saw and heard in the courtroom.  Don't

7    let rumors, suspicions, or anything else that you might have

8    seen or heard outside of the court influence your decision in

9    any way.

10          The evidence from which you are to find the facts

11   consists of the following:  The testimony of the witnesses,

12   documents and other things received as exhibits, and any fact

13   or testimony that was stipulated to, that is, formally agreed

14   to by the parties.

15          The following things are not evidence:  The

16   indictment, the statements and arguments of the lawyers for the

17   parties in the case, questions by the lawyers and questions

18   that I might have asked, objections by lawyers, including

19   objections in which the lawyers stated facts, any testimony

20   that I ordered stricken or instructed you to disregard, and

21   anything that you might have seen or heard about the case

22   outside the courtroom.

23          Jurors, you should use your common sense in weighing

24   the evidence.  Consider it in light of your everyday experience

25   with people and events and give it whatever weight you believe

1    it deserves.  If your experience and common sense tells you

2    that certain evidence reasonably leads to a conclusion, you may

3    reach that conclusion.

4          As I told you in my preliminary instructions, the

5    rules of evidence control what can be received into evidence.

6    During the trial, the lawyers objected when they thought that

7    evidence was offered that was not permitted by the rules of

8    evidence.  These objections simply mean that the lawyers were

9    asking me to decide whether the evidence should be allowed

10   under the rules.

11         You should not be influenced by the fact that an

12   objection was made.  You should also not be influenced by my

13   rulings on objections or any sidebar conferences you may have

14   overheard.  When I overruled an objection, the question was

15   answered or the exhibit was received as evidence, and you

16   should treat that testimony or exhibit like any other.

17         When I sustained an objection, the question was not

18   answered or the exhibit was not received as evidence.  You must

19   disregard the question or exhibit entirely.  Do not think about

20   or guess what the witness might have said in answer to the

21   question.  Do not think about or guess what the exhibit might

22   have shown.

23         Sometimes a witness may have already answered before a

24   lawyer objected or before I ruled on the objection.  If that

25   happened and if I sustained the objection, you must disregard

1    the answer that was given.  Also, if I ordered that some

2    testimony or other evidence be stricken or removed from the

3    record, you must disregard that evidence.

4         When you're deciding the case, you must not consider

5    or be influenced in any way by the testimony or other evidence

6    that I instructed you to disregard.  Although the lawyers may

7    have called your attention to certain facts or factual

8    conclusions that they thought were important, what the lawyers

9    said is not evidence and is not binding on you.  It's your own

10   recollection and interpretation of the evidence that controls

11   your decision in this case.  Also, do not assume from anything

12   I may have said or done during the trial that I have any

13   opinion about any of the issues in the case or about what your

14   verdict should be.

15        Two types of evidence may be used in this trial:

16   Direct evidence and circumstantial or indirect evidence.  You

17   may use both types of evidence in reaching your verdict.

18   Direct evidence is simply evidence which, if believed, directly

19   proves a fact.

20        An example of direct evidence occurs when a witness

21   testifies about something the witness knows from his or her own

22   senses, something the witness has seen, touched, heard, or

23   smelled.

24        Circumstantial evidence is evidence which, if

25   believed, indirectly proves a fact.  It is evidence that proves

1    one or more facts from which you could reasonably find or infer

2    the existence of some other fact or facts.  A reasonable

3    inference is simply a deduction or conclusion that reason,

4    experience, and common sense lead you to make from the

5    evidence.  A reasonable inference is not a suspicion or a

6    guess.  It is a reasoned, logical decision to find that a

7    disputed fact exists on the basis of another fact.

8          For example, if somebody walked into the courtroom now

9    wearing a wet raincoat and carrying a wet umbrella, that would

10   be circumstantial or indirect evidence from which you could

11   reasonably find or conclude that it was raining.  You would not

12   have to find that it was raining, but you could.

13         Sometimes different inferences may be drawn from the

14   same set of facts.  The government may ask you to draw one

15   inference and the defense may ask you to draw another.  You and

16   you alone must decide what reasonable inferences you will draw

17   based on all the evidence and your reason, experience, and

18   common sense.

19         You should consider all the evidence that is presented

20   in this trial, both direct and circumstantial.  The law makes

21   no distinction between the weight that you should give to

22   either direct or circumstantial evidence.  It's for you to

23   decide how much weight to give any evidence.

24         Although the government is required to prove

25   Christopher Mark Heath guilty beyond a reasonable doubt, the

1    government is not required to present all possible evidence

2    related to the case or to produce all possible witnesses who

3    might have some knowledge about the facts of the case.  In

4    addition, as I have explained, Mr. Christopher Mark Heath is

5    not required to present any evidence or to produce any

6    witnesses.

7         Christopher Mark Heath did not testify in this case.

8    A defendant has an absolute constitutional right not to

9    testify.  The burden of proof remains with the prosecution

10   throughout the entire trial and never shifts to a defendant.

11   The defendant is therefore never required to prove that he is

12   innocent.

13        You must not attach any significance to the fact that

14   Christopher Mark Heath did not testify.  You must not draw any

15   adverse inference against him because he did not take the

16   witness stand.  Do not consider for any reason at all the fact

17   that Christopher Mark Heath did not testify.  Do not discuss

18   that fact during your deliberations or allow it to influence

19   your decision in any way.

20        As I stated in my preliminary instructions at the

21   beginning of the trial, in deciding what the facts are, you

22   must decide what testimony you believe and what testimony you

23   do not believe.  You are the sole judges of the credibility of

24   the witnesses.  Credibility refers to whether a witness is

25   worthy of belief.  Was the witness truthful?  Was the witness's

testimony accurate?  You may believe everything a witness says or only part of it or none of it.

You may decide whether to believe a witness based on his or her behavior and manner of testifying, the explanations the witness gave, and all the other evidence in the case just as you would in any important matter where you're trying to decide whether a person is truthful, straightforward, and accurate in his or her recollection.  In deciding the question of credibility, remember to use your common sense, your good judgment, and your experience.

In deciding what to believe, you may also consider a number of factors:  The opportunity and ability of the witness to see or hear or know the things about which the witness testified; the quality of the witness's knowledge, understanding, and memory; the witness's appearance, behavior, and manner while testifying; whether the witness has an interest in the outcome of the case or any motive, bias, or prejudice; any relation the witness may have with a party in the case and any effect the verdict may have on the witness; whether the witness said or wrote anything before trial that was different from the witness's testimony in court; whether the witness's testimony was consistent or inconsistent with other evidence that you believe; and any other factors that bear on whether the witness should be believed.

Inconsistencies or discrepancies in a witness's

1    testimony or between the testimony of different witnesses may

2    or may not cause you to disbelieve a witness's testimony.  Two

3    or more persons witnessing an event may simply see or hear it

4    differently.  Mistaken recollection, like failure to recall, is

5    a common human experience.

6          In weighing the effect of an inconsistency, you should

7    also consider whether it was about a matter of importance or an

8    insignificant detail.  You should also consider whether the

9    inconsistency was innocent or intentional.  You're not required

10   to accept testimony even if the testimony was not contradicted

11   and the witness was not impeached.  You may decide that a

12   witness is not worthy of belief because of the witness's

13   bearing and demeanor or because of the inherent improbability

14   of the testimony or for other reasons that are sufficient to

15   you.

16         After you make your own judgment about the

17   believability of a witness, you can then attach to that

18   witness's testimony the importance or weight that you think it

19   deserves.  The weight of the evidence to prove a fact does not

20   necessarily depend on the number of witnesses who testified or

21   the quantity of evidence that was presented.  What is more

22   important than numbers or quantity is how believable the

23   witnesses were and how much weight you think their testimony

24   deserves.

25         If you believe that a witness knowingly testified

falsely concerning any important matter, you may distrust the witness's testimony concerning other matters.  You may reject all of the testimony or you may accept such parts of the testimony that you believe are true and give it such weight as you think it deserves.

During trial, you've heard the testimony of law enforcement officers.  The fact that a witness is employed as a law enforcement officer does not mean that his or her testimony necessarily deserves more or less consideration or greater or lesser weight than that of any other witness.

At the same time, it is quite legitimate for defense counsel to try to attack the believability of a law enforcement witness on the grounds that his testimony may be colored by a personal or professional interest in the outcome of the case. You must decide, after reviewing all the evidence, whether you believe the testimony of a law enforcement witness and how much weight, if any, it deserves.

You have heard evidence that Tyler Neil Long is an alleged co-conspirator, someone who says he participated in the crime charged and has made a plea agreement with the government.  Tyler Neil Long's testimony was received in evidence and may be considered by you.  The government is permitted to present the testimony of someone who has reached a plea bargain with the government in exchange for his testimony, but you should consider the testimony of Tyler Neil Long with

1    great care and caution.

2           In evaluating Tyler Neil Long's testimony, you should

3    consider this factor along with the others I have called to

4    your attention.  Whether or not his testimony may have been

5    influenced by the plea agreement is for you to determine.  You

6    may give his testimony such weight as you think it deserves.

7           You must not consider Tyler Neil Long's guilty plea as

8    any evidence of Christopher Mark Heath's guilt.  His decision

9    to plead guilty was a personal decision about his own guilt.

10   Such evidence is offered only to allow you to assess the

11   credibility of the witness, to eliminate any concern that

12   Christopher Mark Heath has been singled out for prosecution,

13   and to explain how the witness came to possess detailed,

14   firsthand knowledge of the events about which they testified.

15   You may consider Tyler Neil Long's guilty plea only for these

16   purposes.

17          The government introduced evidence that the defendant,

18   Christopher Mark Heath, made a statement to law enforcement

19   officers.  You must decide whether Christopher Mark Heath did,

20   in fact, make the statement.  If you find that he did make the

21   statement, then you must decide what weight, if any, you feel

22   the statement deserves.

23          In making this decision, you should consider all

24   matters in evidence having to do with the statement, including

25   those concerning Christopher Mark Heath himself and the

1  circumstances under which the statement was made.

2        If, after considering all the evidence, you determine

3  that a statement was made voluntarily, you may give it such

4  weight as you feel it deserves under the circumstances.  On the

5  other hand, if you determine that the statement was not made

6  voluntarily, you must disregard it.

7        In determining whether any alleged statement was made

8  voluntarily, you should consider the defendant's age, training,

9  education, occupation, and physical and mental condition and

10  his treatment while in custody or under interrogation as shown

11  by the evidence in the case.  Also consider all other

12  circumstances in evidence surrounding the making of the alleged

13  statement.

14        The defendant, Christopher Mark Heath, pleaded not

15  guilty to the offenses charged.  Christopher Mark Heath is

16  presumed to be innocent.  The defendant started the trial with

17  a clean slate, with no evidence against him.  The presumption

18  of innocence stays with the defendant unless and until the

19  government has presented evidence that overcomes that

20  presumption by convincing you that Christopher Mark Heath is

21  individually guilty of the offenses charged beyond a reasonable

22  doubt.

23        The presumption of innocence requires that you find

24  Christopher Mark Heath not guilty unless you are satisfied that

25  the government has proven guilt beyond a reasonable doubt.  The

1    presumption of innocence means that Christopher Mark Heath has

2    no burden or obligation to present any evidence at all or to

3    prove that he is not guilty.  The burden or obligation of proof

4    is on the government to prove that Christopher Mark Heath is

5    guilty, and this burden stays with the government throughout

6    the trial.

7              In order for you to find Christopher Mark Heath guilty

8    of the offenses charged, the government must convince you that

9    he is guilty beyond a reasonable doubt.  That means that the

10   government must prove each and every element of the offenses

11   charged beyond a reasonable doubt.  A defendant may not be

12   convicted based on suspicion or conjecture, but only on

13   evidence proving guilt beyond a reasonable doubt.

14             Proof beyond a reasonable doubt does not mean proof

15   beyond all possible doubt or to a mathematical certainty.

16   Possible doubts or doubts based on conjecture, speculation, or

17   hunch are not reasonable doubts.  A reasonable doubt is a fair

18   doubt based on reason, logic, common sense, or experience.

19             It's a doubt that an ordinary, reasonable person has

20   after carefully weighing all of the evidence and is a doubt of

21   the sort that would cause him or her to hesitate to act in

22   matters of importance in his or her own life.  It may arise

23   from the evidence or from the lack of evidence or from the

24   nature of the evidence.

25             If, having now heard all the evidence, you're

1  convinced that the government proved each and every element of

2  the offense charged beyond a reasonable doubt, you should

3  return a verdict of guilty for that offense.  However, if you

4  have a reasonable doubt about one or more of the elements of

5  any offense charged, then you must return a verdict of not

6  guilty for that offense.

7        As you sift through the evidence, the question,

8  jurors, you must ask yourselves is this:  Has the government

9  met its burden to prove the guilt of the defendant beyond a

10  reasonable doubt.  It's for you alone to decide whether the

11  government has proven that Christopher Mark Heath is guilty of

12  the crimes charged solely on the basis of the evidence and

13  subject to the law as I charge you.

14        I must emphasize that if you allow fear, prejudice,

15  bias, or sympathy to interfere with your deliberations, there

16  is a risk that you will not arrive at a true and just verdict.

17  If you have a reasonable doubt as to Christopher Mark Heath's

18  guilt, you should not hesitate for any reason to find a verdict

19  of not guilty.

20        But, on the other hand, if you should find that the

21  government has met its burden of proving Christopher Mark

22  Heath's guilt beyond a reasonable doubt, you should not

23  hesitate, because of sympathy or any other reason, to render a

24  verdict of guilty.

25        As I said before, the law never imposes upon a

1    defendant in a criminal case the burden of calling any

2    witnesses or of producing any evidence.  The question then is

3    whether the prosecution, by its evidence, has proven the

4    defendant guilty beyond a reasonable doubt of any of the

5    charges against him.

6            It's also important to note that the indictment in

7    this case charges that the offenses were committed beginning on

8    or about a certain date.  The government does not have to prove

9    with certainty the exact date of the alleged offense.  It is

10   sufficient if the government proves beyond a reasonable doubt

11   that the offense was committed on a date reasonably near the

12   date alleged.

13           Finally, the indictment alleges that some act in

14   furtherance of the offense charged occurred in the Middle

15   District of Pennsylvania.  There's no requirement that all

16   aspects of the offenses charged or the entire conspiracy take

17   place here in the Middle District of Pennsylvania.  But for you

18   to return a verdict of guilty, the government must convince you

19   that some act in furtherance of the crime charged or part of

20   the conspiracy, either the agreement or one of the overt acts,

21   took place here in the Middle District of Pennsylvania.

22           Unlike all the elements I will describe, the location

23   of the act in furtherance of the crime charged only has to be

24   proved by a preponderance of the evidence.  That means while

25   the government must prove beyond a reasonable doubt that some

act in furtherance of a crime charged took place, the
government only has to convince you that it's more likely than
not that the act in furtherance of the crime charged or part of
the conspiracy actually took place here.

Remember that the government must prove all of the
elements I'll now describe beyond a reasonable doubt.  As you
know, Defendant Christopher Mark Heath is charged in the
indictment with violating federal law, specifically Title 18,
United States Code, Section 924(c)(1)(A) and 1956(h) and Title
21, United States Code, Section 841(a)(1) and 846.

Count 1 charges the defendant with conspiracy to
manufacture, distribute, and possess with the intent to
manufacture and distribute marijuana in violation of Title 21,
United States Code, Section 846.

Count 2 charges Christopher Mark Heath with conspiracy
to commit money laundering in violation of Title 18, United
States Code, Section 1956(h).

Count 18 charges the defendant with manufacture,
distribution, and possession with the intent to manufacture and
distribute marijuana in violation of Title 21, United States
Code, Section 841(a)(1).

Count 19 charges the defendant with possessing, using,
and carrying a firearm in furtherance of and during and in
relation to a drug trafficking crime in violation of Title 18,
United States Code, Section 924(c)(1)(A).

1    As I explained at the start of the trial, an

2    indictment is just a formal way of specifying the exact crimes

3    the defendant is accused of committing.  An indictment is

4    simply a description of the charges against a defendant.  It's

5    an accusation only.  An indictment is not evidence of anything,

6    and you should not give any weight to the fact that Christopher

7    Mark Heath has been indicted in making your decision in this

8    case.

9    As you have heard, Defendant Christopher Mark Heath is

10   charged with more than one offense.  Each offense is charged in

11   a separate count of the indictment.  The number of offenses

12   charged is not evidence of guilt, and this should not influence

13   your decision in any way.  You must separately consider the

14   evidence that relates to each offense, and you must return a

15   separate verdict for each offense.

16   For each offense charged, you must decide whether the

17   government has proven beyond a reasonable doubt that the

18   defendant is guilty of that particular offense.  Your decision

19   on one offense, whether guilty or not guilty, should not

20   influence your decision on any of the other offenses charged.

21   Each offense should be considered separately.

22   Count 1 of the indictment charges that beginning in

23   approximately September, 2014, and continuing through

24   approximately January 7th, 2016, in York County, Pennsylvania,

25   the State of California, and diverse locations within the

1     Continental United States, within the Middle District of

2     Pennsylvania and elsewhere, Christopher Mark Heath agreed or

3     conspired with one or more other persons to manufacture,

4     distribute, and possess with the intent to manufacture and

5     distribute 100 kilograms or more of marijuana.

6        It is a federal crime for two or more persons to agree

7     or conspire to commit any offense against the United States,

8     even if they never actually achieve their objective.  A

9     conspiracy is a kind of criminal partnership.

10       In order for you to find the defendant guilty of

11     conspiracy to manufacture, distribute, and possess with the

12     intent to manufacture and distribute a controlled substance,

13     you must find that the government proved beyond a reasonable

14     doubt each of the following three elements:

15       First, that two or more persons agreed to manufacture,

16     distribute, and possess with the intent to manufacture and

17     distribute marijuana.  I will explain the elements of this

18     offense to you shortly.  Second, that Christopher Mark Heath

19     was a party to or a member of that agreement.  And, third, that

20     Christopher Mark Heath joined the agreement or conspiracy

21     knowing of its objectives to manufacture, distribute, and

22     possess with the intent to manufacture and distribute a

23     controlled substance and intending to join together with at

24     least one other alleged conspirator to achieve those

25     objectives, that is, that Christopher Mark Heath and at least

1    one other alleged conspirator shared a unity of purpose and the

2    intent to achieve those objectives.

3           I will explain these elements in more detail.  The

4    first element of the crime of conspiracy is the existence of an

5    agreement.  The government must prove beyond a reasonable doubt

6    that two or more persons knowingly and intentionally arrived at

7    a mutual understanding or agreement, either spoken or unspoken,

8    to work together to achieve the overall objective of the

9    conspiracy to commit the offense of manufacturing,

10   distributing, and possessing with the intent to manufacture and

11   distribute a mixture and substance containing a detectable

12   amount of marijuana, a Schedule I controlled substance.

13          The government does not have to prove the existence of

14   a formal or a written agreement or an express oral agreement

15   spelling out the details of the understanding.  The government

16   also does not have to prove that all the members of the

17   conspiracy directly met or discussed between themselves their

18   unlawful objectives or agreed to all the details or agreed to

19   what the means were by which the objectives would be

20   accomplished.

21          The government is not even required to prove that all

22   the people named in the indictment were, in fact, parties to

23   the agreement or that all members of the alleged conspiracy

24   were named or that all members of the conspiracy were even

25   known.  What the government must prove beyond a reasonable

1   doubt is that two or more persons in some way or manner arrived

2   at some type of agreement, mutual understanding, or meeting of

3   the minds to try to accomplish a common and unlawful objective.

4        You may consider both direct evidence and

5   circumstantial evidence in deciding whether the government has

6   proven beyond a reasonable doubt that an agreement or mutual

7   understanding existed.  You may find the existence of a

8   conspiracy based on evidence of related facts and circumstances

9   that proved that the activities of the participants in a

10  criminal venture could not have been carried out except as the

11  result of a preconceived agreement, scheme, or understanding.

12       If you find that a criminal agreement or a conspiracy

13  existed, then in order to find the defendant guilty of

14  conspiracy, you must also find that the government proved

15  beyond a reasonable doubt that the defendant knowingly and

16  intentionally joined that agreement or conspiracy during its

17  existence.

18       The government must prove that Christopher Mark Heath

19  knew the goals or objectives of the agreement or conspiracy and

20  voluntarily joined it during its existence intending to achieve

21  the common goals or objectives and to work together with the

22  other alleged conspirators toward those goals or objectives.

23       The government need not prove that Christopher Mark

24  Heath knew everything about the conspiracy or that he knew

25  everyone involved in it or that he was a member from the

1    beginning.  The government also does not have to prove that the

2    defendant played a major or a substantial role in the

3    conspiracy.  You may consider both direct evidence and

4    circumstantial evidence in deciding whether the defendant

5    joined the conspiracy, knew of its criminal objectives, and

6    intended to further the objectives.

7         Evidence that shows that Christopher Mark Heath only

8    knew about the conspiracy or only kept bad company by

9    associating with members of the conspiracy or was only present

10   when it was discussed or when a crime was committed is not

11   sufficient to prove that the defendant was a member of the

12   conspiracy, even if Christopher Mark Heath approved of what was

13   happening or did not object to it.

14        Likewise, evidence showing that Christopher Mark Heath

15   may have done something that happened to help a conspiracy does

16   not necessarily prove that he joined the conspiracy.  You may,

17   however, consider this evidence with all of the other evidence

18   in deciding whether the government has proven beyond a

19   reasonable doubt that Christopher Mark Heath joined the

20   conspiracy.

21        In order to find Christopher Mark Heath guilty of

22   conspiracy, you must find that the government proved beyond a

23   reasonable doubt that he joined the conspiracy knowing of its

24   objectives and intending to help further or achieve those

25   objectives.  That is, the government must prove that the

1    defendant knew of the objectives or goals of the conspiracy,

2    that he joined the conspiracy intending to help further or

3    achieve those goals or objectives, and that Christopher Mark

4    Heath and at least one other alleged conspirator shared a unity

5    of purpose toward those objectives or goals.

6         You may consider both direct evidence and

7    circumstantial evidence, including the defendant's words or

8    conduct and other facts and circumstances in deciding whether

9    the defendant had the required knowledge and intent.  For

10   example, evidence that the defendant derived some benefit from

11   the conspiracy or had some stake in the achievement of the

12   conspiracy's objective might tend to show that the defendant

13   had the required intent or purpose that the conspiracy's

14   objective be achieved.

15        Evidence has been admitted in this case that certain

16   persons who are alleged to be co-conspirators of Defendant

17   Christopher Mark Heath did or said certain things.  The acts or

18   statements of any member of a conspiracy are treated as the

19   acts or statements of all the members of the conspiracy if

20   these acts or statements were performed or spoken during the

21   existence of the conspiracy and to further the objectives of

22   the conspiracy.

23        Therefore, you may consider as evidence against

24   Christopher Mark Heath any acts done or statements made by any

25   members of the conspiracy during the existence of and to

1  further the objectives of the conspiracy.  You may consider

2  these acts and statements even if they were done and made in

3  Christopher Mark Heath's absence and without his knowledge.

4          As with all the evidence presented in this case, it is

5  for you to decide whether you believe this evidence and how

6  much weight to give it.  Acts done or statements made by an

7  alleged co-conspirator before the defendant joined the alleged

8  conspiracy may also be considered by you as evidence against

9  the defendant.  However, acts done or statements made before

10  the alleged conspiracy began or after it ended may only be

11  considered by you as evidence against the person who performed

12  that act or made that statement.

13          Count 2 of the indictment charges that beginning in

14  approximately September, 2014, continuing through approximately

15  January 7, 2016, in York County, Pennsylvania, the State of

16  California, and diverse locations within the Continental United

17  States, within the Middle District of Pennsylvania and

18  elsewhere, Christopher Mark Heath agreed or conspired with one

19  or more other persons to engage in money laundering or

20  transactions involving the proceeds of specified unlawful

21  activity that violates Title 18, United States Code, Section

22  1956(a)(1)(A)(i).

23          Title 18, United States Code, Section

24  1956(a)(1)(A)(i), makes it a crime for anyone to conduct a

25  financial transaction with the proceeds of specified unlawful

1  activity knowing that the property involved represents the

2  proceeds of some form of illegal activity, with the intent to

3  promote the carrying on of specified unlawful activity.

4        A conspiracy is an agreement by two or more persons to

5  commit an unlawful act.  In other words, it is a kind of

6  partnership for criminal purposes.  Every member of the

7  conspiracy becomes the agent or partner of every other member.

8  The government does not have to prove that all the people named

9  in the indictment were members of the plan or that those who

10 were members made any kind of formal agreement.  The heart of a

11 conspiracy is the making of the unlawful plan itself, so the

12 government does not have to prove that the conspirators

13 succeeded in carrying out the plan.

14       Defendant Christopher Mark Heath can be found guilty

15 of this crime only if all the following facts are proved beyond

16 a reasonable doubt:  Two or more people agreed to try to

17 accomplish a common and unlawful plan to violate Title 18,

18 United States Code, Section 1956(a)(1)(A)(i), and Defendant

19 Christopher Mark Heath knew about the plan's unlawful purpose

20 and voluntarily joined in it.

21       A person may be a conspirator even without knowing all

22 the details of the unlawful plan or the names and identities of

23 all the other alleged conspirators.  If the defendant played

24 only a minor part in the plan but had a general understanding

25 of the unlawful purpose of the plan and voluntarily joined in

1   the plan on at least one occasion, that is sufficient for you

2   to find the defendant guilty.

3       Simply being present at the scene of an event or

4   merely associating with certain people in discussing common

5   goals and interests does not establish proof of conspiracy.

6   Also, a person who doesn't know about a conspiracy but happens

7   to act in a way that advances some purpose of one doesn't

8   automatically become a conspirator.

9       Count 18 of the indictment charges the defendant,

10  Christopher Mark Heath, with manufacturing, distributing, and

11  possessing with intent to manufacture and distribute a mixture

12  and substance containing a controlled substance, specifically

13  marijuana, which is a violation of federal law.

14      In order to find Christopher Mark Heath guilty of this

15  offense, you must find that the defendant -- or that the

16  government proved each of the following four elements beyond a

17  reasonable doubt:  First, that the defendant distributed a

18  mixture or substance containing a controlled substance; second,

19  that the defendant distributed the controlled substance

20  knowingly or intentionally; and, third, that the controlled

21  substance was marijuana.

22      To distribute, as used in the offenses charged, means

23  to deliver or to transfer possession or control of a controlled

24  substance from one person to another.  To distribute includes

25  the sale of a controlled substance by one person to another,

1    but it does not require a sale.  Distribute also includes a

2    delivery or transfer without any financial compensation, such

3    as a gift or a trade.

4            You're instructed that as a matter of law, marijuana

5    is a controlled substance, that is, some kind of prohibited

6    drug.  It's solely for you, however, to decide whether the

7    government has proved beyond a reasonable doubt that the

8    defendant manufactured, distributed, and possessed with intent

9    to manufacture and distribute a mixture and substance

10   containing a detectable amount of marijuana.

11           To act knowingly, as used in the offense charged,

12   means that the defendant was conscious and aware that he was

13   engaged in the acts charged and knew of the surrounding facts

14   and circumstances that make out the offenses.  Knowingly does

15   not require that the defendant knew that the acts charged and

16   surrounding facts amounted to a crime.

17           To act intentionally, as used in the offense charged,

18   means to act deliberately and not by accident.  Intentionally

19   does not require that Christopher Mark Heath intended to

20   violate the law.  The phrase "knowingly or intentionally," as

21   used in the offense charged, requires the government to prove

22   beyond a reasonable doubt that Christopher Mark Heath knew that

23   what he manufactured, distributed, and possessed with intent to

24   manufacture and distribute was a controlled substance.

25           In addition, the government must also prove beyond a

1  reasonable doubt that the controlled substance was, in fact,

2  marijuana.  However, as long as you find the government proved

3  beyond a reasonable doubt that the defendant knew that what he

4  was -- what he manufactured, distributed, and possessed with

5  intent to manufacture and distribute was a controlled

6  substance, you need not find that the defendant knew that the

7  controlled substance was marijuana.

8          In deciding whether Christopher Mark Heath acted

9  knowingly or intentionally, you may consider evidence about

10 what he said, what he did and failed to do, how he acted, and

11 all the other facts and circumstances shown by the evidence

12 that may prove what was in Christopher Mark Heath's mind at

13 that time.

14         In order to find Defendant Christopher Mark Heath

15 guilty of possession of a controlled substance with intent to

16 manufacture and distribute, as charged in Count 18 of the

17 indictment, you must find that the government proved beyond a

18 reasonable doubt that Christopher Mark Heath intended to

19 manufacture and distribute a mixture or a substance containing

20 a controlled substance.

21         To find that the defendant had the intent to

22 manufacture and distribute, you must find that the defendant

23 had in mind or planned in some way to manufacture a controlled

24 substance and to deliver or transfer possession or control over

25 a controlled substance to someone else.

1    In determining whether Christopher Mark Heath had the

2    intent to manufacture and distribute, you may consider all the

3    facts and circumstances shown by the evidence presented,

4    including Christopher Mark Heath's words and actions.

5    In determining the defendant's intent to distribute

6    controlled substances, you may also consider, among other

7    things, the quantity and purity of the controlled substance,

8    the manner in which the substance was packaged, the presence or

9    absence of weapons, large amounts of cash, or equipment used in

10   the processing or sale of controlled substance.

11   Count 19 of the indictment charges Christopher Mark

12   Heath with possessing a firearm in furtherance of a drug

13   trafficking crime and with using and carrying a firearm during

14   and in relation to a drug trafficking crime, which is a

15   violation of federal law.  The offense alleged in Count 1 is a

16   drug trafficking crime.

17   In order to find Christopher Mark Heath guilty of this

18   offense, you must find that the government proved each of the

19   following elements beyond a reasonable doubt:  First, that the

20   defendant, Christopher Mark Heath, committed the crime of

21   conspiracy to manufacture, distribute, and possess with the

22   intent to manufacture and distribute 100 kilograms or more of

23   marijuana as charged in Count 1 of the indictment; and, second,

24   that Christopher Mark Heath knowingly possessed a firearm in

25   furtherance of that crime or that Christopher Mark Heath,

during and in relation to the commission of that crime,
knowingly used or carried a firearm.

If you find Christopher Mark Heath possessed the
firearm, you must consider whether the possession was in
furtherance of the crime of conspiracy to manufacture,
distribute, and possess with the intent to manufacture and
distribute 100 kilograms or more of marijuana.

If you find Christopher Mark Heath used or carried the
firearm, you must find that the government proved beyond a
reasonable doubt that Christopher Mark Heath used or carried
the firearm during and in relation to the crime of conspiracy
to manufacture, distribute, and possess with the intent to
manufacture and distribute 100 kilograms or more of marijuana.

The phrase "uses or carries a firearm" means having a
firearm or firearms available to assist or aid in the
commission of the crime of conspiracy to manufacture,
distribute, and possess with the intent to manufacture and
distribute 100 kilograms or more of marijuana.

"Use" means more than the mere possession of a firearm
by a person who commits a crime.  To establish use, the
government must show active employment of the firearm.  If the
defendant did not either disclose or mention the firearm or
actively employ it, the defendant did not use the firearm.

"Carry" means that the defendant had the firearm on
his person or possessed the firearm.  "During and in relation

1  to" means that the firearm must have had some purpose or effect

2  with respect to the conspiracy to manufacture, distribute, and

3  possess with the intent to manufacture and distribute

4  100 kilograms or more of marijuana.

5          The firearm must have at least facilitated or had the

6  potential of facilitating the conspiracy to manufacture,

7  distribute, and possess with the intent to manufacture and

8  distribute 100 kilograms or more of marijuana.

9          In determining whether Christopher Mark Heath used or

10  carried a firearm in relation to the conspiracy to manufacture,

11  distribute, and possess with the intent to manufacture and

12  distribute 100 kilograms or more of marijuana, you may consider

13  all of the factors received in evidence in the case, including

14  the nature of the underlying crime, conspiracy to manufacture,

15  distribute, and possess with the intent to manufacture and

16  distribute 100 kilograms or more of marijuana, how close

17  Christopher Mark Heath was to the firearm in question, the

18  usefulness of the firearm to the conspiracy to manufacture,

19  distribute, and possess with the intent to manufacture and

20  distribute 100 kilograms or more of marijuana, and the

21  circumstances surrounding the presence of the firearm.

22          The government is not required to show that

23  Christopher Mark Heath actually displayed or fired the weapon.

24  However, the government must prove beyond a reasonable doubt

25  that the firearm was in Christopher Mark Heath's possession or

1  under his control at the time that the crime of the conspiracy

2  to manufacture, distribute, and possess with the intent to

3  manufacture and distribute 100 kilograms or more of marijuana

4  was committed and that the firearm facilitated or had the

5  potential of facilitating the conspiracy to manufacture,

6  distribute, and possess with the intent to manufacture and

7  distribute 100 kilograms or more of marijuana.

8      The offense of possession of a firearm in furtherance

9  of drug trafficking charged in Count 19 of the indictment

10  requires that the government prove that Christopher Mark Heath

11  acted knowingly with respect to an element of the offense.

12  This means that the government must prove beyond a reasonable

13  doubt that Christopher Mark Heath was conscious and aware of

14  the nature of his actions and of the surrounding facts and

15  circumstances as specified in the definition of the offense

16  charged.

17      In deciding whether Christopher Mark Heath acted

18  knowingly, you may consider evidence about what Christopher

19  Mark Heath said, what he did and failed to do, how Christopher

20  Mark Heath acted, and all the other facts and circumstances

21  shown by the evidence that may prove what was in the

22  defendant's mind at that time.

23      The term "firearm" means any weapon which will expel

24  or is designed to or may readily be converted to expel a

25  projectile by the action of an explosive.  The term includes

1 the frame or receiver of any such weapon or any firearm muffler

2 or firearm silencer.

3 To possess means to have something within a person's

4 control. The government does not have to prove that the

5 defendant physically held the firearm, that is, had actual

6 possession of it. As long as the firearm was in the

7 defendant's control, he possessed it.

8 If you find that Christopher Mark Heath either had

9 actual possession of the firearm or had the power and intention

10 to exercise control over it, even though it was not in

11 Christopher Mark Heath's physical possession, that is, that the

12 defendant had the ability to take actual possession of the

13 object when he wanted to do so, you may find that the

14 government has proven possession.

15 Possession may be momentary or fleeting. The law also

16 recognizes that possession may be sole or joint. If one person

17 alone possesses a firearm, that is sole possession. However,

18 more than one person may have the power and intention to

19 exercise control over a firearm. This is called joint

20 possession. If you find that Christopher Mark Heath had such

21 power and intention, then he possessed the firearm, even if he

22 possessed it jointly with another.

23 Mere proximity to the firearm or mere presence on the

24 property where a firearm is located or mere association with

25 the person who does control the firearm or the property is

1    insufficient to support a finding of possession.

2           Proof of ownership of the firearm is not required.

3    The government must prove that Christopher Mark Heath knowingly

4    possessed the firearm described in the indictment.  That means

5    that Christopher Mark Heath possessed the firearm purposefully

6    and voluntarily and not by accident or mistake.  It also means

7    that Christopher Mark Heath knew the object was a firearm.

8           "Possession in furtherance of" means for the purpose

9    of assisting in, promoting, accomplishing, advancing, or

10   achieving the goal or objective of the conspiracy to

11   manufacture, distribute, and possess with the intent to

12   manufacture and distribute 100 kilograms or more of marijuana.

13          Mere presence of a firearm at the scene is not enough

14   to find possession in furtherance of a drug trafficking crime.

15   The firearm's presence may be coincidental or entirely

16   unrelated to the underlying crime.

17          Some factors that may help you decide whether

18   possession of a firearm furthers a drug trafficking crime

19   include, but are not limited to the following:  The type of

20   criminal activity that is being conducted, accessibility of the

21   firearm, the type of firearm, whether the firearm was stolen,

22   whether the defendant possesses the firearm legally or

23   illegally, whether the firearm is loaded, the time and

24   circumstances under which the firearm is found, and proximity

25   to drugs or drug profits.

1     Counsel, that concludes my remarks.  Does either

2     counsel have any objection to any of the charge as presented?

3         *MS. ULRICH:*  I do not, Your Honor.

4         *THE COURT:*  Government?

5         *MS. TAYLOR:*  No, Your Honor.  Thank you.

6         *THE COURT:*  Jurors, finally, one of you should be

7     selected to chair your deliberations.  That person will fill

8     out and sign the verdict form that you'll return to us here in

9     open court.

10         The verdict form that I've prepared for you is fairly

11    straightforward.  It presents you with a series of questions,

12    and following those questions are instructions.  If you follow

13    these instructions, you'll have no problem filling out that

14    verdict form and returning it to us in open court at the

15    appropriate time.

16         If you find Defendant Christopher Mark Heath guilty of

17    the offense charged in Count 1 of the indictment, you must

18    answer some questions called jury interrogatories following

19    that count.  Do not answer these jury interrogatories until

20    after you've reached your verdict as to guilt on each count.

21         If you find that the government has not proved the

22    defendant guilty of the offense charged in Count 1 of the

23    indictment, then you do not need to answer the interrogatories

24    following that count.

25         For example, if you find defendant guilty of the

1    offense charged in Count 1, then you must decide by unanimous

2    verdict the quantity of controlled substances that the

3    government proved beyond a reasonable doubt that the defendant

4    conspired to manufacture, distribute, and possess with the

5    intent to manufacture and distribute.

6         Weight or quantity means the total weight of any

7    mixture or substance that contains a detectable amount of the

8    controlled substance charged.  In making this decision, you

9    should consider all controlled substances that the members of

10   the conspiracy actually possessed with the intent to distribute

11   or distributed.

12        If you find that the government has not proved

13   Christopher Mark Heath guilty of the offense charged in Count

14   1, then you do not need to answer the interrogatories for that

15   specific charge.

16        When you've completed the verdict form, please have

17   the foreperson date and sign it and then return that form to

18   Ms. Weida and allow her to know that you've reached your

19   verdict.

20        That concludes my instructions to you explaining the

21   law regarding the testimony and other evidence and the offenses

22   charged.  I want to explain some things about your

23   deliberations in the jury room and your possible verdicts.

24        First, the first thing that you should do in the jury

25   room is choose one of your members to be your foreperson.  That

person will speak for the jury here in court.  He or she will preside over your discussions.  However, the views and vote of the foreperson are entitled to no greater weight than those of any other juror.

Second, I want to remind you that your verdict, whether it's guilty or not guilty on any count, must be unanimous.  To find Christopher Mark Heath guilty of an offense, every one of you must agree that the government has overcome the presumption of innocence with evidence that proves each element of that offense beyond a reasonable doubt.  To find the defendant not guilty, every one of you must agree that the government has failed to convince you beyond a reasonable doubt.

Third, if you decide that the government has proven Christopher Mark Heath guilty, it will be my responsibility to decide what the appropriate punishment should be.  You should never consider the possible punishment in reaching your verdict.  As I've said before, the verdict must be based only on the evidence received in the case and the law as I have given it to you.  You should not take anything that I might have said or done during the trial as indicating what I think of the evidence or what I think your verdict ought to be.  What the verdict will be is the exclusive responsibility of the jury.

Now that all the evidence is in, the arguments are

1  concluded, and I have finished with these instructions, you're

2  free to talk about the case in the jury room.  In fact, it's

3  your duty to talk with each other about the evidence and to

4  make every reasonable effort you can to reach unanimous

5  agreement.  Talk with each other, listen carefully and

6  respectfully to one another's views, and keep an open mind as

7  you listen to what your fellow jurors have to say.

8          Don't hesitate to change your mind if you become

9  convinced that other jurors are right and your original

10  position was wrong, but don't ever change your mind just

11  because other jurors see things differently or just to get the

12  case concluded.  In the end, your vote must be exactly that,

13  your own vote.

14          It's important for you to reach unanimous agreement

15  but only if you can do so honestly and in good conscience.

16  Listen carefully to what the other jurors have to say and then

17  decide for yourself whether the government has proven the

18  defendant guilty beyond a reasonable doubt.  No one will ever

19  be allowed to hear your discussions in the jury room and no

20  record will be made of what you say.  You should all feel free

21  to speak your minds.

22          Remember, if you elected to take notes during the

23  trial, your notes should only be used as memory aids.  You

24  should not give your notes greater weight than your independent

25  recollection of the evidence.  You should rely on your own

1   independent recollection of the evidence or lack of evidence

2   and you should not be unduly influenced by the notes of other

3   jurors.  Notes are not entitled to any more weight than the

4   memory or impression of each juror.

5         Once you start deliberating, do not talk about the

6   case to court officials, to me, or to anyone else except each

7   other.  If you have any questions or messages, the foreperson

8   will write them down on a piece of paper, sign them, and give

9   that paper to Ms. Weida, who will give it to me.  First I will

10   need to talk to the lawyers about what you have asked, and I'll

11   respond as quickly as I can.  In the meantime, if possible,

12   please continue on with your deliberations on some other

13   subject.

14         One more thing about messages, don't ever write down

15   or tell anyone how you voted.  That will stay secret until

16   you've concluded your deliberations.  If you have occasion to

17   communicate with the court while you're deliberating, do not

18   discuss the number of jurors who have voted to convict or

19   acquit on any offense.

20         Jurors, as I know you're all aware, the parties in a

21   criminal case are entitled by law to a trial of 12 jurors.

22   Because of the substantial investment in presenting a case of

23   this type, we make provision in the event that a juror becomes

24   ill or otherwise disabled before we conclude the case.  We do

25   that by selecting alternate jurors.

1          In this case, we empaneled two alternate jurors.

2     Fortunately, we have done that because one juror needed to be

3     excused for a family emergency, so now we have one remaining

4     alternate juror, and that's Juror Number 14, who will be

5     dismissed now with the thanks of the court.  The other jurors

6     will retire to the jury room.

7          And, jurors, we will all simply await for you to alert

8     Ms. Weida to what your intentions are this evening, whether you

9     plan to deliberate or to come back tomorrow morning to

10    deliberate.  You let her know when you've decided that fact,

11    and we will act accordingly.  All right?  Thank you, jurors.

12         *(Jury leaves courtroom.)*

13         THE COURT:  All right.  Counsel, I think we'll give it

14    a few minutes.  I have a feeling that the jurors will not want

15    to deliberate this evening.  Take your seats, if you will, and

16    we'll give it a couple minutes.

17         *(Pause in proceedings.)*

18         COURTROOM DEPUTY:  They want to go home.

19         THE COURT:  They're going to come back at 9:30.

20    Thanks everybody.

21         *(Whereupon, the proceedings were adjourned at 5:55 p.m.)*

22

23

24

25

                    CERTIFICATE OF OFFICIAL COURT REPORTER


          I, Lori A. Shuey, Federal Certified Realtime Reporter, in
and for the United States District Court for the Middle
District of Pennsylvania, do hereby certify that pursuant to
Section 753, Title 28, United States Code, that the foregoing
is a true and correct transcript of the stenographically
reported proceedings held in the above-captioned matter and
that the transcript page format is in conformance with the
regulations of the Judicial Conference of the United States.
          Dated in Harrisburg, Pennsylvania, this 18th day of
December, 2017.


                              **/s/ Lori A. Shuey**
                              Lori A. Shuey
                              Federal Certified Realtime Reporter