IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA          :
                                  :   Case No. 1:16-CR-075
                                  :
            vs.                   :   (Judge Kane)
                                  :
CHRISTOPHER MARK HEATH,           :
            Defendant             :

TRANSCRIPT OF SENTENCING PROCEEDINGS
BEFORE THE HONORABLE YVETTE KANE
UNITED STATES DISTRICT COURT JUDGE
OCTOBER 19, 2017; 10:00 A.M.
HARRISBURG, PENNSYLVANIA

FOR THE GOVERNMENT:

    Meredith A. Taylor, Assistant United States Attorney
    United States Attorney's Office
    228 Walnut Street, Second Floor
    Harrisburg, PA  17101

FOR THE DEFENDANT:

    Lori J. Ulrich, Assistant Federal Public Defender
    Federal Public Defender's Office
    100 Chestnut Street, Suite 306
    Harrisburg, PA  17101

ALSO PRESENT:

    Lori Baker-Dowd, United States Probation Officer

Lori A. Shuey
Federal Certified Realtime Reporter
United States Courthouse
228 Walnut Street, P.O. Box 983
Harrisburg, PA  17108-0983
717-215-1270
lori_shuey@pamd.uscourts.gov
Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription.

1    THE COURT:  Good morning, counsel.  Ms. Taylor.

2         MS. TAYLOR:  Your Honor, this is the case of *United*

3    *States of America v. Christopher Mark Heath*, this court's

4    Docket 1:16-CR-75.  Mr. Heath is present represented by

5    Ms. Ulrich.  Your Honor, this is the time and date set for

6    sentencing in this matter.

7         THE COURT:  Ms. Ulrich, good morning.

8         MS. ULRICH:  Good morning, Your Honor.

9         THE COURT:  I see we have an offense level calculated

10   at 26, criminal history category one, making for a guideline

11   range of 63 to 78 months on Counts 1, 2, and 18 and 60 months

12   on Count 19.  Are there objections that you wish to make part

13   of the record?

14        MS. ULRICH:  Yes, Your Honor.  I have several

15   objections that I want to put on the record.  Normally the

16   first step is, do we have objections to the presentence report,

17   and the answer to that, of course, is yes.

18        But this particular presentence report, the government

19   had responded to my objections, so we went -- the presentence

20   process is, we get the presentence, we both have 14 days to

21   file objections, which we did within our 14 days.  And after

22   that, the government filed their complaints about my objections

23   to the presentence report.  And, actually, it's the

24   government's objections that really contain more factual

25   inaccuracies than the presentence report itself, and that's

1    what I want to address.

2        First, Mr. Heath, in his presentence objections, said

3    that he was never paid for the second trip to Florida.  The

4    government complains in their letter saying that that's not

5    true because he said during his proffer and in the presentence

6    report that he was paid 50,000 for the first trip and 60,000

7    for the second trip, and they cite to Paragraph 24 of the

8    presentence report.  And if you look at Paragraph 24 of the

9    presentence report, it accurately reports what Mr. Heath said,

10   and that is he was paid 50,000 to 60,000 for the first

11   delivery.

12        So not only do I find myself responding to the

13   presentence report, but to factual inaccuracies that weren't

14   there but that the government put in their response to my

15   objections.  In fact, their whole letter is riddled with

16   factual inaccuracies which cause Mr. Heath and I great anguish

17   in having to respond to that and the presentence report.

18        But that's not the only one that they got wrong.

19   Mr. Heath wanted to clarify Paragraph 19 of the presentence

20   report.  Paragraph 19 said that he began growing marijuana in

21   2016.  So in our objections, of course, we needed to clarify

22   that date because he got arrested in 2015.  So as a

23   clarification to the probation office, I just simply said,

24   Mr. Heath wanted to clarify that he started growing marijuana

25   in 2014.

1    Well, the government spends all this time in their
2    response to my objections saying that they, in fact, gave the
3    probation office the year 2016 and somehow suggested that I was
4    wrong, that I was somehow at trial trying to keep out certain
5    dates and I was just trying to fix it in these objections.  I'm
6    really not sure what they were saying.  But the presentence
7    changed it in Paragraph 19, and now it accurately says that he
8    began growing marijuana in 2014.

9    But, of course, me and Mr. Heath, again, experiencing
10   great anguish, had to clarify that that was simply a
11   typographical error in the presentence report, that the
12   government somehow suggested that he was somehow trying to
13   contest drug weights or subverting things by complaining that
14   it was 2014 instead of 2016.

15   Then the government complained that we gave the
16   probation office a trial exhibit to establish, quote,
17   disingenuous drug weights.  And that was relating to Paragraph
18   6 of the presentence report.  Well, rather than trying to
19   establish, quote, disingenuous drug weights, what we were doing
20   was simply clarifying the facts.  And so we submitted the
21   government's own trial exhibit which said the weights in the
22   packages ranged, during that three-month period, from
23   3.44 pounds to 13.77 pounds.

24   In the presentence, it says every package contained
25   between 10 and 20 pounds of marijuana.  Again, we submitted it

1    simply to clarify that, no, that's not exactly right, not every

2    package was 10 to 20 pounds, look at the trial exhibit, those

3    packages ranged from 3.44 to 13.77 pounds, again, causing

4    Mr. Heath and I great anguish when we saw the government's

5    response making it look like Mr. Heath was a liar, when, in

6    fact, all he was really doing was trying to clarify what, in

7    fact, the government had presented at trial.

8          There are additional factual inaccuracies in the

9    government's response.  Really the substantive argument is the

10   acceptance of responsibility, and that all pertains to whether

11   or not he should get his two levels off.  The probation office

12   denied that, and that's really what the government was

13   responding to.  But one of their arguments, again, in their

14   response, that he made no statements whatsoever during trial,

15   before trial, or in his proffer to the agents on June 23rd,

16   2016, about that gun.

17         Again, that is total factual inaccuracy, Your Honor.

18   On October 8th, I asked the government for a copy of the

19   proffer from the agent's standpoint.  I did not get it.  I got

20   it this morning when I walked in here.  But I went through my

21   notes.  And, in fact, I have marked my notes as an exhibit.

22   We'll call it Defense Exhibit 1.  I'll pass that up.

23   Twenty-five pages, Your Honor, of statements he made long

24   before his trial on June 23rd, 2016, about his involvement in

25   this case.

1    But specifically, if you go to Page 9 and 10 of my

2  notes, and I will read them, they're talking about the trips to

3  Florida on Page 9, and they said -- and Mr. Heath is telling

4  them he made a second trip in 2014, also about one and a half

5  months later, about 20 minutes after I left the guy's house, I

6  got stopped for speeding.

7    And he says to these agents on June 23rd, I had my

8  off-duty gun in trunk.  I always had gun with me.  I had my

9  credentials.  And they asked, Did you use the badge to get out

10  if stopped?  And his answer was, and you can see I circled it,

11  No.  And then down below that he says, Never my intention to

12  use the brass badge to get out of anything.

13    And then if you go to Page 10 of my handwritten notes,

14  Mr. Heath is telling them, I always carried the gun and badge.

15  So contrary to the government's representations, he did, in

16  fact, make statements about the gun in his proffer on

17  June 23rd, 2016.

18    Now, it's interesting because the presentence had the

19  proffer because they referred to it in Paragraph 24, yet I got

20  it this morning.  And, of course, when I got theirs, I noticed

21  that they had some information about the gun.  Theirs said,

22  Heath stated that he had his firearm during this trip but

23  believed that he did not have his badge.  That's the extent of

24  what they have that he said.  But yet had the government looked

25  at this, they wouldn't have been able to make the

1    representation that he didn't make a single statement about the

2    firearm, because it's right here in the proffer that's dated

3    June 23rd, 2016.

4          You know, I bring this to the attention of the court

5    because, you know, the government has sought two mandatories in

6    this case.  We tried to get this case worked out with a plea to

7    Count 1 and Count 2, but the government refused.  Appellate

8    waivers became an issue, a lot became an issue.

9          So now here we are arguing the two levels, and the

10   government is arguing against it.  And if they're arguing

11   against it, they should get their facts right.  Okay?  Because

12   their letter caused us great anguish, particularly Mr. Heath,

13   in their representations calling him a liar.  And that is

14   obviously not even close to what happened if you look at their

15   allegations.

16         So with that then, I would like to go into my

17   arguments, the substantive arguments, which is really what this

18   case should have been about post-sentencing.  And it should

19   have been done by way of sentencing memorandum and not in

20   response to my objections, or perhaps we could have had a

21   meeting, because there is a process here in the Middle District

22   that after we file objections, the probation office can request

23   a meeting.  And if they request a meeting, then we have to sit

24   down and talk about it.

25         No one asked me for a meeting.  Had they asked me for

1  a meeting, a lot of this -- I wouldn't have had to spend two,

2  three days on a sentencing memorandum just trying to correct

3  the factual inaccuracies in the government's response to my

4  objections.

5       Your Honor, we are asking -- and we are objecting to

6  Paragraph 38 of the presentence report and where they refuse to

7  recommend two points off for acceptance of responsibility.

8       THE COURT:  Okay.  Before we address that, let me ask

9  you this.

10       MS. ULRICH:  Okay.

11       THE COURT:  You've raised factual objections that you

12  had to Paragraphs 24, 19, and 6.  You indicated that at least

13  in one instance, the probation officer has adopted your

14  recitation of the facts.  That's in Paragraph 19.  And

15  Paragraph 19 now correctly reflects the dates that you

16  suggested.

17       MS. ULRICH:  Yes.

18       THE COURT:  And then as to the other paragraphs, have

19  they been corrected to your satisfaction based on the exchange

20  of information you had with the probation officer?

21       MS. ULRICH:  No, Your Honor, not Paragraph 6.  It

22  still says the packages contained 10 to 20 pounds.  I assume

23  probation -- I think they just note it.  I don't think they

24  even note it in the addendum.  No, no, the Paragraph 6 was not

25  changed, Your Honor.  It still says each package contained 10

1    to 20 pounds of marijuana.  That was not changed.

2         *THE COURT:*  And what do you think it should say?

3         *MS. ULRICH:*  Well, Your Honor, I think that that is

4    what Tyler -- or I think it was Chip Conrad, the informant, is

5    the one that told them that.  But when they got their -- when

6    they got, actually got the information on the packages and that

7    was a trial exhibit from September, 2015, to December 4th,

8    2015, it noted the packages weighed between 3.44 and 13.75,

9    13.75 pounds.  That's attached.

10        Now, this does not reflect all the packages that were

11   mailed, I understand that, but this was from September to

12   December, towards the tail end of the conspiracy.  And that's

13   why we pointed it out, we just simply wanted to -- we weren't

14   even arguing drug weights.  And had that not come up in the

15   government's sentencing memorandum, I probably -- you know, I

16   wouldn't have made a big deal about it today.

17        It's only because the government, in this letter,

18   quote, called us, you know, coming up with disingenuous drug

19   weights, when, in fact, we weren't even -- we haven't even

20   objected to the drug weights.  It was just to clarify a fact

21   that probation had put in their report.  So I don't understand

22   the disingenuous part, I guess.

23        So that is what happened there.  Chip Conrad told them

24   it was 10 to 20 pounds, which, you know, he's probably

25   estimating, I get that, but it doesn't say that there.  And

1   then their exhibit suggested that's not actually, you know,

2   entirely correct, and that's what we were pointing out.

3        *THE COURT:* Okay. And then on Paragraph 24?

4        *MS. ULRICH:* This is one where -- see, that's the

5   thing, that's accurate. The government is the one that said

6   that that said something else.

7        *THE COURT:* Okay.

8        *MS. ULRICH:* The government says he told -- the

9   government says in Paragraph 24, the presentence report says he

10   was paid 50,000 for the first trip and 60,000 for the second

11   trip. That's not even what Paragraph 24 says. So I don't know

12   if they were in a hurry. You know, this isn't something that

13   you should be in a hurry over if you're looking for, you know,

14   a ten-year mandatory minimum and trying to deny acceptance

15   points. You know, you've got to be on here. You've got to get

16   your facts right.

17        So for whatever reason, she just looks, says Paragraph

18   24, that's what it says, but you can see that's not what it

19   says. Paragraph 24 is correct. I don't know why the

20   government even made that complaint in their letter.

21        *THE COURT:* All right. So are you suggesting that

22   Paragraph 6 should be revised to reflect 3.44 to 13.7 pounds of

23   marijuana?

24        *MS. ULRICH:* It could, it could. But the point was --

25   and that would make it accurate, yes. It would make it

1  accurate.

2       *THE COURT:*  Ms. Taylor, would it make it accurate?

3  Would that revision make Paragraph 6 more accurate?

4       *MS. TAYLOR:*  I'm sorry, Your Honor, what revision

5  would that be?

6       *THE COURT:*  Paragraph 6 presently reads, Each

7  marijuana package contains approximately 10 to 20 pounds of

8  marijuana and was mailed to various post offices in York

9  County.  Ms. Ulrich says that 10 to 20 pounds is incorrect,

10 that the paragraph should properly read, Each package contained

11 approximately 3.44 to 13.7 pounds, and that your own exhibits

12 suggest that that's the proper amount.

13      *MS. TAYLOR:*  No, Your Honor, that would not make it

14 more accurate.  That statement -- because those weights that

15 you're quoting are from that exhibit which is just a very small

16 time period.

17      *THE COURT:*  Okay.

18      *MS. TAYLOR:*  That statement is an estimate given by

19 the informant.  So if that statement --

20      *THE COURT:*  Okay.  So I'm going to suggest to the

21 probation office that this paragraph be amended to say, The

22 informant estimated that each package contains approximately 10

23 to 20 pounds.  And then it would be accurate.

24      *MS. ULRICH:*  That's what the informant said.

25      *THE COURT:*  Exactly.

1      MS. ULRICH:  And then we were just correcting it by,

2   okay, look at what the reality is, they weren't all 10 to

3   20 pounds.  The government's exhibit, during that three-month

4   period, shows they're between 3 and 14 pounds.

5      MS. TAYLOR:  But if we could just -- Your Honor, if I

6   could just ask the court to look at what we received, the

7   defendant's objection to that which states that the informant

8   received a total of 250 to 300 pounds of marijuana as a result

9   of the marijuana packages of 10 to 20 pounds that were mailed

10   to various post office boxes in York County.  I'm attaching a

11   government exhibit from trial, which notes that the total

12   weight of the packages ranged from 3.44 to 13.75 pounds, that

13   the total pounds were 132.51.  That's the extent of the

14   objection that we were provided with.

15      Now, what Ms. Ulrich is arguing here today is quite a

16   bit more involved than the objection that probation and I were

17   provided with, which does suggest, I think, certainly the way I

18   read that was that the total -- I mean, it's what it says, the

19   total pounds were 132.51 and attaches that one trial exhibit.

20      So just reading that suggests that that's the argument

21   that the defense was making.  And, yes, I did feel that that

22   needed to be clarified because that -- if you didn't

23   participate or read the transcript of the trial, you wouldn't

24   realize that that was one snapshot with only certain dates that

25   that witness testified to.  That objection does not make that

1  clear at all.

2         *THE COURT:* All right. So we're arguing about

3  nothing, really.

4         *MS. ULRICH:* Correct, Your Honor.

5         *THE COURT:* We're arguing about --

6         *MS. ULRICH:* Basically --

7         *MS. TAYLOR:* Because Ms. Ulrich made that --

8         *MS. ULRICH:* No.

9         *MS. TAYLOR:* Objected to that.

10         *MS. ULRICH:* Why we're arguing is because the

11  government basically said we established disingenuous drug

12  weights. Now she's complaining that she didn't really

13  understand the objection. Well, how about a phone call, how

14  about this meeting post -- you know, post-objections, rather

15  than -- this is a snapshot. We did not contest drug weights.

16  If you look at Paragraph --

17         *THE COURT:* I take your point.

18         *MS. ULRICH:* Okay.

19         *THE COURT:* Counsel, I really think that the issue

20  that Ms. Ulrich is raising is something that maybe we should

21  address outside the confines of this sentencing. Today we're

22  here to talk about Mr. Heath, not about Ms. Taylor. Okay? So

23  this doesn't affect drug amount -- I mean, it doesn't affect

24  the guideline range.

25         *MS. ULRICH:* Correct.

1    THE COURT:  Obviously we want Mr. Heath to enter the

2    penitentiary with an accurate report in case it ever affects

3    his ability for programming or his assignment.  So I think in

4    Paragraph 6 the adjustment is that the informant made these

5    representations and estimates, and that's really the point that

6    needs to be made.  And all the other stuff about how counsel

7    are conducting themselves, I'm happy to sit with you and work

8    through that.

9        MS. ULRICH:  Okay.  Thank you, Your Honor.

10       THE COURT:  I think we should do that.  Okay.  So

11   other than the -- obviously we want to talk about your

12   objection that does bear on the guideline range, but is there

13   anything else in the narrative that should be corrected?

14       MS. ULRICH:  Well, you know, when he gave the proffer

15   on June 23rd, he did talk about the gun, and Paragraph 24

16   doesn't mention that, about the gun.  You know, am I asking for

17   Paragraph 24 to be changed?  No.  But it's not in there, and he

18   did talk about the gun in the proffer.

19       MS. TAYLOR:  Your Honor, the only thing I'd like to

20   make clear is that the discussion of the firearm in the proffer

21   related to the Florida trips.

22       THE COURT:  Okay.

23       MS. TAYLOR:  Not the Pennsylvania trip.

24       THE COURT:  That's on Page 9 of Ms. Ulrich's notes.

25   That makes sense to me because there is a reference to the

1   trunk of a car which we know Mr. Heath was not driving in

2   Pennsylvania, he was driving a truck.

3   MS. ULRICH:  But if you look at Page 10, he said he

4   always carried gun and badge.  So it wasn't just in relation to

5   the Florida trip.  I dispute that.

6   THE COURT:  All right.  So I don't think adding that

7   to Paragraph 24 really is of any assistance to Mr. Heath.  In

8   fact, it might be damaging to him from a corrections standpoint

9   to make it part of the report that as he dealt drugs, he always

10  carried a gun and badge.  Really, I would think we should

11  just --

12  MS. ULRICH:  It's not something that we need to add.

13  I agree with the court.

14  THE COURT:  But I take your point.

15  MS. ULRICH:  Okay.

16  THE COURT:  And I have looked at your notes and

17  probably you want them back.

18  MS. ULRICH:  Actually, I was going to make them part

19  of the record.

20  THE COURT:  You may.

21  MS. ULRICH:  I ask they be made part of the record.  I

22  don't know how the court is going to rule.

23  THE COURT:  All right.  So --

24  MS. ULRICH:  So we are objecting to Paragraph --

25  moving on then to the substantive objection.

1      *THE COURT:* Okay.

2      *MS. ULRICH:* Paragraph 38 of the recommendation

3      against acceptance points, Your Honor.  I filed the brief.  I

4      assume the court had an opportunity to read the brief.

5      *THE COURT:* I have read it.

6      *MS. ULRICH:* Spent a lot of time on that.  You know,

7      the guidelines say generally you go to trial, you don't get

8      your two points off for acceptance.  There are rare situations.

9      And in my 24 and a half years of trying cases, I probably had a

10     few of those rare situations, and I do believe this is one of

11     those, quote, rare situations.

12             And the guidelines note you really should look a lot

13     to what happened pretrial.  And that's why I gave the court

14     some of the information, including that he proffered on

15     June 23rd, 2016, totally admitted his involvement in marijuana

16     growing, the trips to Florida, the trips to York.  That was

17     never an issue for him.

18             And that is also why I added the emails.  I had

19     attached two emails for the court.  And in the one email, we

20     offered, he offered to plead to Count 1 and Count 2 of the

21     indictment.  I know the first offer was to everything.  There

22     was an appellate waiver.  That became a sticking point.  But

23     we -- in the emails I have attached, he offered to plead to

24     Count 1 and Count 2.

25             I'll try to get to my sentencing memorandum so I can

1   get the date on those.  On September 7th -- on September 6th,

2   on September 6th, 2016, long before trial, I sent an email to

3   Ms. Taylor telling her he would plead to Count 1 and Count 2,

4   the conspiracy for money laundering and marijuana, with the

5   appellate waiver.  And I even outlined my reasons in that email

6   concerning the gun, the gun was the problem, and I stated, We

7   do not believe that his actions rise to a level of a 924(c)

8   prosecution.

9          So, you know, we recognized from the get-go he was

10  guilty on the drug and the money laundering and those counts.

11  You know, I know there were some emails in which I asked

12  Ms. Taylor to explain the money laundering because I wasn't

13  quite sure what the facts were to support it.  But he offered

14  to plead to it, and we did not dispute that at trial.

15         It was always about the gun, but the government always

16  refused to drop the 924(c) count.  And, in fact, one day later,

17  on September 7th, which is amazing it got rejected one day

18  later because it always takes weeks, it seems, to get anything

19  approved, but one day later on September 7th she emails me and

20  says that that counteroffer is rejected.

21         So pretrial he gave 25 pages of my written notes

22  proffered to agents.  In September of 2016, he offered to plead

23  to Count 1 and 2 of the indictment.  He admitted even -- and

24  during the trial, by the way, I did not dispute the marijuana

25  and the money laundering.  And I know one of the arguments the

1    government is making is that whatever -- statements of counsel

2    can't be used really to go towards acceptance when, in fact,

3    generally it always goes towards acceptance.

4           If a guy goes to trial and the attorney is up there

5    saying that they're not guilty, then you can be sure that that

6    client is not going to get acceptance points.  And when we sign

7    proffers, of course, if they -- if we present anything at trial

8    through counsel, through me, without a word from Mr. Heath,

9    that's inconsistent with his proffer, the government says,

10   well, we can introduce the proffer then to disprove what

11   counsel is saying.

12          So on the one hand, they're saying we can do that,

13   but, by the way, the statements counsel makes can't be used to

14   go towards acceptance for Mr. Heath.  So we disagree with that.

15   We do believe my arguments should be attributable to Mr. Heath,

16   and we did admit the marijuana and money laundering counts at

17   trial.

18          The day he was arrested, the very day he was arrested,

19   in December of 2015, he admitted his conduct.  It's in here.

20   It's in the presentence.  And what strikes me about that is

21   that nobody even asked him about the gun, I believe, when he

22   was arrested because it wasn't an issue at his arrest in

23   December of 2015.

24          Nobody even asked him.  It's not like they asked him,

25   and he goes, I don't know what you're talking about.  They just

never asked him about the gun during the arrest.  But he admitted that he transported, he admitted that about 65 pounds belonged to him, he admitted that he had been paid 10,000 before the trip and that he was expecting about a hundred thousand when he got back.

Did he lie initially?  Sure he did.  You know, he made statements about his fear as a sheriff, et cetera, but he told them that he did participate -- I mean, he had no choice, they caught him red-handed.  They were there at Chip Conrad's house unloading marijuana.  And so he fully admitted his participation in that the day of his arrest.

Since that time -- that's all pretrial, I think, information that I think is important for the court to consider.  But even after his arrest, I know that there are family members here, there's a Rusty Karl here.  I could call him up to testify.  He was just telling me that even recently when he was talking to Mr. Heath, actually about six months ago, Mr. Heath never blamed anybody else for his conduct.  He knew it was all him, that he was totally responsible for what he did, what he did to himself, what he did to his family.

Rusty Karl is in the courtroom, and I don't think I -- I don't think I need to call him up, but that's essentially what you just told me.  Right?

MR. KARL:  Right.

MS. ULRICH:  A friend of the family.  His mother

1  Loretta Coogan is here; his stepfather Alan Coogan is here; and

2  Rusty's wife is here.  I forget your name.

3          But anyway, so this isn't a situation where he has

4  ever denied his conduct.  After he was convicted, this court,

5  of course, detained him immediately after trial, so he's been

6  in prison since then, and that, of course, was quite an

7  adjustment.  And since he's been there, he has engaged in

8  mental health counseling, doing all the right things, not in

9  there -- you know, he's taken responsibility.  He's always

10  taken responsibility.

11          When he met with the probation officer, he, you know,

12  told her what a terrible decision he had made, he's ruined his

13  life.  This is an individual that has always accepted

14  responsibility for his conduct, Your Honor.  The only issue is

15  whether that firearm was possessed in furtherance of drug

16  trafficking.

17          And interestingly, the government charged him

18  initially with use and carry and possession in furtherance of.

19  The jury did not find that he used or carried the firearm in

20  furtherance of drug trafficking, they found possession, which I

21  still do believe is a legal issue at this point.  A lot of

22  issues have both a factual component and legal.

23          And, you know, the factual issue, there was really no

24  dispute about that gun, where it came from, what he was doing

25  with it.  He was a Yuba County sheriff.  If the court

1    remembers, I presented the documents from Yuba County.  He was

2    lawfully carrying that gun the day of his arrest.  And we

3    didn't dispute where it was in the car.  When he got out of the

4    car, he didn't -- you know, his own co-defendant, Mr. Long,

5    didn't even know he had the gun.

6         So I do believe, you know, once you put the facts

7    aside, which I don't believe the facts are in dispute, it

8    becomes a legal issue, whether those facts are sufficient to

9    sustain a verdict on possession of a firearm in furtherance of

10   drug trafficking.  It is a legal issue.

11        And the cases that have been cited, you know, suggest

12   and in the guidelines they suggest if you're just challenging

13   the applicability of the statute to your conduct, then you

14   still can get acceptance points.  That's the whole reason this

15   case went to trial.  This case -- you know, and the

16   co-defendants never got the 924(c).

17        Mr. Long, who really, he was the one that -- it was he

18   and his family that started this whole growing marijuana

19   business, him and Ramona Long.  It was Tyler Long that had the

20   connect in York.  In fact, Mr. Heath didn't even know Chip

21   Conrad.  All the texts, all these arrangements were made by

22   Tyler Long.  And it was Tyler Long and his mother who were

23   mailing the packages of marijuana back and forth through the

24   post office.

25        Now, I mean, I understand he was a sheriff.  That's

1    unrelated to the acceptance issue.  That really probably goes

2    to 3553(a) factors.  But I think all those factors are

3    important for the court to determine whether, in fact, he

4    should get his two points off for acceptance.  He never has

5    denied his conduct in this case.  It really is, in my opinion

6    still is a legal issue regarding whether those actions are

7    possession in furtherance of.

8          *THE COURT:*  Ms. Ulrich, when was the indictment filed

9    in this case?

10         *MS. ULRICH:*  I want to say March of 2016.

11         *THE DEFENDANT:*  March 23rd.

12         *MS. ULRICH:*  March 23rd, 2016.

13         *THE COURT:*  And when was your client's proffer?

14         *MS. ULRICH:*  June 23rd, 2016, June.

15         *THE COURT:*  And you indicated that by email there was

16   an offer?

17         *MS. ULRICH:*  September, 2016.

18         *THE COURT:*  Let me hear from the government on the

19   acceptance issue.

20         *MS. TAYLOR:*  Well, Your Honor, the government is

21   certainly opposed to acceptance of responsibility in this case.

22   While, obviously, acceptance is available in rare instances

23   where a defendant goes to trial, I don't believe this is one of

24   those rare instances.

25         Mr. Heath did, through counsel, offer to plead guilty

to, as Ms. Ulrich indicated, Count 1 and 2, that would be the
drug trafficking count for the marijuana and the money
laundering. There was never, ever a time where there was any
discussion about a plea to the gun count. I believe that
throughout the pendency of this matter, he's maintained that he
was not willing to negotiate at all as to the gun count.

And I think Ms. Ulrich's email that she pointed the
court to that's attached to her sentencing memorandum makes
that clear when she stated, We do not believe that his actions
rise to a level of a 924(c) prosecution. I don't believe he
has ever accepted responsibility for carrying the firearm in
furtherance of drug trafficking, either pretrial or during the
trial. She indicated that he was lawfully carrying the gun at
the time of the arrest and if you would just put the facts
aside, that this is simply a legal issue, and I would just
simply disagree with those statements, Your Honor.

And respectfully, I think the jury disagreed with
that, as well, because while I understand the point that
Ms. Ulrich is making today, which I believe was the point she
tried to make at trial, that Mr. Heath was lawfully carrying
his gun as a deputy sheriff at the time that he was
transporting this load of marijuana, he wasn't acting as a
deputy sheriff when he was being a drug dealer. He was a drug
dealer carrying a gun, possessing that gun, and that's the
decision that the jury made. And he never, either pretrial or

1    afterwards, never admitted to having -- possessing that gun

2    during that incident or the travel to Pennsylvania.

3        I think the case law, particularly the *Best* case which

4    I initially pointed out to the probation office, which is the

5    Third Circuit case from 2016, was the case that -- was one of

6    the recent cases that determined that a defendant was not

7    entitled to a two-level reduction for acceptance of

8    responsibility after going to trial on charges of drug

9    trafficking and a 924(c), so similar facts to what we have here

10   in Mr. Heath's situation.  And the determination was that the

11   two-level -- the two levels was not appropriate there.

12       I did also point out to probation that there was a

13   Fifth Circuit case, the *Broussard* case, B-r-o-u-s-s-a-r-d,

14   that's a Fifth Circuit case, but that was a case where the two

15   levels was awarded to the defendant in a similar situation.

16   But in a recent Third Circuit case, as I mentioned, the *Best*

17   matter, the two levels was not awarded to the defendant, and I

18   think that the *Best* Third Circuit case is the one that's most

19   similarly situated -- that Mr. Heath is most similarly situated

20   to.

21       Beyond the gun issue, Your Honor, I also pointed out

22   in our filing that as to the drug trafficking charge,

23   Ms. Ulrich has made a couple of statements suggesting that that

24   was not a count that was at issue at the trial as though it was

25   completely conceded, but that's just not accurate.  The drug

count and, in fact, the drug weights were very much at issue,
to the extent that I had to call Special Agent Joe Myers who
was vigorously crossed on the mathematics involved in
calculating the drug weights and whether we were going to meet
the weights that were charged in the indictment.

So that was a matter that was very much at issue at
the time of the trial that the jury had to make a determination
on.  So even beyond the drug -- I'm sorry, beyond the gun
charge, the drug weight -- the drug charge and the drug weight
itself was challenged, so I don't believe that the acceptance
of responsibility, for all those reasons, is appropriate here
in Mr. Heath's case.

MS. ULRICH:  Your Honor, I don't believe we vigorously
contested drug weights at all.  I looked at my opening and my
closing in that case, and it was all on the 924(c).  I'm sure I
asked questions about drug weights during the trial, but in
looking at my opening and closing, we were not contesting drug
weights.

MS. TAYLOR:  Well, Agent Myers is here if the court
would like to hear from him about whether he was -- I mean, if
no one recalls, but whether Agent Myers was called to testify
and was cross-examined on that issue, he's here in the
courtroom today.

THE COURT:  Looking at my own trial notes and relying
on my own recollection, I think Ms. Ulrich is correct, that the

1  real issue at trial was the gun, the accessibility, the lack of

2  direct evidence on the application of the gun, and the

3  defendant lost that fight.  The jury concluded from all the

4  evidence that the gun was a factor, and he was properly found

5  guilty of the 924(c).

6      The testimony was that the defendant volunteered to go

7  it alone, and the inference from that was that he was armed, he

8  had a badge, he had a gun, and he knew that if he was stopped,

9  he had a good likelihood of being able to move forward and

10 deliver those drugs, that he could evade police.

11     I think under all of the circumstances and the

12 evidence at trial, that I really cannot find that acceptance of

13 responsibility is properly awarded to Mr. Heath.  And I note

14 that it really makes very little difference in the guideline

15 calculation.  If I'm reading this correctly, it would be --

16 were he awarded acceptance, we'd be looking at a 24 criminal

17 history, category one.

18     *MS. ULRICH:*  Correct.

19     *THE COURT:*  Instead of the 63 to 78 on those first

20 counts --

21     *MS. ULRICH:*  Correct.

22     *THE COURT:*  -- it would be 51 to 60.

23     *MS. ULRICH:*  It's all over three months, correct.

24     *THE COURT:*  Okay.  So I think we need to talk about

25 the 3553(a) factors.

1       *MS. ULRICH:* I'm sorry, what did you say, Your Honor?

2       *THE COURT:* I said I think we need to move on to the

3 3553(a) factors.

4       *MS. ULRICH:* Your Honor, we're asking the court then

5 to vary from the guideline range under all the circumstances.

6 In looking at the 3553(a) factors, you know, the court has to

7 look at the seriousness of the offense, respect for the law.

8 And I understand, given those two considerations, a sentence of

9 a hundred -- frankly, 120 months, I think, would also take care

10 of the seriousness of the offense and respect for the law.

11       The government charged two mandatories in this case,

12 so, really, this court has no discretion because Congress, you

13 know, has taken discretion away from the courts in cases like

14 this because they have imposed these mandatories. And so

15 there's really nothing we can do to get below -- so, frankly, I

16 think 120 months is actually too long if you look at the

17 sentencing factors, anyway, but the court has no discretion.

18       It certainly, you know, addresses the seriousness of

19 the offense, respect for the law. And we totally get that he

20 was a sheriff when he did this, and that makes it more

21 offensive to the court and to other law enforcement, I know.

22 It makes them all look bad because he's a sheriff and he's

23 taking drugs and he's, you know, stealing them from the

24 forfeiture of drugs and then he's recycling them as a drug

25 dealer. It's totally offensive. But ten years is more than

1  enough time to address those aspects of this case.

2  If you look at the other aspects, deterrence, to

3  protect the public from future crimes, Mr. Heath is not going

4  to be in trouble again.  He has this pending charge out in

5  California, the two assault rifles that he pled to and he's got

6  to be sentenced on.  That's all from -- you know, really

7  related to this case, all from the same time frame.  They

8  searched out there after he got arrested here.  It's pending.

9  Aside from that, there is nothing, and he will never be in

10  trouble again.

11  You know, the other aspect is to provide him with

12  needed educational, vocational, medical, or other correctional

13  treatment.  Well, you know, Mr. Heath has a family.  He has a

14  wife, he has two kids.  He already has worked in construction,

15  and he has a job in construction really the day he leaves

16  prison.

17  So, really, what this comes down to is punishment, and

18  that's all this is.  And we should call it what it is, 120

19  months is just that, it's just for punishment sake, really.

20  Because, I mean, this court could impose five years, and that

21  certainly would impress upon him the seriousness of the offense

22  and respect for the law.  This is a guy who was in law

23  enforcement and has never been in prison before.  Five years

24  would have served that purpose.  Really, any amount of time in

25  prison would serve that purpose, but this court has no choice

1   but to impose the ten years.

2        Yet, you know, Mr. Long and Ramona Long, really two of

3   the more culpable individuals in this case, aren't facing the

4   ten-year mandatory minimum and won't get the ten-year -- I

5   shouldn't say won't when the court sentences them, but they're

6   not facing the mandatory minimum.  But yet it was Tyler and

7   Ramona who really established the mailing.  As I said earlier,

8   Tyler is the one that knew Chip Conrad in York, had all the

9   texts going back and forth, arranged everything.

10        And then aside from that, just some personal factors.

11   And I think the presentence does a nice job of spelling them

12   out.  Since his arrest, he's done everything, he's gone through

13   treatment, expressed remorse over and over and over for his

14   conduct, how it ruined, you know, really, his family.

15        And like Mr. Karl told me just before I came up here,

16   when he was moving him from California to Ohio, Mr. Heath was

17   telling him -- like, he didn't blame anybody else, he blamed

18   himself.  And rightly so, he should blame himself.  But that is

19   what he has done since his arrest.  And the presentence lays

20   out all the treatment, all the counseling he went through.

21        And he followed through.  He followed through in

22   California.  When he was permitted to move away from all that

23   mess in California, he moved to Ohio, and he again got himself

24   right back into counseling to address his issues, never once

25   blaming anybody else for what he did.

1	Aside from this, this is a man who was married for 16

2	years, has two beautiful daughters, Sydney 14, Trinity 8. I

3	know a lot of what the court has seen, it looks like he started

4	spiraling downhill in 2005 when they lost their son who was

5	full term, and I can understand why that would take a toll on

6	the family, which it did.

7	But he doesn't even use that or his subsequent

8	alcohol, really, to say that that's why he committed this

9	offense. It's not. He just made a lot of bad decisions when

10	he committed this offense, and I think he even says in the

11	presentence it was just greed. He acknowledges all of that.

12	He served in our military, the Marine Corps, from 1998

13	to 2002. He got an honorable discharge. He's pretty much

14	worked his whole life. I mean, aside from this -- and this is,

15	you know, this is a serious matter and I'm not trying to

16	minimize it -- he's really lived a law-abiding life trying to

17	do the right thing, raising two kids, staying with his wife,

18	Tatum Heath. She couldn't be here today because she's working,

19	but she's been very involved. I think it's been very hard on

20	her and the girls.

21	I remember when -- and I think even in her letter she

22	states that from the moment he was arrested, he called her and

23	said, look, Tatum, I want to talk to the kids, I want to tell

24	them how I screwed up. And he's never kept it from the kids,

25	what he did wrong, so they're fully aware where he is and why

1  he is where he is and that he's going to be away from the

2  family for a very long time.  Ten years is long enough given

3  his background and the circumstances of this offense, Your

4  Honor.

5          THE COURT:  All right.  Does your client wish to

6  speak?

7          MS. ULRICH:  Yes, Your Honor.

8          THE COURT:  Mr. Heath.  Do you need a minute?

9          THE DEFENDANT:  Yes, please.

10          THE COURT:  Take your time.

11          THE DEFENDANT:  I apologize.

12          THE COURT:  Take your time.

13          THE DEFENDANT:  I'm sorry.  I've been crying for six

14  months.  I'm trying to get past it.  I'm sorry.  I've tried to

15  think what I could tell you that would help you understand why

16  I'm standing here.  And part of it I put in the letter that I

17  wrote to you.

18          But there is no excuse for me to be here.  I made bad

19  decisions.  I accept that.  I wish I could undo it, and not for

20  me.  You know, my family is the one that's suffering.  You

21  know, I'm embarrassed that my daughter thinks of me as Superman

22  and this is what I do.

23          I also need to apologize to not only the court, but to

24  all of the law enforcement guys.  The job field is hard enough

25  without people like me giving it another black eye.  And I was

1  just blinded by the greed.  It was -- there's no excuse.  And

2  it's not going to change once I'm out of the courtroom.  I'm

3  not going to start blaming somebody else.  This is my burden to

4  bear.  I just want to get back to my wife and my children as

5  soon as I can.

6          There are probably a million things I want to say, but

7  I can't.  You know, realistically, I get the easy part of this.

8  You know, my wife has to work and support two kids on her own

9  now.  You know, my oldest daughter will graduate college before

10  I get home, best-case scenario.  But my wife is staying with

11  me, and many days I don't know why because I don't think I

12  deserve it.

13          But I truly am sorry for what I did.  I'm sorry for

14  all the people it affected, not just me and my immediate

15  family, but, like I said, my sheriff's department that I worked

16  for.  You know, that's humiliating for them.  My sheriff was a

17  very good man, or is a very good man, and I gave his department

18  a black eye for greed.  And the severity of that is not lost on

19  me.

20          So I'll leave the rest of what I wrote in my letter

21  as, you know, the other part of how I feel, and I appreciate

22  your time, Your Honor.

23          THE COURT:  All right.  Thank you.  Ms. Taylor.

24          MS. TAYLOR:  Your Honor, as I indicated to Ms. Ulrich

25  before the proceeding started, the government has no objection

1    to a 120-month sentence.

2          *THE COURT:* Well, it's unusual that I know as much as

3    I do about the offense, because most cases, ninety, I think,

4    seven percent of the cases end in a plea bargain, so usually

5    I'm in a situation where I'm trying to cobble together the

6    facts to understand the nature and circumstances that bring a

7    person before the court. I understand very well how Mr. Heath

8    got here.

9          He had a good life, and he, unfortunately, threw it

10    away, and I think it's not all on him. He has co-conspirators

11    who were culpable in this and for whatever reason were chosen

12    to be cooperators instead of those people on trial. It's hard

13    to separate out who is the most culpable in all of this,

14    somebody who abused a position of trust at the U.S. Post Office

15    or somebody who abused their trust at the Yuba County Sheriff's

16    Office, but Mr. Heath is here to answer for it.

17          And I appreciate what he has written and said. I

18    think he's truly remorseful, and that under all of the

19    circumstances, given his personal history and background, that

20    the mandatory 120 months is sufficient and not greater than

21    necessary to meet sentencing objectives. He will be punished.

22    That sentence promotes respect for the law, adequately deters.

23    I don't think he'll be back.

24          *THE DEFENDANT:* No, Your Honor.

25          *THE COURT:* I think this is a really unfortunate case

1    for a lot of reasons, and I think part of it has to do with the

2    marijuana and the attitude that I heard from Mr. Long that it's

3    legal in places and it's really not that bad.  But it's a

4    federal crime, and Mr. Heath knows that, and that's why he's

5    here.

6           Pursuant to the Sentencing Reform Act of 1984, it's

7    the judgment of the court that the defendant, Christopher Mark

8    Heath, is hereby committed to the custody of the Bureau of

9    Prisons to be imprisoned for a term of 120 months.

10          This term consists of 60 months on each of Counts 1,

11   2, and 18 to be served concurrently and 60 months on Count 19

12   to be served consecutively to Counts 1, 2, and 18.

13   Additionally, the 60-month term of imprisonment on Count 19 is

14   imposed consecutively to any sentence of imprisonment that may

15   be imposed in the Superior Court of California, Oroville,

16   California Case Number CM-044128.

17          The court finds that the defendant has the ability to

18   pay a fine.  It's ordered that he pay to the Clerk, U.S.

19   District Court, the sum of $1400 consisting of a special

20   assessment of $100 on each count, for a total of $400 due

21   immediately, and a fine of $1,000 on Count 1.

22          During the term of imprisonment, the fine is payable

23   every three months in an amount after a telephone allowance

24   equal to 50 percent of the funds deposited into the defendant's

25   inmate trust fund account.

In the event that the fine is not paid in full prior to the commencement of supervised release, the defendant shall, as a condition of supervised release, satisfy the amount due in monthly installments of no less than $50 to commence 30 days after release from confinement.

On release from imprisonment, the defendant shall be placed on supervised release for a term of four years. This term consists of four years on Counts 1 and 19 and three years on Counts 2 and 18 to be served concurrently.

Within 72 hours of release from the Bureau of Prisons, the defendant shall report in person to the probation office in the district to which he is released.

While on supervised release, the defendant shall not commit any federal, state, or local crime and shall not possess a dangerous weapon.

The defendant shall comply with the standard conditions that have been adopted by the court and with the following additional conditions:

You must participate in a substance abuse treatment program and follow the rules and regulations of that program. The probation officer will supervise your participation in the program. That may include an evaluation and completion of any recommended treatment.

You must submit to substance abuse testing to determine if you have used a prohibited substance. You must

1   not attempt to obstruct or tamper with the testing methods.

2   You must not use or possess any controlled substance

3   without a valid prescription.  If you do have a valid

4   prescription, you must disclose that prescription information

5   to the probation officer and follow the instructions on the

6   prescription.

7   You must not knowingly purchase, possess, distribute,

8   administer, or otherwise use any psychoactive substances, such

9   as synthetic marijuana and bath salts, that impair a person's

10  physical or mental functioning, whether or not intended for

11  human consumption, except with the prior approval of the

12  probation officer.

13  You must participate in a mental health treatment

14  program and follow the rules and regulations of that program.

15  The probation officer, in consultation with the treatment

16  provider, will supervise your participation in the program that

17  may include an evaluation and completion of any recommended

18  treatment.  You must take all mental health medications that

19  are prescribed by your treating physician.

20  You must submit your person, property, house,

21  residence, vehicle, papers, computers, other electronic

22  communications or data storage devices or media or office to a

23  search conducted by the U.S. probation officer.

24  Failure to submit to a search may be grounds for

25  revocation of release.  You must warn any other occupants that

     1    the premises may be subject to searches pursuant to this

     2    condition.

     3         You must apply all monies received from income tax

     4    refunds, lottery winnings, judgments, and/or any other

     5    unanticipated or unexpected financial gains to the outstanding

     6    court-ordered financial obligation.  And you must cooperate in

     7    the collection of a DNA sample as directed by the probation

     8    officer.

     9         Pursuant to the indictment, the defendant shall

    10    forfeit to the United States his interest in all items listed

    11    there.  It's my determination that the sentence is sufficient

    12    but not greater than necessary to comply with 18, United States

    13    Code, Section 3553(a)(2).

    14         I have considered all seven factors set forth in the

    15    statute, and I recognize that the guidelines and policy

    16    statements and amendments are advisory only.

    17         Mr. Heath, of course, you do have a right to appeal

    18    your conviction and your sentence to the United States Court of

    19    Appeals.  If you're not able to pay the costs of an appeal, you

    20    may ask for leave to appeal in forma pauperis, and if your

    21    request is approved, counsel will be appointed for you and

    22    you'll not be required to pay any costs.

    23         Counsel, is there anything else that should be made

    24    part of the record in this matter?

    25         MS. ULRICH:  I have a few matters.  There was $760 in

1   cash seized from him that York took upon his arrest.  We would

2   ask, of course, that that money be applied towards the fine

3   that was imposed.  I have the paperwork from York and the order

4   if the court needs to see it.

5           THE COURT:  Maybe you could share it with Ms. Taylor.

6           MS. TAYLOR:  I'm not sure what the status of this is

7   in York.  I mean, I'll have to look into it.

8           THE COURT:  Okay.  We'll look into it.

9           MS. ULRICH:  Okay.  There was 3,000 seized from his

10  residence in California, also.

11          THE COURT:  I have a feeling that that money is still

12  in California.  Is that right?

13          MS. ULRICH:  I'm sure it is.  Actually, the government

14  has moved to seize it.

15          THE COURT:  Is it part of the forfeiture?

16          MS. ULRICH:  Yes, it is part of the forfeiture.

17          THE COURT:  Okay.

18          MS. ULRICH:  Actually, we're asking that that money be

19  applied, too.  I don't think we, you know, really address these

20  in these forfeiture cases.  But the court just imposed fines,

21  and we had 760 taken from him at the time of his arrest, 3,000

22  from him in California.  We would ask that that start, you

23  know, going towards the fine, restitution, and forfeiture

24  obligations.

25          MS. TAYLOR:  But, Your Honor, if it's forfeited --

1          THE COURT:  It's forfeited.

2          MS. TAYLOR:  That's correct, Your Honor.

3          THE COURT:  But the 760 -- is it 760 is not forfeited?

4          MS. ULRICH:  $760.

5          MS. TAYLOR:  I don't know what the status of that is

6     in York.

7          MS. ULRICH:  Right here is the order.  It's dated

8     July 13th, 2016.  It says -- the DA filed a petition for

9     forfeiture, and it says, The properties which are the subject

10    of these proceedings are condemned and forfeited and the

11    firearms destroyed, if any; said property to be delivered to

12    the district attorney within 30 days of receipt of this order.

13         MS. TAYLOR:  That was forfeited by the local --

14         THE COURT:  So it's forfeited, now it's the property

15    of the state.

16         MS. ULRICH:  I would still -- that may well be, but

17    that -- I think it should be applied toward the fine of $1,000.

18         THE COURT:  I don't think it can be if it's been

19    forfeited.

20         MS. TAYLOR:  I'm not sure how we would have the

21    authority to --

22         THE COURT:  I don't think we do.

23       (Defendant and Ms. Ulrich confer.)

24         MS. ULRICH:  He asked if we could put the 3,000

25    towards the 225.  I assume that would go towards the 225 since

1  that was all part of the forfeiture proceedings.

2         THE COURT:  The forfeiture includes the $3,000.

3         MS. ULRICH:  Correct.  And the forfeiture is for, I

4  think, 225,000 or 500,000.

5         THE DEFENDANT:  Yeah, 225.

6         MS. ULRICH:  225 for Mr. Heath.  So I guess he's

7  asking does the 3,000 that was forfeited go towards that 225.

8  I think the answer to that would be yes.

9         MS. TAYLOR:  Your Honor, I'm not sure what entity

10  forfeited the 3,000, whether it was the -- because the local

11  authorities were involved, as well as the federal authorities

12  in California.  I would just have to check on that.

13         MS. ULRICH:  I think it's in the indictment, Your

14  Honor.

15         THE COURT:  It is in the indictment, $3,000 is in the

16  indictment.

17         MS. TAYLOR:  I'll just confirm.

18         THE COURT:  So I assume that the forfeiture -- the

19  order of this court orders these particular items forfeited,

20  and that $3,000 is part of that.  So I don't know how the

21  government gets the money from California if some other

22  authority is holding it, but it won't be used to pay a fine.

23         MS. ULRICH:  But it would go towards the 225 ordered

24  in forfeiture, is that what you're saying?

25         THE COURT:  Yes.

1    *MS. ULRICH:*  Okay.  I think that's what we wanted to
2  clarify.

3    *THE COURT:*  Okay.

4    *MS. ULRICH:*  And we would just ask the court to
5  recommend Elkton as the place of confinement.

6    *THE COURT:*  Where is Elkton?

7    *MS. ULRICH:*  Ohio.

8    *THE COURT:*  All right.

9    *MS. TAYLOR:*  Just so I'm clear, Your Honor, did the
10  court need any other information on that $760 that's been
11  forfeited based on the order --

12    *MS. ULRICH:*  I think you're probably -- I agree, if
13  it's forfeited, I don't know that --

14    *THE COURT:*  If the state has it, it's --

15    *MS. ULRICH:*  I don't --

16    *THE COURT:*  Yeah.  I mean, you might ask somebody like
17  Ari Weitzman, who might know.

18    *MS. ULRICH:*  That's a good idea.

19    *THE COURT:*  But, you know, I'm happy to modify the
20  order to make it applicable to the fine if I can do that.

21    *MS. ULRICH:*  I'll have to look into that.

22    *THE COURT:*  From what you have told me, it appears
23  that it's the state, it's been forfeited to the state and now
24  it's in the state treasury.

25    *MS. ULRICH:*  That's what I would think, too.

1    THE COURT:  Sounds like it.  Okay.  So that's all for

2    Mr. Heath.  Counsel, I don't know what your schedule is, I know

3    you probably need a few minutes to meet with Mr. Heath, but

4    after that, I would like to talk to the two of you on another

5    matter.  Okay?

6         MS. ULRICH:  Okay.

7         THE DEFENDANT:  Thank you, Your Honor.

8       (Whereupon, the proceedings were adjourned at 11:10 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF OFFICIAL COURT REPORTER

I, Lori A. Shuey, Federal Certified Realtime Reporter, in and for the United States District Court for the Middle District of Pennsylvania, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-captioned matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated in Harrisburg, Pennsylvania, this 18th day of December, 2017.


**/s/ Lori A. Shuey**
Lori A. Shuey
Federal Certified Realtime Reporter